## UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | |
|---|---|
| HUNTER DEMSTER, JESSICA CHODOR, KENNETH HALT, and MELISSA PEELER, <br><br> *Plaintiffs*, <br><br> v. <br><br> TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States*; GADYACES SERRALTA, *in his official capacity as Director of the U.S. Marshals Service and Chair of the Memphis Safe Task Force*; TYREECE L. MILLER, *in his official capacity as U.S. Marshal for the Western District of Tennessee*; CHAD HUNT, *in his official capacity as Chief Inspector for the U.S. Marshals Service and Commander of the Memphis Safe Task Force*; MARKWAYNE MULLIN, *in his official capacity as Secretary of the U.S. Department of Homeland Security*; TODD LYONS, *in his official capacity as Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement*; JOHN CONDON, *in his official capacity as Acting Executive Associate Director of Homeland Security Investigations*; COLIN JACKSON, *in his official capacity as Acting Special Agent in Charge for HSI Nashville*; RODNEY SCOTT, *in his official capacity as Commissioner of U.S. Customs and Border Protection*; MICHAEL BANKS, *in his official capacity as Chief of the U.S. Border Patrol*; MATT PERRY, *in his official capacity as head of the Tennessee Highway Patrol*; and STEVEN J. MULROY, *in his official capacity as District Attorney for Shelby County, Tennessee*, <br><br> *Defendants*. | Civil Action No. _____ <br><br><br> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................. 1

JURISDICTION AND VENUE .............................................................................. 4

PARTIES ................................................................................................................. 4

FACTUAL ALLEGATIONS .................................................................................. 9

    I.   THE MEMPHIS SAFE TASK FORCE'S DEVASTATING IMPACT ON
       THE MEMPHIS COMMUNITY ................................................................ 9

    II.  MEMPHIS SAFE TASK FORCE AGENTS SYSTEMATICALLY
       RETALIATE AGAINST INDIVIDUALS GATHERING INFORMATION
       ABOUT AND RECORDING TASK FORCE ACTIVITIES ................................... 16

    III. DEFENDANTS, THROUGH THE MEMPHIS SAFE TASK FORCE, HAVE
       IMPLEMENTED A POLICY, PATTERN, AND PRACTICE OF
       VIOLATING PLAINTIFFS' RIGHTS .......................................................... 62

         A.  The Federal Government Has a Policy of Retaliating Against
            Individuals Gathering Information About and Recording Federal
            Immigration and Law Enforcement Officers Performing Their Duties
            in Public ............................................................................................ 62

         B.  The Federal Government's Policy Has Caused Patterns and Practices
            of Retaliation by Federal Agents Operating in Memphis and in Other
            Cities and States ............................................................................... 68

         C.  Defendants Have Failed to Train or Supervise Memphis Safe Task
            Force Agents Not to Retaliate in Violation of the First Amendment
            and Have Failed to Take Action to Address Their Pattern and Practice
            of Misconduct .................................................................................. 77

FIRST CLAIM FOR RELIEF ................................................................................ 79

SECOND CLAIM FOR RELIEF ........................................................................... 80

PRAYER FOR RELIEF ......................................................................................... 81

**INTRODUCTION**

1. This case seeks to end a startling pattern of retaliation, intimidation, and harassment by agents of the Memphis Safe Task Force ("Task Force") against Plaintiffs, four individuals exercising their First Amendment rights to gather information about and record Task Force activities unfolding on the streets of Memphis.

2. Since September 2025, thousands of Task Force agents from federal, state, and local agencies have flooded the streets of Memphis, fundamentally altering life in the city. In the name of crime control, Task Force agents have stopped, menaced, and arrested Memphians engaging in routine, day-to-day activities—traveling to and from their places of work or worship, or dropping off and picking up children from school. Large caravans of Task Force vehicles regularly patrol the streets in some neighborhoods. And it is now commonplace to see heavily armed officers from an alphabet soup of government agencies encircle a car during a traffic stop, surround an individual on the street, or amass outside a home. Task Force agents carry out many stops and arrests with a shocking degree of violence, or the unmistakable threat of it. Agents have aggressively questioned and threatened individuals at gunpoint, rammed their vehicles, and broken into their homes. These activities have disrupted daily routines and threatened to unravel Memphians' strong community bonds.

3. In response, Memphians encountering Task Force agents in public, including Plaintiffs, have stopped to gather information about and record Task Force activities. Their motivations are: to understand what Task Force agents are doing and share that information with others in their community, to obtain information that will help detained individuals and their family members access support, and to document abuses and ensure future accountability. Whatever their motivation, their activities are unequivocally protected by the First Amendment.

1

4.      Task Force agents are systematically retaliating against, intimidating, and harassing Plaintiffs and others lawfully engaged in these constitutionally protected information-gathering and recording activities. They are issuing verbal threats, including threats of arrest, in response to these activities. They are physically intimidating Plaintiffs engaged in these activities, including by using their vehicles to swerve at Plaintiffs and box them into confined areas. They are stopping and questioning Plaintiffs without reasonable suspicion of any crime. They are shining lights at phones and cameras to try to obscure photography or filming of their public activities. They are taunting Plaintiffs by name when they arrive at scenes of Task Force activity, tailing Plaintiffs in their vehicles, and sitting outside Plaintiffs' homes—often after photographing Plaintiffs' faces and license plate numbers and presumably placing their personal information into databases for the purpose of enabling further surveillance and retaliation. And they have used excessive force against and falsely arrested, to date, one of the Plaintiffs.

5.      The Task Force's pattern and practice of retaliation against individuals who gather information about and record its activities—similar to patterns and practices of retaliation in other cities and states where federal agents are operating—is the direct result of federal policy. Although the First Amendment protects the right to gather information about and record immigration and law enforcement officers (including Task Force agents) performing their duties in public, federal policy falsely designates these activities as criminal acts that threaten agents—actively encouraging, even requiring, unlawful responses to Plaintiffs' constitutionally protected activities. The effects of this policy are amplified by federal and state officials' failure to train Task Force agents not to retaliate against individuals for engaging in First Amendment protected activity, to adequately supervise agents to prevent such retaliation, or to take any other action addressing their pattern and practice of misconduct.

2

6.      Task Force agents also routinely invoke Section 5 of Tennessee's Protecting Everyone Against Crime and Extremism Act, to be codified at Tenn. Code Ann. § 39-16-612(a) (the "Halo Law"), which criminalizes approaching law enforcement officers within 25 feet after one warning, against individuals gathering information about and recording Task Force operations. The Halo Law's application to Plaintiffs violates the First Amendment. By forcing Plaintiffs to physically distance themselves from Task Force agents performing their duties in public—even though Plaintiffs' information gathering about and recording of Task Force agents in no way impedes, interferes with, or obstructs agents' execution of their duties—the Halo Law unconstitutionally burdens Plaintiffs' exercise of their First Amendment rights and undermines public oversight of the Task Force.

7.      The First Amendment prohibits these repressive tactics designed to shield government activity from public scrutiny. Memphis Safe Task Force agents cannot threaten, intimidate, harass, or inflict violence on Plaintiffs based solely on their attempts to document Task Force activities occurring in public view. Nor can they force Plaintiffs—on pain of criminal penalty—to stand so far back so as to impair their documentation of government activities where Plaintiffs are not impeding, interfering with, or obstructing those activities. These practices are antithetical to bedrock First Amendment principles that ensure individuals in this country can learn about and publicly debate how their government functions.

8.      Plaintiffs bring this lawsuit to end the Memphis Safe Task Force's policy, pattern, and practice of retaliating against them in response to their gathering information about and recording Task Force agents performing their duties in public in violation of the First Amendment. They also challenge the application of the Halo Law to their information-gathering and recording activities, in further violation of the First Amendment.

3

**JURISDICTION AND VENUE**

9.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, because this action arises under federal law, including the United States Constitution and 42 U.S.C. § 1983. It has remedial authority pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, All Writs Act, 28 U.S.C. § 1651, and the inherent equitable powers of this Court.

10.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1) because a substantial part of the events giving rise to the claims occurred in this District, and under 28 U.S.C. §§ 1391(c)(1) and (e)(1) because at least one Plaintiff is a natural person who resides in this judicial district.

**PARTIES**

**Plaintiffs**

11.    **Plaintiff Hunter Demster** is a resident of Memphis, Tennessee. He operates a soup kitchen in the Cooper-Young neighborhood of Memphis.

12.    **Plaintiff Jessica Chodor** is a resident of Memphis, Tennessee. She is a project and data manager for a non-profit organization that provides support for postpartum parents.

13.    **Plaintiff Kenneth Halt** is a resident of Memphis, Tennessee. He is a community builder at a joint city-county agency.

14.    **Plaintiff Melissa Peeler** is a resident of Memphis, Tennessee. She is a retired school admissions officer and active volunteer with the refugee community, particularly through her church.

**Defendants**

15.    **Defendant Todd Blanche** is Acting Attorney General of the United States. He exercises authority over the U.S. Department of Justice ("DOJ") and its component agencies. DOJ

4

is an executive branch department of the United States government, responsible for enforcing federal law and overseeing DOJ agents operating in cities and states across the country, including as part of the Memphis Safe Task Force. Defendant Blanche also exercises authority over the Task Force pursuant to the September 15, 2025 presidential memorandum establishing the Task Force ("Task Force Memo"), which designates the Attorney General to appoint the Chair of the Task Force and "assess whether public-safety circumstances in Memphis require additional executive action." DOJ and several of its component agencies, including the U.S. Marshals Service ("U.S. Marshals"), the Federal Bureau of Investigation ("FBI"), the Drug Enforcement Administration ("DEA"), and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), are members of the Task Force. Plaintiffs sue Blanche in his official capacity.

16.     As part of the Attorney General's leadership, oversight, and direction of the Task Force's operations, the Attorney General has personally visited Memphis on multiple occasions. For example, on October 1, 2025, former Attorney General Pamela Bondi traveled to Memphis to meet with Governor Bill Lee, directly observe the operations of Task Force agents, and speak to federal, state, and local agents serving on the Task Force. On November 24, 2025, former Attorney General Bondi again visited Memphis to directly address Task Force agents. On March 23, 2026, former Attorney General Bondi appeared with President Donald J. Trump when he spoke in Memphis, including to address the Task Force, where he thanked the Attorney General, among others, for her role in Task Force operations.

17.     The Attorney General's public statements further demonstrate the Attorney General's direct knowledge of the Task Force's operations, role in overseeing them, and endorsement of its pattern and practice of retaliation. For example, on October 7, 2025, former Attorney General Bondi testified before the Senate Judiciary Committee about the Task Force and

5

described the Task Force as "a perfect example of how the Department of Justice should operate," discussed a recent visit to Memphis to address Task Force agents, and cited Task Force operation statistics.

18.     **Defendant Gadyaces Serralta** is Director of the U.S. Marshals and Chair of the Memphis Safe Task Force. He exercises authority over the U.S. Marshals, which is the lead coordinating agency of the Task Force. He also exercises authority over the Task Force as its Chair. Plaintiffs sue him in his official capacity.

19.     As part of Defendant Serralta's leadership, oversight, and direction of the Task Force's operations, he has personally visited Memphis on multiple occasions, including on November 24, 2025, together with former Attorney General Bondi, and on March 23, 2026, together with President Trump and former Attorney General Bondi, as described above. Defendant Serralta has also participated directly in Task Force operations, including in incidents of retaliation against individuals observing, gathering information about, and recording Task Force agents performing their duties in public. For example, as described below, *see infra* ¶¶ 157–60, on the evening of October 19, 2025, Memphis resident David Mason was photographing Task Force activity on Hyde Park Street when he was confronted by Task Force agents, including Defendant Serralta. After photographing Task Force agents performing their duties in public, Mason returned to his car, at which point several armed U.S. Marshals, among them Defendant Serralta, surrounded him and his vehicle. Defendant Serralta himself held his phone up to Mason's face for five to ten seconds and also photographed Mason's license plate. Serralta asked Mason and his wife, who was also present, who they were, and told Mason to "get your priorities straight."

20.     Defendant Serralta's public statements demonstrate his direct knowledge of the Task Force's operations, his role in overseeing them, and his endorsement of its pattern and

practice of retaliation. For example, in a podcast appearance on November 3, 2025, Defendant Serralta described Task Force operations in detail, including both the coordination amongst agencies within the Joint Operations Command Center and his own interaction with Task Force agents within the Center.

21.    **Defendant Tyreece L. Miller** is U.S. Marshal for the Western District of Tennessee. He exercises authority over U.S. Marshals operations throughout the District and U.S. Marshals agents operating in the District, including as part of the Memphis Safe Task Force. Plaintiffs sue him in his official capacity.

22.    **Defendant Chad Hunt** is Chief Inspector for the U.S. Marshals and Commander of the Memphis Safe Task Force. He exercises authority over Memphis Safe Task Force operations. Plaintiffs sue him in his official capacity.

23.    **Defendant Markwayne Mullin** is Secretary of the U.S. Department of Homeland Security ("DHS"). He exercises authority over DHS and its component agencies. DHS is an executive branch department of the United States government, responsible for enforcing immigration law and overseeing its agents operating in cities and states across the country, including as part of the Memphis Safe Task Force. DHS and several of its component agencies, including U.S. Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), U.S. Customs and Border Protection ("CBP"), and U.S. Border Patrol ("Border Patrol"), are members of the Task Force. Plaintiffs sue Mullin in his official capacity.

24.    **Defendant Todd Lyons** is Senior Official Performing the Duties of the Director of ICE. He exercises authority over ICE, its component agencies, and ICE agents operating in cities and states across the country, including as part of the Memphis Safe Task Force. On March 23, 2026, President Trump spoke in Memphis and addressed the Task Force, where he thanked

7

Defendant Lyons, among others, for his role in Task Force operations. Plaintiffs sue him in his official capacity.

25.    **Defendant John Condon** is Acting Executive Associate Director of HSI. He exercises authority over HSI and its agents operating in cities and states across the country, including as part of the Memphis Safe Task Force. Plaintiffs sue him in his official capacity.

26.    **Defendant Colin Jackson** is Acting Special Agent in Charge for HSI Nashville. He exercises authority over HSI operations in Tennessee and Kentucky and HSI agents operating in these jurisdictions, including as part of the Memphis Safe Task Force. Plaintiffs sue him in his official capacity.

27.    **Defendant Rodney Scott** is Commissioner of CBP. He exercises authority over CBP, its component agencies, and CBP agents operating in cities and states across the country, including as part of the Memphis Safe Task Force. On March 23, 2026, President Trump spoke in Memphis and addressed the Task Force, where he thanked Defendant Scott, among others, for his role in Task Force operations. Plaintiffs sue him in his official capacity.

28.    **Defendant Michael Banks** is Chief of Border Patrol. He exercises authority over Border Patrol and its agents operating in cities and states across the country, including as part of the Memphis Safe Task Force. Plaintiffs sue him in his official capacity.

29.    Defendants Blanche, Serralta, Miller, Hunt, Mullin, Lyons, Condon, Jackson, Scott, and Banks are referred to collectively as Federal Defendants.

30.    **Defendant Matt Perry** is head of the Tennessee Highway Patrol ("THP"), which is a member of the Memphis Safe Task Force. He exercises authority over THP troopers, including those operating as part of the Task Force. Plaintiffs sue him in his official capacity.

31.    **Defendant Steven J. Mulroy** is District Attorney ("DA") for Shelby County,

8

Tennessee. Under Tennessee law, he is empowered to "prosecute in the courts of the district all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto," Tenn. Code Ann. § 8-7-103(1), including with respect to the Halo Law. Plaintiffs sue him in his official capacity.

**FACTUAL ALLEGATIONS**

**I.   THE MEMPHIS SAFE TASK FORCE'S DEVASTATING IMPACT ON THE MEMPHIS COMMUNITY**

32.    On September 15, 2025, Tennessee Governor Lee and President Trump met in the Oval Office. During the meeting, President Trump signed the Task Force Memo establishing the Memphis Safe Task Force.[1]

33.    The Memphis Safe Task Force is part of a broader federal initiative, which began in June 2025, to send federal agents to cities and states across the country—including Los Angeles, Chicago, Minnesota, and Maine—to dramatically escalate immigration arrests, detentions, and deportations. Federal officials have also claimed a desire to address crime. Federal agencies participating in these deployments include the same federal agencies participating in the Memphis Safe Task Force, including DHS and DOJ.

34.    The Memphis Safe Task Force began operations on September 29, 2025.

35.    By November 2025, the Task Force had mobilized over 2,000 agents and 31 participating agencies, with a significant number of those agents hailing from DHS (including ICE,

---

[1] Memorandum on Restoring Law and Order in Memphis, 2025 Daily Comp. Pres. Doc. 916 (Sept. 15, 2025), https://perma.cc/W9AA-7JLY.

HSI, CBP, and Border Patrol), DOJ (including the U.S. Marshals, FBI, DEA, ATF), and THP.

36.    As of January 2026, the number of Task Force agents was 2,800.

37.    Governor Lee has said that the Task Force will "last forever."

38.    Since its establishment last fall, the Task Force's thousands of agents have engaged in dragnet traffic and street stop operations and raided homes, including for the purpose of rooting out non-citizens and placing them in immigration detention.

39.    Task Force agents patrol the streets of Memphis in caravans of vehicles—sometimes as long as 10 in number. Caravans are typically led by a THP cruiser followed by unmarked vehicles containing federal Task Force agents. Federal Task Force agents sometimes also ride together with state or local Task Force agents in state and local Task Force agency vehicles.

40.    Task Force agents patrol and engage in dragnet traffic and street stop operations across Memphis but most heavily in the neighborhoods of Berclair and Hickory Hill, as well as along Lamar Avenue near American Way, which are home to immigrant communities and communities of color. Residents of these areas—or Memphians who pass through these areas—typically encounter Task Force agents daily or even multiple times a day.

41.    THP troopers typically initiate traffic stops by pulling over a driver, often for a minor violation, such as driving with unlawfully tinted windows or failure to wear a seatbelt, or sometimes for no violation at all. Once pulled over, federal Task Force agents typically surround the stopped vehicle.

42.    To date, the Task Force has conducted over 120,000 traffic stops.

43.    Task Force agents conducting traffic stops are sometimes joined by a white passenger van, which appears to transfer individuals identified during these stops to immigration

detention. Nearly 90% of Task Force immigration arrests began with a traffic stop.

44.   The Task Force does not track the number of street stops it has undertaken. But public reporting indicates that its operations also focus on street encounters.

45.   Task Force agents have also engaged in home raids, including raiding homes where the target no longer lives or never lived, and arresting individuals who are not the subjects of the raids.

46.   Task Force agents are also aggressively sweeping hotels and motels in Memphis, including in low-income and immigrant-heavy neighborhoods. Task Force agents enter hotels and motels, demanding access to guest registries without a warrant, reviewing guest details (including their identification documents), and entering this information into databases on agents' mobile devices.

47.   Task Force operations have overwhelmingly ensnared people of color. Of the more than 3,000 people arrested during the first two months of the Task Force, only 6% were white. Moreover, white people were more likely to be arrested as a result of an outstanding warrant rather than a traffic or street stop.

48.   As early as October 20, 2025—less than one month into the launch of the Task Force—it was clear to local government officials that the Task Force's dragnet operations were not predominantly about addressing crime. On that date, Shelby County DA Steve Mulroy stated in a town hall meeting that "I think people expected it to be about crime" but that "even on immigration—immigrants who are criminals—that's not what we're seeing."

49.   It quickly became clear that the Task Force's actions were in fact counterproductive to public safety. On February 19, 2026, Shelby County DA Mulroy stated that "the most toxic thing has been ICE. Arresting law-abiding tax-paying people who have lived in our communities

11

for decades peacefully, tearing them apart from their families, that's not making Memphis safer. I

think it's making Memphis less safe."

50.    In pursuit of its goals, Task Force agents have sowed fear and upended daily life in

Memphis communities, subjecting Memphians to harassing stops, violent home invasions, and

other abuse. Illustrative examples include:

a.    On October 8, 2025, an Uber driver was dropping a passenger off near Watkins Street and Brown Avenue when ten Task Force vehicles surrounded his car. One of the Task Force vehicles backed into his car, damaging it so severely that he could no longer drive it. He said, "I was pulled over with a gun and rammed in my car." The agents could not explain why they pulled him over. He was not charged with a crime.

b.    Also on October 8, 2025, a Black ride-share driver was taking a passenger to the airport when a THP trooper pulled her over. He claimed he had stopped her because he hadn't seen her seatbelt, but instead of asking for her driver's license and issuing a citation, he stated he needed to "call it in." Subsequently, a white van with "Immigration" written on the side pulled up behind her.

c.    On October 14, 2025, Shelby County Mayor Lee Harris held a press conference regarding the Task Force, where he shared that a county employee, who is Latino, was pulled over and detained by Task Force agents. The agents eventually let him go without an explanation of why they stopped him. At the press conference, an immigration attorney described numerous reports of Task Force agents refusing to return driver's licenses to Latino individuals following traffic stops. He described one such instance where a client telephoned him and when he arrived at the traffic stop, a DHS agent retrieved the license from his pocket and returned it.

d.    On October 15, 2025, a Black U.S. citizen was stopped while walking from his apartment to a nearby store. An MPD cruiser pulled up and two officers questioned him about where he was coming from and where he was going. Shortly thereafter, four men jumped out of an unmarked SUV with tinted windows, carrying rifles and wearing body armor, but with no identifying badges. One of the men approached him aggressively and asked him if he was from Ethiopia or Ghana. The Task Force agents eventually released him but before doing so, an MPD officer told him that he should

12

keep his identification on him.

e.    On October 30, 2025, Task Force agents approached a house in the Cherokee neighborhood. They disabled a home surveillance camera and attempted to break down the front door. A woman inside opened the door to find three agents on her doorstep, along with several more in her front yard. She was wearing nothing but her underwear. They pointed guns at her and told her to come out with her hands up. They then entered and searched her home. She described the guns pointed at her as "red dots all over [her] body." She asked for a blanket, but they refused. The agents told her they were looking for a man whom she did not know.

f.    On November 7, 2025, dozens of Task Force agents surrounded a house in Berclair, sending a woman to hide in a closet with her twin toddlers. The Task Force agents threw riot control agents through the front windows of the home and broke down a door and a window to force the mother and her children out. Eventually she emerged and Task Force agents took the toddlers from her. The children were outside for more than an hour without any coats. The mother and children were eventually placed into unmarked vehicles.[2]

g.    In November 2025, Task Force agents raided the home of a man and his 15-year-old son on two consecutive days. On both days, agents broke down their door, handcuffed the man, and pointed rifles at both him and his son. Although the man repeatedly asked to see a warrant, agents failed to show him one.

h.    In November 2025, a *Mother Jones* reporter witnessed a stop during which three Black friends were pulled over for their car's tinted windows and one of them was subsequently sent to immigration detention. The driver of the vehicle said he had been pulled over five times in a week and a half and "every time, there's at least five more cars that come, whether that be federal agents, more troopers or regular city [police] cars."

i.    In early December 2025, Task Force agents arrested an Afghan refugee who was walking his two sons, ages five and nine, to school. The agents took all three to an immigration detention center and then called the boys' mother to come pick the children up. When she, also an Afghan refugee, arrived at the detention center, agents arrested her as well. The family was transferred to a detention center

---

[2] Tennesseelookout8588, *Memphis V901, Video Courtesy of Yuleiny Escobar* (YouTube, Dec. 2, 2025), https://www.youtube.com/shorts/0mpFmQ4zm98.

in Texas despite having a scheduled immigration court date.

j.  On February 20, 2026, an 18-year-old high school student was on his way to a school soccer game in a car with his teammates when the driver was pulled over by Task Force agents. An agent asked each passenger in the car for a form of ID and when the student was unable to provide one, the agent called additional agents and arrested him. The student was detained despite being in the immigration system and having a scheduled asylum hearing.

k.  On March 12, 2026, at around 8:30 AM, a night-shift worker was taking a nap at home when his children woke him up crying and told him that Task Force agents were banging on the front door. They ordered him to open the door, threatened to break it down, and pointed guns at him. He asked for a warrant, but they did not show him one. The agents brought him outside, handcuffed him, entered his home, searched it, and then came out and released him. They left without providing any explanation for the intrusion.

51.  A February 2026 investigation by the *Nashville Banner*, in collaboration with four other outlets, analyzed immigration records and more than 50 hours of video footage relating to more than 600 traffic stops by a nearly indistinguishable task force operation in Nashville a few months before the launch of the Memphis Safe Task Force.[3] Similar to the Memphis Safe Task Force, THP and ICE patrolled throughout Nashville in caravans, with THP in a lead vehicle carrying out initial traffic stops, trailed by unmarked vehicles containing federal agents. The records and footage strongly suggest that ICE and THP teams competed with each other on the number of immigration arrests. On at least 11 occasions, ICE agents or THP troopers compared the number of stops or arrests they had made. ICE and THP teams also marked detained individuals with sharpies to denote which "team" had effectuated the arrest. During one stop, an ICE agent approached a handcuffed Latino woman and said, "We gotta give them the mark of the beast, Team

---

[3] *See* Nashville Banner, *Nashville Banner Investigation - ICE/THP Operation: Law enforcement Conduct* (YouTube, Feb. 19, 2026), https://www.youtube.com/watch?v=scI1k0z0NOE; Nashville Banner, *Nashville Banner Investigation - ICE/THP Operation: Profiling* (YouTube, Feb. 19, 2026), https://www.youtube.com/watch?v=hHhNjm8_V9Y (compilations of video footage).

6," following which another agent pulled out a black Sharpie and wrote on her restrained arm. At another stop, a team was asked by a supervisor if they had written "T4" on someone in cuffs.

52.     The footage from Nashville also revealed THP troopers and ICE agents using demeaning language and treating detainees poorly. THP troopers and ICE agents can be heard calling the targets of the stops "bodies," "wet," and other derogatory terms. Memphis-based ICE agents working on the Nashville operation were captured on audio describing Memphis as a "shithole" and joking about how one previous driver quickly provided his passport when approached by ICE, noting that it was "probably the third time he's been stopped tonight." ICE agents routinely refused people permission to contact their families and turned their phones off. In some instances, detainees were forced to hang up on or ignore calls from family members during stops in order to prevent detection of their location. In one incident, after a detainee asked a THP trooper if someone could come pick up his car so that it wouldn't be towed, the trooper then consulted with an ICE agent, who stated, "No, we're not letting them know that they're in immigration custody at all."

53.     In response to this reporting, THP stated that they were participating in the Nashville operation at ICE's request. The investigation also revealed that ICE was not the only federal agency involved in the immigration enforcement operation. At one point, a THP trooper said to another, "We've got ICE in every car and then they've got FBI SWAT trailing them."

54.     The effects of the Task Force's similar tactics and abuses extend beyond the individuals directly impacted by its operations to the broader community in Memphis. Because parents fear that they will be detained while dropping off their kids at school, the Memphis-Shelby County School Board has agreed to create more school busing routes. Nonetheless, school attendance has suffered. For example, Jackson Elementary, which sits in an immigrant-heavy

15

neighborhood, has experienced a 10% decline in daily attendance. One School Board member stated that multiple teachers have reported that students "have just stopped showing up." One teacher stated that up to 25% of her students had stopped showing up to class, and that when they do show up they're "extremely scared" and have said that "they miss their mom, that they want to go home even early in the day."

55.    Attendance at churches frequented by immigrants has also dipped dramatically. At one church with a primarily immigrant congregation, parishioners too scared to leave home have chosen instead to submit prayer requests through online services. Pastors have also agreed to serve as guardians to their congregants' U.S.-born children in the event that they are deported.

56.    Task Force agents are also engaging in dozens of dangerous high-speed chases, triggering several devastating crashes. An investigation by The Institute for Public Service Reporting, in collaboration with four other outlets, revealed that Task Force vehicles, often driving at speeds exceeding 100 mph, have chased motorists down freeways, through red lights on city streets, and into residential neighborhoods, in violation of local Memphis law enforcement regulations regarding vehicle pursuits. The Task Force has typically initiated these pursuits against drivers accused of minor infractions such as failing to wear a seat belt or failing to activate headlights.

## II.    MEMPHIS SAFE TASK FORCE AGENTS SYSTEMATICALLY RETALIATE AGAINST INDIVIDUALS GATHERING INFORMATION ABOUT AND RECORDING TASK FORCE ACTIVITIES

57.    Many Memphians, including Plaintiffs, are encountering squads of Task Force agents—often militarized and unidentifiable—on a regular, or even daily, basis and are stopping to gather information about and record Task Force activities occurring in public view.

58.    These individuals desire to collect and share information with their community; to

help detained neighbors, including by notifying family members of arrests, or connecting them with counsel; and/or to document public government actions including misconduct and abuse.

59.     In response, Task Force agents are engaging in a consistent and pervasive pattern and practice of retaliating against these individuals for gathering information about and recording Task Force activities. This retaliation includes:

- Issuing verbal threats, including threats of false arrest;
- Physically intimidating individuals, including by using their vehicles to swerve at them or box them into confined spaces;
- Stopping and questioning individuals without any reasonable suspicion of any crime;
- Taunting individuals by name when they arrive at scenes, tailing them in their vehicles, and sitting outside their homes, often after photographing their faces and license plate numbers and placing their personal information into databases for the purpose of enabling further surveillance and retaliation;
- Shining lights at phones and cameras to obscure photography and filming;
- Using excessive and unjustified force; and
- False arrest.

60.     Task Force agents also often invoke Tennessee's Halo Law against individuals gathering information about and recording their activities. The Halo Law makes it a misdemeanor to "intentionally approach[], within twenty-five feet (25'), a law enforcement officer after the officer has ordered the person to stop approaching or to retreat and the officer is lawfully engaged in the execution of official duties" in the following three scenarios: (1) a lawful traffic stop; (2) an active investigation of the scene of an alleged crime; or (3) an ongoing or immediate threat to public safety.

61.     Twenty-five feet is often too far to obtain a clear line of sight to a public scene that individuals seek to gather information about, to ask questions of officers or witnesses, or to clearly hear or record a public conversation. When an officer is making an arrest in public, for instance, from 25 feet individuals cannot hear or audio-record an officer identifying themselves as law

17

enforcement or providing *Miranda* warnings to the individual under arrest.

62.     The Halo Law also creates a floating buffer zone, moving as the invoking officer moves, making it difficult for individuals to understand where exactly the zone begins and ends, and often pushing them much further than 25 feet away from a scene.

63.     Plaintiffs are Memphians who regularly gather information about and record Memphis Safe Task Force activity, including through photography and filming. Plaintiffs film only activity occurring in public, and primarily from public streets and sidewalks. Plaintiffs maintain safe distances from their subjects. They do not physically impede, interfere with, or obstruct immigration or law enforcement action. When asked to step back by Task Force agents, including pursuant to the Halo Law, Plaintiffs seek to comply.

**Plaintiff Hunter Demster**

64.     Hunter Demster is a resident of Memphis. He operates a soup kitchen in the Cooper-Young neighborhood of Memphis.

65.     Demster observes, gathers information about, and records Memphis Safe Task Force activity on a near-daily basis in order to provide accurate and timely information to individuals impacted by Task Force activity and to hold Task Force agents accountable to the public, including by identifying Task Force agents and agencies operating in his community. Demster typically gets out of his car and records Task Force activity on his phone. He sometimes uses a dash cam in his car to record Task Force activity.

66.     Demster has been intimidated or retaliated against on numerous occasions while gathering information about and filming Task Force activity. Task Force agents have threatened him with arrest. They have physically intimidated him, including through threatening gestures and by using their vehicles to accelerate or swerve towards him. They have subjected him to retaliatory

18

traffic stops. They have repeatedly photographed his face and license plate. Numerous unknown Task Force agents have called him by name while he is gathering information and filming. He has also observed Task Force vehicles loitering outside his home.

67.     Task Force agents have invoked the Halo Law against Demster on at least 40 to 50 occasions. When agents invoke the Halo Law against Demster, it is typically unclear whom or what he should be 25 feet from. When Demster asks agents for clarification, he frequently receives different answers. Sometimes agents approach Demster while telling him to get back 25 feet, pushing him further and further away. Sometimes different agents invoke the Halo Law against Demster multiple times at the same scene. When Demster backs up after the Halo Law is invoked against him, he often loses vantage point of the scene and is unable to capture audio of what the agents are saying in his videos.

68.     On the afternoon of October 24, 2025, Demster filmed a gathering of about 30 Task Force agents gathered in the parking lot of the Benjamin Hooks Library. While he was filming, a THP trooper said to Demster and other community members "you guys gonna go to jail for interfering, I suggest you back on that way" and gestured in a random direction. Demster continued filming from the parking lot as the agents returned to their vehicles. Suddenly, an unmarked Ford Expedition, driven by a masked agent from an unknown federal agency with an agent wearing a Border Patrol vest in the passenger seat, sped up and swerved at Demster, braked immediately after passing Demster, and then continued driving away. Demster was caught off guard and terrified. If the agent had driven the vehicle two inches closer to Demster, the vehicle would have clipped him.

69.     On the night of November 7, 2025, Demster heard from a friend that a mother of twin toddlers had locked herself and the toddlers in a closet after Task Force agents tried to force

19

entry into their home on Macon Road near Jackson Avenue. Demster drove to the area, parked down the block from the house, and approached on foot while filming. Demster observed about 100 Task Force agents and 60 vehicles. Almost every federal agent was armed with an AR-15 rifle strapped across their front. When Demster was still about 100 to 150 feet away from the scene, an HSI agent instructed Demster to "get 25 feet back" and Demster complied after informing the agent he was not "engaging" or "interfering" but rather "filming the police." Several minutes later, a THP trooper approached and told Demster to get back 25 feet again, to behind a tow truck. After complying with this directive, Demster was approximately 150 to 175 feet away from the house and unable to observe what was happening in front of the house, nor was he able to capture audio documenting the interactions of the agents clustered holding the twin toddlers in the street.

70.    On the afternoon of November 11, 2025, Demster was driving past the Grizzly Mart gas station on Macon Road and National Street, when he saw about ten Task Force vehicles in the parking lot. Demster saw the MPD Hispanic Liaison Officer at the scene. He was familiar with the Liaison Officer because he had previously documented her driving her MPD cruiser with an HSI agent. Demster filmed the Task Force members detaining a young Latino woman in one of the unmarked Task Force trucks. A DEA agent approached Demster aggressively and invoked the Halo Law while walking towards Demster. When Demster asked what he needed to be 25 feet from, the agent responded "from what we're doing" and "it's my discretion how far you go back, so keep goin' back." Demster backed up until he was against the wall at the rear of the parking lot and unable to back up further.[4] As a result, Demster was no longer able to see the young woman

_____

[4] Video footage of this incident is available here: ACLU, *Hunter Demster – November 11, 2025*, at 0:04 (YouTube, May 12, 2025), https://youtube.com/shorts/ASCs5GfSLa4.

who had been detained.

71. After leaving the scene and returning home, Demster saw the MPD Hispanic Liaison Officer drive past his house while grinning at him. Demster's house is not on one of the main streets that someone leaving the Grizzly Mart would be likely to use. Demster felt threatened and unsafe.

72. On the afternoon of November 23, 2025, Demster filmed a Task Force traffic stop in the parking lot of St. Stephen's Methodist Church. Demster observed about 20 Task Force agents who had pulled over several young Latino men, who were in handcuffs by the time Demster arrived. Demster verbally provided Know Your Rights information to the detained individuals while filming the scene. As the Task Force was dispersing, a THP trooper approached Demster and threatened to arrest him.

73. On the afternoon of December 1, 2025, Demster arrived home to find an unmarked black SUV with tinted windows and an out-of-state license plate, characteristics common to unmarked Task Force vehicles, idling across the street from his house. Demster rarely sees vehicles idling on his street. Demster was not comfortable being in his house with the vehicle idling across the street, so he quickly returned to his car. Demster followed the vehicle when it left and observed it activate blue and red flashing lights and join a Task Force traffic stop. Demster observed the agents wearing body armor vests in the vehicle but could not see any agency identifiers.

74. On the afternoon of December 2, 2025, Demster arrived home to find another unmarked vehicle with tinted windows and an out-of-state license plate idling down the street from his house. Demster approached the vehicle in his car and asked the agents what was going on but did not receive any response. Demster could see two agents wearing vests inside the car, but he could not see any agency identifying marks. Fearful for his safety, Demster reached out to other

21

community members to come join him on his street. Later, two to three THP vehicles pulled up to the last house at the end of the street. The unmarked vehicle joined them. Demster overheard the Task Force members question the resident of that house about an individual who reportedly had not lived there for a long time. As a result of the December 1 and 2 incidents, Demster no longer feels safe in his own home.

75.     On the evening of December 2, 2025, Demster was driving down Highland Street between Summer Avenue and Tutwiler Avenue when he saw a caravan of four or five Task Force vehicles that had pulled over a young Black man. Demster parked his car and began filming as he walked towards the Task Force vehicles. When Demster was about 30 feet away, a Border Patrol agent approached, shone a bright light in Demster's face, and said "how you doin, how you doin, good?" while about two inches from Demster. Demster thought the agent was going to hurt him. Later, the same Border Patrol agent returned and loudly and repeatedly insulted Demster in front of other community members who were also present.

76.     On the afternoon of December 12, 2025, Demster was driving down Waring Road towards Macon Road, when he saw Task Force vehicles initiate a traffic stop of two Latino women. Demster pulled over, got out of his car, and began filming from about 40 feet away. Demster also verbally provided Know Your Rights information to the women. After the Task Force dispersed, Demster returned to his car. About five minutes later, a THP vehicle followed by several unmarked vehicles sped past Demster's car and one of the unmarked vehicles slammed on its brakes right as it was passing Demster's car.

77.     Demster pulled out from where he had parked. The THP vehicle made a U-turn and shortly after Demster pulled out, the THP vehicle and unmarked vehicles began to follow Demster with lights and sirens activated. Demster pulled over. At least six agents—wearing vests marked

22

U.S. Marshals, IRS-Criminal Investigation ("IRS-CI"), Police Federal Agent, as well as vests that were not clearly marked—got out and stood next to Demster's vehicle.

78.    A THP trooper approached and told Demster they had pulled him over for a broken taillight. Demster gave the trooper his license and registration and informed the trooper that his taillight was not broken; one had to be replaced and looked dimmer in the daylight. The federal agents continued to stand next to Demster's car while the trooper took Demster's license and registration back to the THP vehicle.[5] The trooper wrote Demster a ticket for a broken taillight and released him.

79.    On March 9, 2026, Demster appeared in traffic court for this broken taillight ticket. The Assistant District Attorney told Demster that his ticket had not been entered into the system and there was no actual case against him.

80.    On the afternoon of December 17, 2025, Demster heard that Task Force agents had gathered in a yard near Summer Avenue and Lipford Street. Demster arrived, got out of his car, and began filming a group of 20 to 30 Task Force agents from over 100 feet away. After about five minutes, the Task Force agents began to disperse and Demster went back to his car. A federal agent in an unmarked black Nissan Titan truck drove past Demster standing next to his car and said "good job Hunter" over the vehicle's loudspeaker.[6] The federal agent identifying Demster by name caused Demster to question whether he should continue to observe and record Task Force activity.

81.    On the evening of December 23, 2025, Demster heard that Task Force agents were

---

[5] Video footage of the federal agents standing next to Demster's car is available here: ACLU, *Hunter Demster – December 12, 2025* (YouTube, May 12, 2026), https://youtube.com/shorts/_CvAT1Z0vYU?si=ts3o_hQdKX9dJpKw.

[6] Video footage of the vehicle driving past Demster is available here: ACLU, *Hunter Demster – December 17, 2025* (YouTube, May 12, 2026), https://youtu.be/M2HWCncvoWU.

in front of a house on Owen Road near Mendenhall Road. Demster arrived, got out of his car, began filming, and approached the gathering of agents. As he approached, an HSI agent turned to Demster and said, "oh hey Hunter." Demster had never seen this agent before. The unknown agent calling Demster by name made him extremely uncomfortable. About 30 seconds later, a THP trooper invoked the Halo Law against Demster. Demster complied. As a result, he was unable to discern the agency affiliations of many of the federal agents present or see what activities the Task Force members were engaged in.

82.    On the afternoon of January 6, 2026, Demster was driving past Macon Road and Homer Street and saw that Task Force agents had stopped a Latino teenager with a motor bike who appeared to be about 15 years old. Demster pulled over, got out of his car, and began filming from about 25 feet away. After about ten minutes, an unmarked black Chevrolet Tahoe drove up from behind Demster. Demster stepped to the side, but the vehicle still almost clipped him.

83.    Demster walked around the back of the Tahoe, and the Tahoe then began to reverse towards him and stopped. The vehicle again almost hit him. A federal agent got out of the driver's seat and Demster recognized him as the Border Patrol agent who had shone a light in Demster's face and publicly insulted him on December 2, 2025. As soon as Demster recognized the agent, he felt a ball of anxiety in his stomach and his "flight or fight" response activate. The Border Patrol agent again insulted Demster in front of another community member whom Demster did not know.

84.    On the afternoon of January 22, 2026, Demster heard there were Task Force agents at Macon Road and Holmes Street. Demster drove over, parked, and began filming as he approached the scene. When he was about 30 to 40 feet away, an agent Demster believed was from IRS-CI invoked the Halo Law. When Demster asked what he needed to be 25 feet from, the agent

24

responded, "from me." Demster backed up and as a result was unable to observe anything specific about the scene.

85.     Demster began to walk back to his car. An unmarked Chevrolet sedan sped past Demster and stopped just past his car. Demster was terrified and thought he was going to be kidnapped. Demster saw an agent in the car holding a phone like they were filming or taking pictures. Another community member who had remained at the scene later told Demster the driver was the same IRS-CI agent who had invoked the Halo Law against him.

86.     On the afternoon of February 16, 2026, Demster heard about Task Force activity near Perkins Road and Janice Circle. Demster drove past the Task Force activity, parked, and began filming as he walked towards the scene. Demster observed three people in handcuffs seated on the curb next to their vehicle while Task Force members emptied the vehicle trunk. Demster filmed for about five minutes from 25 feet away and verbally provided Know Your Rights information to the people on the curb when a THP trooper began to question them. The THP trooper threatened Demster with arrest for impeding and interfering in their investigation. Then an HSI agent told Demster to get back, and the THP trooper threatened to arrest Demster and send him to jail if he was not 25 feet away. Demster backed up because he was afraid of being arrested even though he was already 25 feet away.

87.     Plaintiff Melissa Peeler was also observing and recording this Task Force scene from the sidewalk on the opposite side of the street. Task Force agents never spoke with her and did not invoke the Halo Law against her. Peeler was closer to some of the Task Force vehicles than Demster.

88.     On the afternoon of March 3, 2026, Demster was on the sidewalk filming Task Force activity at Kingsbury Middle School when a vehicle labeled Homeland Security Federal

25

Protective Service Police drove up next to him. The two agents in the vehicle rolled down the window and one of the agents said to Demster, "You called us Border Patrol the other night. We're not Border Patrol. We're Customs and Border Protection." Demster did not recognize either agent. The agent driving the vehicle said "I dunno, Hunter" as he drove away.

89.     On the evening of March 4, 2026, Demster heard about a gathering of Task Force agents at Baltic Street and Pacific Avenue. Demster arrived at the scene, took photos of the agents present from his car, and drove away. When Demster was a few blocks away stopped at a stop sign, a THP vehicle driving on an avenue perpendicular to Demster made a U-turn, activated its lights and sirens, and pulled Demster over near the corner of Pope Street and Faxon Avenue. The THP trooper wrote Demster another ticket for a broken taillight. Demster's taillight was not broken; one taillight was brighter than the other. Demster saw an agent wearing a vest marked Police Federal Agent get out of the THP vehicle while the trooper had him stopped. When Demster appeared in traffic court on March 9, 2026, for his first broken taillight ticket, the Assistant District Attorney informed Demster that his second ticket had not been entered into the system either.

90.     On the afternoon of March 5, 2026, Demster heard about Task Force activity near the corner of Baltic Street and Faxon Avenue. Demster drove over, parked, and began filming as he approached on foot. As Demster approached, a Border Patrol agent told Demster he had to stay back 25 feet. When Demster asked from what, the agent replied, "from that officer," indicating another officer at the scene. An MPD officer then approached the federal agents and pointed to Demster. It appeared the MPD officer was identifying Demster to the federal agents.

91.     On the evening of March 24, 2026, Demster was driving home when he saw a car pulled over by a THP vehicle and several unmarked vehicles in the parking lot of the Dollar General on Summer Avenue and North Holmes Street. Demster parked and got out of his car to

26

film. As Demster approached the scene, he saw three people being detained by the agents. Demster filmed from over 30 feet away. After about 20 minutes, a plainclothes federal agent drove into the parking lot in an unmarked truck, got out of his vehicle, and immediately held his phone up towards Demster, presumably to film Demster or take his photograph.[7] Demster asked the agent what he was taking a photograph of, but the agent did not respond.

92.     On the evening of April 2, 2026, Demster documented Task Force activity from his car near the corner of Pacific Avenue and Baltic Street. After filming from his car for about two to three minutes, an agent wearing a Diplomatic Security Service ("DSS") vest took a photo of Demster through his front windshield. The DSS agent then walked to the rear of Demster's car and stood next to a second DSS agent who took a photo of Demster's license plate.[8] It is common for agents to take Demster's picture while he is documenting Task Force activity, but it is still intimidating every time. Each time a different agent takes Demster's picture, he feels the Task Force is continuing to discuss him and he fears the retaliation he has experienced will worsen.

93.     On the evening of April 10, 2026, Demster observed Task Force activity near Kingsbury High School. Demster parked and began filming as he approached the scene. When Demster was about 40 feet away, a Shelby County Sheriff invoked the Halo Law by telling Demster he had to be "25 feet back from the furthest agent away." Demster backed up as directed. Demster was surprised to hear the Halo Law invoked this way. An HSI agent then walked towards Demster and said, "Halo Law." Demster backed up again as directed. As a result, it was difficult

---

[7] Video footage of the agent photographing or filming Demster is available here: ACLU, *Hunter Demster – March 24, 2026* (YouTube, May 12, 2026), https://youtube.com/shorts/437pKjDG6Gw.

[8] Video footage of the agents photographing Demster is available here: ACLU, *Hunter Demster – April 2, 2026 (Part 1)* (YouTube, May 12, 2026), https://youtube.com/shorts/Fa8o-Lh5Zx0; ACLU, *Hunter Demster – April 2, 2026 (Part 2)* (YouTube, May 12, 2026), https://youtube.com/shorts/gdRtpwK2tZQ.

for Demster to see what was happening at the house where the Task Force agents appeared to be gathered. After the Task Force dispersed, Demster spoke to the family in the house: an elderly woman and her granddaughter, who was sobbing because the agents had pointed assault weapons at her in her home. Demster was left scared and shaking.

94.    Demster has become hypervigilant as a result of the retaliation he has experienced while filming Task Force activity. He feels he has to watch his back at all times and is constantly anxious and tense. His sleep has become dysfunctional, and he experiences borderline panic attacks.

95.    Having unknown Task Force agents repeatedly identify Demster by name terrifies him and makes him concerned that he will be arrested or detained for recording Task Force activity. Demster questions whether he should continue to observe and record Task Force activity.

96.    Demster has scaled back his observation and filming of Task Force activity because of the anxiety and fear he experiences as a result of the retaliation and intimidation he has faced.

97.    Demster's behavior when he does go out to observe, gather information, and record Task Force activity has also changed as a result of the incidents he has experienced. He often does not get out of his car to film. When he is the first community member to arrive at a scene, he now remains in his car and waits for other community members to arrive before approaching the scene to film.

98.    Now, when Demster does get out of his car to film Task Force activity, he gets stress headaches from standing on the sidewalk and pulling out his phone. Demster has observed, gathered information about, and recorded immigration and law enforcement activity for almost a decade, but has never experienced consistent physical stress reactions before he began

28

experiencing retaliation from Task Force agents.

**Plaintiff Jessica Chodor**

99.    Jessica Chodor is a resident of Memphis. She works as a project and data manager for a nonprofit organization that serves postpartum parents.

100.    Chodor regularly observes, gathers information about, and records Memphis Safe Task Force activity in order to provide support to those who are detained and their families, to ensure that there is an independent record of Task Force operations, and to hold Task Force agents accountable for any abuses.

101.    While observing, gathering information about, and recording Task Force activity, Chodor has been photographed by federal agents and has been subjected to both a retaliatory traffic stop and a retaliatory arrest. Task Force agents have also invoked the Halo Law against Chodor.

102.    On September 30, 2025, Chodor heard that Task Force agents were at a neighborhood playground at 1520 East Brooks Road. She drove to the area and began filming the operation. While she was stopped in the parking lot filming, two HSI agents walked across the parking lot, and took photographs of Chodor and her license plate.

103.    On October 1, 2025, Chodor saw a THP cruiser and two unmarked vehicles pulling over a car at the intersection of Given Avenue and Pope Street. She got out of her car and walked to the street across from the traffic stop in order to observe and record the scene. A plainclothes agent wearing a vest walked over to her vehicle, which was half a block away, and took a photograph of her car and license plate.

104.    On October 2, 2025, Chodor was attempting to record a Task Force operation in the Nutbush neighborhood. When she arrived, she saw multiple plainclothes agents in face masks detaining a Latino man and shackling his hands, waist, and feet. Chodor had her phone out to

29

record the scene. A Task Force agent told Chodor to stay back, and in compliance with the Halo Law, she stayed 25 feet away from him, even though that meant that she could not get close enough to the scene to fully capture what was happening. From that distance, she also could not hear or record what was being said. When she moved up and down the street in either direction to try to get a clearer view, the agent mirrored her steps to further obstruct her line of sight.

105.    On October 28, 2025, Chodor experienced two incidents of severe retaliation for her information-gathering and filming activities: a retaliatory traffic stop and a retaliatory arrest. First, at around 6:30 PM, Chodor observed a THP vehicle and an unmarked Ford F-150 pulling over a car near the intersection of Mount Moriah Road and Ridgeway Road. She began recording the traffic stop with her phone, which was mounted to her dashboard. She saw a THP officer, two agents in plainclothes and HSI vests, and one agent in plainclothes and a vest surrounding the car. As she drove by the scene, she rolled down her window, and expressed her concern by shouting, "It takes four agents to do a traffic stop on one man? And you're not terrorizing our city?," and then continued driving.

106.    After she drove away, she noticed the THP vehicle and unmarked F-150 from the traffic stop following her. Chodor was obeying all traffic laws. The THP vehicle then turned on its lights and siren, indicating she should pull over, which she did. The THP vehicle and F-150 both stopped behind her vehicle.

107.    A THP officer approached Chodor's driver's side window and asked her whether there was an issue or a problem. Chodor was confused and replied, "You pulled me over—is there an issue or a problem?" to which the officer replied that she had passed by yelling out the window. Chodor asked the THP officer if that was illegal, and if that was the reason why he pulled her over. The officer said yes and told her that she was impeding his investigation and his traffic stop.

30

Chodor asserted that he needed a valid reason to pull her over. The trooper told her that he had a valid reason, and when she asked again if it was because she yelled out her window, he replied that he was concerned because of her yelling.

108. The THP officer refused to let Chodor leave and demanded to see her driver's license. He told her that she was being detained on a valid traffic stop for yelling out the window, and then added a new, false accusation that she was holding her phone to record while she was driving. Chodor denied that accusation and indicated that her phone was clearly mounted to her dashboard. Nevertheless, she complied and gave him her driver's license. He took her license back to his car and then returned it to her and indicated that she was free to go.[9]

109. Second, at around 7:30 PM, as Chodor was making her way home, she heard that the Task Force had pulled over some individuals at Pendleton Street and Park Avenue. About ten minutes later, Chodor arrived at the scene and saw a Latino couple in a truck, with a THP cruiser and at least three unmarked vehicles near the truck. She parked down the street and walked toward the scene. Chodor passed a group of at least three agents in plainclothes and vests, who looked at her as she approached but said nothing. She walked over to a THP officer standing behind the truck and stopped at least ten feet away from the traffic stop.

110. Chodor intended to film the interaction and had her phone out. She told the officer that she wanted to make sure that the detainees were okay. The officer told her that they were fine and to go back to her car. Chodor told the officer that she was not going to go back to her car. The officer then claimed that Chodor was interfering and threatened to arrest her if she did not return to her car. Chodor started backing away. She was nervous and looked at her phone to ensure she

---

[9] Video footage of the traffic stop is available here: ACLU, *Jessica Chodor – October 28, 2025 (Pullover)* (YouTube, May 12, 2026), https://www.youtube.com/shorts/a6pqsDE6V8I.

had the officer in the video frame, at which point she realized she had not actually pressed the record button; she then pressed record to begin filming.

111.    As she was moving away from the officer, Chodor asked how she was interfering and told the officer that she was going to walk across the street, which she knew she was legally allowed to do. The officer demanded that she go back to her car, which was too far from the scene for Chodor to film the traffic stop. Chodor responded, "25 feet, I can stand anywhere 25 feet away from your scene," and moved toward the other side of the street. The officer continued to aggressively approach her and told her to go all the way back to her car.

112.    As Chodor continued to move across the street, there were other state troopers and federal agents nearby, watching the encounter, and another officer started to approach Chodor. The THP officer pointed to her car and said, "You're going back there to your car or you're going to jail." Chodor continued to back away across the street from the scene and informed the officer that she was not going back to her car, because she was not legally obligated to do so.[10]

113.    The THP officer grabbed Chodor's arm and then tackled her to the ground. He and another officer placed such a forceful weight on Chodor's back that she could not breathe. They pulled her left arm behind her and her right arm was pinned to the ground beneath her body. One of the agents shouted at her that she was about to be tased and demanded that she give them her other arm. She communicated that they had pinned her arm underneath her and that she could not get it out. They then shifted their weight off her and she was able to give them her other arm.

114.    The officers then handcuffed her, forced her up, pulled her arms high up behind

---

[10] Video footage of this interaction just prior to the THP trooper tackling and arresting Chodor as filmed on Chodor's phone is available here: ACLU, *Jessica Chodor – October 28, 2025 (Arrest)* (YouTube, May 12, 2026), https://www.youtube.com/shorts/V8AvcoHXIik.

her, and placed her in the back of the THP vehicle.[11] Chodor was terrified and screamed "Help! Help!" in hopes of calling witnesses, but all she could see were agents standing in the street. She suffered extreme pain from the assault.

115. While she was sitting in the back of the THP car, the THP trooper came to the backseat door and opened it. Next to the trooper was a federal agent wearing a bulletproof vest and a mask that covered his face. The agent asked her if she was a U.S. citizen. Chodor told him that she did not want to talk, and he left.

116. Chodor was taken to Shelby County Jail East, where she was detained for 27 hours. While she was in jail, she was unable to sleep due to overcrowding, harsh lights, and severe cold. There was no bed or bedding provided, and there was not enough space for the detainees to lay down, even on the dirty concrete floor. She was denied water for eight hours and food for nine hours. She was in severe pain from the assault, and she was denied her prescription medication and painkillers.

117. Chodor was charged with Resisting Official Detention. Her charges were dismissed on December 5, 2025.

118. After she was released from jail, Chodor continued to experience severe physical pain from the assault, including neck pain, rib contusions, and bruised wrists. She felt extremely fearful and disoriented. For days, she was involuntarily shaking and she could not leave her house, except to seek medical attention with the support of her family. She had unrelenting flashbacks of the assault and her time in detention. She was afraid to drive a vehicle and was unable to work for

---

[11] Bodycam footage of the incident from Chodor walking up to the THP trooper to her detention in the THP vehicle is available here: ACLU, *Jessica Chodor – October 28, 2025 (Bodycam footage)* (YouTube, May 12, 2026), https://www.youtube.com/watch?v=goDCot13rjM.

over a week.

119. Chodor continues to experience fear, panic, and flashbacks from the retaliatory incidents, especially when driving. She has struggled to focus, and her performance at work has suffered.

120. As a result of these incidents, Chodor stopped observing, gathering information about, and recording Task Force agents entirely between October 29 and December 5, 2025. After her charges were dropped, she resumed these activities but has reduced their frequency because of the toll the incidents have taken on her and her family, and because she fears retaliation by Task Force agents. When she does go out to gather information about and record Task Force operations, she is gripped by anxiety and fear that Task Force agents will retaliate against her again.

121. Chodor has submitted a complaint to THP about the retaliatory incidents that occurred on the evening of October 28, 2025, placing Defendant Perry and THP on notice of these unlawful actions.

**Plaintiff Kenneth Halt**

122. Kenneth Halt is a resident of Memphis. He is a community builder at a joint city-county agency.

123. In his personal capacity, Halt regularly observes, gathers information about, and records Memphis Safe Task Force activity to provide support to those adversely impacted by law enforcement, bear witness to such activity, and hold officers accountable for any abuses of their authority.

124. While observing, gathering information about, and recording Task Force activity, Halt has been physically intimidated by agents, including through threatening gestures and being boxed in by their vehicles. He has been stopped and questioned by Task Force agents, even when

they admit that he has done nothing unlawful. He has had his photograph taken on numerous occasions by Task Force agents, been followed by Task Force vehicles while driving his own truck, and observed federal agents loitering in parked vehicles outside his home. Task Force agents have also shone bright lights at Halt, preventing him from filming their public activities.

125.    On the afternoon of November 6, 2025, Halt stood on Breedlove Street and Jackson Avenue to witness and record the aftermath of a traffic stop and detention by agents from HSI, THP, and Tennessee Bureau of Investigation. While he was observing, an agent in an unmarked grey Ram truck used his phone to take a picture of Halt and other civilians at the scene.

126.    On the evening of November 21, 2025, Halt was driving through the intersection of Given Avenue and North Highland Street, just behind a Task Force convoy. After Halt yelled "La migra" out his open truck window, the unmarked vehicle at the rear of the convoy, just ahead of Halt's truck, abruptly stopped in the intersection, prompting Halt to slam on his brakes to avoid a collision and forcing him to partially protrude into a lane of oncoming traffic.

127.    The passenger of the unmarked vehicle, who was wearing a U.S. Marshal vest, exited the car and walked to the driver's side of Halt's vehicle to confront Halt, asking him what he had been yelling out the window.

128.    After a brief conversation, the U.S. Marshal got back into his vehicle. Halt parked his car, exited, and filmed the same convoy carrying out a traffic stop. At the conclusion of that traffic stop, Halt drove to the parking lot of a vacant Walgreens at 3502 Summer Avenue to regain his composure, as he was shaken by the confrontation with the Marshal.

129.    Over the course of the next five minutes, at least half a dozen THP and unmarked vehicles drove past the parking lot with their windows down, making direct eye contact with Halt

35

and scowling.

130.    On the afternoon of November 28, 2025, Halt was observing and intermittently filming a detention at a gas station at 1372 Elvis Presley Boulevard when a plainclothes agent approached Halt, used a cell phone to take a picture of Halt's face, and walked away.

131.    On the evening of December 6, 2025, Halt stood on the sidewalk at 3608 Macon Road as he observed and recorded a car on the opposite side of the street that had been pulled over by a Task Force caravan. An agent inside one of the Task Force vehicles held up a phone to record video or take a picture of Halt. That same Task Force vehicle shone a bright spotlight at Halt, creating a glare that interfered with Halt's filming of the scene.[12]

132.    On the evening of December 26, 2025, Halt was observing and recording a traffic stop in a Top Notch Market parking lot at 3022 Park Avenue. A Border Patrol agent shone a spotlight at Halt, creating a glare that interfered with his filming; accused him of holding up a "black object" (which was Halt's cell phone); and after Halt got into his car, boxed Halt in using an unmarked Task Force vehicle, preventing Halt's immediate egress.[13]

133.    On the evening of December 30, 2025, Halt and his housemate, Benjamin Reese, stopped to observe and attempt to record a Task Force scene that was concluding at Lamphier Avenue and National Street. They then got in Halt's car and drove away from the scene; as they were driving, they noticed an MPD cruiser following them. Fearful for their safety, Halt navigated

---

[12] Video footage of the agents photographing or filming Halt and shining a spotlight at him is available here: ACLU, *Kenneth Halt – December 6, 2025* (YouTube, May 12, 2026), https://www.youtube.com/watch?v=yilRvOznbX8.

[13] Video footage of the agent shining a spotlight at Halt and accusing him of holding up a black object is available here: ACLU, *Kenneth Halt – December 26, 2025* (YouTube, May 12, 2026), https://www.youtube.com/watch?v=eJvtIlQ9rbw.

to a gas station at 3541 Jackson Avenue, where he was boxed in by the cruiser.

134.    Two agents exited the cruiser to confront Halt and Reese: one MPD officer in uniform and one agent in plainclothes with a vest that said "SPECIAL AGENT." The officer who approached Halt's driver's side window asked why Halt and Reese were "pulling up on our scenes." Halt asked whether he and Reese had done anything illegal. The officer said no, but then stated "when it's an investigation, you could be charged with impeding an investigation, if you're haltering [sic] what we're doing. Were you haltering [sic] what we were doing or not?" The officer warned Halt to stay 25 feet away from law enforcement "from now on." The agents then got back into the cruiser and drove away.[14]

135.    On the afternoon of January 2, 2026, Halt was observing and gathering information about a Task Force raid at Los Primos Market at 3746 Townes Avenue. From the front passenger seat of an unmarked SUV, an HSI agent made eye contact with Halt and mimed shooting a gun at him with his fingers.

136.    On the afternoon of January 3, 2026, Halt and Reese observed a Task Force traffic stop conducted by a THP cruiser and an unmarked vehicle. After leaving the scene and driving away, Halt realized he was being followed by the same two vehicles. Halt subsequently pulled into a strip mall at 3224 Jackson Avenue and began driving in slow circles around the parking lot. The two vehicles followed as he did so. Halt parked the car, and he and Reese entered the nearby McDonald's in an effort to deescalate the situation. While Halt and Reese were in the McDonald's, the THP and unmarked vehicles waited in the parking lot for approximately ten minutes before

---

[14] Video footage of this stop and interaction is available here: ACLU, *Kenneth Halt – December 30, 2025* (YouTube, May 12, 2025), https://www.youtube.com/watch?v=8j_uRUDE79c.

eventually driving away.

137.    On several occasions, Halt has noticed unmarked Task Force vehicles sitting outside his home. For example, on February 5, 2026, Halt observed a vehicle idling on his street. The vehicle had tinted windows and out-of-state plates. A few weeks later, on February 25, 2026, Halt was notified by his neighbors, and subsequently verified on his home video camera, that there were three unmarked vehicles—at least one of which was driven by an agent wearing a tactical vest—sitting outside his home for approximately 20 minutes.[15]

138.    The retaliation that Halt has experienced as a result of recording the Task Force has profoundly affected his life. He suffers stress-induced headaches that last weeks at a time, and his general mental and physical health has deteriorated due to the incidents described above. He continues to engage in information-gathering about and recording of Task Force activities, but he fears that his loved ones and neighbors will be targeted by Task Force agents as punishment for his observation and recording activities.

**Plaintiff Melissa Peeler**

139.    Melissa Peeler is a resident of Memphis. She has been retired since 2012.

140.    Peeler regularly observes, gathers information about, and records the Memphis Safe Task Force in order to bear witness to and document Task Force activity.

141.    Peeler has been subjected to retaliatory conduct by Task Force agents in response to her observation, information gathering, and recording. Task Force agents have threatened her with arrest, boxed her in with their vehicles, taken photos and videos of her, and taunted her by

---

[15] Video footage of the three unmarked vehicles outside of Halt's home is available here: ACLU, *Kenneth Halt – February 25, 2026 (Part 1)* (YouTube, May 12, 2026), https://youtu.be/GHJ_ma6t2as; ACLU, *Kenneth Halt – February 25, 2026 (Part 2)* (YouTube, May 12, 2026), https://youtu.be/rjTowXttWRQ.

calling her name even when she is not familiar with them.

142.     Peeler has also had the Halo Law invoked against her approximately ten times. Generally, Task Force agents invoke the Halo Law by simply saying "Halo Law" or "25 feet." Whenever the Halo Law is invoked against her, Peeler tries to comply by backing up from where she's standing, despite often being confused by how agents are measuring the 25-foot zone. Moving back makes it harder to see and hear what is going on and to speak to Task Force agents, including by asking them what agencies they are with and what is happening. It also makes it harder to take clear photos and videos.

143.     On October 5, 2025, around mid-day, Peeler was recording a traffic stop on Summer Avenue involving multiple Task Force agents from more than 25 feet away. An HSI agent approached her and asked her to move back. Peeler responded that she was already "well beyond 25 feet" and continued to film. The agent then threatened to arrest Peeler for "loitering." This threat of arrest frightened Peeler, but she responded that she knew her rights and that he could not arrest her for loitering where she was standing. Later, as the traffic stop was wrapping up, Peeler noticed a black pickup truck, similar to other unmarked Task Force vehicles, in the parking lot. The driver's side window was rolled down, and the driver was holding his phone vertically toward Peeler, like he was taking a photo or a video.

144.     In or around early October 2025, Peeler arrived at a Task Force traffic stop in Berclair. There were approximately two to three Task Force vehicles and five to seven Task Force agents. She arrived in her car, stopped, and began taking photos of the stop with her phone out of her car window. When she arrived, an ICE agent whom she recognized seeing at several previous traffic stops, but whom she did not know personally, said, "Hey Melissa, you're late." Peeler found

39

this frightening and chilling.

145.    In or around early October 2025, Peeler drove to a church on Grey Road where she heard there was Task Force activity. When she arrived, she saw two unmarked vehicles with tinted windows in the church lot, which she suspected were Task Force vehicles. She stopped and began to take photos of the vehicles from her car. All of a sudden, two SUVs drove up: one parked in front of her and another parked behind her, such that she was boxed in and could not have pulled away. A male agent from the SUV in front of her car approached Peeler's window and told her to leave. Peeler was scared and immediately left the scene once the agent got back in and moved his car.

146.    On the morning of December 9, 2025, Peeler observed a Task Force traffic stop and arrest involving several DEA and THP officers on one of the northbound streets from Macon Road. She parked her car behind the convoy of Task Force vehicles and immediately began taking photos and videos of the traffic stop from her car. Although she was approximately ten feet away, the agents did not speak to her and did not object to her presence. About ten minutes later, two journalists from a news outlet arrived and began filming with a large shoulder-held video camera. Peeler got out of her car to join them on the sidewalk. The agents began to yell at all three of them to move back 25 feet but did not specify where the measurement of 25 feet should begin and end. Peeler and the journalists moved back but, as a result, her ability to see and hear what was going on and record video and audio of the scene was significantly impaired.

147.    On the afternoon of February 5, 2026, Peeler and her husband observed more than five Task Force vehicles and more than ten Task Force agents, including THP officers and FBI agents, crowded near a house. After parking down the road, Peeler walked towards the scene and began taking videos with her cellphone. An officer reacted to her lifting up her phone and warned

her to stay back. When Peeler tried to ask him what was happening, he told her to stand behind a line of cars parked on the curb. Although the cars were more than 25 feet away from the scene, Peeler complied. As a result, her ability to see and hear what was going on and record video and audio of the scene, was significantly impaired. Eventually, the agents began to leave the scene, and the car Peeler was standing behind drove away. Peeler then attempted to move closer to the scene while remaining 25 feet away. The same officer again told her to stay back. Peeler responded that she was "way past 25 feet" and could "barely see the house." But she moved back anyway.

148.    Because of these incidents, Peeler now fears retaliation by Task Force agents when observing, gathering information, and recording them. As a result, she now engages in these activities less frequently than she did prior to these incidents. When she does engage in these activities, she stays in her car more often instead of standing on the sidewalk, and she speaks to agents less frequently.

149.    Because she has been subject to repeated invocations of the Halo Law, Peeler now typically observes, gathers information about, or records Task Force agents well beyond 25 feet regardless of what the agents are doing. As a result, her ability to see and hear what is going on, speak to Task Force agents, and record video and audio, is often significantly impaired.

*** 

150.    In addition to the named Plaintiffs, the Task Force's pattern and practice of retaliation has affected numerous community members, further demonstrating its consistent and widespread effects in Memphis. These persons include:

**David Mason**

151.    David Vaughn Mason is a resident of Memphis. He is an Associate Professor of Theatre at Rhodes College.

152.    Mason has been observing, gathering information about, and photographing Task Force activity since October 2025. From October through early December 2025, he observed and photographed Task Force activity almost daily, sometimes three to four times a day. From December 2025 through February 2026, he observed and photographed about two to three times a week. Beginning in March 2026, as the weather improved, Mason resumed observing and photographing Task Force activity more frequently. Mason photographs Task Force activity with two large cameras. He typically arrives at the scenes of Task Force activity on a red Vespa scooter.

153.    Mason photographs Task Force activity to bear witness to and create a photographic record of Task Force activity. He hopes agents might be incentivized to act lawfully if they know they are being watched and photographed. When Mason takes his cameras out, Task Force agents sometimes think he is a journalist.

154.    Mason is autistic. His autism affects how close he gets to Task Force activity. His natural inclination is to maintain a distance from Task Force activity when observing such activity. At closer than 25 feet of distance, Mason experiences physical discomfort because of his autism. Even though he regularly maintains a substantial distance—of more than 25 feet—from Task Force activity, Mason has had the Halo Law invoked against him 30 to 50 times. Task Force agents have also intimidated and retaliated against Mason by photographing him and his license plate, and by shining bright lights at him or his cameras in an attempt to interfere with his photography.

155.    On October 8, 2025, Mason observed and photographed Task Force activity on Jackson Avenue. Almost immediately as he approached the scene, an FBI agent shouted at Mason that he had to stay back 25 feet, as pictured below. Mason was more than 60 feet away. Mason remained on the far side of the street to photograph Task Force activity but his view of the activity

42

was severely limited.



156.    On the afternoon of October 16, 2025, Mason was stopped on his scooter in a gas station parking lot when he saw a THP vehicle and an unmarked Ford F-150 on Trezevant Street concluding a traffic stop. Mason walked up the street with his cameras and photographed a federal agent in a tactical vest marked "Police" exit the F-150 and speak with the THP trooper. The trooper drove away shortly thereafter and Mason returned to his scooter. Mason stowed his cameras and looked up to see the F-150 make a U-turn and drive back in his direction. The F-150 came to a stop near Mason. The federal agent driving the F-150 pointed a cell phone camera toward Mason's face and held it there for several seconds, presumably to photograph or video him.

157.    On the evening of October 19, 2025, Mason and his wife observed Task Force activity targeting a house on Hyde Park Boulevard. Upon arrival, Mason saw approximately 20 agents, including U.S. Marshals, an HSI agent, state troopers, and MPD officers. A Black man was handcuffed in the street. Mason photographed the Task Force activity until the agents uncuffed the man and let him go.

158.    Mason returned to his car to pack up. Several armed U.S. Marshals, including a

43

man he later identified as Defendant Gadyaces Serralta—Director of the U.S. Marshals—approached him from 60 feet away, as pictured below.



159.    Mason was standing by the driver's side door of his car, and his wife was in the front passenger seat with the door closed. Serralta held his phone about six inches from Mason's face for five to ten seconds to photograph Mason while two other U.S. Marshals stood along the passenger side of the car looking at Mason over the roof. Serralta then walked between Mason and his car and made a show of photographing Mason's license plate.

160.    Serralta asked Mason who he and his wife were and told Mason to "get your priorities straight" in a steely voice. The U.S. Marshals then returned to their vehicles. Mason was agitated and understood this to be an effort to intimidate him.

161.    As Mason was getting into his car to leave, an unmarked black vehicle leaving the scene pulled up alongside him. The driver, wearing a U.S. Marshal vest, asked who Mason was with and then drove to the end of the street and sat there, about 60 feet away. Mason had to drive past the parked officer to leave.

162.    Immediately after the encounter with Defendant Serralta on the evening of October

44

19, 2025, Mason and his wife drove to the location of different Task Force activity on Wales Avenue. Mason observed a crowd of 20 to 30 officers from HSI, the U.S. Marshals, FBI, THP, and MPD, as pictured below. Mason learned from observers present that the agents had arrived at the house under the pretense of serving a warrant on someone who did not live there and had detained a married couple.



163.    Mason parked more than 150 feet away and walked up with his cameras past where MPD vehicles had blocked the road, about 90 to 150 feet away from the scene. As a U.S. Marshal was interacting with other observers, Mason tried to move closer to the house to photograph the agents' faces and vehicle license plates. An FBI agent stopped Mason while he was still 60 feet away from the scene. Mason told the agent he was not close to 25 feet from the scene, and the agent responded that Mason had to "get back to where I want you."

164.    Mason observed and photographed the Task Force operation for two hours. Because the agents prevented him from getting within 25 feet of the scene, Mason was unable to

capture many details of the officers' identities and their activity.

165.    On the night of November 7, 2025, Mason learned about Task Force activity near the intersection of Macon Road and Holmes Street. Mason arrived at the scene about 15 to 20 minutes after Task Force agents had thrown riot control agents into a house where there was a family with small children inside. Mason observed approximately 20 to 30 Task Force agents, including from HSI, Border Patrol, FBI, DEA, DSS, THP, and MPD, as pictured below.



166.    Mason tried to approach the scene and was stopped by a state trooper or an MPD officer. He was no closer than 90 feet from the house. Mason then crossed the street and moved away from the house. A Latino teenager who was an extended family member of the besieged family approached Mason and asked for help interacting with federal agents about the family's car before it was towed. The boy was terrified. Mason, his wife, and the boy crossed the street to the sidewalk at the corner of the raided house. An HSI agent approached and ordered them to move back across the street. Mason complied, crossed the street, and joined a small crowd of people, including other observers.

167.    As Mason began photographing from the north side of Macon Road, an agent on

the south side of the street shone a powerful flashlight towards the small group of which Mason was part, as pictured below. The agent shining the light was approximately 30 to 45 feet away and intentionally angled his light toward Mason's camera. When Mason crouched to photograph, the light followed him. The bright light prevented Mason from identifying which agency the agent belonged to.



168.    A tow truck appeared about 120 feet down Macon Road, and Mason walked toward it. He saw that agents had surrounded the Latino boy on the lawn of the raided house. Mason walked across the street to reach the boy, and a state trooper and another agent came from the yard and stopped him in the middle of the street. Mason explained he was assisting the boy, but the agents insisted Mason return to the crowd on the other side of the street. Mason backed up and continued photographing. An agent—Mason believes the same agent who shone the light at him

earlier—again shone a flashlight at his camera, as pictured below.



169.     About an hour after Mason arrived at the scene, a minivan came, and agents secured twin toddlers from the targeted house in the van, as pictured below. Over the course of this Task Force activity, Mason was told to get back by five to ten different agents, including HSI and Border Patrol agents and state troopers, even though he was already back at least 25 feet from the house.



170.     On the night of November 19, 2025, Mason observed Task Force activity at Angelus Street. Upon his arrival, he saw several HSI agents, at least one DSS agent, and a state

trooper. Two people were already in handcuffs. As Mason approached with his cameras, an HSI agent asked: "Are you press?" Mason said he was not, and the agent told him: "In Tennessee we have a Halo Law, which means you have to be back 25 feet." Mason responded that he was further than 25 feet from the scene. The agent responded, "You're not 25 feet from me."

171. Mason reiterated that he was already more than 25 feet from the concentration of agent activity. The HSI agent started shouting, "Back! Back! Back! Back!" The agent made pushing motions with her hands and stepped towards Mason. Mason backed up and his ability to photograph Task Force activity was hindered.

172. On the night of January 18, 2026, Mason and his adult son passed a gathering of Task Force vehicles on Rangeline, a major four-lane street. Mason parked in an adjoining alley, approached the scene, and observed federal agents from HSI, the U.S. Marshals, and the DEA, as well as state troopers and MPD officers. Mason photographed from at least 120 feet away and observed officers bring a person out of a house in handcuffs and place him in an MPD vehicle. As the vehicles began leaving the scene, a black Dodge Charger with a "Government" plate made a U-turn and drove by Mason and his son at a slow speed. As the Charger approached, Mason was still holding his camera up by his face and was hit by a bright beam of light in his face. An officer kept the beam of light on Mason as the vehicle passed slowly by, preventing Mason or his son from seeing the driver or identifying the driver's agency.

173. On the afternoon of April 18, 2026, Mason observed Task Force activity at Watts Avenue and Walter Street. When Mason arrived, he saw Task Force vehicles positioned around a blue house on the intersection's southeast corner. Mason walked to the southeast corner of the intersection where he could see the porch of the blue house about 60 feet away. He photographed and observed agents bringing several people, including children, out of the house. An agent

49

standing 100 feet from Mason walked towards him and shouted, "The Halo Law says you have to be back 25 feet." Mason asked the officer from which point he must be 25 feet away. The agent replied he had to be 25 feet from an empty MPD vehicle. Mason asked for clarification, and the agent replied, "It is where I say it is." Mason stepped back and lost his line of sight to the blue house.

174.    Mason walked 30 feet past the blue house's driveway looking for a new vantage point and observed a group of agents bring a man in handcuffs to the gate at the end of the driveway. As the agents approached the gate, an MPD officer shouted, "25 feet" at Mason. After stepping through the gate, the MPD officer stepped towards Mason and reiterated, "You have to be 25 feet away." When Mason asked for clarification, the officer said he had to be 25 feet from the blue house. Mason was well over 25 feet from the house.

175.    On the afternoon of May 5, 2026, Mason observed Task Force activity at the corner of Rock Road and Byron Road in the Berclair neighborhood. When he arrived, Mason observed about ten Task Force agents, all armed with handguns in holsters. The agents had parked their vehicles crossways across the street at least 60 feet away in each drivable direction from a house they appeared to be targeting. As soon as Mason, who was carrying his cameras, reached the rear end of a Task Force vehicle blocking the street, a crowd of six or seven agents in the street in front of the targeted house, nearly 100 feet away, loudly shouted "25 feet" at Mason. A U.S. Marshal charged across the intersection to the cordon made by the Task Force vehicles and yelled at Mason about the Halo Law. The U.S. Marshal then retrieved his phone, saying "if you film me, I'll film you."

176.    As Mason tried to photograph the scene, the U.S. Marshal and another agent shouted at him and moved into position to block him from walking on the sidewalk even one step

50

beyond an imaginary line. As a result, Mason could only observe and photograph from a 15-foot-wide area, from which most of the Task Force activity was not visible.

177. Mason believes the agents who shine lights at him are doing so to obstruct his photography. Mason has observed that agents tend to shine lights at observers holding phones or cameras but not at other observers.

178. When the Halo Law has been invoked against Mason, he is typically already at least 25 feet away from Task Force activity, and it is never clear to Mason from which point he must be 25 feet away. Mason has observed that agents invoke the Halo Law to indicate an arbitrary place they want observers to stand. When Mason is forced to back up after the Halo Law has been invoked against him, his ability to photograph Task Force activity is impeded. Sometimes he loses his vantage point and cannot capture details in his photographs, particularly at night. Every step back from a scene where light is minimal significantly reduces what Mason's cameras can capture, even though they are high quality.

**Jim West**

179. Jim West is a resident of Memphis. He is a physician who has been retired since 2024.

180. West regularly observes, gathers information about, and records the Memphis Safe Task Force in order to document Task Force activity, prevent abuses of power, and create a record of any misconduct that might occur.

181. West has faced multiple incidents of retaliation by Task Force agents while observing, gathering information about, and recording their activities. Task Force agents have photographed him and have verbally pressured and physically intimidated him to stop recording.

182. West has also had the Halo Law invoked against him over a dozen times. Typically,

51

Task Force agents immediately tell him to get back 25 feet when they see him approach. When the Halo Law is invoked, West always backs up. Depending on where the incident is occurring, West can lose his vantage point of the scene when he backs up. It is also usually hard to speak with agents once he has moved back 25 feet.

183.    West began observing, gathering information about, and recording immigration and law enforcement activity prior to the Task Force's arrival. For example, in June and July 2025, West observed, gathered information about, and photographed federal immigration enforcement activity occurring in Memphis on numerous occasions. On July 18, 2025, CBP revoked West's Global Entry status. He had previously maintained Global Entry status for over a decade without incident. The notice informing him of the revocation indicated the revocation may have occurred because West is subject to a law enforcement investigation or is suspected of conduct related to terrorism. West believes the revocation of his Global Entry status is connected to his observing and recording federal law enforcement activity. He is not aware of being the subject of any law enforcement investigation or of being suspected of conduct related to terrorism. He has since reapplied for Global Entry, but his application has remained pending for approximately eight months.

184.    After the Task Force began its operations in Memphis, on or around the evening of November 2, 2025, West observed four individuals being detained following a minor automobile accident at the corner of Leawood Street and Fairoaks Avenue. Multiple Task Force agents were present, including from HSI, Border Patrol, the U.S. Marshals, FBI, IRS-CI, and THP. Shortly after West began filming, the Marshal approached West. West asked the Marshal about the detention, and the Marshal responded that he would only speak to West if he turned his camera

off. West stopped recording.

185.    On or around the afternoon of November 21, 2025, West observed over half a dozen Task Force agents gathered under the carport of a house near Basswood Street in the Parkway Village area of Memphis. Officers wore tactical vests marked "HSI" and "Police ICE," and at least one MPD cruiser and one other unmarked law enforcement vehicle was on the scene. An Enforcement and Removal Operations ("ERO") vehicle arrived on the scene after West. West learned that local authorities had executed an arrest warrant at the house for matters unrelated to immigration but discovered an undocumented person in the residence. With the neighbors' permission, West began videorecording from their lawn, approximately 30 to 40 feet from the carport, where most officers were gathered, and over 25 feet from other agents in the street. An MPD officer approached West and angrily told him that he was on private property and could not record. Even after West explained he had the neighbors' permission, the officer commanded him to back up despite West being well beyond 25 feet from the scene. West complied and, as a result, lost the ability to see what was happening on the scene.

186.    On December 3, 2025, West observed approximately six THP troopers and federal agents detaining an individual near the corner of Macon Road and Graham Street. West and another volunteer stood across the street, at least 50 feet from the scene. West pulled out his phone to record the scene. But before West could begin recording, an agent wearing a vest marked "DSS" crossed the street, stood no more than two feet away from West and the volunteer, and photographed both of them. When West and the volunteer asked the agent why he took their pictures, the agent stated he needed the photographs to verify they were not wanted criminals or dangerous people. From this statement, West inferred that the agent intended to use facial

recognition technology.

187.    On the morning of December 22, 2025, West stopped to observe a Task Force traffic stop on I-40 just past the Jackson exit. Two THP SUVs were present. West positioned himself off to the side of the road to observe and record the events. He began speaking with a woman he understood to be the driver's sister or wife, who had arrived separately. A THP trooper approached and told West he was being nosy. A while later, a vehicle arrived containing federal agents wearing green tactical vests marked "Police HSI," and West began recording. Seconds later, a THP trooper briskly approached and asked in a hostile tone, "Why are you here now?" West stated that he had been called by a friend of the woman present. The trooper responded threateningly, "Well, I'm about to call a friend and say you need to get off." West stopped recording immediately because the trooper seemed aggressive and belligerent. When the trooper walked away, West attempted to resume recording, but when the trooper noticed West was recording, he loudly demanded that West stop and started following him toward his car. West stopped recording immediately, got into his car, and left the scene.

188.    As a result of these incidents, West remains constantly on edge for fear of Task Force retaliation. He is now much more hesitant to observe and record Task Force activity, experiences deep unease and anxiety when arriving at Task Force scenes, and must overcome fear of retaliation to exercise his basic right to gather information about and record Task Force activity. His wife has also expressed concerns about his safety and asked him to engage in this work less frequently.

**Christopher Kersey**

189.    Christopher Kersey is a resident of Memphis. He works at Whole Foods in

Germantown, Tennessee and is a student at Southwest Tennessee Community College.

190.    Kersey actively observed, gathered information about, and recorded Task Force activity approximately two to three times a week from early October 2025 to late December 2025. Kersey paused observing and recording Task Force activity in late December 2025 after personally experiencing retaliation and due to an increase in intimidating and retaliatory actions against individuals observing and recording law enforcement activity across the country. He was unable to focus on his academic courses and full-time work schedule while experiencing retaliation by the Task Force. Kersey plans to resume observing, gathering information about, and recording the Task Force when his semester ends in May 2026.

191.    Kersey hopes that by observing, gathering information about, and recording Task Force activities he will be able to help his neighbors by providing accurate and timely information to the loved ones of individuals who have been stopped or detained by the Task Force. Kersey also hopes to hold Task Force agents accountable to the public by documenting their activities. Kersey typically uses a digital single lens reflex ("DSLR") Canon camera to document Task Force activity. He often uses a telephoto lens attachment that is larger than the camera and very visible. He also sometimes records on his phone. Kersey has noticed that Task Force agents are more likely to photograph him when he is carrying his camera rather than just his phone.

192.    Kersey has been retaliated against on several occasions while gathering information about and filming Task Force activity. Task Force agents have threatened him with arrest and attempted to physically intimidate him. They have also photographed his face and tailed him in a Task Force vehicle.

193.    Task Force agents have invoked the Halo Law against Kersey at least five to ten times. When the Halo Law is invoked against Kersey, it is frequently unclear what he should be

55

25 feet away from. Kersey has observed that Task Force agents tend to invoke the Halo Law when Kersey gets within 50 feet of them while he is carrying his telephoto lens.

194. On the afternoon of October 16, 2025, Kersey was driving home when he saw a caravan of Task Force vehicles initiate a traffic stop in the parking lot of the Kirby Office Park, near the corner of Knight Arnold Road and Kirby Parkway. Kersey parked on the opposite end of the parking lot and began taking pictures from his car. The Task Force agents noticed Kersey taking photos almost immediately. Kersey then began approaching the scene on foot while continuing to take photos. When he was 75 to 100 feet away, he sat down on the curb and continued photographing the Task Force activity.

195. As the Task Force agents began to disperse, an unmarked silver GMC driven by one of the federal agents passed by Kersey as he was sitting on the curb and parked nose to nose with his car. As Kersey approached his car, an HSI agent in the GMC waved at him.

196. The GMC followed Kersey as he pulled out, followed him onto the highway, and tailed him on the highway for over five minutes before exiting. Kersey felt paranoid for days afterwards and lived in fear he would see Task Force agents outside his home. After this incident, he started trying to park far enough away from Task Force activity that Task Force agents would not be able to tell which car was his.

197. On the evening of October 23, 2025, Kersey was approaching La Michoacana, a Mexican ice cream shop, on Winchester Road between Kirby Parkway and Ross Road on foot when he saw a group of Task Force agents gathered next to a THP SUV with its lights on. Kersey approached the group while taking photographs. He then had a brief exchange with a masked HSI agent. This agent took out his phone and photographed Kersey.

198. On the evening of October 31, 2025, Kersey photographed Task Force agents

56

making an immigration arrest in the parking lot of the Shell gas station on the corner of Shelby Drive and Mendenhall Road. Kersey parked, got out of his car, and began photographing the Task Force agents. A THP trooper that Kersey was photographing got out of his vehicle and said he was "concerned for [Kersey]'s safety." Kersey found this statement odd as the parking lot was empty. The THP trooper then invoked the Halo Law. Kersey complied by backing up about five feet and moving to the side so he no longer had a direct vantage point to the THP trooper. Kersey had a verbal exchange with an HSI agent wearing a balaclava and sunglasses, who began walking towards Kersey and puffing up his chest in response. As the Task Force agents began to disperse, an unmarked silver Ford with an ATF agent and plainclothes federal agent drove past Kersey, slowed down, and the plainclothes agent in the passenger seat took Kersey's photo on his phone. Kersey felt scared and bewildered.

199.   On the afternoon of December 19, 2025, Kersey was driving around his neighborhood when he saw two Task Force vehicles making a traffic stop near the intersection of Winchester Road and Clarke Road. Kersey parked around the corner from the scene and approached on foot while filming on his phone. As Kersey approached, an HSI agent invoked the Halo Law. Kersey backed up and both the HSI agent and a THP trooper standing near the HSI agent got back in a THP vehicle. When Kersey asked the occupants of the vehicle the Task Force had stopped what they had been pulled over for, the THP trooper immediately got partially out of the vehicle, threatened Kersey with arrest for interfering, and invoked the Halo Law again. Kersey backed up and eventually crossed the street to observe from a different angle. As the Task Force was dispersing, Kersey had another verbal exchange with the THP trooper, who once again threatened to arrest him.

200.   Kersey stopped regularly observing, gathering information about, and recording

Task Force activity in large part because of these incidents of retaliation and intimidation. These incidents made Kersey feel that he could be targeted just for attempting to exercise his rights and help his community. He felt the only reason he did not experience more severe retaliatory incidents was due to luck. He could not balance this fear with his schoolwork.

201.    Although Kersey plans to resume observing, gathering information about, and recording the Task Force regularly once the school year ends in May 2026, he fears experiencing further retaliation. He is also afraid that the retaliation he has experienced will escalate into physical violence or arrest and detention.

**Jordyn Gualdani**

202.    Jordyn Gualdani is a photojournalist who resides on a small farm in Morrison, Tennessee. He is a member of the National Press Photographers Association, and his work appears in various digital outlets.

203.    Gualdani has traveled to and continues to travel to Memphis to cover Memphis Safe Task Force activity. He covers the Task Force because he believes that it is important that the public receives the information it needs to make informed decisions about the government's conduct. His coverage includes photographs of Task Force agents conducting their work. While reporting, he keeps his press credentials visible on both his person and in his car.

204.    While reporting in Memphis, Task Force agents have invoked the Halo Law against Gualdani on multiple occasions. Gualdani has also been subjected to retaliatory bumper rushing by Task Force agents after he observed, gathered information about, and photographed Task Force activity.

205.    In early October 2025, Gualdani and a colleague were driving in Memphis while covering the Task Force. They spotted Task Force agents detaining an individual. Gualdani pulled

58

into the parking lot where the detention was taking place and started to take photographs of the scene. When Gualdani exited the vehicle to take photographs, one of the Task Force agents started yelling "Halo Act" and forcefully told Gualdani to get back. He was already 25 feet away from the location where the individual was detained. Despite Gualdani's invocation of his First Amendment right to document the encounter, the agents continued to advance toward him while repeating their demand that he get back 25 feet. The Task Force agents pushed Gualdani back so far that he found it difficult to photograph the scene.

206. On the evening of October 4, 2025, Gualdani and three other photojournalists were driving in Memphis in two cars to report on Task Force activity. They came upon a large group of Task Force agents in a gas station parking lot. When Gualdani and his colleagues parked their cars and approached the gas station, they saw two young Latino men on the scene interacting with the agents. Gualdani and his colleagues began to photograph the scene. Eventually the agents released the men.

207. Gualdani and his colleagues returned to their respective cars. In the car, Gualdani attempted to transfer the photos he had taken from his camera to his iPhone. But the phone would not connect to the camera. At the same time, Gualdani noticed that his phone would not connect to his car's stereo system via Bluetooth. After investigating the issue, he saw that his phone was connected to a network that he did not recognize.

208. On information and belief, cell site simulators and/or other technologies available to federal law enforcement agencies are capable of interfering with cell phones' wireless data connectivity and/or causing cell phones to connect with a simulator or related technology.

209. Shortly thereafter, Gualdani received a call from his colleagues, who were in the other car. They told him that Task Force agents had pulled up in two unmarked vehicles, boxing

59

in their car, and started taking photos of their faces. They said the agents also attempted to take photos of one photojournalist's laptop screen, which was open, as he had been attempting to upload photos from his camera to his computer. One of the journalists in that car also reported experiencing unusual issues with his cell phone's connectivity.

210.    Over the following several days, Task Force agents bumper rushed Gualdani several times. Bumper rushing occurs when a driver follows another vehicle and rapidly accelerates towards it, approaching the rear bumper of the other vehicle so aggressively that the lead driver fears a collision before the trailing driver pulls back. Task Force agents repeated this bumper rushing tactic multiple times in a row. When they did so, Gualdani feared that they would crash into his car. Other journalists reporting on the Task Force in Memphis informed Gualdani that agents bumper rushed them as well. Each bumper rushing incident involving Gualdani was instigated by the same Task Force-operated silver Ford F-150 pickup truck.

211.    On one occasion, the F-150 appeared behind Gualdani on an expressway after he left the scene of Task Force activity where he was taking photographs. It then proceeded to bumper rush him multiple times before pulling up alongside his vehicle. When it did so, the agents in the vehicle glared at him before driving away. Gualdani saw that one agent wore an HSI vest and another wore an FBI vest. Gualdani had previously seen both agents on the scene of the stop at the gas station on October 4, 2025.

212.    A few nights later, Gualdani was driving on the same expressway after leaving the scene of Task Force activity where he was taking photographs when the F-150 appeared again behind his vehicle. The pickup truck barreled toward his car and bumper rushed him before backing off slightly. In an attempt to defuse the situation, Gualdani slowed down. The F-150 matched his pace but refused to pass. Gualdani then sped up to get away from the truck, but it

accelerated to match his speed. Soon thereafter, the F-150 swerved into the next lane, pulled up alongside Gualdani, and veered into Gualdani's lane. Fearing that the agents would sideswipe him, Gualdani slammed the brakes, leaned on his horn, and pulled over to the side of the road to avoid a collision.

213.    The Task Force agents' retaliation against Gualdani for photographing them as part of his reporting on their activities has impacted his sense of safety on the job. It has also forced Gualdani to consider the wisdom of continuing to report on the Task Force. He fears Task Force agents might injure him if he continues to do so.

**Rob Brown**

214.    Rob Brown is the owner of Da Sammich Shop, which is located in the predominantly Black neighborhood of Orange Mound.

215.    On January 4, 2026, Task Force agents descended upon the parking lot of Da Sammich Shop, which was closed at the time. Da Sammich Shop was then one of the only restaurants in the city that featured a sign reading "Stop. No ICE access in this business" on its front door. Brown started filming the Task Force agents and livestreaming on Facebook, which prompted community members to join him in the parking lot of the restaurant. In response, more Task Force agents arrived and filled the parking lot, blocking in some community members and preventing them from leaving. Agents threatened community members with arrest as they peacefully protested law enforcement presence. Eventually, the officers left without making any arrests or issuing any citations.

### III. DEFENDANTS, THROUGH THE MEMPHIS SAFE TASK FORCE, HAVE IMPLEMENTED A POLICY, PATTERN, AND PRACTICE OF VIOLATING PLAINTIFFS' RIGHTS

**A.    The Federal Government Has a Policy of Retaliating Against Individuals Gathering Information About and Recording Federal Immigration and Law Enforcement Officers Performing Their Duties in Public.**

216.    Federal officials with policymaking authority and oversight over the Memphis Safe Task Force and agents operating as part of the Task Force expressly define gathering information about and recording immigration and law enforcement officers performing their duties in public, including Task Force agents, as threatening, criminal, and even terrorist behavior, warranting government action.

217.    This policy stigmatizes people engaged in constitutionally protected activities, including Plaintiffs; deliberately and recklessly conflates these protected activities with violence and criminal obstruction; and directs and encourages immigration and law enforcement officers to respond to these activities, including by engaging in the retaliatory actions alleged herein.

218.    Federal Defendants have made this policy explicit.

219.    For example, on July 12, 2025, Defendant DHS Secretary stated that "violence is anything that threatens [agents] and their safety. So . . . it's videotaping them, where they're at when they're out on operations . . . ."

220.    On December 22, 2025, in response to a press request asking if DHS considered following or recording a federal law enforcement officer to be obstruction of justice, the DHS Office of Public Affairs responded: "That sure sounds like obstruction of justice."

221.    On January 8, 2026, Defendant Lyons made a statement likening observing law enforcement officers to impeding and threatening them: "If the American public would just not interfere with a law enforcement operation . . . , no citizens should walk up in the middle of a

62

traffic stop . . . . You shouldn't go up to a sheriff that's conducting a lawful operation in your home county or town. These individuals that are listening to this political rhetoric and that are following these [sic] guidance, go out there and impede us, you know, threaten officers, be legal observers as they say, it's just not right."

222.    On January 13, 2026, DHS posted a statement by Homeland Security Advisor Stephen Miller directed "to all ICE officers" on its official X account: "You have federal immunity in the conduct of your duties, and anybody who . . . tries to obstruct you is committing a felony." Miller's statement was in response to the establishment of the Illinois Accountability commission, whose objective is to "create a public record of the conduct of federal agents" operating in Chicago from September to December 2025, including by "gather[ing] publicly-available videos documenting the actions of federal officers." DHS also shared a video clip of Miller making the statement.

223.    The Cato Institute has compiled numerous examples of federal agents across the country confronting individuals who are merely observing, gathering information about, and recording their activities. The agents use a near identical script, warning the individuals that they are "impeding" and threatening arrest.[16]

224.    Federal Defendants have also equated gathering information about and recording immigration and law enforcement officers performing their duties in public with "doxing."

225.    For example, on September 9, 2025, the DHS Assistant Secretary for Public Affairs said in an official statement that "videotaping ICE law enforcement and posting photos and videos

---

[16] David J. Bier, *The Government Unconstitutionally Labels ICE Observers as Domestic Terrorists*, Cato Inst. (Dec. 15, 2025), https://perma.cc/8NBK-PXNB.

of them online is doxing our agents," adding, "[w]e will prosecute those who illegally harass ICE agents to the fullest extent of the law."

226.   On January 31, 2026, in response to a press request for an official statement, the DHS Assistant Secretary for Public Affairs similarly stated that "videoing our officers in an effort to dox them and reveal their identities [] is a federal crime and a felony."

227.   Federal Defendants have further equated gathering information about and recording immigration and law enforcement officers performing their duties in public as constituting acts of domestic terrorism.

228.   On December 4, 2025, in response to a presidential directive to "investigate, prosecute, and disrupt entities and individuals engaged in acts of political violence and intimidation," Defendant Attorney General issued a memorandum to all law enforcement agencies labeling "doxing" and "conspiracies to impede . . . law enforcement" as acts of domestic terrorism, which should be referred to a Joint Terrorism Task Force ("JTTF") "for investigation." The memorandum indicates that certain viewpoints, including "opposition to law and immigration enforcement," are common ideological indicia of domestic terrorism.

229.   A few weeks prior to the December 2025 Attorney General memorandum, the FBI issued a report titled "United States: Threat Activity Targeting Government Personnel or Facilities Related to Immigration Enforcement Efforts." The report states that "[t]he FBI has opened criminal and domestic terrorism investigations in response to observed threats against immigration enforcement activity across the areas of responsibility of 23 field offices." The report describes "conducting surveillance" or "discussing operational plans with other like-minded individuals via encrypted communications applications" as "indicators that individuals may be planning an attack against ICE personnel, ICE facilities or operations, or other law enforcement." "[E]ncrypted

64

communication applications" include most commonly used communications platforms, including Apple iMessage, WhatsApp, and Signal, all of which offer end-to-end encryption to their users. The report indicates that as of October 31, 2025, one of the field offices with pending investigations is the FBI field office in Tennessee.

230. The FBI report does not define "conducting surveillance." However, DHS has defined individuals walking around on foot in the vicinity of federal agents and collecting "video footage" as surveillance in the context of threats to immigration enforcement activity, without any explanation or regard for the First Amendment protections that adhere to these activities. On June 14, 2025, following the deployment of federal agents to Los Angeles, the DHS Federal Protective Services ("FPS") Intelligence Operations Division issued an Assessment titled "Recent Anti-Law Enforcement Tactics Used in Unlawful Civil Arrest." The Assessment identifies as suspicious and threatening "surveillance methods," "scouts on foot," "video footage of ICE agents conducting enforcement operations," and the use of social media "as a format for individuals to share videos." It further identifies notetaking, picture taking, and livestreaming as suspicious and threatening. FPS intelligence products are routinely shared with other federal, state, and local law enforcement agencies, including Defendant federal and state agencies.

231. Federal Defendants have produced additional intelligence assessments that further establish and implement their policy.

232. On July 7, 2025, the Tennessee Fusion Center—part of a national network of DHS fusion centers, each of which brings together federal, state, and local law enforcement personnel to collect, analyze, and distribute intelligence to federal, state, and local agencies—issued a Daily Intelligence Summary describing ICEBlock, a phone app that allows users to share information gathered about DHS agents and their activities, as "Posing [a] Threat to Officer Safety." THP,

helmed by Defendant Perry, is a partner agency of the Tennessee Fusion Center, and Defendant Perry receives and has access to its intelligence products.

233. On July 11, 2025, Defendants issued a Joint FBI/DHS Public Safety Awareness Report, an intelligence product that, on information and belief, has been disseminated to FBI and DHS agents and to other federal, state, and local law enforcement agencies, including Defendant federal and state agencies. The report describes websites that post "photos and videos of LE [law enforcement] personnel . . . conducting official duties" as "rais[ing] a risk of doxing, violence or disruption to LE operations, primarily ICE personnel." The report does not connect any of the specific websites to the identified risks.

234. A federal district court recently held, in a case challenging DHS retaliation against individuals observing, reporting on, and recording DHS agents performing their duties in public, that the plaintiffs had "plausibly and sufficiently alleged" that DHS had "established, sanctioned, and ratified an agency policy of treating videorecording of DHS agents in public as a threat that may be responded to with force and addressed as a crime." Order Den. Defs.' Mot. to Dismiss at 17, *L.A. Press Club v. Noem*, No. 2:25-cv-005563 (C.D. Cal. Jan. 8, 2026) (emphases omitted). The court cited to the June 14, 2025 DHS FPS Intelligence Assessment, as well as various "statements by government officials in support of this alleged policy," including the July 12, 2025 DHS Secretary Statement and the September 9, 2025 DHS Statement, all described above. *Id*.; *see supra* ¶¶ 219, 225, 230.

235. Against the backdrop of their federal policy, Defendants with policymaking authority and oversight over the Memphis Safe Task Force have directly encouraged Task Force agents to act with impunity. For example:

> a. On October 1, 2025, former Attorney General Bondi and Homeland Security Advisor Stephen Miller visited Memphis and spoke with

66

Task Force agents.

Bondi stated: "All the Memphis police officers, all of you, we are here to have your backs, all of the law enforcement officers in this room. You've got our backs and we are going to have yours."

Miller stated: "To the Memphis Police Department, the officers that I see sitting in front of me, we are about to provide you with a level of support you cannot even imagine. This isn't just a task force. This is an all-of-government unlimited support operation: ATF, DEA, FBI, ICE, Department of War, every resource we have." He continued: "I see the guns and badges in this room. You are unleashed. The handcuffs you're carrying, they're not on you anymore. They're on the criminals. And whatever you need to get it done, we're going to get it done."

b. On November 3, 2025, Defendant Serralta appeared on Senator Marsha Blackburn's podcast and stated, "if we handcuff our law enforcement officers, then the handcuffs are taken and the bad guys are gonna get away" in the context of discussing the "success" of the Memphis Safe Task Force.

236. Defendant Matt Perry, head of THP, is aware of, and has endorsed and adopted, this federal policy. Defendant Perry is, or should be, aware of Federal Defendants' public statements of their policy and, upon information and belief, receives and/or has access to the intelligence assessments and other documents stating this policy.

237. On September 15, 2025, Defendant Perry submitted an affidavit in a case seeking public records from THP related to THP and ICE's partnership in immigration raids in Nashville in May 2025. In the affidavit, Defendant Perry emphasized that "[t]he highly politicized nature of immigration enforcement both in Tennessee and across the United States has caused . . . increased threats to those law enforcement officers who are involved in immigration enforcement." He indicated that public knowledge of information about THP troopers involved in immigration enforcement, including their names, badge numbers, and vehicle numbers, "creates a very real safety concern" and that he has seen that concern manifest "both in the Department and across the

67

country." He also described as an "operational vulnerabilit[y]" circumstances in which members of the public "show up to traffic stops," noting that such conduct has "already happened."

**B.  The Federal Government's Policy Has Caused Patterns and Practices of Retaliation by Federal Agents Operating in Memphis and in Other Cities and States.**

238. Because they stem from the same federal policy of Federal Defendants, the pattern and practice of retaliation that Plaintiffs and other Memphians have experienced, as set forth in paragraphs 64–215 above, is being replicated in other cities and states across the country where similar federal task forces are operating.

239. Just as Plaintiffs and others have experienced in Memphis, individuals gathering information about and recording federal agents performing their duties in public in other cities and states have had their faces and license plates photographed. And just like Plaintiffs and others have experienced in Memphis, individuals elsewhere have also been taunted by name, been tailed in their vehicles, and had federal agents sit outside their homes, often in connection with having their faces and license plates photographed. For example:

    a.    On January 3, 2026, Minnesota State Representative Brad Tabke and his wife observed and gathered information about federal agents as they conducted an operation at a local apartment complex. Federal agents blocked them in the apartment parking lot and appeared to take down their license plate information. Later, as Tabke left the parking lot behind a vehicle with federal agents, the vehicle led him to his home and took pictures of his home. Records reviewed by the *Minnesota Star Tribune* reveal that federal agents ran Tabke's license plate number earlier that day. Tabke has said that he has seen federal agents outside his home at least a half dozen times.

    b.    On January 6, 2026, a photojournalist was gathering information about and photographing federal agents in a parking lot in Minneapolis when three DHS agents approached his vehicle. One of the agents photographed his license plate. He then came to the driver's side window where the photojournalist showed him his press pass. The agent told him that he did not care if he was press

68

and then photographed his face and his press pass.

c.      On January 21, 2026, a Maine resident filmed federal agents making an immigration arrest in a residential area and monitoring an elementary school bus stop. She then continued observing and gathering information about the agents by following their vehicle. The vehicle drove to the resident's home, where several other federal agents in other vehicles arrived. The resident's friend recorded the subsequent encounter between the resident and the agents outside of her home. In the recording, an agent approaches the resident's car holding a smartphone and says, "This is a warning. We know you live right here." Other federal agents approached the resident's friend and began filming him.

d.      On January 21, 2026, a Maine resident was recording federal agents in a public parking lot when one of the agents took a picture of her, her vehicle, and her license plate. The agent said to her, "I hope you know that if you keep coming to things like this, you are going to be on a domestic terrorist watchlist. Then we're going to come to your house later tonight."

e.      On January 26, 2026, a Minnesota resident drove to the parking lot of an apartment building to observe and gather information about federal agents parked in the lot. When one of the vehicles with federal agents drove out of the lot, she continued to observe and gather information by following it. The vehicle with federal agents pulled into a parking lot and suddenly stopped. A federal agent leaned out of the vehicle and then photographed the resident. As the resident started to drive away, the vehicle with federal agents drove at the resident's car and then one of the agents leaned out the window and taunted, "Emily, Emily, we're going to take you home." The agent repeated the resident's name several times and stated the resident's home address. The vehicle with federal agents drove out of the parking lot and the resident drove in the opposite direction, but after a block, the resident noticed that the vehicle with federal agents was tailing her. She was terrified and drove to a restaurant, where she waited for several hours before finally driving home.

f.      On March 5, 2026, NPR interviewed a Minneapolis resident who has frequently observed immigration enforcement activity in her neighborhood. She shared that federal agents have addressed her by the name of her wife under whose name their car is registered. She stated: "They would get out their phones and then come and stand right in front of my car and take pictures of me . . . and take pictures of our license plate."

69

240.    Federal Defendants employ a variety of tools and technologies, which rely on photographs of individuals and/or their license plates to gather and track information about individuals they are targeting. On information and belief, Memphis Safe Task Force agents are surveilling Plaintiffs and others using these or similar tools and technologies.

241.    Examples of DHS using such tools and technologies—including on individuals observing, gathering information about, and protesting their activities—include:

a.    On November 17, 2025, *404 Media* reported that DHS had begun deploying a mobile app called Mobile Companion, which allows agents to scan a license plate in the field using a smartphone. Agents are then able to access previous sightings of the vehicle, information about the vehicle's travel patterns, and data from private data brokers, including the driver's phone numbers, addresses, license data, voter registration, and more. The app can also be used to set up watchlists of license plate numbers and send real-time notifications whenever a listed vehicle is captured on a national camera network.

b.    On January 30, 2026, the *New York Times* reported that at least seven U.S. citizens, including individuals observing and gathering information about DHS agents, had been informed by those agents that they were being recorded with facial recognition technology, including an app called Mobile Fortify. The article stated that, according to three former and current DHS officials, facial recognition is just one of several technologies deployed in Minneapolis to track U.S. citizens protesting the presence of federal agents.

c.    On February 5, 2026, *Wired* reported that DHS agents have been using Mobile Fortify on non-citizens and U.S. citizens alike during federal operations. According to the reporting, Mobile Fortify's biometric data "is stored in databases linked by a centralized platform known as the Automated Targeting System (ATS)." Some of those databases may retain data for up to 15 years; data can "persist longer if shared with other agencies beyond CBP's control."

d.    On February 6, 2026, NBC News reported that federal agents deployed to locations across the country, including Chicago, Minneapolis, and Maine, have been using smartphones loaded with facial recognition technology, including Mobile Fortify, to photograph the faces of people they encounter in their daily operations, including individuals observing their activities, and in

70

some instances, running those photos through facial recognition software in real time.[17] The software is intended to rapidly identify the individual and present their biographical information to the federal agent. DHS responded to a request for comment by providing an emailed statement that the facial recognition technology is designed to quickly identify persons of interest to the agency.

242. DOJ agents also use automated license plate readers and facial recognition technology in the field.

243. Numerous individuals who have observed and gathered information about federal agents performing their duties in public have reported federal agents using these technologies on them. For example:

a. On January 10, 2026, a Minnesota resident was observing and gathering information about federal agents parked in the lot of a local Mexican supermarket. When one of the vehicles left the lot, she followed it to continue observing and gathering information. While following the vehicle, she stopped on the road. A federal agent exited one of the vehicles in front of her and approached her vehicle. The agent addressed her by name and told her that they had "facial recognition" and that his body cam was recording. Three days later, she received an email notice that her Global Entry/TSA Pre-Check privilege had been revoked. As described above, *see supra* ¶ 183, Jim West received a similar notice regarding his Global Entry privilege after observing, gathering information about, and recording federal agents in Memphis.

244. Federal Defendants place personal information about individuals gathering information about and recording federal agents performing their duties in public into databases or other information systems for the purpose of enabling further surveillance and retaliation. On information and belief, Memphis Safe Task Force agents are placing the personal information of Plaintiffs and others gathering information about and recording Task Force agents performing their

---

[17] Kevin Collier et al., How ICE Agents Are Using Facial Recognition Technology to Bring Surveillance to the Streets, NBC News (Feb. 6, 2026), https://perma.cc/L7KD-T8RZ.

duties in public into databases or other information systems for these purposes. Examples of DHS

and DOJ placing personal information about individuals gathering information about and

recording federal agents performing their duties in public into databases or other information

systems include:

a. On January 23, 2026, independent journalist Ken Klippenstein reported that DHS has "ordered immigration officers to gather identifying information about anyone filming them" and, in the words of one federal official, "to send that information to Intel who will do a 'work-up' on them." The official further explained that the work-up entails "trying to identify them via social media, running their license plates if available, and running a criminal history check."

b. A few days later, Klippenstein reported on the existence of a "patchwork system" of "more than a dozen secret and obscure watchlists" that Defendants, including DHS and the FBI, are using to track individuals they perceive as protesting issues including federal immigration enforcement. According to Klippenstein, the watchlists "go by codenames like Bluekey, Grapevine, Hummingbird, Reaper, Sandcastle, Sienna, Slipstream, and Sparta . . . ." Some of the watchlists are reportedly "used to link people on the streets together, including collecting on friends and families who have nothing to do with any purported lawbreaking." Klippenstein reported that these watchlists are used "to organize . . . information in possession of the federal government" including to "process tips, situation reports and collected photographs and video submitted by both the public and from agents in the field" to "create a 'common operating picture'" to "allow task forces to target individuals for surveillance and arrest."

In particular, Klippenstein reported that a senior government official, who confirmed the existence of the watchlists, stated that these lists, which can comprise "this social media post, that video taken of someone videoing ICE, the mere attendance at a protest . . . eventually just become[] . . . list[s] . . . of criminality, with the cops thinking that indeed they are dealing with criminals and terrorists."

c. On January 27, 2026, CNN reported that a DHS official in Minneapolis sent a memo to HSI officers asking them to use a form—titled "intel collection non-arrests"—to "capture all images, license plates, identifications, and general information on . . .

72

agitators, protestors, etc., so we can capture it all in one consolidated form." According to CNN, the memo stated that agents had previously informally shared information about "protestors" and "agitators" with each other.

d. On February 2, 2026, Klippenstein published leaked screenshots of entries in the DHS Intelligence Reporting System on individuals protesting DHS operations in Portland, Oregon. The screenshots reveal that Intelligence Reporting System entries include the individual's name, date of birth, social security number, passport number and expiry, address, and phone number. Through Intelligence Reporting System, federal agents can access at least 28 different databases maintained by the government as well as DMV data, license plate data, and "certain law enforcement and/or intelligence data."

e. On February 10, 2026, Reuters published an article in which it reported that two ICE officials had shared that ICE "has been tracking the names of protesters in an internal database for several months" and that the database "contains names, photos, actions that provoked suspicion, locations and license plates," and that "the effort was intended to spot patterns that could lead to charges."

245. Just as Plaintiffs and others have experienced in Memphis, individuals gathering information about and recording federal agents performing their duties in public in other cities and states have been threatened with arrest—and falsely arrested. For example:

a. In June 2025, DHS agents tackled and arrested a photographer who was videorecording an immigration raid in a Los Angeles parking lot. When they tackled him, the agents pushed their knees into the photographer's back and neck until he could not breathe and feared for his life. The agents then held the photographer in detention for more than 24 hours before releasing him. No criminal charges were filed against him.

b. On December 7, 2025, a Minnesota resident and her husband were sitting in their car in the parking lot of their church when they observed federal agents surrounding the car of someone across the street from them. The resident got out of her car to record. She then returned to her car. Three or four vehicles with federal agents suddenly pulled up and agents came running up to their car. They ordered them to put their hands up and were yelling and screaming. One of the agents yelled: "We know exactly who you are. You are a citizen so you think we can't do anything to you. But we will detain

73

and hold you." The agent later yelled: "Record this. Now get out your little phone and record this." The agents eventually walked away.

c.    On December 9, 2025, a Minnesota resident who had heard of immigration arrests happening in her neighborhood went over to observe and record. When she arrived, she saw several federal agents standing outside a house and walked toward them to get a sense of what was happening. When she was about six feet away from the officers, she asked one of the agents, "Are you ICE?" The agent walked towards her and told the resident to "get back." The resident then heard a few other agents nearby saying something to the effect of "Get back!" and "Take her down!" Just like agents tackled and arrested Plaintiff Chodor in Memphis, *see supra* ¶¶ 109–14 federal agents similarly grabbed the Minnesota resident, pulled her to the ground, and handcuffed her. While on the ground, she started yelling for help because she was afraid she was being kidnapped. They took her to a federal detention building and left her in a cell for five hours before she was released.

246.    Just as Plaintiffs and others have experienced in Memphis, individuals gathering information about and recording federal agents performing their duties in public in other cities and states have been physically intimidated, including by federal agents using their vehicles to swerve at them and box them in. For example:

a.    In September 2025, a Chicago resident was sitting in a parked car taking photographs of federal agents from about 50 to 100 feet away. While she was taking photographs, federal agents in a vehicle drove up to her vehicle, blocked her into her parking space so that she could not drive away, and then photographed her.

b.    On January 18, 2026, a Minnesota resident drove into the parking lot of a Hilton Garden Inn to observe and gather information about federal agents there. He pulled into the lot and took a picture of federal agents sitting in a parked vehicle. One of the agents saw him taking a picture and started following the resident's vehicle as he pulled out of the lot. The agent began driving erratically, tailgating, and at one point, swerving into the next lane to pull up next to the resident's vehicle. While driving alongside the resident's vehicle, the agent took out a phone and pointed it at the resident and his vehicle. The agent then accelerated the truck and maneuvered in front of the resident's vehicle abruptly, cutting the resident off and nearly causing the resident to crash into him. Approximately an hour

74

and a half after this encounter, the resident's wife received a call on her cell phone from an unknown phone number. She did not pick up her phone, but the caller left a voicemail that said: "We have your information."

c. On January 26, 2026, a Minnesota resident was observing and gathering information on federal agents parked at a Spanish immersion daycare, including by noting the plate number of a law enforcement vehicle and sharing that information with other community members. When the agents drove away, the resident followed in his car and then eventually peeled off and drove into a parking structure. A vehicle with federal agents followed him into the parking structure and then another vehicle with federal agents sped towards him from the other direction, boxing him in. The agents told him to get out of his vehicle, searched him, and filmed him on their cellphones. One of the agents asked him who he was speaking with on the phone, who had told him to be out there, and if he was getting paid to be there. They eventually let him go but not before telling him that they knew who he was. When he left to drive away, the vehicles with federal agents followed him, so he drove to a parking lot and parked.

247. Just as Plaintiffs and others have experienced in Memphis, individuals gathering information about and recording federal agents performing their duties in public in other cities and states have been stopped without any reasonable suspicion that they have committed a crime. For example:

a. On December 11, 2025, a Minnesota resident was observing and gathering information about federal agents at a residential complex while parked in her car. When the agents got in their cars to drive off, she pulled out as well. She was driving home but in the same direction as the vehicles with the federal agents. While driving, a vehicle behind her activated police lights and she pulled over to the side of the road. Two vehicles pulled over behind her. A vehicle in front of her slammed on its brakes and accelerated backwards towards her car. Federal agents got out of all three vehicles and surrounded her car. They yelled at her through her window and said that what she was doing was illegal. They eventually left.

248. The patterns and practices of retaliation occurring in other cities and states have been challenged in several federal lawsuits, of which, upon information and belief, Defendants are

or should be aware:

    a.    In *Los Angeles Press Club v. Noem*, individuals, including observers, are challenging a policy, pattern, and practice of retaliation against them for gathering information about and recording federal agents in Los Angeles and the surrounding metropolitan area. *L.A. Press Club v. Noem*, No. 2:25-cv-005563 (C.D. Cal. filed June 18, 2025). That lawsuit names Defendants DHS Secretary and Lyons among the defendants.

    b.    In *Chicago Headline Club v. Noem*, individuals, including observers, challenged a policy, pattern, and practice of retaliation against them for gathering information about and recording federal agents in Chicago and the surrounding metropolitan area. *Chi. Headline Club v. Noem*, No. 1:25-cv-12173 (N.D. Ill. filed Oct. 6, 2025). That lawsuit names Defendants Attorney General, DHS Secretary, Lyons, and Scott among the defendants.

    c.    In *Tincher v. Mullin*, individuals, including observers, are challenging a policy, pattern, and practice of retaliation against them for gathering information about and recording federal agents in Minnesota. *Tincher v. Mullin*, No. 0:24-cv-04669 (D. Minn. filed Dec. 17, 2025). That lawsuit names Defendants DHS Secretary, Lyons, and Scott among the defendants.

249.    Defendants, including Defendant Perry, likewise are or should be aware that Memphis Safe Task Force agents, including THP troopers, are engaged in a similar pattern and practice of retaliating against individuals gathering information about and recording Task Force agents performing their duties in public because, *inter alia*, it has been widely reported. For example:

    a.    On October 14, 2025, the Tennessee Lookout reported on the repeated invocation of the Halo Law against Plaintiff Demster while gathering information about and recording Task Force agents, including THP troopers. The Tennessee Lookout reached out to THP for comment, but THP had not responded by the time of publication.

    b.    On November 7, 2025, *MLK50* reported on the arrest of Plaintiff Chodor, including that THP officers arrested her and charged her with "resisting official detention" when she arrived at the scene of a Task Force traffic stop. Plaintiff Chodor's arrest was also covered by Action News 5 and ABC24-Memphis.

c.    On November 25, 2025, *MLK50* reported on the arrest of an individual who was observing and gathering information about a scene at which Task Force agents were present, including THP.

d.    On March 11, 2026, the *Memphis Flyer* reported on the experiences of individuals who observe, gather information about, and record Task Force agents, including THP troopers, performing their duties in public. Several of those individuals described experiencing retaliation by Task Force agents.

**C.    Defendants Have Failed to Train or Supervise Memphis Safe Task Force Agents Not to Retaliate in Violation of the First Amendment and Have Failed to Take Action to Address Their Pattern and Practice of Misconduct.**

250.    Defendants have failed to adequately train, instruct, or supervise their respective agents regarding their obligation not to retaliate in violation of the First Amendment, including when operating as part of the Memphis Safe Task Force.

251.    In February 2026, documents leaked by former ICE Assistant Chief Counsel Ryan Schwank, who served as an instructor at the federal government's law enforcement training academy until last year, to Senator Richard Blumenthal's office, detailed substantial cuts by the Trump administration to training requirements for new DHS agents. Those documents show that the length of ICE's training program has been cut by approximately 40%, from 584 hours to approximately 340 hours. That 240-hour reduction in training has involved the elimination of courses about the Constitution, when officers' use of force is appropriate, and legal limits on officers' authority. In response to these disclosures, DHS issued the statement: "Our officers receive extensive firearm training, are taught de-escalation tactics, and receive Fourth and Fifth Amendment comprehensive instruction." Schwank responded in turn, "[N]otice that they don't say anything about the removal of the First Amendment protections. . . . They won't deny that part in the statement they issued."

252.    Those records also show that ICE has downgraded the graduation requirements for

its training program. To graduate, cadets must pass only nine practical exams, down from twenty-five. And those records show that the remaining exams are "evaluated, if at all, mainly by open-book, multiple choice written exams and without any graded practical examinations." Schwank stated that the result has been "widespread concerns among training staff that even in the final days of training, the cadets cannot demonstrate a solid grasp of the tactics or the law required to perform their jobs."

253. Despite this weakening of ICE's training program, the agency has more than doubled in size, adding 12,000 new officers in the past year. The agency plans to graduate more than 4,000 officers by September 2026. And according to the agency, the new officers—with their substandard training—are already deployed across the country and engaged in enforcement operations.

254. DOJ law enforcement agents—including U.S. Marshals and FBI agents—deployed to the Memphis Safe Task Force are carrying out roles that they are not adequately trained to carry out. After FBI agents were placed on patrol duties with local police during a similar task force, the D.C. Safe and Beautiful Task Force, multiple federal law enforcement officials stated that FBI agents were not trained or equipped for this type of policing. Former FBI Deputy Director Andrew McCabe stated: "FBI agents are not police officers. Most of them don't come to the FBI from a background as a police officer. So they don't have the training and the skillset and the experience of doing that work, which can be dangerous both for them and for the people they would be policing."

255. DOJ law enforcement agents are also typically only minimally trained in conducting traffic stops, which constitute a substantial portion of enforcement activity by the Memphis Safe Task Force. DOJ agents are also not trained or instructed on carrying out

immigration enforcement, even though one in five U.S. Marshals and FBI agents (and almost half of DEA agents and over two-thirds of ATF agents) are now tasked with carrying out such duties, and these agents are involved in immigration enforcement operations as part of the Task Force.

256. Defendant Perry has failed to investigate or discipline the THP trooper(s) involved in Plaintiff Chodor's arrest, even though Plaintiff Chodor has submitted a complaint to THP and the circumstances of her arrest were the subject of public reporting.

257. After reporting revealed widespread THP trooper abuses during joint operations with ICE in Nashville in May 2025, state legislators pressed Defendant Perry for a response. In February 2026, a state senator asked Defendant Perry during a legislative hearing "what steps have been taken to ensure that it is stopped." Defendant Perry refused to state that THP would take any affirmative action to address this pattern and practice of misconduct.

## FIRST CLAIM FOR RELIEF
**Violation of the First Amendment to the United States Constitution (Retaliation)**
**(Against Federal Defendants and Defendant Perry)**

258. Plaintiffs incorporate paragraphs 1–8, 11–257 as if fully set forth herein.

259. Plaintiffs bring this claim against Federal Defendants pursuant to the First Amendment to the United States Constitution.

260. Plaintiffs bring this claim against Defendant Perry pursuant to 42 U.S.C. § 1983.

261. Defendants maintain a policy, pattern, and practice of retaliation that violates Plaintiffs' First Amendment rights.

262. The First Amendment protects Plaintiffs' gathering of information about and recording of Memphis Safe Task Force agents performing their duties in public.

263. The First Amendment is applied to the states through the Fourteenth Amendment.

264. Defendants' actions in response to Plaintiffs' First Amendment-protected activities

79

would chill a person of ordinary firmness from engaging in similar First Amendment-protected activities.

265.    Defendants' actions against Plaintiffs are substantially motivated by Plaintiffs' gathering of information about and recording of Memphis Safe Task Force agents performing their duties in public.

## SECOND CLAIM FOR RELIEF
**Violation of the First Amendment to the United States Constitution (Halo Law)**
**(Against Federal Defendants, Defendant Perry, and Defendant Mulroy)**

266.    Plaintiffs incorporate paragraphs 1–8, 11–257 as if fully set forth herein.

267.    Plaintiffs bring this claim against Federal Defendants pursuant to the First Amendment to the United States Constitution.

268.    Plaintiffs bring this claim against Defendants Perry and Mulroy pursuant to 42 U.S.C. § 1983.

269.    The Halo Law is unconstitutional as applied to Plaintiffs' gathering of information about and recording of Memphis Safe Task Force agents performing their duties in public.

270.    The First Amendment protects Plaintiffs' gathering of information about and recording of Memphis Safe Task Force agents performing their duties in public.

271.    The First Amendment is applied to the states through the Fourteenth Amendment.

272.    The Halo Law burdens Plaintiffs' exercise of their First Amendment rights to gather information about and record Memphis Safe Task Force agents performing their duties in public.

273.    As applied to Plaintiffs, who are gathering information about or recording Memphis Safe Task Force agents performing their duties in public without impeding, interfering with, or obstructing agents' duties, the Halo Law is not narrowly tailored to a significant government

interest.

274.    The Halo Law does not leave open ample alternative channels for Plaintiffs to engage in their First Amendment-protected information gathering about and recording of Memphis Safe Task Force agents performing their duties in public.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request that the Court:

A.    Declare that Defendants' policy, pattern, and practice of retaliating against Plaintiffs for gathering information about and recording Memphis Safe Task Force agents performing their duties in public violates the First Amendment.

B.    Declare that Defendants' application of the Halo Law against Plaintiffs where Plaintiffs are gathering information about or recording Memphis Safe Task Force agents performing their duties in public without impeding, interfering, or obstructing agents' duties violates the First Amendment.

C.    Enjoin Defendants from retaliating against Plaintiffs for gathering information about and recording Memphis Safe Task Force agents performing their duties in public.

D.    Order Defendants to expunge all records they have retained as part of their policy, pattern, and practice of retaliating against Plaintiffs for gathering information about and recording Memphis Safe Task Force agents performing their duties in public.

E.    Enjoin Defendants from applying the Halo Law against Plaintiffs where Plaintiffs are gathering information about or recording Memphis Safe Task Force agents performing their duties in public without impeding, interfering with, or obstructing agents' duties.

F.    Award Plaintiffs reasonable costs and attorneys' fees incurred in this action.

G.    Grant such other and further relief as the Court may deem just and proper.

Dated:   May 13, 2026

Respectfully submitted,

By:   /s/ *Zee Scout*

Zee Scout (BPR# 042637)
Lucas Cameron-Vaughn (BPR# 036284)
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, Tennessee 37212
Tel: (615) 320-7260
Zscout@aclu-tn.org
Lucas@aclu-tn.org

Scarlet Kim**
Ken Sexauer**
Brian Hauss**
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
scarletk@aclu.org
ksexauer@aclu.org
bhauss@aclu.org

Matthew Borden
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Tel: (415) 599-0210
borden@braunhagey.com

Faith E. Gay* (Bar No. 2117117)
Corey Stoughton (Bar No. 4152633)
Katherine Buoymaster (Bar No. 6096903)
Sylvia Woodmansee (Bar No. 6136618)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 390-9000
fgay@selendygay.com
cstoughton@selendygay.com
kbuoymaster@selendygay.com
swoodmansee@selendygay.com

Marissa R. Benavides
BRAUNHAGEY & BORDEN LLP
200 Madison Ave., 23rd Floor
New York, NY 10016
Tel: (646) 829-9403
Benavides@braunhagey.com

*Admission pending
**Pro Hac Vice application forthcoming*

*Attorneys for Plaintiffs Hunter Demster, Jessica Chodor, Kenneth Halt, and Melissa Peeler*

82