# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

|  |  |
|---|---|
| HUNTER DEMSTER *et al*., | |
| *Plaintiffs*, | Case No. 26–cv–02546 |
| v. | |
| TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States*, *et al*., | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** |
| *Defendants*. | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................1

LEGAL STANDARD.......................................................................................................2

ARGUMENT....................................................................................................................2

I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ...........................2

    A.   Plaintiffs are likely to succeed on their claim that Defendants have violated
       the First Amendment by unconstitutionally retaliating against them ...........................2

         1.   Task Force agents engage in a persistent pattern of retaliation against
           Plaintiffs for exercising their First Amendment rights ....................................2

         2.   The Court should enjoin Defendants because they are liable for Task
           Force agents' persistent pattern of retaliation against Plaintiffs.......................9

    B.   The Halo Law is unconstitutional as applied to Plaintiffs' peaceful,
       non-obstructive information-gathering and recording ..................................................14

II.   ABSENT AN INJUNCTION, PLAINTIFFS WILL BE IRREPARABLY HARMED ..........19

III.   THE BALANCE OF EQUITIES FAVORS THE PLAINTIFFS, AND A
     PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST.......................................20

## TABLE OF AUTHORITIES

**CASES**

*ACLU of Illinois v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) .................................................................................. 4, 18

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) ...................................................................................................... 9

*Bantam Books, Inc. v. Sullivan*,
372 U.S. 58 (1963) ........................................................................................................ 6

*Benison v. Ross*,
765 F.3d 649 (6th Cir. 2014) ...................................................................................... 8

*Brown v. Kemp*,
86 F.4th 745 (7th Cir. 2023) ..................................................................................... 15

*Center for Bio-Ethical Reform, Inc. v. City of Springboro*,
477 F.3d 807 (6th Cir. 2007) ...................................................................................... 7

*Churchill Downs Technology Initiatives Co. v. Michigan Gaming Control Board*,
162 F.4th 631 (6th Cir. 2025) ..................................................................................... 2

*Connection Distributing Co. v. Reno*,
154 F.3d 281 (6th Cir. 1998) ...................................................................................... 2

*Crawford v. Geiger*,
131 F. Supp. 3d 703 (N.D. Ohio 2015) ..................................................................... 4

*Crawford v. Geiger*,
650 F. App'x 190 (6th Cir. 2016) .............................................................................. 4

*Cruise-Gulyas v. Minard*,
918 F.3d 494 (6th Cir. 2019) ...................................................................................... 6

*Deep South Today v. Murrill*,
779 F. Supp. 3d 782 (M.D. La. 2025) ..................................................................... 16

*Deja Vu of Nashville, Inc. v. Metropolitan Government of Nashville*,
274 F.3d 377 (6th Cir. 2001) .................................................................................... 20

*Elrod v. Burns*,
427 U.S. 347 (1976) .................................................................................................... 19

*Ex parte Young*,
209 U.S. 123 (1908) .............................................................................................. 10, 19

*Fields v. City of Philadelphia*,
862 F.3d 353 (3d Cir. 2017)..................................................................................... 4

*Fordyce v. City of Seattle*,
55 F.3d 436 (9th Cir. 1995)....................................................................................... 4

*Freeman v. Spoljaric*,
667 F. Supp. 3d 636 (S.D. Ohio 2023)...................................................................... 4

*Fritz v. Charter Tp. of Comstock*,
592 F.3d 718 (6th Cir. 2010)................................................................................. 6, 7

*G & V Lounge, Inc. v. Michigan Liquor Control Commission*,
23 F.3d 1071 (6th Cir. 1994)............................................................................... 19, 20

*Garcia v. Montgomery County*,
145 F. Supp. 3d 492 (D. Md. 2015) ......................................................................... 7

*Garrison v. Louisiana*,
379 U.S. 64 (1964).................................................................................................... 3

*Hartman v. Moore*,
547 U.S. 250 (2006) ................................................................................................. 2

*Hill v. Lappin*,
630 F.3d 468 (6th Cir. 2010)................................................................................. 5, 6

*Hils v. Davis*,
52 F.4th 997 (6th Cir. 2022)..................................................................................... 3

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)..................................................................................................... 15

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978)..................................................................................................... 3

*Irizarry v. Yehia*,
38 F.4th 1282 (10th Cir. 2022)........................................................................... 4, 6, 7

*Jones v. Caruso*,
569 F.3d 258 (6th Cir. 2009)................................................................................... 20

*Jordan v. Jenkins*,
73 F.4th 1162 (10th Cir. 2023)................................................................................ 15

*Kiser v. Reitz*,
765 F.3d 601 (6th Cir. 2014).................................................................................... 19

iii

*Larson v. Domestic & Foreign Commerce Corporation*,
    337 U.S. 682 (1949) .................................................................................................. 10

*Los Angeles Press Club v. Noem*,
    No. 25-05563, 2026 WL 103972 (C.D. Cal. Jan. 8, 2026) ...................................... 11

*Lozman v. City of Riviera Beach*,
    585 U.S. 87 (2013) ...................................................................................................... 8

*MacIntosh v. Clous*,
    69 F.4th 309 (6th Cir. 2023) ....................................................................................... 6

*McCullen v. Coakley*,
    573 U.S. 464 (2014) .............................................................................................. 16, 17

*Mt. Healthy City School District Board of Education v. Doyle*,
    429 U.S. 274 (1977) .................................................................................................... 7

*Ness v. City of Bloomington*,
    11 F.4th 914 (8th Cir. 2021) ....................................................................................... 4

*Nicodemus v. City of South Bend*,
    137 F.4th 654 (7th Cir. 2025) .......................................................................... 15, 16, 18

*Nieves v. Bartlett*,
    587 U.S. 391 (2019) ................................................................................................. 6, 8

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................................. 20

*Paterek v. Village of Armada*,
    801 F.3d 630 (6th Cir. 2015) ...................................................................................... 9

*Peace v. Carter*,
    817 F. Supp. 3d 650 (S.D. Ohio 2025) ....................................................................... 4

*Project Veritas Fund v. Rollins*,
    982 F.3d 813 (1st Cir. 2020) ....................................................................................... 4

*Reform America v. City of Detroit*,
    37 F.4th 1138 (6th Cir. 2022) .............................................................................. 16, 18

*Richards v. Perttu*,
    96 F.4th 911 (6th Cir. 2024) .............................................................................. 2, 5, 8

*Richmond Newspapers, Inc. v. Virginia*,
    448 U.S. 555 (1980) .................................................................................................... 3

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020) .................................................................................................. 19

*Rudd v. City of Norton Shores*,
  977 F.3d 503 (6th Cir. 2020) .................................................................................. 6

*Russell v. Lundergan-Grimes*,
  784 F.3d 1037 (6th Cir. 2015) ......................................................................... 10, 19

*Schenck v. Pro-Choice Network of Western New York*,
  519 U.S. 357 (1997) ....................................................................................... 16, 17, 18

*Sharpe v. Winterville Police Department*,
  59 F.4th 674 (4th Cir. 2023) ................................................................................... 4

*Shaw v. Smith*,
  166 F.4th 61 (10th Cir. 2026) ................................................................................. 10

*Sisters for Life v. Louisville-Jefferson County*,
  56 F.4th 400 (6th Cir. 2022) .............................................................................. 17, 18

*Smith v. City of Cumming*,
  212 F.3d 1332 (11th Cir. 2000) ............................................................................... 4

*Southern Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*,
  860 F.3d 844 (6th Cir. 2017) ................................................................................... 2

*Spann v. Hannah*,
  No. 20-3027, 2020 WL 8020457 (6th Cir. Sep. 10, 2020) .................................... 10

*Thaddeus-X v. Blatter*,
  175 F.3d 378 (6th Cir. 1999) ................................................................................. 6, 7

*Top Flight Entertainment, Ltd. v. Schuette*,
  729 F.3d 623 (6th Cir. 2013) .................................................................................. 10

*Turner v. Lieutenant Driver*,
  848 F.3d 678 (5th Cir. 2017) ................................................................................... 4

*Turner v. Williams*,
  65 F.4th 564 (11th Cir. 2023) .................................................................................. 6

*Vereecke v. Huron Valley School District*,
  609 F.3d 392 (6th Cir. 2010) ................................................................................... 8

*Verizon Maryland, Inc. v. Public Service Commission of Maryland*,
  535 U.S. 635 (2002) ................................................................................................ 10

v

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ................................................................................................ 16

*Zilich v. Longo*,
    34 F.3d 359 (6th Cir. 1994) ..................................................................................... 6

**STATUTES**

Tenn. Code Ann. § 39-16-602 ....................................................................................... 17

Tenn. Code Ann. § 39-16-602(a) .................................................................................... 9

Tenn. Code Ann. § 39-16-612(a) .................................................................................. 15

Tenn. Code Ann. § 39-17-305 ....................................................................................... 17

Tenn. Code Ann. § 55-8-104 ......................................................................................... 17

Tenn. Code Ann. § 8-7-103(1) ....................................................................................... 19

**INTRODUCTION**

Since September 2025, thousands of agents from federal, state, and local agencies have flooded the streets of Memphis as part of the Memphis Safe Task Force ("Task Force"). Plaintiffs and other Memphians routinely and lawfully observe, gather information about, and record the Task Force to share information with their community, help detained people, and hold agents accountable for misconduct and abuse. Task Force agents have responded by systematically retaliating against them. This pattern and practice of retaliation, like similar patterns and practices of retaliation in other cities and states where federal agents are operating, stems from a federal policy defining Plaintiffs' information-gathering and recording activities as threats to law enforcement. The Task Force's policy, pattern, and practice of retaliating against Plaintiffs for documenting public Task Force operations violates the First Amendment.

Task Force agents also routinely invoke Section 5 of the Protecting Everyone Against Crime and Extremism Act ("Halo Law") against Plaintiffs and others peacefully gathering information and recording their activities. The Halo Law criminalizes approaching law enforcement officers within 25 feet after one command. By forcing Plaintiffs to distance themselves from Task Force agents performing their duties in public—even though their information-gathering and recording in no way impedes, interferes with, or obstructs agents' duties—the Halo Law separately violates Plaintiffs' exercise of their First Amendment rights.

Plaintiffs seek a preliminary injunction, as outlined in the Proposed Order, on their claims challenging (1) Task Force retaliation against them for gathering information about and recording Task Force agents; and (2) application of the Halo Law against them while engaged in these activities without impeding, interfering with, or obstructing agents' duties.

1

## LEGAL STANDARD

To obtain a preliminary injunction, a movant must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 637 (6th Cir. 2025). "[T]hese are factors to be balanced, not prerequisites to be met." *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (citation omitted). But "[w]hen a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). All four factors weigh in favor of relief here.

## ARGUMENT

I.    **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS**

A.    **Plaintiffs Are Likely to Succeed on Their Claim that Defendants Have Violated the First Amendment by Unconstitutionally Retaliating against Them**

1.    <u>Task Force Agents Engage in a Persistent Pattern of Retaliation Against Plaintiffs for Exercising Their First Amendment Rights.</u>

The First Amendment prohibits "[o]fficial reprisal for protected speech." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). "A First Amendment retaliation claim has three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in the conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Richards v. Perttu*, 96 F.4th 911, 917 (6th Cir. 2024) (citation omitted). Plaintiffs readily meet these elements.

***First***, Plaintiffs are engaged in activities protected by the First Amendment: gathering

2

information about and recording Task Force agents performing their duties in public. The "public interest in a free flow of information to the people concerning public officials" is "paramount." *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964). The right to gather information about public officials is foundational to effectuating this principle. Just as "freedom of the press could be eviscerated" absent "some protection for seeking out the news," *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 576 (1980) (citation omitted), so too could freedom to discuss the government without protection for gathering information about public officials, *see Hils v. Davis*, 52 F.4th 997, 1002 (6th Cir. 2022) (holding both the "press and public" have a right to "gather information in public settings"); *see also Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978) (describing "an undoubted right to gather news 'from any source by means within the law'" (citation omitted)).

Plaintiffs routinely observe and gather information about Task Force agents performing their duties in public to "ensure there is an independent record of the incident" and to "hold immigration and law enforcement officers accountable." Decl. of Jessica Chodor ¶ 10 ("Chodor Decl."); *see also* Decl. of Hunter Demster ¶ 14 ("Demster Decl."); Decl. of Kenneth Halt ¶¶ 3, 15 ("Halt Decl"); Decl. of Melissa Peeler ¶¶ 8, 25 ("Peeler Decl."). They also gather information that may help individuals detained or arrested by the Task Force. Demster Decl. ¶¶ 3–4; Chodor Decl. ¶ 4; Halt Decl. ¶ 18; Peeler Decl. ¶ 25.

Plaintiffs also take photos and videos of Task Force agents performing their duties in public. *See, e.g.*, Demster Decl. ¶¶ 15–16; Chodor Decl. ¶¶ 4, 17; Halt Decl. ¶ 15, 17; Peeler Decl. ¶ 27. The right to record law enforcement officers in public is a corollary of the right to gather information about how the government functions. "[T]o record is to see and hear more accurately" because photos and videos "corroborate[] or lay[] aside subjective impressions for

3

objective facts" and "facilitate discussion because of the ease in which they can be widely distributed via different forms of media." *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017); *see also Freeman v. Spoljaric*, 667 F. Supp. 3d 636, 661–62 (S.D. Ohio 2023) ("Filming the police . . . as they perform their official duties acts as a watchdog of government activity." (citation and quotation marks omitted)).

Every federal appellate court to squarely address the issue has held that the First Amendment protects the right to record law enforcement officers performing their duties in public. *See Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 680–81 (4th Cir. 2023); *Irizarry v. Yehia*, 38 F.4th 1282, 1289 (10th Cir. 2022); *Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021); *Project Veritas Fund v. Rollins*, 982 F.3d 813, 831–33 (1st Cir. 2020); *Fields*, 862 F.3d at 359–60; *Turner v. Lieutenant Driver*, 848 F.3d 678, 690 (5th Cir. 2017); *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 600–01 (7th Cir. 2012); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995). Several district courts in this Circuit have done the same. *See, e.g.*, *Peace v. Carter*, 817 F. Supp. 3d 650, 662–63 (S.D. Ohio 2025); *Freeman*, 667 F. Supp. 3d at 661–62; *Crawford v. Geiger*, 131 F. Supp. 3d 703, 714 (N.D. Ohio 2015), *rev'd on other grounds*, 650 F. App'x 190 (6th Cir. 2016).

***Second***, Task Force agents have subjected Plaintiffs to adverse action, including by:[1]

- Issuing verbal threats, including threats of arrest, *see, e.g.*, Demster Decl. ¶¶ 29, 49, 92–93; Peeler Decl. ¶¶ 34–38; *see also* Kersey Decl. ¶¶ 36–37; West Decl. ¶¶ 38–44;
- Physically intimidating individuals, including by:
  - Using their vehicles to swerve or drive at them, *see, e.g.*, Demster Decl. ¶¶ 30–32, ¶ 76; *see also* Gualdani Decl. ¶¶ 33–42, and box them in, *see, e.g.*, Halt Decl. ¶¶ 65–66; Peeler Decl. ¶¶ 48–55; *see also* Reese Decl. ¶ 18;

---

[1] As of January 2026, there were approximately 2,800 Task Force agents, *see, e.g.* Ex. 1 (citing figure), with a significant number hailing from the Department of Homeland Security ("DHS"), Department of Justice ("DOJ"), and Tennessee Highway Patrol ("THP"), *see, e.g.* Ex. 2 (reflecting these agents making up nearly 50% of Task Force). Federal agents operating as part of the Task Force typically wear plain clothes, their agency affiliation is not often apparent, and they are sometimes masked. *See, e.g.*, Demster Decl. ¶ 11; Chodor Decl. ¶ 8; Halt Decl. ¶¶ 11–12.

- o Tailing them in their vehicles, *see, e.g.*, Halt Decl. ¶¶ 50, 69–71, 87–88; *see also* Kersey Decl. ¶¶ 21–22; Reese Decl. ¶¶ 15–18;
- o Using threatening gestures, *see, e.g.,* Demster Decl. ¶¶ 57–59; Halt Decl. ¶¶ 81–83 (miming shooting a gun); *see also* Kersey Decl. ¶ 31;
- Stopping and questioning individuals without reasonable suspicion, *see, e.g.*, Demster Decl. ¶¶ 64–67, 99–102; Halt Decl. ¶¶ 71–80; Chodor Decl. ¶¶ 19–23; *see also* Reese Decl. ¶¶ 18–22;
- Taunting individuals by name and driving by or sitting outside their homes, often after photographing them, and placing their personal information into databases, *see, e.g.*, Demster Decl. ¶¶ 45–47, 50–51, 53–54, 130–35 (sitting outside home), 69, 71, 96, 133 (calling name), 84, 109–110, 113–15 (photographing Demster); Halt Decl. ¶¶ 19–22 (photographing Halt), 35–41 (same), 44–47 (recording Halt), 89–93 (sitting outside home), 95–99 (same), 100–05 (same); Peeler Decl. ¶¶ 41–47 (photographing Peeler and calling name); *see also* Reese Decl. ¶¶ 28–31 (sitting outside home);[2]
- Shining lights at faces, phones, and cameras to obscure recording, *see, e.g.*, Demster Decl. ¶ 34; Halt Decl. ¶¶ 42–47, 57–63, 110–15; *see also* Mason Decl. ¶¶ 58–60, 69;
- Using excessive and unjustified force, *see, e.g.*, Chodor Decl. ¶¶ 26–52 (tackling Chodor, pinning her to ground, and handcuffing her); and
- Falsely arresting individuals, *see, e.g.*, *id.*

All this conduct is adverse because it is clearly "*capable of* deterring a person of ordinary firmness" from continuing to gather information about and record Task Force activity. *Richards*, 96 F.4th at 918 (quoting *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010)). "Because 'there is no justification for harassing people for exercising their constitutional rights,' the deterrent effect of

---

[2] DHS and DOJ agents place personal information about individuals gathering information about and recording them in public into government information systems to enable further surveillance and retaliation. *See, e.g.*, Ex. 3 (DHS and FBI maintain watchlists on individuals perceived as protesting immigration enforcement and government official quoted stating lists can comprise "video[s] taken of someone videoing ICE," which "eventually just become[] . . . list[s] of criminality"); Ex. 4 (DHS has "ordered immigration officers to gather identifying information about anyone filming them" and "to send that information to Intel" to "do a 'work-up' on them"); *see also* Ex. 5 (DHS uses mobile app to scan license plates and set up watchlists of license plate numbers); Ex. 6 (DHS uses facial recognition mobile app on U.S. citizens and stores biometric data in databases). Numerous observers have been told by agents of their placement in a database. *See, e.g.* Ex. 7, at ¶¶ 6–26 (observer recording agent told "I hope you know that if you keep coming to things like this, you are going to be on a domestic terrorist watchlist"); Ex. 8, at ¶¶ 10–17 (observer recording agent told "we have a nice little database and now you're considered a domestic terrorist, so have fun with that"); Ex. 9, at ¶¶ 6–10, 12–14 (observer gathering information told by agent he would be added to list of domestic terrorists and has had agents sit outside his house).

the adverse action need not be great in order to be actionable." *Lappin*, 630 F.3d at 473 (citation omitted). And "[t]he standard is reduced even more" where, as here, "the plaintiff before the court" is "an ordinary citizen." *Rudd v. City of Norton Shores*, 977 F.3d 503, 514 (6th Cir. 2020); *see also Fritz v. Charter Tp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010) ("Plaintiff is not a public employee, official, or prisoner, and so the level of injury she must allege would be the lower limit of a cognizable injury for a First Amendment retaliation claim.").

Each of these actions clears that low threshold. Threats of arrest are "quintessential retaliatory conduct," *Turner v. Williams*, 65 F.4th 564, 580 (11th Cir. 2023), for "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around," *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963). Task Force agents have repeatedly threatened Plaintiffs with arrest, *see supra* pp. 4, and have also acted on the threat, Chodor Decl. ¶¶ 26–52; *see Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (recognizing that retaliatory arrest is adverse action).

Threats of physical harm are likewise "adverse action that would deter a person of ordinary firmness from speaking." *MacIntosh v. Clous*, 69 F.4th 309, 316 (6th Cir. 2023); *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999); *Zilich v. Longo*, 34 F.3d 359 (6th Cir. 1994). Plaintiffs have been subjected to such threats, *see supra* pp. 4–5, and Defendants have gone even further and repeatedly physically intimidated Plaintiffs, *see supra* pp. 4–5; *see also Irizarry*, 38 F.4th at 1293 ("driving . . . police cruiser 'right at' plaintiff and 'gunn[ing]' it at his nearby colleague" was adverse action).

Defendants have also subjected Plaintiffs to "unwarranted police stop[s]," which constitute adverse action. *Cruise-Gulyas v. Minard*, 918 F.3d 494, 498 (6th Cir. 2019) (stopped after making "crude gesture"); *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822, 824

6

(6th Cir. 2007). For example, agents stopped Halt after he attempted to film Task Force activity, interrogating "why [he was] pulling up on [their] scenes" even as they admitted he had not done anything illegal. Halt Decl. ¶¶ 71–80; *see also* Demster Decl. ¶¶ 64–66, 99–101 (pulled over and ticketed after documenting traffic stop), ¶¶ 67, 102 (tickets never entered into system); Chodor Decl. ¶¶ 19–25 (pulled over after recording and criticizing agents at traffic stop).

Defendants have regularly subjected Plaintiffs to harassment and other "gratuitous show[s] of uninvited law enforcement interest"—often after photographing their faces and license plates—in a manner that "would certainly be enough to chill others" from gathering information about and recording the Task Force. *Garcia v. Montgomery Cnty.*, 145 F. Supp. 3d 492, 502, 515 (D. Md. 2015); *Fritz*, 592 F.3d at 724 ("harassment" may amount to adverse action); *Thaddeus-X*, 175 F.3d at 398 (same). Defendants have also placed photographs of Plaintiffs, their license plates, and/or other personal information in government information systems to enable further surveillance and harassment. *See supra* note 2. Halt's experience is illustrative: Task Force agents have repeatedly photographed his face, Halt Decl. ¶¶ 22, 35–41, and then repeatedly sat outside his house, *id.* ¶¶ 90–93, 95–99, 100-105; *see also supra* p. 5; Mason Decl. ¶¶ 44–45 (Director of U.S. Marshals Service photographing Mason and then telling him to "get your priorities straight").

Finally, Defendants have shined bright lights at Plaintiffs' faces, phones, and cameras to prevent them from filming Task Force activity. *See supra* p. 5; *Irizarry*, 38 F.4th at 1297 ("blocking [] filming [and] shining a flashlight into the camera lens" infringes on First Amendment right).

***Third***, Plaintiffs' protected activity is a "motivating factor" behind Task Force agents' adverse actions. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *see also Thaddeus-X*, 175 F.3d at 394 (relevant inquiry whether "adverse action was motivated at least in part by the plaintiff's protected conduct"). "A causal link can be shown through direct or

7

circumstantial evidence," *Benison v. Ross*, 765 F.3d 649, 661 (6th Cir. 2014) (citation omitted), including by "a suspicious temporal proximity between [the] grievance and the alleged retaliatory action," *Richards*, 96 F.4th at 919. Both direct and circumstantial evidence support Plaintiffs' theory of causation.

In some instances, Task Force agents have explicitly stated that the reason for their adverse action was *because* Plaintiffs were observing and/or filming their activity. For example, Halt was pulled over after attempting to film Task Force activity and when he asked why agents were following him, an agent responded that he wanted to know why Halt was "pulling up on our scenes." Halt Decl. ¶¶ 74–75; *see also* Demster Decl. ¶ 124 (agent asked why Demster was filming and then said "alright [] I'll film you too"); Chodor Decl. ¶¶ 19–25 (agent stated Chodor was pulled over for yelling out window and recording with phone).

Circumstantial evidence further demonstrates that Plaintiffs' protected activities were the motivating factor behind Defendants' adverse actions. The "temporal connection" between Plaintiffs' protected conduct and Defendants' adverse actions is a matter of seconds and minutes. *Cf. Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) (the closer the temporal proximity, the stronger the causal inference). In incident after incident, the sequence is the same: Plaintiffs begin observing and/or filming Task Force agents, and agents quickly respond. *See, e.g.*, Demster Decl. ¶¶ 30–31, 45–49, 57, 64–67, 69, 71, 76, 92, 96, 98–100, 135–36; Chodor Decl. ¶¶ 19–23, 26–39; Halt Decl. ¶¶ 29–31, 43–47, 57–66, 69–88, 107–12; Peeler Decl. ¶¶ 34–38, 46–55.[3]

---

[3] With respect to Chodor's arrest, the Supreme Court has required a "plaintiff pressing a retaliatory arrest claim [to] plead and prove the absence of probable cause for the arrest." *Nieves*, 587 U.S. at 402. Even assuming this element applies to Chodor's claim for prospective relief against an unconstitutional policy, pattern, or practice, *but see Lozman v. City of Riviera Beach*, 585 U.S. 87, 100–01 (2013), it is satisfied here. Chodor was backing away from the scene at the time she was

In addition to the above direct and circumstantial evidence, a federal policy treating gathering information about and recording immigration and law enforcement officers as threatening and criminal substantiates that the Task Force's adverse actions are motivated by Plaintiffs' protected activities. *See infra* pp. 10–13. The Task Force has acted exactly as dictated by that policy, repeatedly targeting individuals who engage in these activities. *Cf. Paterek v. Vill. of Armada*, 801 F.3d 630, 647 (6th Cir. 2015) (finding "strong circumstantial evidence of a retaliatory motive" from multiple adverse actions "considered together").

> 2.  The Court Should Enjoin Defendants Because They Are Liable for Task Force Agents' Persistent Pattern of Retaliation Against Plaintiffs.

This suit properly seeks "to enjoin unconstitutional actions by state and federal officers," who lead and direct the Task Force and/or its agents.[4] *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) (noting "long history of judicial review of illegal executive action, tracing back to England"); *see also Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682

---

arrested. She never resisted official detention, which is the charge that was filed against her and eventually dropped. Nor did agents have probable cause to believe she was committing any other crime, such as intentionally obstructing them. *See* Tenn. Code Ann. § 39-16-602(a). For these reasons, a court would likely find there was no probable cause for Chodor's arrest.

[4] With respect to their retaliation claim, Plaintiffs seek relief against two individuals exercising authority over the Task Force: (1) the Attorney General ("AG") (formerly Pamela Bondi, currently Acting AG Todd Blanche) and (2) U.S. Marshals Service Director and Task Force Chair Gadyaces Serralta. *See* Ex. 10, at §§ 2(a), (e) (presidential memo establishing Task Force and instructing AG to appoint Chair and "assess whether public-safety circumstances in Memphis require additional executive action"). Plaintiffs also seek relief against individuals exercising authority over Task Force agents: Acting AG Blanche (Task Force & DOJ agents); U.S. Marshals Service Director Serralta (Task Force & U.S. Marshals agents); Task Force Commander Chad Hunt (Task Force agents); U.S. Marshal for the Western District of Tennessee Tyreece L. Miller (U.S. Marshals agents); DHS Secretary Markwayne Mullin (DHS agents); Senior Official Performing Duties of the ICE Director Todd Lyons (ICE agents); Acting Executive Associate Director of HSI John Condon (HSI agents); Acting Special Agent in Charge for HSI Nashville Colin Jackson (same); CBP Commissioner Michael Banks (CBP agents); Chief of Border Patrol Michael Banks (Border Patrol agents); Head of THP Matt Perry (THP agents). *See* Complaint ¶¶ 15–28, 30. Plaintiffs hereinafter refer collectively to these Defendants as "Task Force Defendants" and collectively to these Defendants, minus Defendant Perry, as "Federal Defendants."

9

(1949); *Ex parte Young*, 209 U.S. 123 (1908). To secure injunctive relief, Plaintiffs need only show "an ongoing violation of federal law," *Spann v. Hannah*, No. 20-3027, 2020 WL 8020457, at *3 (6th Cir. Sep. 10, 2020) (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)), by a federal or state official who "ha[s], by virtue of the office, some connection with the alleged unconstitutional act or conduct of which the plaintiff complains," *Top Flight Ent., Ltd. v. Schuette*, 729 F.3d 623, 634 (6th Cir. 2013) (citation and quotation marks omitted); *see also Ex parte Young*, 209 U.S. at 157 ("officer must have some connection with the enforcement of the act"); *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048 (6th Cir. 2015) ("Enjoining a[n] . . . official under *Young* . . . is appropriate when there is a realistic possibility the official will take legal or administrative actions against the plaintiff's interests.").

A plaintiff can demonstrate an official's "connection" in numerous ways, including through: (1) existence of a policy resulting in the unconstitutional act, *see, e.g.*, *Top Flight*, 729 F.3d at 634; (2) knowledge or official sanction of a pattern or practice, *see, e.g.*, *id*. (plaintiffs failed to allege "sufficient connection," such as "knowledge of" acts); *Shaw v. Smith*, 166 F.4th 61, 77 (10th Cir. 2026) (plaintiffs may challenge "an unconstitutional pattern of officially sanctioned behavior" (citation and quotation marks omitted)); or (3) inadequate training; *see, e.g.*, *Russell*, 784 F.3d at 1048 (officials properly named because they "train state and local personnel" on implementation of challenged law); *Shaw*, 166 F.4th at 77 (head of state highway patrol properly named where plaintiffs alleged agency "inadequately trains its troopers").

Here, Defendants are connected to the Task Force's pattern and practice of retaliation in all three ways. First, Federal Defendants, who have policymaking authority and oversight of the Task Force and/or its agents, have expressly articulated a federal policy defining gathering information about and recording immigration and law enforcement officers performing their duties

10

in public as threatening and criminal, warranting government action. *See, e.g.* Kim Decl. ¶ 13 &

Ex. 11 (Defendant DHS Secretary equating "videotaping" agents to "violence"); Ex. 12 (DHS

responding to press request asking if it considers recording a federal law enforcement officer to be

obstruction of justice with "[t]hat sure sounds like obstruction of justice"); Kim Decl. ¶ 15 & Ex.

13 (Defendant Lyons stating "no citizens" should "go up to a sheriff that's conducting a lawful

operation" and likening legal observing to impeding and threatening officers); *see also L.A. Press

Club v. Noem*, No. 25-05563, 2026 WL 103972, at *9 (C.D. Cal. Jan. 8, 2026) (holding plaintiffs

plausibly alleged DHS "established, sanctioned, and ratified an agency policy of treating

videorecording of DHS agents in public as a threat that may be responded to with force and

addressed as a crime"); Ex. 14 (DHS statement quoting Homeland Security Advisor Stephen

Miller instructing ICE officers that "anybody who . . . tries to obstruct you is committing a felony"

in response to creation of state commission to gather videos documenting federal agents); Ex. 15

(collecting examples of federal agents nationwide using near-identical script warning individuals

observing and recording federal agents that they are "imped[ing]" and threatening arrest).

Federal Defendants have also produced intelligence assessments that further establish and

implement their federal retaliation policy, by defining gathering information about and recording

immigration and law enforcement officers performing their duties in public as threatening and

criminal. For example, following the deployment of federal agents to Los Angeles in June 2025,

DHS Federal Protective Services ("FPS") issued an intelligence assessment identifying individuals

walking around the vicinity of federal agents, "video footage of ICE agents conducting

enforcement operations," and the use of social media "for individuals to share videos" as

suspicious and threatening "surveillance methods." Ex. 16. The assessment further identified

"livestreaming LEO [i.e., law enforcement officer] interactions," the "discreet use of cameras,"

and "note taking" as "suspicious activity." *Id*.; *see also* Ex. 17 (FBI and DHS joint report describing posting "photos and videos of LE personnel . . . conducting official duties" as "rais[ing] a risk of . . . violence or disruption to LE operations"); Ex. 18 (Tennessee DHS Fusion Center intelligence summary describing phone app where users share information about DHS agents and activities as "Posing [a] Threat to Officer Safety").[5]

Federal Defendants have, pursuant to their federal retaliation policy, targeted, surveilled, and investigated individuals who gather information about and record immigration and law enforcement officers performing their duties in public. *See, e.g.*, Ex. 4 (DHS ordering "immigration officers to gather identifying information about anyone filming them" and "to send that information to Intel" to "do a 'work-up' on them"); Ex. 3 (FBI and DHS maintaining watchlists, including on the basis of "video[s] taken of someone videoing ICE," which "allow task forces to target individuals for surveillance and arrest"); Ex. 21 (FBI report stating it had opened investigations, including in its Tennessee field office, regarding "threats against immigration enforcement activity" and describing "conducting surveillance" as an "indicator[ ] . . . individuals may be planning an attack against ICE personnel . . . or other law enforcement").

The existence of a federal retaliation policy—against individuals gathering information about and recording immigration and law enforcement officers performing their duties in public— is further borne out by the nearly identical patterns and practices of retaliation experienced by

---

[5] Defendant Perry receives and/or has access to the intelligence assessments and other documents stating this federal policy. For example, the DHS FPS intelligence assessment is an intelligence product that is routinely shared with other federal, state, and local law enforcement agencies. *See, e.g.*, Ex. 19 (describing FPS authority "to work closely with state and local agencies under vague conditions" including through information sharing). Defendant Perry also receives and/or has access to reports by the Tennessee DHS Fusion Center, which brings together federal, state, and local law enforcement personnel to collect, analyze, and distribute intelligence to federal, state, and local agencies. THP is a partner agency of the Tennessee Fusion Center. *See* Ex. 20.

individuals engaged in these expressive activities nationwide. Since June 2025, the Trump administration has sent federal agents to Los Angeles, Chicago, Minnesota, Maine, and other cities and states to carry out mass immigration arrests and, purportedly, to address crime. Guided by the same federal retaliation policy described above, federal agents have threatened arrest and arrested; physically intimidated; stopped and questioned; and taunted and surveilled Plaintiffs, other Memphians, and many other individuals nationwide—because of their information-gathering and recording activities. *See, e.g.*, Complaint ¶¶ 239, 243, 245–47 and Exs. 7, 22–34.

Second, even if there were no federal retaliation policy, Task Force Defendants, including head of THP Defendant Perry, would be liable because they are aware of the pattern and practice of retaliation against individuals gathering information about and recording Task Force agents, including because it has been widely reported. *See, e.g.*, Ex. 35 (arrest of Chodor), Ex. 36 (arrest of observer); Ex. 37 (retaliation by Task Force agents). Task Force Defendants' knowledge of this pattern and practice of retaliation, combined with their repeated characterizations of Plaintiffs' expressive activities as threatening and criminal, amounts, at minimum, to tacit endorsement of the Task Force's ongoing abuses against Plaintiffs, *see supra* pp. 11–12; *see also* Kim Decl. ¶ 40 & Ex. 38 (Defendant AG promising to have Task Force agents' "backs"); Kim Decl. ¶ 41 & Ex. 39 (Defendant Serralta touting "success" of Task Force as stemming from its leaders not "handcuff[ing] . . . law enforcement officers"), Ex. 40 (Defendant Perry personally attesting that sharing information about THP troopers and vehicles involved in immigration enforcement "creates a very real safety concern" for THP, including civilians showing up to traffic stops).

Finally, even if there was no federal retaliation policy or tacit endorsement of the Task Force's pattern and practice of retaliation, Task Force Defendants would be liable for inadequately training Task Force agents not to retaliate against individuals gathering information about and

13

recording them in violation of the First Amendment. Indeed, ICE's training program has been cut by 40%, including courses on the Constitution, appropriate use of force, and the legal limits of officers' authority—resulting in "widespread concerns among training staff" that prospective agents do not have "a solid grasp of the tactics or the law required to perform their jobs." Ex. 41; *see also* Ex. 42 (eliminating ICE instruction on First Amendment); Ex. 43 (former FBI Deputy Director stating, in evaluating deployment of DOJ agents to similar D.C. Safe and Beautiful Task Force, that they "are not police officers" and "don't have the training and the skillset and the experience of doing that work, which can be dangerous both for them and for the people they would be policing"); Ex. 44 (similar statements by two federal law enforcement officers).

Defendant Perry, the head of THP, has failed to investigate or discipline THP troopers who have retaliated against individuals for gathering information about or recording Task Force agents. For example, he has failed to discipline troopers involved in the retaliatory traffic stop and arrest of Plaintiff Chodor, even though Chodor submitted a complaint to THP, Chodor Decl. ¶ 53, following widespread public reporting of her arrest, *see, e.g.*, Ex. 35. Defendant Perry has also failed to appropriately oversee troopers involved in joint operations with federal agents. For example, after reporting revealed widespread trooper abuses in May 2025 following joint operations with ICE, Perry refused to state that THP would take affirmative action to address this misconduct when state legislators pressed him for a response. Ex. 45.

Because each Defendant has a connection to the unconstitutional conduct from which Plaintiffs seek relief, they are proper defendants in this action.

**B.    The Halo Law Is Unconstitutional as Applied to Plaintiffs' Peaceful, Non-Obstructive Information-Gathering and Recording**

Plaintiffs are also likely to succeed on their claim that the Halo Law is unconstitutional as applied to them. When evaluating an as-applied, pre-enforcement First Amendment challenge to

a statute, a court asks first whether, "as applied to plaintiffs[,] the conduct triggering coverage under the statute" implicates the First Amendment, and then whether the statute satisfies the relevant standard of review as applied to "the particular speech plaintiffs propose to undertake." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 28, 36 (2010).

***First***, Plaintiffs' conduct triggering the Halo Law implicates the First Amendment. The Halo Law makes it a misdemeanor to "intentionally approach[], within twenty-five feet (25'), a law enforcement officer after the officer has ordered the person to stop approaching or to retreat". Tenn. Code Ann. § 39-16-612(a). This expansive power applies in three broad scenarios—(1) a lawful traffic stop; (2) an active investigation of the scene of an alleged crime; or (3) an ongoing or immediate threat to public safety. § 39-16-612(a)(1)–(3). Plaintiffs routinely gather information about and record Task Force agents in these scenarios, triggering repeated invocations of the Halo Law by agents against Plaintiffs and others while they are engaged in these expressive activities. *See, e.g.*, Demster Decl. ¶¶ 119–20, 127–29; Chodor Decl. ¶¶ 15–16; Halt Decl. ¶¶ 76–80; Peeler Decl. ¶¶ 56–73; Mason Decl. ¶¶ 34, 50, 65, 72–73, 76; West Decl. ¶¶ 16–20, 31–33; Kersey Decl. ¶¶ 29–30, 35–37; Gualdani Decl. ¶¶ 16–21.

The First Amendment protects Plaintiffs' expressive activities. *See supra* pp. 2–4. The right to gather information and record includes the "conduct and activities necessary" to engage in these activities, such as "approaching" to gain "visual or physical proximity" to a newsworthy event, *Brown v. Kemp*, 86 F.4th 745, 779 (7th Cir. 2023), or "remain[ing] in the area to be able" to see or record "the observable police conduct," *Jordan v. Jenkins*, 73 F.4th 1162, 1169 (10th Cir. 2023). For that reason, courts regularly apply First Amendment scrutiny to laws establishing buffer zones impacting those engaged in expressive activities. *See, e.g.*, *Nicodemus v. City of South Bend*, 137 F.4th 654, 663 (7th Cir. 2025); *Deep South Today v. Murrill*, 779 F. Supp. 3d 782, 816–18 (M.D.

15

La. 2025); *see also, e.g.*, *McCullen v. Coakley*, 573 U.S. 464, 477 (2014).

***Second***, because the Halo Law is a content-neutral burden on Plaintiffs' First Amendment activity, it is subject to intermediate scrutiny. *Reform Am. v. City of Detroit*, 37 F.4th 1138, 1149 (6th Cir. 2022); *see also McCullen*, 573 U.S. at 477; *Nicodemus*, 137 F.4th at 663; *Deep South Today*, 779 F. Supp. 3d at 818. To survive intermediate scrutiny, the restriction must (1) "serve[] a 'significant governmental interest'"; (2) be "narrowly tailored' to that purpose"; and (3) "le[ave] open 'ample alternative channels for communication of the information.'" *Reform Am.*, 37 F.4th at 1149 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). The Halo Law, as applied to Plaintiffs, fails these requirements.

For a buffer zone law like the Halo Law to be narrowly tailored to serve a significant government interest, there must be: (1) a strong record of repeated unlawful activity, such as violent and obstructive conduct; and (2) a showing, including based on past enforcement, that existing laws have not or cannot sufficiently address this unlawful conduct. *See, e.g.*, *McCullen*, 573 U.S. at 470–71, 490–96; *Schenck v. Pro-Choice Network of W.N.Y.*, 519 U.S. 357, 362–66, 377–83 (1997). *McCullen* is instructive. There, the Supreme Court struck down a law establishing a fixed 35-foot buffer zone around reproductive healthcare facilities, even though the legislative record was filled with evidence of repeated violence, obstruction of entrances, and harassment of patients and staff. 473 U.S. at 470–71, 496. The Court held that the law was not narrowly tailored, because other laws, such as existing criminal prohibitions on obstructing access to healthcare facilities, could more narrowly address the issues at hand without burdening protected speech. *Id.* at 490–93.

Here, the Halo Law is not narrowly tailored to any significant government interest, including an interest in preventing obstruction of law enforcement. *See* Pugel Decl. ¶¶ 34–51.

16

Officers can invoke the law when an individual's presence in no way impedes their ability to perform their duties. And existing statutes are fully sufficient to prevent individuals from interfering with law enforcement. *See Sisters for Life v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 404 (6th Cir. 2022) (intermediate scrutiny requires proof that state "'seriously undertook to address' the problems it faces 'with less intrusive tools readily available to it'" (quoting *McCullen*, 573 U.S. at 494) ); Pugel Decl. ¶ 46. Tennessee's obstruction of justice statute already makes it "an offense for a person to intentionally prevent or obstruct . . . a law enforcement officer . . . from effecting a stop, frisk, halt, arrest or search of any person . . . by force." Tenn. Code Ann. § 39-16-602. And Tennessee's disorderly conduct statute makes it an offense to "refuse[]," "with intent to cause public annoyance or alarm," "to obey an official order to disperse issued to maintain public safety in dangerous proximity to a fire, hazard or other emergency." *Id.* § 39-17-305; *see also id.* § 55-8-104 (criminalizing "willfully fail[ing] or refus[ing] to comply with any lawful order or direction of any police officer invested by law with authority to direct, control or regulate traffic").

Plaintiffs do not interfere with Task Force agents' duties when gathering information about and recording them. During the many times agents have invoked the Halo Law against Plaintiffs while they were engaged in these activities, Plaintiffs were not interfering with agents' duties or posing any risk to a significant government interest. *See, e.g.*, Demster Decl. ¶¶ 14–15; Peeler Decl. ¶ 26; Halt Decl. ¶ 16; Chodor Decl. ¶¶ 12–13; *see also* Pugel Decl. ¶¶ 41, 44.

The Halo Law's "floating" buffer zone exacerbates its tailoring problem. In *Schenck*, the Court struck down an injunction mandating 15-foot "floating buffer zones around people entering and leaving [reproductive healthcare] clinics because they burden more speech than is necessary." 519 U.S. at 377. As the Court explained, "[s]ince the buffer zone floats," individuals who want to engage in expressive activities "must move as the individual moves, maintaining 15 feet of

17

separation." *Id*. at 377–78. The Court observed that the floating buffer zone makes it "quite difficult" for an individual wishing to engage in expressive activities "to know how to remain in compliance with the [law]"—a "lack of certainty" that "leads to a substantial risk that much more speech will be burdened than the [law] by its terms prohibits." *Id*. at 378; *Nicodemus*, 137 F.4th at 670 (public must be "in constant motion and constantly on alert" to remain outside floating buffer zone). So too here. *See, e.g.*, Demster Decl. ¶¶ 22, 44, 72, 82–83, 88, 93, 103, 119–20, 127–29; *see also* Mason Decl. ¶¶ 28, 65, 72–73; Kersey Decl. ¶¶ 30, 35–36; Pugel Decl. ¶¶ 44, 50. To make matters worse, Task Force agents often invoke the Halo law from an arbitrary point or multiple agents invoke the Halo Law at the same scene, causing further confusion. *See, e.g.*, Demster Decl. ¶¶ 36, 39, 93, 119–20; Peeler Decl. ¶ 61; Mason Decl. ¶¶ 50, 65, 72–73, 76; West Decl. ¶¶ 19, 31–33; Kersey Decl. ¶¶ 35–36; Gualdani Decl. ¶¶ 16–17, 20–21; *see also* Pugel Decl. ¶¶ 41, 44, 50.

The Halo Law also does not leave open alternative ways for Plaintiffs to effectively engage in their First Amendment-protected activities. *Reform Am.*, 37 F.4th at 1151. "[A]udio and audiovisual recording are uniquely reliable and powerful methods of preserving and disseminating news." *Alvarez*, 679 F.3d at 607. It is thus "highly unlikely that other methods could be considered reasonably adequate substitutes." *Id.* That is true here, where the Halo Law requires Plaintiffs to abide by a 25 foot buffer zone—about the length of a school bus or telephone pole—which is too great a distance to reliably see or hear what is going on, speak to law enforcement officers or detainees, capture clear photos, videos, or audio, or to otherwise gather information about and record public Task Force activity. *See* Demster Decl. ¶¶ 24, 39, 41, 44, 72, 82, 93, 103, 120, 128–29; Chodor Decl. ¶¶ 15–16; Peeler Decl. ¶¶ 32, 62; *see also* Mason Decl. ¶¶ 29, 31, 35, 51, 66, 72, 78; West Decl. ¶¶ 20, 31–33; Kersey Decl. ¶ 30; Gualdani Decl. ¶¶ 17, 20; *see also Schenck*, 519 U.S. at 377 (15 feet is beyond "normal conversational distance"); *Sisters for Life*, 56 F.4th at 405

18

(buffer zone prevents "close, personal conversations").[6]

## II.    ABSENT AN INJUNCTION, PLAINTIFFS WILL BE IRREPARABLY HARMED

Without injunctive relief, Plaintiffs will suffer irreparable harm from Defendants' unconstitutional actions. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1078–79 (6th Cir. 1994).

Plaintiffs continue to gather information about and record the Task Force, so they risk continued retaliation from Defendants while this case proceeds. *See, e.g.*, Demster Decl. ¶¶ 130–36, 141–49; Chodor Decl. ¶¶ 5, 62; Halt Decl. ¶ 109; Peeler Decl. ¶ 77. But Defendants' retaliation has chilled their willingness to do so as frequently as they otherwise would. *See, e.g.*, Demster Decl. ¶¶ 93, 130–36, 141–49 ("significantly more afraid to approach and film Task Force agents" and more often "sit[s] in [his] car" rather than getting out to record); Chodor Decl. ¶¶ 5, 60, 62 (reduced observation hours due to "psychological toll" of retaliation); Halt Decl. ¶¶ 118–22; Peeler Decl. ¶¶ 77. Fear of retaliation has also changed how Plaintiffs gather information and record. *See, e.g.*, Demster Decl. ¶¶ 145–47 (now stays in car and does not roll down window when filming);

---

[6] With respect to their Halo Law challenge, Plaintiffs seek relief against Defendants Mulroy and Perry because they each have "some connection with the enforcement of the act." *Ex parte Young*, 209 U.S. at 157. Defendant Mulroy is empowered to "prosecute . . . all violations of the state criminal statutes and perform all prosecutorial functions attendant thereto," Tenn. Code Ann. § 8-7-103(1), including with respect to the Halo Law, *see Russell*, 784 F.3d at 1047 (state Attorney General properly named because he has "jurisdiction . . . to investigate and prosecute violations of the election laws" and "[a] plaintiff need not wait until a prosecutor initiates adverse action to have standing to sue to protect his First Amendment rights"). As for Defendant Perry, "there is a realistic possibility [he] will take legal or administrative actions against [ ] plaintiff[s'] interests," *id.*, given that THP troopers have repeatedly invoked the Halo Law against Plaintiffs and others, *see* Demster Decl. ¶¶ 39, 72, 93; Peeler Decl. ¶¶ 56–61, 68–73; Kersey Decl. ¶¶ 29–30, 36; *see also Kiser v. Reitz*, 765 F.3d 601, 609 (6th Cir. 2014) (credible threat "when the same conduct has drawn enforcement actions or threats of enforcement in the past").

19

Peeler Decl. ¶ 78 ("remains "in [her] car further away" and "interact[s] with officers less"). And Plaintiffs' physical and mental health has deteriorated as a result. *See, e.g.*, Demster Decl. ¶¶ 55, 141, 143, 147–48; Chodor Decl. ¶¶ 54–59; Halt Decl. ¶¶ 119–121; Peeler Decl. ¶ 24.

Similarly, the Halo Law has had a chilling effect on Plaintiffs' speech. Faced with the threat of criminal penalty, Plaintiffs comply when Task Force agents invoke the Halo Law against them to the detriment of their information-gathering and recording activities. Forced to stand at least 25 feet away from an invoking officer, Plaintiffs are often unable to fully see and hear what is going on or to speak with law enforcement officers or others at the scene or to take clear photos, videos, and audio of Task Force activity. *See supra* p. 18.

## III.    THE BALANCE OF EQUITIES FAVORS THE PLAINTIFFS, AND A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST.

Finally, the balance of equities and public interest weigh decisively in favor of granting injunctive relief. Because this case involves government actors, the balance of the equities merges with the fourth factor—the public interest. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc.*, 23 F.3d at 1079 (citation omitted); *see also Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009) ("[T]he public as a whole has a significant interest in ensuring . . . protection of First Amendment liberties . . . ." (citation omitted)). If, as here, "the plaintiff[s] shows a substantial likelihood" that government conduct violates the First Amendment, "no substantial harm to others can be said to inhere in its enjoinment," *Deja Vu of Nash., Inc. v. Metro. Gov't of Nashville*, 274 F.3d 377, 400 (6th Cir. 2001).

Dated: May 28, 2026

Zee Scout (BPR# 042637)
Lucas Cameron-Vaughn (BPR# 036284)
ACLU FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, Tennessee 37212
Tel: (615) 320-7260
zscout@aclu-tn.org
lucas@aclu-tn.org

Matthew Borden
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Tel: (415) 599-0210
borden@braunhagey.com

Marissa R. Benavides
BRAUNHAGEY & BORDEN LLP
200 Madison Ave., 23rd Floor
New York, NY 10016
Tel: (646) 829-9403
benavides@braunhagey.com

Respectfully Submitted,

*/s/ Scarlet Kim*
Scarlet Kim*
Ken Sexauer*
Brian Hauss*
AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
scarletk@aclu.org
ksexauer@aclu.org
bhauss@aclu.org

Faith E. Gay* (Bar No. 2117117)
Corey Stoughton (Bar No. 4152633)
Katherine Buoymaster (Bar No. 6096903)
Sylvia Woodmansee (Bar No. 6136618)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 390-9000
fgay@selendygay.com
cstoughton@selendygay.com
kbuoymaster@selendygay.com
swoodmansee@selendygay.com

*Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs Hunter Demster, Jessica Chodor, Kenneth Halt, and Melissa Peeler*