# EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

ELINOR HILTON and COLLEEN FAGAN, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

KRISTI NOEM, Secretary of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,

Defendants.

Case No.

**DECLARATION OF ELINOR HILTON IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER**

I, Elinor Hilton, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am 25 years old and a current resident of Portland, Maine. I have lived in Maine for 24 years.

2. I work as a community coordinator for a local community organization and am a practicing artist.

3. On January 21, 2026, I took the day off of work to observe ICE operations in Portland. At approximately 11:30 A.M. I was driving around South Portland when I saw a message in a community Signal group that there were ICE agents at a nearby Home Depot.

4. I drove to the Home Depot and pulled into the southwest end of the parking lot where I saw two groups of people with cars tucked into a corner near the garden center. I believe these agents were ICE or other DHS agents based on their uniforms, vehicles, and the fact that they seemed to be detaining someone, which were similar to uniforms, vehicles, and other encounters I have seen that were later identified through community reporting as involving DHS.

5. The groups of agents I saw were staggered: the first group, which consisted of two vehicles and at least two agents (Agent 3 and 4 in the Complaint), were using their vehicles to block the second group of agents and their approximately five to six vehicles, which were farther back in a corner of the parking lot and appeared to be in the process of detaining one or more individuals.

6. I parked my car in a public parking spot about 20 feet from the first group of agents and their vehicles. Immediately after parking, I got out of my car, began filming with my phone, and cautiously walked towards the first group of agents.

7. I began filming because I wanted to document what the agents were doing, in case they violated the law or used excessive force during the detention.

8. True and correct excerpts of the videos I recorded are being provided with the filing of this Declaration.

9. I slowly approached Agents 3 and 4, holding my phone out in front of me to film them and their vehicle.

10. When they saw that I was recording them, Agent 3 pulled out his phone and held it up to record my face and my car.

11. Agents 3 and 4, along with their vehicles, were positioned in a way that blocked my view of the detention, which was taking place about 75 feet behind them in the far corner of the parking lot. After I started recording, I walked around Agents 3 and 4 to get a better view of the second group of agents and the person (or people) they were detaining. I made sure to keep my distance from Agents 3 and 4 as I walked past.

12. As I approached the second group of agents, another agent (Agent 5), walked toward me and said "You stay back." I replied, "I can record." Agent 5 then responded, "Absolutely you can. I just want you to stay right there for me, that's all I care about." I then repeated, "I can record." Agent 5 again responded, "Absolutely. 100% you can. I just ask you to stay right there."

13. As Agent 5 instructed me to stay where I was, approximately 35 feet from the second group of agents in the back corner, Agent 3 got into his car, drove around me, and then aggressively swerved right in front of me, again blocking my view of the second group of agents. Then Agent 3 got out of his car and started filming my face again.

14. I again walked around Agent 3 and his car to get a better view of the second group of agents and the person (or people) they were detaining.

15. As I walked around, two other agents from the group in the back involved in the detention (Agents 6 and 7) walked toward me. Agent 6, who was carrying pepper spray, said "You have like 5 friends on Facebook nobody wants to see you. Just go back over there alright." I replied, "I'm just recording," to which he responded, "We're still gonna do what we do, alright." I again said, "I'm just recording." Agent 6 replied, "Your whistles—you're not gonna stop nothing."

16. At this point, I stopped walking toward the detention area. I repeated to them, "I'm just recording." Agent 6 then gestured towards me and said, "Get back." I continued to film, and then told him, "This is my right, I know my rights."

17. As Agents 6 and 7 turned to walk away from me and towards the back corner of the parking lot, Agent 3 stepped in front of me holding his phone out as if to film me. As Agent 3 stood in front of me, blocking my view of the back corner of the parking lot, he said, "Yeah you can film, just let them…" I responded, "I know I can film." And Agent 3 replied, "Yeah, okay."

18. I stepped to the side of Agent 3 so I was able to more clearly see the back corner of the parking lot, but I did not move closer to the other group of agents. I said, "And I'm gonna film what they're actually doing, cause I'm allowed to do that." Agent 3 replied, "Oh good for you. Alright. It's a good project."

19. As I did this, another agent from the back group involved in the detention (Agent 8) approached me while holding up his phone as if recording. Agent 8 got really close to me, approximately six inches from my face, and thrust the phone directly in front of me, holding it there to film me.

20. After a brief moment, Agent 8 stepped back and to the side slightly, and he asked Agent 3, who was continuing to film me, "Which car did she get out of? Was it this car?" Agent 3 responded, "I got em, I got em. Yeah I got em." At that point I briefly stopped filming very briefly as I was startled at how close Agents 3 and 8 were to me.

21. I remained standing in the same location, continuing to comply with the instruction not to move any closer to the agents in the back corner. While I stood there, Agent 3 said to me, "I hope you know that if you keep coming to things like this, you are going to be on a domestic terrorist watchlist. Then we're going to come to your house later tonight."

22. At this point, I began filming again. Agent 3 then turned to Agent 8 to reiterate: "She's just going on the domestic terrorist watchlist." Agent 8 replied, "Oh, absolutely."

23. As I filmed, Agent 8 put his phone away and, turning his back to me, walked towards the back corner where Agent 5 was standing a few feet in front of the vehicles surrounding the detainee(s). As Agent 8 walked toward Agent 5, Agent 5 asked, "What's up?" Agent 8 replied, "It's alright, she's just going on a domestic terrorist watchlist. I just want to put it in." Agent 5 then responded, "Absolutely, go for it."

24. Up until that point, I was the only person present in the parking area who appeared to be observing the agents. But at this point, another person arrived and began watching and filming the agents as well.

25. The other observer came to stand near me in the same location where Agent 6 had instructed me to stop a few minutes earlier. We used our phones to film the agents and the detention occurring behind them. However, it was difficult to see what was happening because some of the agents positioned themselves in a manner that blocked our view. While we were standing there, one of the agents said, "If you get any closer, you will be sprayed!" Agent 5 then said, "Did you hear what my partner just said?" An agent near the detention area then said to Agent 5, "Let her get closer," and Agent 5 stepped several feet back.

26. While I was continuing to film, Agent 8 said to the other observer and me: "We're gonna do the same thing. Just for a warning, we're putting you into a watchlist." Moments later, Agent 6, who at that point was standing directly in front of me and brandishing pepper spray, pointed to the observer to my left and said, "Take a picture of this guy. We'll put him on the watchlist," while performing a dance known as "flossing." Agent 6 then yelled, in the direction of the other observer, "Alright, don't be scared now."

27. During this time, as we continued to watch and film, Agent 6 asked the other observers and me, “Are you all getting paid for this?” Also during this time, over the course of about 15 minutes, several additional observers—approximately four to six people—arrived and also began watching and filming.

28. Then, a large number of additional law enforcement agents, approximately ten to fifteen agents, arrived in four to five large SUVs.

29. Many of these agents were wearing helmets and vests, and were carrying what appeared to be paintball or pepperball guns.

30. The agents got out of their vehicles and told me and the other observers to move even farther away from the back corner area. We all complied with the agents’ directions and moved back as instructed. We stood where we were directed and continued to watch and film from that new location for approximately ten more minutes.

31. While I filmed, the agents stood in front of me and the other observers, and I was unable to see or record what was happening to the detainee(s) in the back corner of the parking lot.

32. From where I was standing, it appeared that the agents loaded one or more people into a van. After the person was placed inside the vehicle, many of the agents returned to their own vehicles and began to leave the parking lot. The majority of the agents drove away shortly thereafter, although some agents remained behind. I stayed in the area for a few more minutes with a small number of other observers before eventually getting into my own car and leaving.

33. Immediately after I left the parking lot, my boyfriend called me. I told him what just happened and was really shaken.

34. I then continued driving around South Portland for approximately 30 minutes before going to my brother’s home to tell him and his partner what had happened. When I arrived,

I immediately broke down and began crying. I was overwhelmed, to the point that they needed to help me calm down. I continued to cry as I told them what happened earlier. I felt shaken by my encounter with the federal agents and was worried, based on the things the agents said, that ICE might come to my home or otherwise retaliate against me. During this time, I also talked to several friends and family members about what had happened and how upset I was.

35. My brother and his partner expressed concern for my safety and suggested that it might be safer for me not to sleep at my home that night. A few hours later, I briefly returned to my home to pack an overnight bag. I then went to a friend's house, where I spent the night.

36. In the week after this experience, I did not go out to observe or verify any law enforcement activity. I was afraid of being recognized or retaliated against.

37. I have not stopped observing law enforcement activity entirely, but I have greatly reduced how often I go out. Since January 21, I have twice gone to locations where ICE activity had been reported in order to verify whether enforcement activity was actually occurring and to document it if so, but I did not encounter any agents during those times. On both occasions, I felt much more anxious and scared than I had before the January 21 incident.

38. On one of those occasions, I returned to the same Home Depot where the January 21 encounter occurred. While I was there, I experienced what felt like a panic attack. I felt my heart rate increase, my breathing became faster, I began sweating, and I felt anxious and unsettled. Shortly after this, I left the Home Depot.

39. I remain worried and scared that ICE agents may come to my home, as they threatened to do. Because of this fear and anxiety, I have made other changes to my day-to-day life.

40. Because they recorded my face and my car, I am now scared that an agent might recognize my car, follow through on what they threatened, and come to arrest me. So I've stopped using my car for anything related to ICE observation or protesting. I've also started parking farther away from wherever I am going, including my own house and my brother's home, because I am afraid someone might identify my car and figure out where I live.

41. I also changed the way that I travel. On a recent personal trip, I did not take my personal phone with me. I'm worried that if I was put on a list or in a database of some kind, it could give law enforcement agents a reason to pull me aside and question me, look at what I have on my phone, or arrest me. I now intend to take these precautions anytime I travel in the future.

42. On that same recent trip, I was much more nervous and anxious than usual about flying. I was worried about the possibility that my movements or communications could be monitored.

43. I am also concerned that I could be placed on a "no-fly list" or a similar watchlist that could affect my ability to travel in the future.

44. I have also become much more cautious about my online presence. For example, I made my Instagram account private.

45. I am an artist, and I no longer attach my name or social media handle to artwork that I create. I have also asked community organizations and others that I create art for not to give me credit publicly for my work. I've done this because I am concerned that law enforcement might use publicly available information to identify or target me.

46. I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge.

Executed on February 22, 2026.

*/s/ Elinor Hilton*
Elinor Hilton