# EXHIBIT 19

EXPERT BRIEF

# Inside the Federal Protective Service, Homeland Security's Domestic Police Force

The agency's broad mandate and few rules foster abuse and facilitate crackdowns.

Spencer Reynolds

Published **October 8, 2024**

Government Power

SHARE

Millions of Americans access federal buildings where the government provides necessary services. The Federal Protective Service, or FPS, is tasked with securing those facilities and keeping government employees and visiting members of the public safe. This important work of securing access to public institutions has its roots in a small cadre of officers formed shortly after [link-1] the Revolutionary War to protect public sites. This function grew rapidly during the New Deal expansion of federal agencies, and FPS's scope, powers, and access to data were further expanded after the attacks of September 11, 2001.

In 2002, FPS became part [link-2] of the newly created Department of Homeland Security, and its activities and authorities have expanded dramatically in the years since. FPS now operates well beyond the bounds of federal property. It has the power to bring into its operations the other large police forces under the control of DHS, including Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), and the Secret

Service. FPS also works with other federal, state, and local law enforcement agencies as well as defense contractor personnel.

But this expansion in the scope of its operations has not been matched by the development of rules to ensure that the agency's operations are legitimate and transparent, and this has led FPS to overreach under political pressure. In 2020, for example, FPS oversaw and facilitated a months-long DHS-led crackdown on racial justice demonstrators in Portland, Oregon. While some vandalism [link-3] — broken windows and graffiti — did occur at a federal courthouse, the government response, which invoked FPS's legal authority to protect federal property, included camouflage-clad Border Patrol special forces [link-4] officers whisking [link-5] protesters off the streets into unmarked vans and the DHS intelligence office creating dossiers [link-6] on protesters and monitoring journalists.

Now, the Heritage Foundation's Project 2025 has called for [link-7] further exploiting FPS's protective mission for political ends. Project 2025 proposes to deploy FPS to quash mass protests while making the agency directly responsive to political decision makers.

The DHS inspector general has documented [link-8] FPS's lack of processes and safeguards to prevent this type of abuse. FPS's permissive operating environment has allowed DHS political leadership to deploy it to facilitate [link-9] crackdowns on demonstrations, monitor [link-10] nationwide protest movements, and intimidate [link-11] people speaking their mind about hot-button topics online. Moreover, a broad mandate and lack of clear safeguards have likely undermined FPS's core physical security mission, as evidenced in numerous oversight inquiries about its inability to manage its contractor workforce.

To address these persistent problems, three main steps are needed. First, Congress should narrow and clarify FPS's purpose. Second, FPS must strengthen transparency to Congress and the public about how it secures federal facilities. And third, states and localities should prepare, as they have at times in the past, to defend their constituents against overreach by DHS law enforcement through legislation and executive order.

# History, Critical Failures, and Permissive Legal Authorities

The agency has roots in a narrowly tailored mandate to protect federal facilities. Federal legislation in 1948 recognized [link-12] the "special policemen" of the New Deal–era agency that Congress created to oversee the maintenance and management of buildings that housed federal agencies. Its special policemen operated under narrow legal authority to enforce federal law on federal property and enforce posted regulations. Eventually they were transferred [link-13] to the General Services Administration (GSA), formalized as the Federal Protective Service by administrative order [link-14] in 1971, and codified [link-15] in the Homeland Security Act of 2002 as part of sweeping congressional reforms after the attacks of September 11, 2001.

In its early days, FPS largely maintained [link-16] fixed posts at government buildings. Local police forces, operating under the authority of state or local government, also played an important role in managing criminal enforcement around federal facilities.

Yet the last three decades have found FPS struggling. The agency's highest-profile failure was its inability to prevent Timothy McVeigh's 1995 bombing of a federal building in Oklahoma City, an act of domestic terrorism that killed 168 people. Poor staffing, training, and oversight were blamed [link-17] for the failure [link-18]. With additional funding from Congress, FPS sought to improve its performance, doubling its federal workforce and tripling its spending on security by increasing [link-19] its contract guard workforce, which has grown to 15,000 [link-20] officers today. FPS also participated in a new government security committee [link-21] to implement intelligence sharing, technological upgrades, and nationwide security standards.

However, a review [link-22] from the GSA's inspector general found the reforms changed little. The review identified numerous violations of national policy, such as those related to firearms qualifications and use. The report further found that the absence of controls and oversight led to operational breakdowns and insufficient training.

ing, weapons, guard eligibility, and suitability to be applied to all GSA guard contracts. Our review of this program concluded that an absence of controls and oversight had led to operational breakdowns at the regional levels. For example, we found hundreds of guards were on post without valid suitability determinations; armed guards were on post without any firearms training or they were overdue for firearms qualifications; and guard services in one region were being acquired through a short-cut method without being subject to critical program requirements.

In addition to these formal audits, we have encountered a number of situations over the last few years involving regional FPS employees acting in violation of established national policy. These situations included several instances of FPS officers carrying firearms

Excerpt from September 28, 2000, testimony of the GSA's deputy inspector general. Source: govinfo.gov, emphasis added by the Brennan Center.

In particular [link-23], for decades [link-24] key oversight [link-25] bodies have [link-26] consistently [link-27] found mismanagement [link-28] of the [link-29] agency's [link-30] contractor workforce [link-31]. In fiscal year 2024 alone, FPS spent [link-32] approximately $1.7 billion on contract guards [link-33], more than 76 percent of its total budget. Constellis Group, the security conglomerate formed from the merger between defense contractor Triple Canopy and the company formerly known as Blackwater, today holds FPS's largest contract [link-34]s [link-35], valued together at $225 million or more. The two organizations, fixtures of the global war on terror, have been plagued by scandal. Blackwater may be best known for the homicides [link-36] committed by its embassy guards in Iraq. Triple Canopy paid [link-37] a $2.6 million settlement in response to allegations that it submitted false claims for payment to the Department of Defense for unqualified guards stationed in Iraq. FPS has nevertheless hired Constellis Group to guard federal buildings.

## Expansive authorities provide discretion but little guidance

FPS's legal authority appears in only one short section of title 40 of the U.S. code, referred to as section 1315 [link-38], which emphasizes the priority of protecting federal facilities and the people in them. This authority is extraordinarily broad, setting few standards for where FPS may operate, how the secretary may implement his statutory discretion, and how FPS may work with other agencies. Section 1315 offers no guidance regarding FPS's constitutional obligations when people engage in political or expressive activity at or near federal buildings. Moreover, section 1315 is full of permissive catchall provisions tied mainly to ill-defined purposes and partnerships with DHS and other law enforcement agencies. With such a broad mandate, it is unsurprising that FPS faces challenges in managing its operations.

Problems with the agency's legal authorities include the following:

FPS lacks geographic limits on its operations, leaving it to conduct broad investigations untethered from threats to federal infrastructure. The agency may conduct operations off federal property "to the extent necessary to protect the property and persons on the property." Yet the legislation does not set a limit on how far off federal property FPS may work, nor does it mandate clear guidelines or explain what off-site work would be "necessary" to protect federal infrastructure. While some discretion can provide flexibility to deal with emerging challenges, a directive [link-39] that implements FPS's responsibilities gives little direction to agency officials about the limits on their operations. Public FPS policy [link-40] offers guidance on a range of administrative topics, and some policies allude to training [link-41] and performance management [link-42], but none contain standards or practices to rein in the abuse that has resulted from the agency's actions off federal property.

DHS agencies often have expansive catchall missions they can use to justify illegitimate practices, and FPS is no different: its officers [link-43] may "carry out such other activities for the promotion of homeland security as the [s]ecretary may prescribe." This serves as an enormous grant of discretion to DHS to develop and execute new missions.

There is some good news: FPS's policy [link-44] suggests that the DHS general counsel has interpreted this provision to require that these "other activities" relate to the protection of federal property. Yet this does not appear to be a legally binding constraint and during times of increased political pressure, statutory interpretation has enabled abusive practices [link-45] elsewhere at DHS. For instance, the Office of Intelligence and Analysis has a similar authority [link-46] to prevent unspecified "other threats to homeland security." During the racial justice demonstrations of 2020, that office determined [link-47] its personnel could spy on Americans protesting against confederate monuments, a decision [link-48] that was roundly criticized [link-49] as overreach [link-50].

FPS may call upon police from DHS's most troubled agencies, such as CBP or ICE, to support its work via what is known as "cross-designation" of officers. The publicly available version [link-51] of the guidelines for these operations largely restates FPS's statute and basic criminal law. It offers little

to guide officers, nor does it set standards for the protection of Americans.

FPS's authority allows it to work closely with state and local agencies under vague conditions, fostering the sort of abusive environment the Brennan Center has documented [link-52] elsewhere, with the sharing [link-53] of suspicionless information, monitoring of political activities, and broad access to sometimes unregulated databases. DHS may enter into agreements with state and local agencies for officers designated under section 1315 to enforce nonfederal law. And the secretary may permit FPS to use the facilities of any federal, state, or local agency, with consent of the head of the assisting agency.

FPS policy [link-54] interprets its section 1315 authority to allow officers to join terrorism and other task forces without any connection to federal property. Terrorism task forces are operated [link-55] by the FBI with little transparency and implement inadequate investigative standards that have enabled abusive targeting of activists under the guise of counterterrorism.

The problems with these authorities effectively allow FPS to operate far beyond its core mission of providing specialized policing to secure the safety of federal buildings and the people using them. Section 1315 certainly emphasizes securing federal facilities, but — as described below — FPS has used its authority to stray far afield in its investigative practices to conduct nationwide social media monitoring programs targeting government critics, to manage crackdowns well off federal property and over the objections of local governments, to offload responsibility to suspect contracting firms, and to promote [link-56] the sharing [link-57] of information that drives abuses by other police agencies.

FPS can and should look to other agencies to conduct properly predicated investigations rather than conduct these sweeping activities itself. Numerous other government agencies exist to conduct investigations off property secured by FPS: the FBI and state and local police for general criminal matters, the Secret Service when an investigation involves a protectee [link-58] such as the president, the Capitol Police when it involves the U.S. Capitol complex, federal agency police departments when an investigation requires their subject matter expertise, and so on. Indeed, this issue arose in the wake of the January 6 attack on the U.S. Capitol amid discussion [link-59] about whether FPS could have done more.

Ultimately, other agencies — such as the Capitol Police — had the primary responsibility [link-60] to protect the legislature.

# Targeting Americans' Political Expression

Political targeting is a frequent problem [link-61] at DHS. Congress has granted the department a broad mandate [link-62], enabling DHS officials to take an elastic view of what it means to promote homeland security and public safety. Its component agencies lack sufficient safeguards [link-63] to protect against racial, ethnic, and political bias and are without guidance to promote rigorous investigative techniques.

Under these conditions, abusive practices are effectively inevitable. Across administrations, FPS has targeted Americans for their political speech and activities, even when unrelated to threats to federal infrastructure. Here are some examples:

**Extremists Action Calendar:** In 2006 FPS issued what it called a "civil activists and extremists action calendar [link-64]," listing advocacy groups and events. It named 75 protests, 60 of which had nothing to do with federal property.

**Sponsor**: Various Anti-War Groups
**Date:**03/18/06 **Time:** 1200 hours
**Location:** Salt Lake City, UT – Gather at Pioneer Park and sidewalk march to the City County Building at Washington Square for rally
**Topic/Issue:** Anti-war rally and march – Global Day of Action
**Anticipated Number:** unknown
**Notes**: no further information
**Officer Safety Issues and Concerns:** no further information
**Source:** ICE FIU

A representative entry from the "extremists action calendar." Source: Federal Protective Service, via Prison Legal News.

**Occupy Wall Street**: Internal [link-65] FPS emails [link-66] from 2011 [link-67] reveal heavy monitoring [link-68] of Occupy Wall Street protesters [link-69], even where they had nothing to do with federal facilities. The agency tracked protests — well beyond the rare instances that impacted federal property — throughout Colorado [link-70], Miami [link-71], New Jersey [link-72], and New York [link-73]. An FPS regional director in the Northeast asked [link-74] for updates about "what these groups are doing wherever they are in New England, not just at federal [buildings]." In Michigan, one inspector asked [link-75] for intelligence specifically to justify "the need for

an FPS presence at our facilities." In Boston, FPS acknowledged no federal facilities were impacted but nevertheless disseminated intelligence bulletins [link-76] because the Boston Police Department had said protesters blocked traffic and "taunted officers." FPS similarly shared intelligence without a connection to federal property in Maine, Vermont, and elsewhere. DHS simultaneously messaged [link-77] to the media and the public that its involvement was "rare" and limited to federal property.



Sponsoring Organization: Malcolm X Grassroots Movement – a part of the Occupy Wall Street movement.

Purpose: To recognize the African slaves used to build Wall Street and to protest the continued inequalities between minorities and the wealthy on Wall Street

Potential for Crowd Violence: This protest is not targeted at the federal government. There is no specific indication the protest will be violent or that protestors will attempt to damage federal property.

FPS assessment of a monitored event. Source: Federal Protective Service, via Jason Leopold, emphasis added by the Brennan Center.



ON BACKGROUND

- FPS only has jurisdiction when a protest takes place on federal property, and in some cases, shares that jurisdiction with local authorities.

  The GSA is the permitting authority for protests on federal property.

- DHS is not actively coordinating with local law enforcement agencies and/or city governments concerning the evictions of Occupy encampments writ large.

FPS media talking points about its limited jurisdiction. Source: Department of Homeland Security, via Jason Leopold, emphasis added by the Brennan Center.

**Black Lives Matter:** Amid DHS's issuance [link-78] of a swirl of intelligence based on "internet chatter" and concerns about an attack on a private energy provider, department intelligence and law enforcement officers descended on Baltimore during 2015 Black Lives Matter demonstrations. FPS alone sent 400 of its officers to monitor peaceful activities, on the theory that unrest might harm federal facilities. DHS separately sent, under FPS leadership, Border Patrol special forces — the same personnel who only a few years later would gain notoriety when they were deployed on the streets of Portland, Oregon.

**2020 Racial Justice Demonstrations:** In perhaps the most infamous incident involving FPS, the agency led a DHS campaign to crack down on racial justice demonstrators in Portland following the police murder of George Floyd. ICE and CBP personnel, including special forces [link-79] usually tasked to the border, were cross-designated [link-80] to FPS, which also received support [link-81] from the DHS Office of Intelligence and Analysis. While some of the protests occurred near federal facilities in Portland, FPS operated throughout the city, and personnel under its control were widely criticized for whisking protesters into unmarked minivans [link-82].

**Trucker Freedom Convoy:** In 2022, truck drivers in Canada organized protests against a

vaccine mandate for cross-border truckers. The convoy made headlines, especially as it proceeded into the United States with the intention of traversing the country in protest of public health laws. FPS issued regular intelligence reports [link-83] while stating it did not know whether the caravan would enter Washington, DC, or impact federal facilities. In one instance, a senior FPS official appeared to justify the agency's concern by pointing to potential traffic delays [link-84] that could impact commuting federal workers — a matter of inconvenience unrelated to the safe operations of federal property.

Good afternoon (b)(6); (b)(7)(C) attached are the talking points that I'll use for this afternoon's (b)(7)(E) We have not observed an impact to any FPS-protected facilities at this point but expect some impact, mostly traffic congestion that prevents or delays federal employees from getting to and from work, if blockades occur in major metropolitan areas. We'll keep you all posted as this develops.

Kris Cline
Principal Deputy Director
Federal Protective Service

Excerpt of email from a senior FPS official regarding traffic delays. Source: Federal Protective Service, via Jason Leopold, emphasis added by the Brennan Center.

---

**Critics of Supreme Court's *Dobbs* Decision:** In 2022, FPS responded with a heavy hand to public outcry over a leaked Supreme Court draft opinion that would ultimately become the decision to overturn *Roe v. Wade*. FPS officers in parked vehicles half a mile from a federal courthouse in Los Angeles claimed [link-85] they were attacked by protesters, who in turn accused them of instigating the confrontation "by straying beyond the courthouse, driving into the crowd, and using aggressive crowd control measures."

Later, an FPS agent joined Texas police at the house of a woman who had posted [link-86] obscenity-laden comments about burning down "every" government building, a post that may have been incendiary but hardly constituted [link-87] an actual threat. Indeed, it communicated a desire that would be impossible to fulfill, did not target particular facilities or people, and lacked specific details.

Yet the letter, reproduced below, from FPS to the social media poster made clear that the agency had monitored her commentary; it characterized her speech as "unwarranted and unwelcome" and threatened criminal charges if she did not stop. FPS's letter [link-88] read:

> This letter is in reference to your recent post on Twitter. Specifically, on June 4, 2022, you became upset at the Roe Vs Wade [sic] decision and stated, "Burn every fucking government building down

> right the fuck now. Slaughter them all. Fuck you god damn pigs."
>
> This letter is to advise you that any further communications containing any real or implied harassment/threats against the personal safety of agencies, employees or contractors towards government facilities [sic] are unwarranted and unwelcome. You are advised as of the date of this letter to cease and desist in any conduct deemed harassing/threatening in nature, when communicating to or about the federal government. Failure to comply with this request could result in the filing of criminal charges for violations of 18 United States Code Statue [sic] 115.
>
> In closing, please refrain from any harassing/threatening language when contacting any government agency.

FPS defended its reaction to a single hyperbolic blog post as part of its mandate to protect federal facilities, despite the vague connection. Social media is "irresistible" to law enforcement, even though it often leads to low-quality intelligence that congests and undermines information-sharing practices, as Brennan Center fellow and former FBI agent Mike German has explained [link-89].

## Reliance on Private Companies for Surveillance

This social media monitoring at times relies on private intelligence contractors. For instance, in recent months, FPS has used Dataminr [link-90] to track social media posts and protests related to the war in Gaza. Prior Brennan Center analysis [link-91] has explained how the firm works: Dataminr "claims to detect real-time threats by sifting through unfiltered social media data, including the stream of internal data referred to as X's 'firehose.' " The company has been criticized [link-92] for targeting Black Lives Matter protests. At its founding, Dataminr took investment [link-93] from the social media company X (formerly Twitter) and the Central Intelligence Agency's venture capital nonprofit, In-Q-Tel.

Social media monitoring raises [link-94] a host of questions under the best of circumstances: Can officers accurately interpret the slang, in-jokes, and jargon used by anonymous users? How do officers avoid bias? What guardrails, if any, are in place to ensure that officers are not simply snooping on the basis of disfavored po-

litical views? Reliance on private firms [link-95] makes the process even more obscure and its agents less accountable. Contractors are reticent to explain their methods [link-96] even to government, let alone the public. In this way, they evade independent oversight.

The nature of FPS's relationships with other intelligence firms is vague. FPS contractor Toffler Associates provides [link-97] research to DHS to "identify potential threats and disruptions to domestic security." RELX Group offers [link-98] LexisNexis repositories that cobble together [link-99] vast amounts of data about individuals from public and other records, such as those it obtains from local government agencies. Gonzales Consulting Services, a company that monitors [link-100] alarm systems for FPS, states on its website that it facilitates access [link-101] to law enforcement and intelligence data. Deficient contracting information makes it difficult to ascertain the exact nature of these services and how FPS uses them.

# Harmful Reliance on Other Agencies

At times, FPS has called on border and security forces, turning them into urban cops. Perhaps FPS's most controversial power is cross-designation, its section 1315 authority to absorb other DHS law enforcement officers into its ranks. DHS relied [link-102] on this authority during Black Lives Matter demonstrations in 2015, and its power was on full display during DHS's 2020 operations to counter racial justice protests in Portland. Cross-designation allowed FPS to facilitate the involvement of other DHS officers, including the border special forces who took people off the streets.

FPS may draw on the approximately 92,000 [link-103] law enforcement officers working across DHS, assigned to CBP, ICE, the Secret Service, the U.S. Coast Guard, and the Transportation Security Administration. Officers cross-designated to FPS are meant to follow guidelines approved by the secretary and attorney general and to undergo training before deployment. The guidelines [link-104] are not publicly available, but the DHS inspector general found [link-105] that many of the 755 DHS officers deployed to Portland were

not sufficiently trained or prepared by DHS for the operation.

In addition, the expertise and culture of the specific law enforcement agencies may be squarely at odds with the cross-designated role they are expected to play. For example, officers at CBP, the department's largest law enforcement agency, typically operate in remote environments and rely on military tactics. They regularly engage with migrants, not protesters. And they have been routinely criticized [link-106] for abusive [link-107] behavior in violation of applicable rules in their ordinary line of duty. This is not a workforce that should be dropped into U.S. cities to enforce federal law — or even state and local law — against protesters. Yet FPS's section 1315 authority puts no prohibitions on the use of these and other specialized police units.

Further, the agency's rules for collaboration with state and local governments are vague. FPS is authorized to enter into arrangements to coordinate with nonfederal agencies and divide up jurisdiction and investigative functions. However, state and local police can limit these arrangements, as they have no obligation to open their data coffers to federal agencies or permit federal officers to use their facilities or enforce their laws. States and localities are also free to regulate or outright prohibit coordination with DHS.

Local governments take different approaches. For instance, an arrangement [link-108] between Arlington County, Virginia, and FPS regulates how FPS will operate in Arlington and how it will divide jurisdiction with the county. Though clearer than congressional guidance, the paperwork is still vague, offering little direction to officers and giving the public little insight into how the agencies actually operate to police them.

> FPS shall:
>
> a. Consistent with federal law, have primary law enforcement responsibility for property owned or controlled by the Federal government under concurrent federal jurisdiction within the County of Arlington, Virginia.
>
> b. Consistent with federal law, FPS will continue to support local law enforcement for all property owned or controlled by the Federal government under proprietary jurisdiction.
>
> c. In conjunction with the protection of Federal property owned or possessed by the Federal Government and the persons thereon, enforce state and local law within that property or on any street, sidewalk, or property adjacent thereto within the County of Arlington, Virginia

Excerpt of Arlington County memorandum laying out FPS responsibilities. Source: Federal Protective Service.

In 2020, in response to the presence of DHS police and intelligence officers, the Portland City Council passed a prohibition [link-109] on certain types of collaboration with the department, illustrating how lawmakers can protect against overreach. The council found that DHS and the Trump administration had engaged in

various verbal attacks on the city and imposed an "unprecedented" deployment, including of border forces with no training in crowd control. To address this, the resolution limited local police collaboration with DHS and prohibited the sharing of information with involved federal agencies.


NOW, THEREFORE, BE IT RESOLVED, that all members of the Portland Police Bureau shall not provide, request, or willingly receive operational support (which includes but is not limited to embedding in a federal incident command center, sharing or receiving information from above defined federal forces, engaging in policing or crowd control measures with above federal forces) from any agent or employee representing or constituting part of deployment under executive order from the president, be they from Department of Homeland Security, the U.S. Marshals Service, the Federal Protective Service, U.S. Customs and Border Protection or any other service;

Excerpt of prohibitions in Portland legislation.

Source: City of Portland, emphasis added by the Brennan Center.

Resolutions like the one adopted in Portland can be a check against abuse, but redundancies in the modern security information–sharing environment effectively undermine these constraints. While local police may be prohibited from working directly with DHS law enforcement, they routinely work with other federal law enforcement partners, including terrorism and drug task forces, as well as with "fusion centers [link-110]," intelligence-sharing hubs housing representatives from various intelligence and police agencies. Federal, state, and local police may also be members of a virtual sharing platform, such as the network [link-111] that DHS runs for tens of thousands of police nationwide, including its own, or may maintain email lists that share bulletins of questionable intelligence value with DHS. That is how FPS received intelligence about the political activities of Atlanta environmentalists [link-112] and community college protesters [link-113] about the war in Gaza — none of which implicated federal property. These intelligence operations are designed to swap information freely, even when it is of little investigative value and can foster [link-114] political targeting.




Excerpt from a local police intelligence report shared with FPS about a picnic and a town hall meeting to discuss political issues. Source: Atlanta Police Department, via Brennan Center.

Generally, even if information is not intended to reach DHS, once it is shared with a federal agency that is willing and able to pass it on, DHS may freely [link-115] obtain it for its own purposes. This may include data that a local motor vehicle agency or labor department has

shared with a federal civilian agency. Or a local government may provide [link-116] identification information about residents to data brokers like LexisNexis, which compiles and then sells it to federal agencies — including FPS.

With so many ways to evade safeguards, well-meaning local legislators may determine they need to implement broader protections as well.

# Recommendations

FPS has a key role to play in protecting public access to federal facilities as well as the employees who work there, and effective security is essential to that mission. With appropriate flexibility to allow officers to respond to emerging threats, Congress should more closely restrict FPS's activities to keep the agency focused on its core mission of ensuring the security of government facilities. Other types of activities should be left to agencies that are better situated to conduct them. Earlier models for the protection of federal property, predating the creation of FPS, offer a workable starting point. Congress must also demand greater transparency so that the public understands what FPS does on our behalf. State and local officials concerned about the potential for abuse can also limit their partnerships with FPS.

Accordingly, Congress should clarify and focus FPS's authorities as follows:

Return FPS to its earlier practice of working on-site at federally owned or leased facilities so that it can focus on ensuring security. When the need arises to take an investigation off federal property, FPS should generally refer the matter to the relevant agency, thereby lessening the risk of the biased intelligence and investigative practices that have plagued the agency for decades.

End the practice of cross-designation. Border police do not belong in American cities controlling protesters or enforcing general criminal laws, especially given FPS's consistently deficient training practices.

Prohibit the expenditure of funds on federal enforcement of state and local laws without clear guardrails or a demonstration that it contributes to increased safety. This step will focus FPS on enforcing federal law directly tied to the protection of federal facilities, improving the execution of its core mission. In addition, Congress should establish more robust protections in what coordination does occur between FPS and non-fed-

eral agencies, requiring that documentation address topics such as geographic limits, specified facilities and resources at issue, and standards for transferring investigations. Congress should also direct that the documentation be made fully public on DHS's website.

Eliminate the catchall grant of discretion to FPS. The secretary should not be able to direct FPS to determine and execute undefined "other activities for the promotion of homeland security." Such authority offers the secretary little guidance for implementation and can allow DHS to engage in abusive practices.

End politicized fishing expeditions and targeting by developing clear guardrails on the policing of protests that affect federal facilities. The Brennan Center has issued social media use principles [link-117] for state and local law enforcement that are broadly applicable to the type of security policing FPS conducts, including that officers must articulate and document specific facts to justify monitoring constitutionally protected speech during investigations, must never use protected political or religious views or traits such as ethnicity as a basis for determining that a public safety concern exists, and must share collected data only with agencies that need it to resolve a specific public safety concern. These and other principles should also apply to contractors used by agencies, such as Dataminr.

Congress should also mandate comprehensive, regular public reporting about routine and non-routine FPS and DHS law enforcement operations, which should be included in an annual report posted on DHS's public website. Such reporting should include:

With respect to FPS:

- The number of FPS personnel — employees and contractors — deployed under section 1315
- The number of facilities protected by FPS under section 1315, with a breakdown of federally owned, commercially leased, and state or local facilities
- A summary of each agreement with federal, state, local, or private sector entities for FPS support during the reporting period sufficient to disclose the other entity involved, each party's specific responsibilities, the location of the duties to be performed, the categories of information exchanged and the rules applicable to that informa-

tion, and any accountability mechanisms to ensure that participants adhere to the agreement
- Any detention, arrest, or use of force made under either federal or non-federal law
- The number and nature of incidents involving speech or activity protected by the First Amendment, civil unrest, riots, protests, or claims of domestic violent extremism or domestic terrorism.

With respect to all other DHS law enforcement agencies:

- The number of personnel deployed under section 1315
- The number of personnel deployed pursuant to executive order, presidential proclamation, or request by non-federal official
- The location and duration of deployments, including city, state, and facility
- Whether any deployments involved activities off federal property and a description of such deployment
- A description of the use of any agency technology pursuant to deployments (for example, unmanned aerial vehicles, facial recognition technology, or license plate readers)
- DHS's asserted legal justification to support the deployment
- Any detention, arrest, or use of force under either federal or non-federal law
- The number and nature of policed incidents involving speech or activity protected by the First Amendment, civil unrest, riots, protests, or claims of domestic violent extremism or domestic terrorism.

In all cases:

- Any activities undertaken "for the promotion of homeland security" as stated at 40 U.S.C. § 1315(b)(2)(F)
- A summary of intelligence or information support provided by the DHS Office of Homeland Security Situational Awareness and Office of Intelligence and Analysis, including the incident described in the intelligence, number and dates of reports created, and any collection of information concerning speech or activity protected by the First Amendment, civil unrest, riots, protests, or claims of domestic violent extremism or domestic terrorism.

States and localities have significant power to protect their constituents against federal overreach. To do so, they should rely on executive actions of governors, attorneys general, and mayors as well as legislative protections passed by state legislatures or city councils. Effective protections must be broad enough to address the redundancies in today's information-sharing practices that agencies can abuse to weaponize these tools against dissent.

Protective measures could address the following:

- Elastic memoranda of understanding with FPS that would condone broad federal policing off federal property or the involvement of any cross-designated officers of other DHS agencies;
- Any agreement that would allow DHS officers to enforce state or local laws;
- Use of state or local facilities and resources to host FPS officers or DHS personnel cross-designated to the agency;
- Holding persons in detention for DHS officers to conduct intelligence or investigative interviews or take them into custody;
- Social media monitoring of political activities;
- Sale of data to or sharing of data with brokers who contract with federal law enforcement or intelligence agencies;
- Sharing law enforcement, administrative (e.g., driver records), and other information with DHS, including sharing with any fusion center, task force, or electronic platform that federal law enforcement may access, or giving DHS agencies access to law enforcement systems such as gang or intelligence databases; and
- Sharing information with other federal agencies without clear prohibitions on further sharing with federal law enforcement or intelligence agencies.

# Conclusion

The Federal Protective Service has a critical mission to protect federal facilities, the public that accesses them, and the people who work there. But its broad mandate with few constraints has led to years of abuse and mismanagement. This dynamic undercuts the agency's important mission and allows its weaponization against Americans based on political views and activities.

Congress should refocus FPS's mission, cut unnecessary and vague authorities, and mandate clear safeguards and transparency. These steps will both help improve its important day-to-day work and safeguard against impulses to use the agency to crack down on expressions of dissent. And should those circumstances arise, states and localities have key steps they can take to protect constituents against FPS and DHS overreach.

STAY UP TO DATE

## Informed citizens are democracy's best defense

First Name

Last Name

Email Address *

Zip Code *

SIGN ME UP

We respect **your privacy**.

### Links

link-1: shortly after https://commdocs.house.gov/committees/trans/hpw107-43.000/hpw107-43_0.htm

link-2: became part https://www.gao.gov/assets/820/814186.pdf?inline=1#page=10

link-3: vandalism https://www.opb.org/article/2021/03/12/protesters-vandalize-portlands-federal-courthouse-again/

link-4: special forces https://www.cbp.gov/sites/default/files/documents/Border%20Patrol%20Tactical%20Unit.pdf?inline=1

link-5: whisking https://www.npr.org/2020/07/17/892277592/federal-officers-use-unmarked-vehicles-to-grab-protesters-in-portland

link-6: dossiers https://www.washingtonpost.com/national-security/dhs-compiled-intelligence-reports-on-journalists-who-published-leaked-documents/2020/07/30/5be5ec9e-d25b-11ea-9038-af089b63ac21_story.html

link-7: called for https://static.project2025.org/2025_MandateForLeadership_FULL.pdf?inline=1#page=193

link-8: documented https://www.oversight.gov/sites/default/files/oig-reports/OIG-21-05-Nov20.pdf?inline=1

link-9: facilitate https://www.vice.com/en/article/fearing-a-catastrophic-incident-400-federal-officers-descended-on-the-baltimore-protests/

link-10: monitor https://s3.documentcloud.org/documents/676802/dhs-spy-files-on-the-occupy-movement-pt-1.pdf?inline=1

link-11: intimidate https://www.newsweek.com/homeland-security-visits-woman-over-her-tweet-about-roe-v-wade-reversal-1721236

link-12: recognized https://www.govinfo.gov/content/pkg/STATUTE-62/pdf/STATUTE-62-Pg281-2.pdf?inline=1

link-13: transferred https://disposal.gsa.gov/s/act49

link-14: administrative order https://apps.dtic.mil/sti/tr/pdf/ADA520574.pdf?inline=1#page=10

link-15: codified https://www.govinfo.gov/content/pkg/PLAW-107publ296/pdf/PLAW-107publ296.pdf?inline=1

link-16: maintained https://www.govinfo.gov/content/pkg/CRPT-106hrpt676/html/CRPT-106hrpt676.htm

link-17: were blamed https://www.ojp.gov/pdffiles1/Digitization/156412NCJRS.pdf?inline=1

link-18: failure https://www.congress.gov/106/crpt/hrpt676/CRPT-106hrpt676.pdf?inline=1

link-19: increasing https://s3.documentcloud.org/documents/241279/federal-protective-service-needs-to-improve-its.pdf?inline=1#page=5

link-20: 15,000 https://x.com/FPSDHS/status/1835770439790133552

link-21: committee https://www.govinfo.gov/content/pkg/FR-1995-10-24/pdf/95-26497.pdf?inline=1

link-22: review https://www.govinfo.gov/content/pkg/CHRG-106shrg71528/pdf/CHRG-106shrg71528.pdf?inline=1

link-23: particular https://s3.documentcloud.org/documents/242131/homeland-security-the-federal-protective-service.pdf?inline=1

link-24: decades https://www.gao.gov/assets/gao-09-859t.pdf?inline=1

link-25: oversight https://www.govinfo.gov/content/pkg/GOVPUB-HS-PURL-gpo25885/pdf/GOVPUB-HS-PURL-gpo25885.pdf?inline=1

link-26: have https://www.govinfo.gov/content/pkg/GOVPUB-HS-PURL-gpo25885/pdf/GOVPUB-HS-PURL-gpo25885.pdf?inline=1

link-27: consistently https://www.gao.gov/products/gao-10-341

link-28: mismanagement https://www.govinfo.gov/content/pkg/CHRG-111hhrg61743/html/CHRG-111hhrg61743.htm

link-29: the https://www.gao.gov/assets/gao-12-943t.pdf?inline=1

link-30: agency's https://www.gao.gov/assets/820/814186.pdf?inline=1

link-31: workforce https://www.gao.gov/products/gao-24-107599

link-32: spent https://transportation.house.gov/uploadedfiles/07-23-2024_edpbem_hearing_-_david_marroni_-_testimony.pdf?inline=1#page=3

link-33: contract guards https://transportation.house.gov/uploadedfiles/07-23-2024_edpbem_hearing_-_david_marroni_-_testimony.pdf?inline=1

link-34: largest contract https://www.usaspending.gov/recipient/b9a8aca3-3402-7ba5-301b-8cabbaf8b523-C/latest

link-35: s https://www.usaspending.gov/recipient/b9a8aca3-3402-7ba5-301b-8cabbaf8b523-C/latest

link-36: homicides https://www.nytimes.com/2014/06/30/us/before-shooting-in-iraq-warning-on-blackwater.html

link-37: paid https://www.justice.gov/usao-edva/pr/government-contractor-pays-26m-settle-false-claims-act-suit

link-38: section 1315 https://www.govinfo.gov/content/pkg/USCODE-2022-title40/pdf/USCODE-2022-title40-subtitleI-chap13-sec1315.pdf?inline=1

link-39: directive https://www.dhs.gov/sites/default/files/publications/released_records.pdf?inline=1#page=27

link-40: policy https://www.dhs.gov/publication/fps-management-directives

link-41: training https://www.dhs.gov/sites/default/files/publications/career_path_requirements_for_inspectors.pdf?inline=1

link-42: management https://www.dhs.gov/sites/default/files/publications/employee_performance_management_manual.pdf?inline=1

link-43: officers https://uscode.house.gov/view.xhtml?req=(title:40%20section:1315%20edition:prelim)

link-44: policy https://www.dhs.gov/sites/default/files/publications/released_records.pdf?inline=1#page=33

link-45: abusive practices https://www.brennancenter.org/our-work/policy-solutions/new-vision-domestic-intelligence

link-46: similar authority https://www.govinfo.gov/content/pkg/USCODE-2010-title6/pdf/USCODE-2010-title6-chap1-subchapII-partA-sec121.pdf?inline=1

link-47: determined https://www.washingtonpost.com/national-security/dhs-authorizes-personnel-to-collect-information-on-protesters-it-says-threaten-monuments/2020/07/20/6f58867c-cace-11ea-b0e3-d55bda07d66a_story.html

link-48: decision https://www.lawfaremedia.org/article/dhs-authorizes-domestic-surveillance-protect-statues-and-monuments

link-49: criticized https://www.splcenter.org/presscenter/splc-action-fund-responds-dhs-collecting-personal-information-people-deemed-threatening

link-50: overreach https://www.nytimes.com/2020/07/10/us/politics/homeland-security-statues-trump.html

link-51: version https://www.dhs.gov/sites/default/files/publications/released_records.pdf?inline=1#page=14

link-52: documented https://www.brennancenter.org/our-work/policy-solutions/ending-fusion-center-abuses

link-53: sharing https://www.brennancenter.org/events/bad-partners-why-local-law-enforcement-should-leave-fbi-joint-terrorism-task-forces

link-54: policy https://www.dhs.gov/sites/default/files/publications/released_records.pdf?inline=1#page=33

link-55: operated https://www.aclu-or.org/sites/default/files/field_documents/michael_german_testimony_against_portland_in_the_jttf.pdf?inline=1

link-56: promote https://www.brennancenter.org/our-work/policy-solutions/ending-fusion-center-abuses

link-57: sharing https://www.brennancenter.org/our-work/policy-solutions/new-vision-domestic-intelligence

link-58: protectee https://www.secretservice.gov/protection

link-59: discussion https://s3.documentcloud.org/documents/23600429/gpo-j6-transcript-ctrl0000062451.pdf?inline=1#page=43

link-60: primary responsibility https://s3.documentcloud.org/documents/23862034/230627-hgsac-jan6-report.pdf?inline=1#page=96

link-61: problem https://www.justsecurity.org/86876/dhss-newest-target-atlanta-cop-city-activists/

link-62: broad mandate https://www.brennancenter.org/our-work/research-reports/course-correction-homeland-security

link-63: safeguards https://www.brennancenter.org/our-work/policy-solutions/stronger-rules-against-bias

link-64: calendar

https://www.prisonlegalnews.org/media/publications/civil_activists_and_extremists_action_calendar_federal_protective_services_2006.pdf?inline=1

link-65: Internal https://s3.documentcloud.org/documents/676802/dhs-spy-files-on-the-occupy-movement-pt-1.pdf

link-66: emails https://s3.documentcloud.org/documents/1017609/ows-nppd-region-2-final.pdf

link-67: 2011 https://s3.documentcloud.org/documents/327086/dhs-occupy-3.pdf

link-68: monitoring https://s3.documentcloud.org/documents/625741/ows-nppd-region-5-final.pdf

link-69: protesters https://s3.documentcloud.org/documents/625742/ows-nppd-region-6-final.pdf

link-70: Colorado https://s3.documentcloud.org/documents/625742/ows-nppd-region-6-final.pdf#page=20

link-71: Miami https://s3.documentcloud.org/documents/625742/ows-nppd-region-6-final.pdf#page=18

link-72: New Jersey https://s3.documentcloud.org/documents/625742/ows-nppd-region-6-final.pdf#page=21

link-73: New York https://s3.documentcloud.org/documents/625742/ows-nppd-region-6-final.pdf#page=22

link-74: asked https://s3.documentcloud.org/documents/676802/dhs-spy-files-on-the-occupy-movement-pt-1.pdf#page=11

link-75: asked https://s3.documentcloud.org/documents/625741/ows-nppd-region-5-final.pdf#page=15

link-76: intelligence bulletins https://s3.documentcloud.org/documents/702728/0068066.pdf#page=12

link-77: messaged https://s3.documentcloud.org/documents/327086/dhs-occupy-3.pdf#page=75

link-78: issuance https://www.vice.com/en/article/fearing-a-catastrophic-incident-400-federal-officers-descended-on-the-baltimore-protests/

link-79: special forces https://www.npr.org/2020/07/23/894712004/border-patrol-response-to-portland-unrest-straying-from-mission-or-continuing-on

link-80: cross-designated https://www.cbp.gov/newsroom/speeches-and-statements/statement-cbp-response-portland-oregon

link-81: support https://www.cnn.com/2021/10/01/politics/dhs-intelligence-branch-portland-internal-review/index.html

link-82: minivans https://www.npr.org/2020/07/17/892277592/federal-officers-use-unmarked-vehicles-to-grab-protesters-in-portland

link-83: intelligence reports https://s3.documentcloud.org/documents/22083930/leopold-dhs-fps-foia-freedom-trucker-convoy.pdf?inline=1

link-84: traffic delays https://s3.documentcloud.org/documents/22083930/leopold-dhs-fps-foia-freedom-trucker-convoy.pdf?inline=1#page=76

link-85: claimed https://www.latimes.com/california/story/2022-05-05/why-were-federal-police-squaring-off-with-abortion-rights-protesters-in-l-a-s-streets

link-86: posted https://www.newsweek.com/homeland-security-visits-woman-over-her-tweet-about-roe-v-wade-reversal-1721236

link-87: hardly constituted https://www.techdirt.com/2022/07/05/federal-agent-stupidly-threatens-twitter-user-with-arrest-over-protected-first-amendment-expression/

link-88: letter https://i0.wp.com/www.techdirt.com/wp-content/uploads/2022/07/FWnBCKhWAAAV4Qc-2.jpeg?w=1536&ssl=1

link-89: explained https://www.brennancenter.org/our-work/research-reports/focusing-fbi

link-90: Dataminr https://www.bloomberg.com/news/newsletters/2024-05-03/israel-hamas-war-protesters-targeted-by-dhs-surveillance

link-91: analysis https://www.brennancenter.org/our-work/analysis-opinion/documents-reveal-how-dc-police-surveil-social-media-profiles-and-protest

link-92: criticized https://mashable.com/article/dataminr-twitter-black-lives-matter-protests

link-93: investment https://techcrunch.com/2016/05/09/dataminr-was-in-an-unpaid-pilot-with-intel-agencies-when-twitter-ended-the-deal/

link-94: raises https://www.brennancenter.org/our-work/research-reports/social-media-surveillance-us-government

link-95: private firms https://www.brennancenter.org/our-work/analysis-opinion/data-brokers-are-running-wild-and-only-congress-can-rein-them

link-96: their methods https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole

link-97: provides https://www.usaspending.gov/award/CONT_AWD_70RFP320FCEH00002_7001_HSHQEH14A00005_7001

link-98: offers https://www.usaspending.gov/award/CONT_AWD_70RFP323FREH00022_7001_03310319D0028_0300

link-99: cobble together https://www.wbur.org/onpoint/2024/04/18/your-data-the-u-s-government-and-the-new-american-surveillance-state

link-100: monitors https://www.usaspending.gov/award/CONT_AWD_28321320C00060016_2800_-NONE-_-NONE-

link-101: facilitates access https://gcs-usa.com/emergency-management/

link-102: relied https://www.vice.com/en/article/fearing-a-catastrophic-incident-400-federal-officers-descended-on-the-baltimore-protests/

link-103: 92,000 https://www.dhs.gov/news/2024/09/12/us-department-homeland-security-recognizes-158-employees-secretarys-award-ceremony#:~:text=DHS%20has%20the%20third%20largest,department%20in%20the%20federal%20government.

link-104: guidelines https://www.congress.gov/116/meeting/house/109612/witnesses/HHRG-116-HM09-Wstate-PattersonL-20190611.pdf?inline=1#page=4

link-105: found https://www.oig.dhs.gov/sites/default/files/assets/2021-04/OIG-21-31-Mar21.pdf?inline=1

link-106: routinely criticized https://www.pogo.org/reports/the-border-zone-next-door-and-its-out-of-control-police-force

link-107: abusive https://www.yahoo.com/news/operation-whistle-pig-inside-the-secret-cbp-unit-with-no-rules-that-investigates-americans-100000147.html

link-108: arrangement https://public.powerdms.com/ARLVAPD/documents/850124

link-109: prohibition https://www.portland.gov/sites/default/files/2020-07/resolution-to-cease-ppb-cooperation-with-militarized-federal-force-final.pdf

link-110: fusion centers https://www.brennancenter.org/our-work/policy-solutions/ending-fusion-center-abuses

link-111: the network https://www.hsdl.org/c/view?docid=759439

link-112: environmentalists https://www.brennancenter.org/our-work/research-reports/atlanta-police-department-social-media-surveillance-documents

link-113: protesters https://assets.bwbx.io/documents/users/iqjWHBFdfxIU/racSwkL01YgI/v0#page=80

link-114: foster https://www.brennancenter.org/our-work/analysis-opinion/internal-atlanta-police-records-reveal-monitoring-cop-city-opponents

link-115: freely https://www.brennancenter.org/our-work/policy-solutions/new-vision-domestic-intelligence

link-116: provide https://www.vice.com/en/article/ice-urged-to-drop-lexisnexis-contract/

link-117: principles https://www.brennancenter.org/our-work/research-reports/principles-social-media-use-law-enforcement