# EXHIBIT 24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| ELINOR HILTON, COLLEEN FAGAN, POLYXENIA PANTOS, and CARLYN WILLIAMS,<br>  on behalf of themselves and all others<br>  similarly situated,<br><br>         Plaintiffs,<br><br>v.<br><br>MARKWAYNE MULLIN, Secretary of Homeland Security; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement; JOHN A. CONDON, Acting Executive Director, Homeland Security Investigations; RODNEY SCOTT, Commissioner, U.S. Customs and Border Protection; MICHAEL BANKS, Chief, U.S. Border Patrol; THE U.S. DEPARTMENT OF HOMELAND SECURITY; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; HOMELAND SECURITY INVESTIGATIONS; U.S. CUSTOMS AND BORDER PROTECTION; U.S. BORDER PATROL; UNIDENTIFIED FEDERAL AGENCIES; and UNIDENTIFIED FEDERAL AGENTS,<br><br>         Defendants. | Case No. 26-cv-00092-JAW<br><br><br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      As the federal government expands its aggressive deportation campaign throughout the country, ordinary Americans in Maine are holding their government to account by bearing witness and protesting the government's abusive tactics. Defendants and other federal agents acting at their direction are responding by unlawfully retaliating against Mainers exercising their constitutional right to dissent.

2.      The federal government is pursuing a conscious course of action to silence and sideline Mainers and other Americans who choose to observe, record, and share information about the conduct of federal agents who have been deployed to their streets.

3.      In an effort to chill their protected activity, federal law enforcement agencies, including the Department of Homeland Security and its immigration enforcement agencies, are leveraging the government's significant surveillance capabilities to collect and track personal information about observers and protestors. In some cases, federal agents also have used these surveillance tools and the information they collect to threaten and harass Mainers, again seeking to deter them from exercising their First Amendment rights.

4.      Plaintiffs are residents of Maine who have engaged in lawful, expressive activity to voice support for their neighbors, oppose the administration's policies, and document the actions of federal agents to promote accountability.

5.      In retaliation for that protected activity, Plaintiffs have had their faces scanned or other personal data collected, have been added to one or more government "databases" or "watchlists," and have been told by government agents that they are "domestic terrorists." An agent who filmed Plaintiff Colleen Fagan told her, "We have a nice little database. And now you're considered a domestic terrorist, so have fun with that." Plaintiff Elinor Hilton received a

similarly chilling threat: "If you keep coming to things like this, you are going to be on a domestic terrorist watchlist. Then we're going to come to your house later tonight." And Plaintiff Carlyn Williams received a disturbing phone call from "the Department of Homeland Security" warning that her spouse, Plaintiff Polyxenia Pantos, might be added to a "domestic terrorism watchlist" if Pantos continued observing immigration enforcement operations.

6.      Plaintiffs are far from the only Maine residents Defendants have targeted for intimidation. Plaintiffs bring this lawsuit to vindicate not only their own constitutional rights, but also the rights of their fellow Mainers whose information has been or will be collected and tracked because they choose to observe, document, and speak out against the administration's immigration tactics.

7.      Absent injunctive relief, Plaintiffs must either abandon their constitutional rights or accept being cataloged and branded as "domestic terrorists." That is a choice the Constitution does not require Plaintiffs, or anyone, to make.

## PARTIES

8.      **Plaintiff Elinor Hilton** is a resident of Portland, Maine. Hilton has lived in Maine for most of her life. On the morning of January 21, 2026, Plaintiff Hilton engaged in constitutionally protected activities by observing and recording law enforcement activity in a public parking lot. While she was doing so, Defendants collected Hilton's biometric data and license plate information. Defendants told Hilton, "If you keep coming to things like this, you are going to be on a domestic terrorist watchlist. Then we're going to come to your house later tonight."

9.      **Plaintiff Colleen Fagan** is a resident of Portland, Maine. She is a lifelong Mainer. On the morning of January 23, 2026, Plaintiff Fagan exercised her constitutional right to

observe and record law enforcement activity in public spaces. While she was doing so, Defendants collected her biometric data and license plate information and told her she was being added to a "nice little database" and being labeled in the database as a "domestic terrorist."

10.     **Plaintiff Polyxenia Pantos** is a resident of South Portland, Maine, and the spouse of Plaintiff Carlyn Williams. On the morning of January 20, 2026, Plaintiff Pantos exercised their constitutional right to observe and record law enforcement activity in public spaces. While they were doing so, Defendants collected, at minimum, the license plate information of the car they were driving, which is owned by Plaintiff Williams. Plaintiff Pantos has since been detained and subjected to enhanced screening by Defendants while returning to the country from Canada.

11.     **Plaintiff Carlyn Williams** is a resident of South Portland, Maine, and the spouse of Plaintiff Pantos. On the afternoon of January 20, 2026, Plaintiff Williams received a phone call from someone at the Department of Homeland Security, warning her that Plaintiff Pantos might be added to a "domestic terrorist" watchlist if they continued to exercise their constitutional right to observe and record law enforcement activity in public spaces. Plaintiff Williams has since been detained and subjected to enhanced screening by Defendants while returning to the country from Canada.

12.     **Defendant Markwayne Mullin** is sued in his official capacity as the Secretary of Homeland Security.

13.     **Defendant Todd Lyons** is sued in his official capacity as the senior official currently performing the duties of the Director of U.S. Immigration and Customs Enforcement ("ICE").

14.     **Defendant John A. Condon** is sued in his official capacity as the Acting Executive Associate Director for ICE's Homeland Security Investigations ("HSI") directorate.

3

15.     **Defendant Rodney Scott** is sued in his official capacity as the Commissioner of U.S. Customs and Border Protection ("CBP").

16.     **Defendant Michael Banks** is sued in his official capacity as the Chief of the U.S. Border Patrol ("USBP").

17.     **Defendant U.S. Department of Homeland Security** ("DHS") is a federal agency headquartered in Washington, D.C.

18.     **Defendant U.S. Immigration and Customs Enforcement** is a component agency of Defendant DHS headquartered in Washington, D.C.

19.     **Defendant Homeland Security Investigations** is a directorate of Defendant ICE headquartered in Washington, D.C.

20.     **Defendant U.S. Customs and Border Protection** is a component agency of Defendant DHS headquartered in Washington, D.C.

21.     **Defendant U.S. Border Patrol** is a component of Defendant CBP headquartered in Washington, D.C.

22.     **Defendants Unidentified Federal Agencies** are unidentified agencies, departments, or components of the U.S. government whose employees or agents, acting under color of federal law and within the scope of their federal employment and duties, are participating in the unlawful conduct described in this Complaint.

23.     **Defendants Unidentified Federal Agents** are unidentified agents and officers of federal agencies, acting under color of federal law and within the scope of their federal employment and duties, who are participating in the unlawful conduct described in this Complaint.

## JURISDICTION AND VENUE

24. The Court has jurisdiction under 28 U.S.C. § 1331 because the claims in this civil action arise under the First Amendment to the United States Constitution.

25. Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(B) because a substantial part of the events or omissions giving rise to these claims occurred in this District. In addition, venue is proper under 28 U.S.C. § 1391(e)(1)(C) because Plaintiffs Hilton, Fagan, Pantos, and Williams all reside in this District.

## FACTUAL ALLEGATIONS

**I. Defendants Are Unlawfully Targeting and Intimidating Maine Residents Because of Their Protected Activity.**

26. In Maine, as elsewhere in the country, the federal government has deployed thousands of federal forces—including ICE agents and other law enforcement—as part of a mass deportation campaign. The average number of monthly immigration-related arrests in Maine has been significantly higher since the administration began expanding its efforts to accomplish the "largest deportation program in American history" and meet a stated goal of at least 3,000 immigration-related arrests daily.

27. On January 20, 2026, DHS announced Operation "Catch of the Day," which it described as a concerted immigration enforcement surge across Maine. DHS has not publicly confirmed what additional law enforcement resources have been committed to Maine, but DHS has publicly said that it has a "target list" of 1,400 individuals to arrest through this effort. More than 200 people were arrested within the first week of the operation. Immigration arrests and detentions have continued, and it has been publicly reported that ICE plans to expand its offices in Maine.

28.    Operation "Catch of the Day" followed similar operations in Los Angeles, Portland, Or., Chicago ("Operation Midway Blitz"), and Minnesota ("Operation Metro Surge"). These and other operations throughout the country have led to widespread protests and other forms of constitutionally protected dissent—including by those who are making it a point to witness and document the administration's tactics and hold it to account for abuses of power ("observers").

29.    Defendants have consistently and aggressively sought to suppress this protected activity wherever it takes place. Among other things, federal agents have routinely antagonized observers following DHS vehicles, describing their actions as "impeding law enforcement" and threatening them with arrest. *See, e.g.*, *Chicago Headline Club v. Noem*, 2025 WL 3240782, at *9 n.8 (N.D. Ill. Nov. 20, 2025). Observers have also reported other "disturbing conduct," including federal agents following them to their homes, telling them they know where they live, and in extreme cases, threatening them with physical violence. *See, e.g.*, *Tincher v. Noem*, 2026 WL 125375, at *9 n.15 (D. Minn. Jan. 16, 2026).

30.    At the same time, federal agents and officials have engaged in a monthslong campaign to falsely label observers and other protestors as "domestic terrorists." This year began with high-level administration officials labeling both Renee Good and Alex Pretti as domestic terrorists after federal agents shot and killed them in separate incidents in Minnesota.

31.    As they have elsewhere, Defendants in Maine have engaged in a clear policy and practice to chill the exercise of protected activity: federal agents identify and collect biometric and other personal information about the individuals witnessing and documenting agents' conduct, often by scanning their faces or license plates. That information is then stored in

6

government databases or on watchlists that subject the observers to additional scrutiny and harm.

32.    In some instances, the harm extends beyond wrongfully including observers in databases or watchlists on the basis of their protected activity. For individuals such as Plaintiffs, agents have used that identifying information to further deter protected activity—either by expressly threatening observers that they will be treated as "domestic terrorists" or by engaging in other tactics designed to send an unmistakably threatening message.

**A. Plaintiffs Are Labeled "Domestic Terrorists" and Threatened Because They Observe and Record Immigration Operations.**

### i.  *Plaintiff Colleen Fagan*

33.    Plaintiff Colleen Fagan is a resident of Portland, Maine. She was born and raised in Maine. Fagan is a social worker with deep ties to her community and a strong commitment to public service.

34.    Plaintiff Fagan believes strongly in advocating for the rights of immigrants in the United States. Peaceful protest is deeply important to her, and she has attended protests to voice her support for her preferred policies and show solidarity with immigrant communities.

35.    Observing and documenting law enforcement operations to detain and deport members of her community is one of the ways Plaintiff Fagan has expressed her views. On January 23, 2026, she acted as an observer in order to document the conduct of federal agents in her town, to help spread awareness of law enforcement tactics she disagrees with, and to hold federal agents accountable for their misconduct by capturing it on video.

36.    On that morning, soon after Operation "Catch of the Day" began, Plaintiff Fagan exercised her constitutional right to observe and record law enforcement activity in public spaces. She documented two separate law enforcement encounters in her community.

7

37.     The first encounter involved the arrest and detention of a local woman outside an apartment building.

38.     While driving on Westbrook Street in South Portland, Plaintiff Fagan observed several federal agents questioning a woman in her car. Fagan pulled over to the opposite side of the road to observe, and from her own car, began to record the interaction on her phone. Fagan watched and recorded as the law enforcement agents questioned the woman, forcibly removed her from her car as the woman screamed and cried for help, restrained her, and then drove away with her. At all times as she was observing this arrest, Fagan remained in her own car. At no time did agents indicate to her that she was obstructing or impeding their arrest.

39.     The second encounter began later that morning in the parking lot of a different apartment complex on Westbrook Street.

40.     While driving through the neighborhood, Fagan noticed at least two large, black vehicles that she thought were federal agents stopped inside the complex and blocking some of its parking spots.

41.     Plaintiff Fagan parked her car several car lengths away from the agents' vehicles and began to record. Fagan decided to record this encounter out of a general desire to document immigration enforcement activity, to hold agents accountable for any unlawful conduct, and due to the dramatic nature of the arrest that she had witnessed an hour prior, which had left her particularly concerned about how federal agents were acting in her community.

42.     Immediately after she began recording, two federal agents began walking toward Plaintiff Fagan and a second individual who was also observing. Both agents already had smartphones out and held up as if to record video or take photos. Neither agent had visible identification, and they both had their faces covered by masks.

8

43.    One agent (Agent 1) approached Plaintiff Fagan and appeared to film her face. Agent 1 then walked back to his vehicle. As seen in the video Fagan recorded, Agent 1 was masked and did not have a nameplate attached to his clothing, but he did have a law enforcement badge affixed to his protective vest, along with the words "POLICE."

44.    Agent 1 recorded, scanned, or otherwise captured Plaintiff Fagan's biometric data with his smartphone.



*Agent 1, filming Plaintiff Fagan's face*

45.     A second agent (Agent 2) walked behind Plaintiff Fagan to her vehicle and appeared to document Fagan's vehicle license plate number using his smartphone. Agent 2 recorded, scanned, or otherwise captured Fagan's license plate with his smartphone.



*Agent 2, filming Plaintiff Fagan's vehicle*

46.     As Agent 2 turned back from Plaintiff Fagan's vehicle, Fagan remained where she had been recording and said, "It's not illegal to record." Agent 2 continued to walk back toward Fagan—who remained stationary—and responded, "Exactly, that's what we're doing."

47.     Fagan's recording then captures her asking, "Why are you taking my information down?" Agent 2, who had been moving toward Plaintiff Fagan continuously until he was just feet away, turned to face her, looked directly into her camera, and said, "Cause we have a nice little database. And now you're considered a domestic terrorist, so have fun with that."

48.     Agent 2 remained masked during the entirety of the incident and did not identify himself to Plaintiff Fagan.

10

49.     Throughout the interaction, Plaintiff Fagan maintained a reasonable distance from the agents and their vehicles. The agents never told Fagan that she was acting unlawfully; in fact, Agent 2 said "exactly" in response to Fagan's statement that what she was doing was lawful.

50.     Nevertheless, by informing Plaintiff Fagan that observing and recording them had resulted in her inclusion in a "nice little database" and being labeled as a "domestic terrorist," the agents conveyed clearly and expressly that their purpose in capturing her face and license plate was to intimidate her and suppress lawful First Amendment activity.

51.     The agents' actions and statements reflect a DHS policy or practice of collecting and maintaining personal data about individuals who engage in protected First Amendment activity by observing and recording immigration operations.

52.     Each of the agents' actions and statements—collecting and storing her personal information, including her in a government database, and specifically labeling her a "terrorist"—was designed to intimidate Plaintiff Fagan into ceasing her constitutionally protected activity.

### ii.   Plaintiff Elinor Hilton

53.     Plaintiff Elinor Hilton is a resident of Portland, Maine. She has lived in Maine since early childhood.

54.     Plaintiff Hilton believes strongly in advocating for the rights of immigrants in the United States and has previously attended protests to voice support for and solidarity with immigrant communities.

55.     Observing and documenting law enforcement operations that detain and deport members of the local community has become an important part of the way Plaintiff Hilton expresses opposition to the administration's policies and practices on immigration. Hilton followed news reports of federal agents violating the law in other cities around the country

11

during public immigration operations and decided it was important to document what was happening in Portland.

56.    On the morning of January 21, 2026, after seeing reports of a possible immigration operation, Plaintiff Hilton drove to a Home Depot in South Portland. Upon arriving, she saw two groups of federal agents believed to be from DHS: at least two agents (Agents 3 and 4) were using their vehicles to block off an area of the parking lot near the store's garden center, and a second group of at least four agents was farther back in the corner of the parking lot and appeared to be in the process of detaining or arresting one or more individuals.

57.    Plaintiff Hilton parked in a public parking spot several rows away from Agents 3 and 4, exited her vehicle, and immediately began filming with a smartphone.

58.    Less than one minute later, Agent 3 began using his smartphone to capture Hilton's face, vehicle, and license plate. Agent 3 recorded, scanned, or otherwise captured Hilton's face with his smartphone.

 

*Agent 3 filming Plaintiff Hilton's face*

59.    Plaintiff Hilton began walking away from Agents 3 and 4 and toward the second group of agents (who were approximately 75 feet away) in order to capture better footage of the

12

arrest. Agents 3 and 4 did not instruct Hilton to stop, and she maintained a reasonable distance from them.

60.  As Plaintiff Hilton walked closer to the second group of agents, one of the agents from that group (Agent 5) walked toward Hilton and directed her to remain where she was and not move any closer. Plaintiff Hilton complied, and did not move any closer.

61.  While Plaintiff Hilton was speaking with Agent 5, Agent 3 got into his vehicle, drove around Hilton, and then swerved right in front of her, seemingly to block any view of the second group of agents. Then Agent 3 got out of his vehicle and started filming Hilton's face again.

62.  At this time, two other agents (Agent 6, who was carrying pepper spray, and Agent 7) approached Plaintiff Hilton. Agent 6 reiterated the instruction for Hilton not to come any closer. Again, she complied.

63.  As Agent 6 turned away from Plaintiff Hilton, Agent 3—whose vest had "HSI" affixed to it—stepped directly in front of Hilton with his smartphone outstretched and proceeded to record her. Hilton stated to Agent 3, "I know I can film." Agent 3 replied, "Yeah, okay."



*Agent 3 filming Plaintiff Hilton's face*

13

64.    As Plaintiff Hilton spoke with Agent 3, another agent (Agent 8) quickly walked toward her. Agent 8 stood within approximately six inches of Hilton's face and proceeded to record her with a smartphone at extremely close range. After a brief moment, Agent 8 stepped back slightly but continued filming for approximately one to two minutes longer.



*Agent 8 filming Plaintiff Hilton's face*

65.    Agent 8 then asked Agent 3—both of whom were continuing to film Plaintiff Hilton—"Which car did she get out of? Was it this car?" Agent 3 replied, "I got 'em, I got 'em. Yeah, I got 'em."

66.    As Plaintiff Hilton remained in the same location, Agent 3 said, "I hope you know that if you keep coming to things like this, you are going to be on a domestic terrorist watchlist. Then we're going to come to your house later tonight." He then turned to Agent 8 to reiterate: "She's just going on the domestic terrorist watchlist." Agent 8 replied, "Oh, absolutely."

67.    Plaintiff Hilton continued standing in the same location, attempting to record the arrest from a distance. Agent 8 turned and walked away, approaching Agent 5, who asked, "What's up?" Agent 8 replied, "It's alright, she's just going on a domestic terrorist watchlist. I just want to put it in." Agent 5 then responded, "Absolutely, go for it."

14

68.     Up until this point, Plaintiff Hilton was the only person present in the parking area who appeared to be observing the agents. But at this point, another person arrived and began watching and filming the agents, as well.

69.     After Hilton continued to film for another several minutes, Agent 8 told Hilton and the other observer, "We're gonna do the same thing. Just for a warning, we're putting you into a watchlist." Moments later, Agent 6 pointed at the other observer standing near Plaintiff Hilton and said, "Take a picture of this guy! We'll put him on the watchlist."



*Agent 6 pointing at an off-camera observer*

70.     Again, the message of intimidation was express and clear: Plaintiff Hilton's lawfully protected First Amendment activity, and that of her fellow observer, would result in them having their personal data captured and being placed on a "domestic terrorist watchlist."

71.     Around this time, approximately four to six other individuals arrived at the scene and began observing and filming the agents, as well. As Plaintiff Hilton and the other observers stood there, Agent 6 asked the group, "Are you all getting paid for this?" Shortly thereafter, the agents directed Plaintiff Hilton and the other observers to move farther away. They all complied.

72.     Upon information and belief, the federal agents involved in the encounter with Plaintiff Hilton are not the same agents as those involved in the encounter with Plaintiff Fagan.

15

### iii.   Plaintiffs Polyxenia Pantos and Carlyn Williams

73.    Plaintiffs Polyxenia Pantos and Carlyn Williams are a married couple residing in South Portland, Maine. Plaintiff Williams was born and raised in Maine.

74.    On the morning of January 20, 2026, Plaintiff Pantos was driving their spouse Plaintiff Williams' car (a Chevrolet Bolt) to a daycare where they work as an occupational therapist. Around 10 a.m., Plaintiff Pantos noticed a group of several unmarked vehicles on the side of the road. Aware that it was the first day of enhanced immigration operations in Maine, Plaintiff Pantos pulled over intending to observe and record the actions of federal agents.

75.    Having previously witnessed a violent incident involving the police, Plaintiff Pantos considered it their responsibility as a citizen to witness the actions of law enforcement. By observing the agents' conduct, Plaintiff Pantos intended both to make the agents aware that people were watching and to help hold them accountable for any wrongdoing.

76.    After exiting their vehicle, Plaintiff Pantos took photos of the agents and remained on the scene for approximately five minutes. They remained at least 10 feet away from the agents at all times and did not interact with or speak to the agents at all.

77.    During the incident, Plaintiff Pantos observed a female agent (Agent 9) wearing a vest marked "POLICE HSI" photographing another observer's license plate.



*Agent 9*

78.     A video of the immigration operation that Plaintiffs Pantos witnessed was later posted online at https://www.instagram.com/reels/DTvRBzwjsHN/. Near the end of that video, a male agent (Agent 10) can be seen holding up his phone and apparently recording the observer who was filming the video. Agent 3 from Plaintiff Hilton's encounter also appears in the video and interacts with the person filming.



*Agent 10 filming an observer*

79.     After leaving the scene, Plaintiff Pantos called their spouse, Plaintiff Williams, multiple times, distraught about the incident they had just witnessed.

80.     At 3:17 p.m., Plaintiff Williams received a phone call from an undisclosed number. Williams answered, and the person on the line (Agent 11) asked, "Is this Carlyn Williams?" Plaintiff Williams responded, "May I ask who is calling?" to which the person on the

18

line said, "This is the Department of Homeland Security." After Plaintiff Williams confirmed, "This is she," the caller asked, "Does anyone other than you ever drive your vehicle?"

81.     Plaintiff Williams responded, "No, not really." The caller then asked again if Williams was sure no one else drives her vehicle, and Williams responded that sometimes her spouse drives it.

82.     The caller then asked questions along the lines of: "Was she driving it this morning? Are you aware that she stopped at an incident?" Plaintiff Williams felt disoriented by the questions and indicated she was not sure. The caller then said something like, "You should encourage her not to do anything like that in the future because people who are doing things like that might get added to a domestic terrorism watchlist." The call then ended.

83.     The call lasted approximately one minute. The caller never provided their name or any identifying information other than their employment at DHS.

84.     The call confirmed that Plaintiff Pantos' First Amendment-protected activity had already resulted in the collection of personal data about both Plaintiffs Pantos and Williams—at minimum, Williams' cell phone number and the license plate information of the car that both regularly drive.

85.     The caller also unmistakably threatened that continuing to engage in "things like that"—*i.e.*, constitutionally protected activity observing and recording immigration agents— would lead to placement on a domestic terrorist watchlist.

86.     Nearly two months later, Plaintiffs Pantos and Williams traveled to Quebec City, Canada to celebrate their anniversary. The couple drove Plaintiff Pantos' car, a Hyundai—not the car that Pantos had driven on the morning of January 20, 2026.

19

87.     On the afternoon of March 16, 2026, Plaintiffs Pantos and Williams arrived at the Jackman Border Crossing to return to Maine. After taking their passports and reviewing them in the booth, a CBP agent (Agent 12) instructed Plaintiffs to pull aside and took their phones and car keys. He directed Plaintiffs to wait inside the terminal.

88.     Upon information and belief, the CBP agent encountered some kind of flag or lookout on Plaintiffs' passports that required additional screening or questioning.

89.     After a few minutes in the terminal, Agent 12 called Plaintiffs to the desk and asked Plaintiff Williams whether she had her car registration with her. Plaintiff Pantos told the agent that the couple had been driving Pantos' car. The agent stated he understood but pointedly asked again whether Plaintiff Williams had her car registration. After Plaintiff Williams said the registration was in her car at home, the agent asked additional questions about her car and its license plate number.

90.     Neither Plaintiff Pantos nor Plaintiff Williams had indicated prior to the agent's questions that they owned another vehicle. The registration on Plaintiff Williams' car does not expire until May 31, 2026, and there is no conceivable reason to ask about her car other than the incident involving Plaintiff Pantos on January 20, 2026.

91.     Plaintiffs Pantos and Williams were detained for approximately one hour and were treated as if they were under investigation during that time. When Plaintiff Pantos asked to use the restroom, the woman behind the counter stated, "I don't know what you're in for, so I need to check with him" (meaning Agent 12).

92.     Neither Plaintiff Pantos nor Plaintiff Williams had ever encountered any issue while reentering the United States after international travel.

93.     Upon information and belief, Plaintiffs' detention at the border is directly related to the incident on January 20, 2026, when a DHS agent collected their license plate information because of Plaintiff Pantos' constitutionally protected activity. The experience indicates that Plaintiffs Pantos and Williams have indeed been placed on a government list or database of some kind, as the DHS caller threatened.

**B. DHS Agents Have Retaliated Against Numerous Other Maine Residents for Engaging in Protected Activity.**

94.     Plaintiffs are not the only Mainers who have had agents scan their faces or vehicles because they were engaging in protected First Amendment activity.

95.     After observing another ICE sighting in a friend's car, Plaintiff Williams was told by two other observers at the same sighting that they had seen federal agents photographing their license plates.

96.     In some cases, federal agents have not only collected biometric data and vehicle information, but have then used the information they collected to locate observers' residences, go to those residences, and further intimidate observers by making clear that agents know where they live—exactly as Agent 5 told Plaintiff Hilton would happen to her "if you keep coming to things like this."

97.     For example, Westbrook resident and school committee member Erin Cavallaro engaged in protected activity by observing immigration agents and following their vehicles at a safe distance in order to document their conduct. Cavallaro described her goals and those of fellow observers as "to bear witness to ICE activity in our community. To document what we see, and ensure transparency and accountability—not to interfere with law enforcement."

98.     During the week of January 23, 2026, Cavallaro saw an ICE vehicle in the parking lot of a local coffee shop and "decided to follow safely behind to see what neighborhood

21

it would be going to next in an effort to let others know so we could all bear witness to what their activities were." Cavallaro reported that within a couple of minutes she realized that the agent was leading her to her own home, where he then began "honking aggressively." Cavallaro believed the agents obtained her home address and location by scanning her license plate. Cavallaro understood the federal agents' actions as "clearly . . . an attempt to let me know 'we know who you are, we know where you live,'" and thus pressure her to stop documenting their actions.

99.    Another Westbrook resident, Liz McLellan, encountered federal agents on January 21, 2026. That morning, McLellan filmed agents making an immigration arrest in a residential area on Pleasant Street in Westbrook.

100.    McLellan then learned that federal agents were monitoring an elementary school bus stop in Frenchtown. She and other residents observed and documented the agents' activities. After the agents departed, McLellan followed a female agent in an unmarked vehicle in her own car. The agent soon drove to McLellan's home, where several other agents joined. The agents likely obtained McLellan's name and address by recording her face or license plate during one or both of her constitutionally-protected observations of agent activity that morning.

101.    McLellan's friend recorded the subsequent encounter between McLellan and the agents in front of her residence. In the recording, an agent approaches McLellan's car holding a smartphone and says, "This is a warning. We know you live right here." Other federal agents then approached McLellan's friend and began filming him. About a minute later, the female agent returned to McLellan's car and said, "This is your one warning. You're impeding an operation."

102. Public reports quote McLellan saying that the incident "definitely felt like a pure intimidation tactic" and that she considered the event to be "one of the scariest things that ever happened to me." Afraid for her family's safety, she arranged for her children to stay away from their home.

103. On January 29, 2026, ICE issued a press release that included the following statement from ICE Deputy Assistant Director Patricia Hyde: "Our officers arrested more than 200 alien offenders in less than a week despite the organized efforts from activist groups, radical politicians and protestors to thwart our activities. ICE will not be deterred from enforcing U.S. immigration law."

104. The press release also included an image of a woman in a pink hat standing in the doorway of her vehicle, with her smartphone raised as if to record one or more agents who were also photographing or documenting her. The woman in the pink hat is McLellan. The January 29, 2026, press release is no longer available on ICE's website.

105. Yet another Westbrook resident, Joe Salisbury, reported that after he documented an agent while driving behind the agent, the agent led him "right to [his] house" and "pumped [the] brake in front of [his] house." A recording Salisbury submitted to CNN shows a silver sedan slowing down as Salisbury says, "They're gonna stop in front of my house this time." Federal agents likely obtained Salisbury's address by taking photographs of his license plate during this encounter.

106. Like the threat to put observers in a government database or watchlist and to label them "domestic terrorists," driving by or otherwise appearing at observers' homes is intended to punish and deter the exercise of First Amendment activity. The message is clear: Defendants are

23

tracking those who observe or record them and will retaliate against those that they are able to identify.

## II.    Defendants Have a Policy and Practice of Collecting and Maintaining Records About Observers in One or More Government Databases.

107.    As detailed above, federal agents told both Plaintiffs Fagan and Hilton that, because they observed and recorded DHS immigration operations, they and other observers would be added to a "watchlist" or "database" using the information that agents had collected about them. Another DHS official obtained Plaintiff Williams' cell phone number and called to convey a very similar warning about Plaintiff Pantos ending up on a "domestic terrorism watchlist." Days later, a federal agent told another observer in Minnesota that he "would be added to a list of domestic terrorists" after photographing his face and license plate. And as detailed below, ICE officials have confirmed the existence of government databases containing personal information about observers who were exercising their First Amendment rights.

108.    Consistent with these official statements, Defendant DHS has a policy and practice of collecting and maintaining in one or more government databases or watchlists personal information about individuals because they have exercised their constitutional right to peacefully observe or record immigration enforcement operations by Defendants. As set forth above, Plaintiffs and Class Members have been subjected to that policy and practice in violation of their First Amendment rights.

### A. Defendants Are Gathering Information About Individuals Engaged in Protected Activity, Often Harnessing New Surveillance Tools and Technologies.

109.    Consistent with Plaintiffs' experiences, it has been widely reported that DHS agents are routinely photographing, filming, recording, or otherwise capturing information about observers at immigration enforcement operations. These encounters have been reported not just in Maine, but also in other cities, such as Minneapolis and Chicago.

24

110. Agents have used both smartphones and professional-grade photo equipment to capture photographs of observers. On January 24, 2026, it was reported that ICE agents were using sophisticated equipment to scan the faces of the crowd that gathered in Minneapolis in response to Alex Pretti's shooting.

111. According to a February 10, 2026 report in *Reuters*, two ICE officials confirmed that "ICE has been tracking the names of protesters in an internal database for several months." The government database reportedly "contains names, photos, actions that provoked suspicion, locations and license plates."

112. Other government officials have confirmed that Defendants are systematically collecting and maintaining information about observers.

113. According to recent reporting by freelance journalist Ken Klippenstein, DHS has ordered agents to gather identifying information about any person filming them and to "send that information to Intel who will do a 'work-up' on them." The "work-up" would include "trying to identify them via social media, running their license plates if available, and running a criminal history check."

114. In January 2026, a DHS official sent a memorandum to HSI agents assigned to Minnesota asking them to "capture all images, license plates, identifications, and general information on hotels [sic], agitators, protestors, etc., so we can capture it all in one consolidated form." The form is titled "intel collection non-arrests," indicating that it is used to record information about individuals who are not arrested for criminal activity.

115. On January 16, 2026, White House border czar Tom Homan confirmed in an interview with Laura Ingraham on *Fox News* that federal officials planned to create a database to track individuals the administration believed to be impeding ICE officers: "If you interfere or

impede or assault an ICE officer, you will be prosecuted and one thing I'm pushing for now, Laura, we're going to create a database."

116.    According to a January 30, 2026 report, three current and former DHS officials confirmed to the *New York Times* that agents are using technologies like facial recognition to track protestors, separate from their use in investigating individuals connected to immigration offenses.

117.    These accounts of Defendants' actions are consistent with publicly available information about the advanced technologies Defendants have recently acquired and deployed, including facial recognition software, license plate readers, and other technologies that can help locate and track individuals.

118.    ***Facial recognition.*** Defendants use facial recognition technology as one means to implement the challenged policy and practice. In May 2025, Defendants ICE and CBP began using a new facial recognition app, Mobile Fortify, that aims to enable agents to identify an individual using a smartphone camera. Once an agent takes a photo of an individual's face, the app searches through approximately 200 million images across a number of government databases for a possible match. If the system identifies a purported match, it displays the subject's name and biographical information.

119.    DHS records explain that the "'Mobile Fortify' application utilizes CBP's facial comparison … to quickly identify subjects of interest during operations." A DHS privacy assessment on Mobile Fortify further states, "ICE does not provide the opportunity for individuals to decline or consent to the collection and use of biometric data/photograph collection."

26

120.    As of January 2026, DHS agents had used Mobile Fortify in the field more than 100,000 times. DHS agents routinely use Mobile Fortify and/or other facial recognition technology to identify individuals who are not themselves the targets of enforcement operations.

121.    According to government records, all photos taken using Mobile Fortify are retained in DHS's Automated Targeting System for 15 years, along with geolocation data tracking where the agent's encounter with the individual took place. The Automated Targeting System is a system of records used to screen travelers entering and exiting the United States.

122.    In September 2025, in the midst of the federal crackdown in Chicago, Defendant ICE also paid $3.8 million for facial recognition tools provided by Clearview AI. Clearview has a private database of billions of images scraped from online sources (*e.g.*, social media, YouTube, and millions of other websites).

123.    ***License plate readers.*** As another method to implement the challenged policy and practice, DHS uses license plate readers that allow agents to obtain information about a vehicle's owner and travel history.

124.    In November 2025, public reporting confirmed that ICE had begun deploying a mobile app called Mobile Companion, which allows agents to scan a license plate in the field using a smartphone. The agent is then able to access previous sightings of the vehicle, information about the vehicle's travel patterns, and data from private data brokers including phone numbers, addresses, associates, social media activity, driver license data, voter registration, and more. The Mobile Companion app can also be used to set up watchlists of license plate numbers and obtain real-time notifications whenever a listed vehicle is captured on a national camera network.

125.    Defendant Border Patrol also uses a network of license plate readers and predictive intelligence to identify and detain individuals whose travel patterns it considers suspicious.

126.    These represent just a sample of the vast (and increasing) technological capabilities at Defendants' disposal. Pursuant to the challenged policy and practice, Defendants are wielding these technological capabilities and other surveillance methods to collect information about observers and maintain biometric and other personal identifying information about them.

**B. Defendants Have Logged the First Amendment Activities of Observers into Databases and Watchlists that They Maintain or Access.**

127.    Also pursuant to the challenged policy and practice, Defendants have maintained the personal identifying information they collect in official government databases or watchlists, in response to observers exercising their protected First Amendment rights.

128.    As noted, two ICE officials have confirmed to *Reuters* that ICE has an "internal database" tracking the names of protestors, along with "photos, actions that provoked suspicion, locations and license plates."

129.    On January 28, 2026, Ken Klippenstein reported that two senior national security officials confirmed the existence of more than a dozen "watchlists" that Defendant DHS is using to track protestors and/or so-called "domestic terrorists" (the same label affixed to Plaintiffs by Defendants). According to the report, the lists and applications are "new domestic-related watchlists—a set of databases and applications—[that] exist inside and outside the FBI and are used by agencies like ICE and the Border Patrol," and are referred to by code names like "Bluekey, Grapevine, Hummingbird, Reaper, Sandcastle, Sienna, Slipstream, and Sparta." These lists and applications are "interlocking," and some are reportedly "used to link people on the

streets together, including collecting on friends and families who have nothing to do with any purported lawbreaking."

130.    According to the same report, a DHS lawyer said about the collection and maintenance practice, "We over collect and everyone agrees we should create this or that list or application to wrestle the information to submission lest we miss something important. . . . So the data people do their thing and pretty soon you actually have Big Brother."

131.    These newly-reported databases are in addition to numerous previously publicly known systems and databases maintained by Defendant DHS that are intended to track and aggregate data related to individuals suspected of terrorism and other crimes. These include:

- the Intelligence Reporting System - Next Generation ("IRS-NG"), which feeds into, among other things, the Automated Targeting System database;

- the Watchlist Service, which obtains information from the FBI's Terrorist Screening Dataset and disseminates that information to DHS components;

- the ICE Intelligence Records System, which includes, among other things, intelligence products prepared by ICE for use by criminal investigators; and

- the Enforcement Integrated Database and associated applications like the EID Arrest Guide for Law Enforcement, which include, among other things, information about investigations and arrests by DHS agents.

Information maintained in these systems and databases is accessible by federal officials and agents both within and outside of DHS.

132.    Recently leaked DHS documents reflect that protestors have been entered into the IRS-NG database based on their participation in protests and advocacy of particular viewpoints. For example, certain leaked entries from IRS-NG show the identity of protestors (found through

open-source research conducted by DHS analysts) and describe their protest activity. These entries contain no allegations of unlawful conduct by these individuals—merely their lawful expressive activities, such as using a bullhorn or "advocating the principles of Antifa" in videos.

133.    According to DHS records, IRS-NG provides federal agents access to at least 28 interconnected government databases. An individual entered into the IRS-NG database is thus effectively entered into a broader federal screening architecture.

134.    Because of the interconnected nature of IRS-NG and other databases, the act of logging an individual's information into the system effectively causes that individual's information to be disseminated across these databases to all federal personnel who have access to these interconnected systems.

135.    Defendants have informed Plaintiffs that at least one relevant database or watchlist exists. A DHS agent indicated to Plaintiff Fagan that the agency has a "little database" that he was uploading her information into, which would result in her being labeled a "domestic terrorist." Likewise, after a DHS agent appeared to collect Plaintiff Hilton's biometric data, he told her that she was in danger of being added to "a domestic terrorist watchlist." And a DHS agent called Plaintiff Williams to warn that Plaintiff Pantos would be added to a "domestic terrorism watchlist" if they continued to observe ICE operations.

136.    Thus, the information collected about individuals who engage in protected First Amendment activity by observing and recording immigration enforcement operations—including Plaintiffs and Class Members—is populated into (and thereby disseminated through) one or more of the databases or watchlists maintained by Defendants DHS and other federal agencies.

137. The experiences of Plaintiffs Pantos and Williams provide compelling evidence that the personal information of people observing and recording immigration operations has been logged in a database or watchlist of some kind.

138. First, Plaintiff Williams received a phone call from someone at "the Department of Homeland Security" several hours after one or more agents in the field captured her license plate information. The person immediately asked Plaintiff Williams whether anyone else drives her car, rather than asking whether Plaintiff Williams *herself* had been at the incident that morning—strongly suggesting that the caller knew what Plaintiff Williams looks like and knew she had not been present that morning.

139. These details indicate that the license plate information obtained by DHS agents in the field was not merely stored locally on the agents' phones. Instead, an agent affirmatively used the license plate information hours later to access (and likely record) additional information about Plaintiff Williams in one or more databases.

140. Second, Plaintiffs Pantos and Williams' detention at the border on March 16, 2026 all but confirms that their information has been logged in a database or watchlist that is accessible by CBP agents in addition to ICE. The CBP agent at the Jackman Border Crossing appeared to encounter some kind of flag or lookout when he reviewed their passports, resulting in enhanced screening.

141. There is ample evidence that Plaintiffs were detained because of the incident on January 20, 2026 where Plaintiff Williams' license plate information was captured at an immigration enforcement operation. The first substantive questions the CBP agent asked Plaintiffs all concerned Williams' car and license plate number—even though the couple was driving Plaintiff Pantos' car and had not indicated to the agent that they even owned another car.

31

In addition, neither Plaintiff Pantos nor Plaintiff Williams had ever had an issue reentering the country after international travel. Yet on their first international trip since the incident in January 2026, they were subjected to enhanced screening and questioned about Plaintiff Williams' car.

142.    DHS officials have denied the existence of a "domestic terrorist" database, and in testimony before Congress on February 10, 2026, Defendant Lyons suggested that Plaintiffs' information was not in fact added to any database. That denial is inconsistent with numerous public reports and the statements of other federal officials and agents, including the agents who directly interacted with Plaintiffs. As alleged above, public reporting—including statements from DHS and ICE officials—confirms that Defendants ICE, DHS, and potentially other federal agencies have been tracking protestors in databases or watchlists for several months.

143.    If Defendants' denials *were* true—and the actions captured on video simply involved federal agents *pretending* to add observers to a database—then they are deliberately lying about domestic terrorist watchlists or databases to unlawfully intimidate observers. If Plaintiffs' information was not entered into a database or watchlist, then the statements by Agents 2, 3, 8, and 11 could only have been made to punish observers' First Amendment activity with the intent to chill future exercise of their First Amendment rights.

**III.    The Conduct That Plaintiffs and Class Members Are Experiencing Is Consistent with Agency Leadership Directives to Deter and Even Criminalize Core First Amendment Activity.**

144.    Federal agents in Maine are deploying a similar playbook to the one they have used across the country—collecting personal information about observers, maintaining records about their identities and activities, and weaponizing this information to threaten and harass people engaging in lawful, constitutionally protected activities. This campaign flows from the directives of DHS leaders and other administration officials. In addition to ordering agents to gather information about protected activity, DHS leadership has improperly characterized the

observation and videotaping of federal agents as a crime, abandoned policies meant to guard against the surveillance of First Amendment activities, and described lawful protected activities as domestic terrorism.

### A. DHS Leadership Characterizes Videotaping Officers During Immigration Enforcement Activity as a Crime.

145. Defendants have persistently—and incorrectly—taken the position that filming federal agents in public is a crime.

146. In July 2025, at a DHS press conference, then-Secretary of Homeland Security Kristi Noem publicly claimed that "videotaping" federal agents "where they're at, when they're out on operations" was "violence" and "threatening their safety." Noem intentionally mischaracterized what is in fact First Amendment-protected activity as conduct that amounts to a federal crime.

147. In September 2025, then-DHS Assistant Secretary for Public Affairs Tricia McLaughlin said in an official statement that "videotaping ICE law enforcement and posting photos and videos of them online is doxxing our agents," adding that DHS would "prosecute those who illegally harass ICE agents to the fullest extent of the law." That statement willfully misstates the law. In fact, it is entirely lawful to record federal agents in a public space while they are engaged in policing activity; federal laws against doxxing only prohibit the publication of restricted personal information, none of which would be available from just videotaping agents in the course of performing their duties.

148. Defendants have thus directed agents to treat efforts to observe and record law enforcement operations as "violence" and criminal activity.

149. Courts have already found that Defendants are systemically disregarding the rights of observers who monitor and videotape immigration enforcement operations. In

33

September 2025, a district court in California found that an "avalanche of evidence . . . suggests that federal agents acted pursuant to a common and widespread practice of violating the First Amendment rights of journalists, legal observers, and protestors." *L.A. Press Club v. Noem*, 709 F. Supp. 3d 1036, 1067 (C.D. Cal. 2025), *appeal docketed*, No. 25-5975 (9th Cir., Sept. 19, 2025). In January 2026, the same court found plausible allegations of a DHS policy "to treat photography and videorecording of DHS officers in public as 'threats' or 'doxxing' that DHS officers may respond to with force and address as crimes." *L.A. Press Club v. Noem*, 2026 WL 103972, at *8-9 (C.D. Cal. Jan. 8, 2026).

150.    And despite their efforts to suppress lawful observing and recording activity like Plaintiffs', Defendants have granted exclusive access to immigration operations and facilities to those journalists who portray them in a more favorable light.

**C. DHS Leadership Has Abandoned or Deviated from Policies That Prohibit the Collection and Maintenance of Information About First Amendment Activities.**

151.    DHS leadership's recent position on observer activities also marks a significant deviation from prior DHS policies, including policies issued during the first Trump administration.

152.    For example, a May 2019 DHS memorandum prohibited precisely the kind of record collection and maintenance at issue here. The memorandum, entitled "*Information Regarding First Amendment Protected Activities*," specifically directed that DHS personnel "shall not collect, maintain in DHS systems, or use information protected by the First Amendment unless (a) an individual has expressly granted their consent for DHS to collect, maintain, and use that information; (b) maintaining the record is expressly authorized by a federal statute; or (c) that information is relevant to a criminal, civil, or administrative activity relating to a law DHS enforces or administers." The memorandum also directs that "DHS

34

personnel should not pursue by questioning, research or other means, information relating to how an individual exercises his or her First Amendment rights unless one or more of the same conditions applies." The memorandum makes clear that information protected by the First Amendment includes "[i]nformation about an individual's associations with others for lawful purposes, including participation in protests or other non-violent demonstrations against government policy or actions."

153.    Although there has been no public announcement, Defendants have either explicitly or implicitly rescinded the 2019 memorandum. At the time the complaint in this case was filed, the 2019 memorandum appeared on the DHS website as "archived" and was described as "contain[ing] outdated information that may not reflect current policy or programs." The website was updated to remove this language on March 13, 2026, after Defendants filed their opposition to Plaintiffs' motion for a temporary restraining order.

154.    Similarly, the use of facial recognition technology against observers and protestors departs from prior DHS policy limiting the use of such technology. In September 2023, DHS issued Directive 026-11, titled "*Use of Face Recognition and Face Capture Technologies*," to ensure that facial recognition and capture technologies were "used properly" "to support critical law enforcement investigations, while protecting privacy and individual rights."

155.    DHS Directive 026-11 explicitly states that the agency "does not use [face recognition or face capture] technologies to profile, target, or discriminate against any individual solely for exercising their Constitutional rights or to enable systemic, indiscriminate, or wide-scale monitoring, surveillance, or tracking." It also includes a requirement that facial recognition not be used as the sole basis of any law or civil enforcement related action.

156.    DHS has also either explicitly or implicitly rescinded Directive 026-11 at some point before February 2026. Although there has been no public announcement, DHS Directive 026-11 is no longer available in the agency's online publication library, and another DHS website discussing the directive is described as "archived." The archived website indicates that it "contains outdated information that may not reflect current policy or programs." Defendants' rescission of this directive is further evidence that they have deliberately adopted a policy and practice of recording and intimidating individuals engaged in lawful observation and recording activities.

157.    As of September 2023, Defendant ICE also had a policy governing facial recognition technology that "limit[s] the collection of probe photos in certain contexts, such as participation at events protected by the First Amendment (e.g., protests)." Also as of that date, a training for HSI staff instructed that "staff may not collect probe photos based solely on an individual's participation in a noncriminal organization or event protected by the First Amendment." Although there has been no public announcement, Defendants have either explicitly or implicitly rescinded this policy, given their recording of individuals engaged in lawful observation and recording activities.

### D. DHS Leadership and Other Administration Officials Characterize Protesting Immigration Policies and Operations as "Domestic Terrorism."

158.    The intimidation, threats, and harassment Plaintiffs have experienced—including but not limited to the threat of being placed in a domestic terrorist database—are also a direct consequence of a monthslong campaign by Defendants and others in the current administration to falsely label protestors and observers as "domestic terrorists."

159.    In particular, Defendants and other senior administration officials have repeatedly referred to individuals observing and recording DHS operations as "domestic terrorists."

36

160.    On September 25, 2025, Defendant Lyons described those protesting Operation Midway Blitz in Chicago as "domestic terrorists," explaining that Defendant HSI would be investigating "professional agitators" as such. An October 2025 DHS video similarly described protestors in Portland, Oregon as "terrorists."

161.    On September 25, 2025, the President issued National Security Presidential Memorandum-7 ("NSPM-7"), "*Countering Domestic Terrorism and Organized Political Violence*."

a.    NSPM-7 directs the National Joint Terrorism Task Force and its local offices to "coordinate and supervise a comprehensive national strategy to investigate, prosecute, and disrupt entities and individuals engaged in acts of political violence and intimidation designed to suppress lawful political activity or obstruct the rule of law."

b.    NSPM-7 instructs the Attorney General to "issue specific guidance that ensures domestic terrorism priorities include politically motivated terrorist acts such as organized doxing campaigns, swatting, rioting, looting, trespass, assault, destruction of property, threats of violence, and civil disorder."

c.    Critically, NSPM-7 identifies certain ideological beliefs as indicators of domestic terrorism, suggesting that domestic terrorists "portray foundational American principles (e.g., support for law enforcement and border control) as 'fascist' to justify and encourage acts of violent revolution." NSPM-7 also cites "extremism on migration, race, and gender; and hostility towards those who hold traditional American views on family, religion, and morality" as motivations that may "animate" political violence.

162.    On December 4, 2025, the Attorney General issued a memorandum to all federal prosecutors and law enforcement agencies with the subject line "*Implementing National Security*

37

*Presidential Memorandum-7: Countering Domestic Terrorism and Organized Political Violence*" (the Bondi Memo).

a.    The Bondi Memo declares domestic terrorism to be a priority of federal law enforcement and directs the JTTFs to "map the full network of culpable actors involved in the referred conduct."  The JTTFs are run by the Federal Bureau of Investigation and include DHS components such as HSI.

b.    The Bondi Memo also repeats the ideological indicia of "domestic terrorism" articulated in NSPM-7, including "opposition to law and immigration enforcement."

c.    As particularly relevant here, the Bondi Memo identifies "doxing" and "impeding" immigration and other law enforcement as forms of domestic terrorism. The memo does not define "doxing," but references calls to require ICE agents to give their names and to operate unmasked. The Bondi Memo also encourages prosecutors to be "particularly mindful" of the possibility of charging alleged domestic terrorists with violating 18 U.S.C. § 111, the statute that prohibits assaulting, resisting, or impeding federal officers.

163.    According to internal FBI documents, as of late 2025, the FBI had opened a number of domestic terrorism investigations "in response to observed threats against immigration enforcement activity," including investigations out of field offices in Minnesota and Maine. Defendants' domestic terrorism investigations have included, upon information and belief, investigations into individuals who engaged in First Amendment-protected activity, such as lawfully observing and recording DHS activity in public places.

164.    On January 7, 2026, after an ICE agent shot and killed Renee Good in Minneapolis, DHS's official X (Twitter) account and then-Secretary Noem accused Good of domestic terrorism. Similarly, within hours of a Border Patrol agent shooting and killing Alex

38

Pretti on January 24, 2026, Noem claimed Pretti "committed an act of domestic terrorism, that's the facts." And after Renee Good's shooting, the Department of Justice began a criminal investigation into Good's wife, reportedly focusing on her connections to community groups that have been monitoring and protesting ICE. That investigation prompted six federal prosecutors to resign.

165.    On January 26, 2026, FBI Director Kash Patel announced an FBI investigation into Signal group chats that Minnesota residents have used to share information about ICE operations, suggesting that they "put[] law enforcement in harm's way." Asked about the investigation, White House border czar Tom Homan stated, "I'm not going to show our hand. But they'll be held accountable. Justice is coming."

166.    This is the context in which Defendants have leveled the threat of a "domestic terrorist" label against Plaintiffs and others engaged in protected activity across the country.

## IV.    Defendants' Actions Cause Significant Harm.

167.    Defendants' policy and practice of collecting and maintaining biometric and other personal information about individuals because they engage in protected observer activities is objectively chilling and has caused substantial harm. Likewise, Defendants' pattern and practice of threatening and harassing observers—including by labeling these individuals as "domestic terrorists" and threatening to follow them to their homes—is objectively chilling, and has caused substantial harm.

### A.  The Federal Agents' Actions and Statements Are Objectively Chilling.

168.    Any reasonable person would feel intimidated by federal agents making a point of recording or otherwise capturing their faces, license plate information, or other personal data, and then maintaining that information in an official database, solely because they engaged in peaceful protected activity. Indeed, courts have long recognized that the government's collection

39

of personal information chills the exercise of constitutional rights, as it signals the government is watching closely. *See United States v. Moore-Bush*, 36 F.4th 320, 358 (1st Cir. 2022). Defendants' collection and maintenance of biometric data and other personal information have been key parts of their strategy to intimidate observers in Maine who exercise their First Amendment rights.

169. The collection and maintenance of their personal information are chilling precisely because of the many ways that government agents can weaponize such information. Indeed, there are numerous reports of federal agents in Maine and in other states using personal information obtained in the field to harass and intimidate protestors and observers, making them fear for their personal safety.

170. As described above, federal agents have apparently obtained the home addresses of observers in Maine by scanning their faces or license plates, and have then driven by the individuals' homes in order to further intimidate them. One such individual, McLellan, described the incident as "one of the scariest things that ever happened to me" and arranged for her children to stay away from their home.

171. Similar experiences have been widely reported elsewhere. In Minnesota, for example, one observer reported that ICE agents took photos of her license plate and then walked up to her car window and said, "Hello Judith. How are you today?" The observer continued following the federal agents' vehicles, which soon led her to her own home. Another Minneapolis observer reported that he and a friend were following ICE agents in his friend's car when the agents led them to the friend's home, where the ICE agents took photos of the residence. As with the Maine residents, the observers in both of these incidents clearly understood ICE to be engaging in intimidation tactics.

172. More than a dozen declarations recently filed in federal court in Minnesota describe federal agents obtaining the addresses of observers and showing up at their homes. Given the stark pattern of Defendants misusing personal information about observers, any reasonable person will be concerned that they would face similar harassment as a result of their protected First Amendment activity.

173. Defendants also appear to be using the information they have collected to interfere with observers' travel. DHS is responsible for screening travelers and operating trusted traveler programs like Global Entry and TSA Precheck. One observer from Minnesota reported that DHS revoked her Global Entry status without explanation just days after a federal agent used facial recognition to identify her. And during another incident, a federal agent reportedly detained an observer in a vehicle and stated, "The registered owner of this vehicle is going to have fun trying to travel." Again, given this pattern of incidents, the experience of Plaintiffs Pantos and Williams, and DHS's significant authority with respect to travel, any reasonable person would be concerned that they will face similar issues as a result of their protected First Amendment activity.

174. In addition, being told you have been labeled a "domestic terrorist" in an official government database or watchlist, as Plaintiffs were, is especially and objectively frightening.

175. Although there is no statutory mechanism or other legal authority for the federal government to officially designate an individual as a "domestic terrorist" under federal law, being labeled as such (or some other equivalent label deeming someone a risk to national security) nonetheless has real impact and an intended chilling effect on those threatened.

176. Being labeled a "domestic terrorist" or the equivalent likely carries immense collateral risk, such as being subjected to enhanced screening at government checkpoints.

177. The administration's rhetoric and tendency to misrepresent the facts surrounding protests raise a reasonable fear of other risks, such as to one's employment, benefits, and—especially given recent shootings by federal officials in Minnesota—physical safety. Threats of a "domestic terrorist" label based on the exercise of First Amendment rights would thus chill any reasonable person.

178. Against the backdrop of NSPM-7 and the Bondi Memo, Defendants' "domestic terrorist" threats have a particularly acute chilling effect on collective protected activity, such as organizing with others to observe, record, and protest immigration operations.

179. Individuals now have good reason to fear that they appear on a government "list," or in a government database, that either specifically labels them as domestic terrorists or lumps together those engaged in protected advocacy along with those who may have actually planned or carried out violence or other criminal activities. Defendants' maintenance of such records causes ongoing harm in the form of reputational injury.

180. The prospect of being so labeled is particularly chilling because there is no clear way for an individual or organization to know for sure and to challenge a purported domestic terrorist label or designation—especially since Defendants disclaim any such activities when subject to oversight, despite public reporting to the contrary.

### B. Plaintiffs Have Been Specifically Harmed as a Result of Defendants' Intimidation Efforts.

181. Plaintiffs Fagan, Hilton, Pantos, and Williams have been specifically harmed as a result of being recorded, placed in a federal database or watchlist, threatened with being labeled a "domestic terrorist," and otherwise intimidated by Defendants.

182. Since her interaction with federal agents on January 23, 2026, Plaintiff Fagan has not engaged in any protest activity in the form of observing and recording law enforcement

officers in public. Plaintiff Fagan plans to observe and record Defendants in the future and is anxious about how agents will treat her now that they have collected her data.

183.    Because of her experience and a federal agent telling her that she is now labeled a "domestic terrorist" in a government database, Plaintiff Fagan is worried about being placed on a "no-fly" or a similar list that would subject her to enhanced scrutiny or risk when traveling. She also is afraid of having her current or future employment adversely affected by Defendants' characterization of her conduct.

184.    Plaintiff Fagan worries about what might happen if Defendants focus more attention on her now that they have identified her, and if that threatens her safety.

185.    Plaintiff Hilton did not stay at her home the night of January 21, 2026. After a federal agent indicated that agents would come to her house if she persisted in observing immigration enforcement operations, she feared they would actually do so.

186.    Although Hilton has continued observing DHS operations, she has greatly reduced how often she does so and has avoided driving her own car while observing. She also now parks several blocks from wherever she is going, including her own home and the homes of family members, out of concern that federal agents might recognize her car and trace it to her home.

187.    In addition, Plaintiff Hilton has altered her travel practices. On a recent trip, she did not bring her personal phone when flying out of concern that, if placed on a government list or database, agents might detain her, search her phone, or arrest her.

188.    Hilton is afraid of being placed on a "watchlist" of "domestic terrorists," as she was told, and that it will interfere with her ability to travel.

43

189.    Plaintiff Hilton, who is an artist, no longer attaches her name or social media handle to her work, and has asked community businesses and other groups not to publicly credit her for her work. She has taken these steps out of concern that law enforcement could use publicly available information to identify or further target her.

190.    Plaintiff Pantos has not engaged in any protected activity observing or recording immigration agents since January 20, 2026. Although Pantos considered it a civic duty to witness the actions of ICE agents in their community, they fear that their decision to do so on January 20 ended up endangering their spouse, their foster child, and their clients (many of whose families are vulnerable).

191.    Plaintiff Williams was also hesitant to observe and record ICE operations after receiving the phone call from DHS on January 20, 2026. She had many opportunities to respond to ICE sightings near their home, but she largely chose not to do so out of fear of interacting with federal agents. On the two occasions when Plaintiff Williams did choose to observe ICE agents after January 20, she drove with someone else rather than risk additional scrutiny of her vehicle.

192.    Since Plaintiffs' detention at the border on March 16, 2026, Plaintiff Williams has decided not to respond to any ICE sightings. She believes it is too risky to continue observing and recording ICE agents.

193.    Plaintiffs Pantos and Williams are also concerned about the impact of these experiences on their ability to travel. They are strongly considering avoiding any international travel for the foreseeable future, fearing that they would again be detained upon returning to the country.

194.    Plaintiff Williams is enrolled in TSA PreCheck and has seen reports of other observers of ICE operations losing their TSA PreCheck status. Plaintiff Williams is concerned

that her status will be revoked or otherwise affected as well, leading to additional issues while traveling.

195.    Plaintiffs Pantos and Williams have also feared that their placement on a government watchlist will jeopardize their personal safety, particularly as a married gay couple. Plaintiffs are aware that DHS was able to obtain Williams' phone number on January 20, 2026 and likely has their home address and other information as well. Plaintiffs have taken additional measures, including sharing their locations, keeping their home locked, and turning their phones off while traveling. They have discussed the need to take further measures, such as buying a gun for protection and having a plan for leaving the home if necessary.

## CLASS ALLEGATIONS

196.    Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2), Plaintiffs bring certain claims in this action for themselves and on behalf of others similarly situated across the District of Maine.

197.    Plaintiffs seek certification of the following proposed class: All individuals who have exercised or will exercise their constitutional right to peacefully observe or record immigration enforcement operations conducted by Defendants in the District of Maine and whose biometric data or other personal information is or will be collected and maintained by Defendants because of that activity (hereinafter referred to as the "Class").

198.    The Class satisfies the requirements for class certification set forth Rule 23(b)(2) because Defendants have acted and refused to act on grounds that generally apply to the Class, including by: (1) collecting personal information about Class Members in response to those Class Members observing or recording immigration enforcement operations in public in the District of Maine; (2) maintaining that information in one or more government databases or

45

watchlists; (3) using the information to identify Class Members when they are engaged in protected First Amendment activity; and (4) including Class Members on watchlists or databases maintained by Defendants because of their protected First Amendment activity.

199.    Injunctive and declaratory relief is therefore appropriate with respect to the Class as a whole.

200.    The Class also satisfies the four requirements of Rule 23(a).

201.    First, the Class satisfies the numerosity requirement of Rule 23(a)(1). The exact number of Class Members is unknown, but based on public reports about individuals observing and recording immigration enforcement operations in the District, the number of Class Members is at least in the hundreds. The Class is so numerous, and is constantly growing as more individuals observe and record immigration enforcement operations across the District, that joinder of all Class Members is impracticable.

202.    Second, the Class meets the commonality requirement of Rule 23(a)(2). The members of the Class are subject to the same policy and practice described above. In addition, there are questions of law and fact common to the Class, including but not limited to:

a.    Whether observing or recording federal law enforcement officers engaged in public duties in public spaces is protected under the First Amendment.

b.    Whether Defendants have a policy or practice of collecting biometric or other personal information of Class Members based on the Class Members having engaged in protected First Amendment activity, such as observing or recording immigration enforcement operations.

46

c.  Whether Defendants have a policy or practice of maintaining that biometric or other personal information of Class Members in one or more government lists or databases because of their protected First Amendment activity.

d.  Whether Class Members' protected First Amendment activity is a motivating factor for Defendants' above-described policies and practices.

e.  Whether Defendants' above-described policies and practices are justified by a compelling government interest and, if so, whether they are the least restrictive means of advancing that interest.

f.  Whether Defendants' above-described policies and practices would deter a person of ordinary firmness from engaging in protected First Amendment activities.

203.   Third, the Class meets the typicality requirement of Rule 23(a)(3) because the claims of Plaintiffs are typical of the claims of the Class. Each Plaintiff has observed and recorded DHS immigration operations in the District of Maine; was subjected to Defendants' policies and practices enumerated above; and seeks protection to bar continuing or repeated implementation of those policies and practices in the future.

204.   Plaintiffs have the same interests and have suffered the same type of injuries as the Class Members, and their claims are based on the same legal theories as the claims of the members of the Class. Plaintiffs seek the same relief as all members of the Class.

205.   Fourth, the Class meets the adequacy requirement of Rule 23(a)(4). Plaintiffs seek the same relief as the other Class Members. Plaintiffs will defend the rights of all Class Members fairly and adequately. Plaintiffs are members of the Class, and their interests do not conflict with those of the other Class Members.

206.    The Class is represented by experienced attorneys from Protect Democracy Project, Dunn Isaacson Rhee LLP, and Drummond Woodsum. Class counsel are all experienced in civil rights law, class actions, and other complex litigation, and they are familiar with the issues in this case. The interests of the members of the Class will be fairly and adequately protected by Plaintiffs and their attorneys.

**CLAIMS FOR RELIEF**

**COUNT I**
**Named Plaintiffs and Plaintiff Class Against All Defendants**
**Violation of the First Amendment (Retaliation)**
**(First Amendment Records)**

207.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

208.    The First Amendment protects the right to gather information about public officials performing public duties in public. It also protects the right to observe and record public officials performing their duties in public, including law enforcement. *Glik v. Cunniffe*, 655 F.3d 78, 83-84 (1st Cir. 2011); *Gericke v. Begin*, 753 F.3d 1, 7 (1st Cir. 2014).

209.    Plaintiffs and other Class Members have engaged in constitutionally protected activities—namely, peacefully observing or recording immigration enforcement operations for expressive purposes and to gather and disseminate information about those operations. Plaintiffs and other Class Members wish to continue engaging in these constitutionally protected activities.

210.    Defendants are collecting and maintaining Plaintiffs' and other Class Members' biometric data and other personal information because of their exercise of their First Amendment rights. This information is maintained in one or more government databases or watchlists.

48

211. Defendants and the federal agents discussed in this Complaint are operating pursuant to an official federal policy, approved by responsible federal agency heads with final policymaking authority.

212. Defendants' actions would likely deter a person of ordinary firmness from engaging in protected First Amendment activity.

213. Plaintiffs' and other Class Members' protected activity was and is at least a motivating factor in Defendants' adverse actions against them.

214. Defendants' ongoing conduct in violation of Plaintiffs' and other Class Members' constitutional rights and liberties has caused and is causing them irreparable harm.

215. Plaintiffs and other Class Members seek declaratory and injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

**COUNT II**
**Named Plaintiffs and Plaintiff Class Against All Defendants**
**Violation of the First Amendment (Free Speech, Assembly, Association)**
**(First Amendment Records)**

216. Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

217. As described more fully above, Plaintiffs and other Class Members have engaged in constitutionally protected activities and wish to continue to do so.

218. Defendants are collecting and maintaining Plaintiffs' and other Class Members' biometric data and other personal information because of their exercise of their First Amendment rights. This information is maintained in one or more government databases or watchlists.

219. Defendants and the federal agents discussed in this Complaint are operating pursuant to an official federal policy, approved by responsible federal agency heads with final policymaking authority.

49

220.    Defendants' actions are designed to chill, suppress, and control speech that they do not like.

221.    Defendants' actions do not serve any governmental interest, much less a significant or compelling governmental interest.

222.    Defendants' actions are not narrowly tailored to any governmental interest.

223.    Plaintiffs' and other Class Members' exercise of their rights to engage in constitutionally protected activity is being chilled due to the collection and maintenance of their personal information and the objectively reasonable fear that it will be used to target them for future adverse actions.

224.    Defendants' ongoing conduct in violation of Plaintiffs' and other Class Members' constitutional rights and liberties has caused and is causing them irreparable harm.

225.    Plaintiffs and other Class Members seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

## COUNT III
### Named Plaintiffs Against All Defendants
### First Amendment (Retaliation)
### (Threats and Harassment)

226.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

227.    As described more fully above, Plaintiffs have engaged in constitutionally protected activities and wish to continue to do so.

228.    Defendants have subjected Plaintiffs to adverse actions that would likely deter a person of ordinary firmness from engaging in protected First Amendment activity. These actions include verbal threats and other intimidation tactics, such as statements that Plaintiffs are being added to a "watchlist" or "database"; statements that Plaintiffs have been labeled "domestic

50

terrorists" in internal government databases; telling Plaintiff Hilton that federal agents would come to Hilton's residence at night; and detaining Plaintiffs Pantos and Williams at the border.

229.    There is a nationwide pattern and practice of federal agents making similar threats and engaging in similar acts of harassment.

230.    Plaintiffs' protected activity was and is at least a motivating factor in Defendants' adverse actions against Plaintiffs.

231.    Defendants' ongoing conduct in violation of Plaintiffs' constitutional rights and liberties has caused and is causing them irreparable harm.

232.    Plaintiffs seek declaratory and injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

**COUNT IV**
**Named Plaintiffs Against All Defendants**
**Violation of the First Amendment (Free Speech, Assembly, Association)**
**(Threats and Harassment)**

233.    Plaintiffs incorporate by reference each of the paragraphs in this Complaint as if restated fully herein.

234.    As described more fully above, Plaintiffs have engaged in constitutionally protected activities and wish to continue to do so.

235.    As described more fully above, Defendants are threatening or harassing Plaintiffs because of their exercise of their First Amendment rights. Defendants' conduct includes verbal threats and other intimidation tactics, such as statements that Plaintiffs are being added to a "watchlist" or "database"; statements that Plaintiffs have been labeled "domestic terrorists" in internal government databases; telling Plaintiff Hilton that federal agents would come to Hilton's residence at night; and detaining Plaintiffs Pantos and Williams at the border.

51

236. As described more fully above, Defendants have made these threats to Plaintiffs because of their protected activity.

237. There is a nationwide pattern and practice of federal agents making similar threats and engaging in similar acts of harassment.

238. Defendants' actions are designed to chill, suppress, and control speech that they do not like.

239. Defendants' actions do not serve any governmental interest, much less a significant or compelling governmental interest.

240. Defendants' actions are not narrowly tailored to any governmental interest.

241. Plaintiffs' exercise of their rights to engage in constitutionally protected activity is being chilled due to Defendants' threats and harassment.

242. Defendants' ongoing conduct in violation of Plaintiffs' constitutional rights and liberties has caused and is causing them irreparable harm.

243. Plaintiffs seek injunctive relief and reasonable attorneys' fees, costs, and expenses relating to this action.

## **PRAYER FOR RELIEF**

244. Plaintiffs respectfully request that the Court enter judgment in their favor and grant the following relief:

1. A determination that this action may proceed as a class action under Rule 23(b)(2) of the Federal Rules of Civil Procedure;

2. Designation of Plaintiffs as class representatives and designation of Plaintiffs' counsel as class counsel;

3. A declaration, pursuant to 28 U.S.C. § 2201, that the federal actions described in this Complaint constitute violations of the First Amendment;

4. A preliminary and permanent injunction barring Defendants, their officers, officials, agents, servants, employees, attorneys, and all persons acting in concert or participation with them, from engaging in the unconstitutional collection, maintenance, and dissemination of records based on First Amendment-protected activity and from threatening, harassing, and otherwise retaliating against Plaintiffs and other Class Members for exercising their First Amendment rights;

5. An order requiring expungement of any records collected or maintained about Plaintiffs and other Class Members based on their exercise of First Amendment rights;

6. Attorneys' fees, costs, and expenses; and

7. Such other and further relief as the Court may deem just and proper.

53

Dated: April 27, 2026

Respectfully submitted,

*/s/ JoAnna Suriani*
JoAnna Suriani*
Janine M. Lopez*
**Protect Democracy Project**
2020 Pennsylvania Ave. NW, Suite # 163
Washington, DC 20006
(202) 579-4582
joanna.suriani@protectdemocracy.org
janine.lopez@protectdemocracy.org

Genevieve Nadeau*
Kenneth Parreno*
**Protect Democracy Project**
15 Main Street, Suite 312
Watertown, MA 02472
(202) 579-4582
genevieve.nadeau@protectdemocracy.org
kenneth.parreno@protectdemocracy.org

Jessica Marsden*
**Protect Democracy Project**
510 Meadowmont VIII. Cir. No. 328
Chapel Hill, NC 27517
(202) 579-4582
jess.marsden@protectdemocracy.org

Melissa A. Hewey
David M. Kallin
**Drummond Woodsum**
84 Marginal Way, Suite 600
Portland, ME 04101
(207) 253-0528
mhewey@dwmlaw.com
dkallin@dwmlaw.com

Karen L. Dunn*
Jeannie S. Rhee*
L. Rush Atkinson*
Yotam Barkai*
John Paredes*
Benjamin J. Cabranes*
**Dunn Isaacson Rhee LLP**
401 9th Street, NW

54

Washington, DC 20004
(202) 240-2900
kdunn@dirllp.com
jrhee@dirllp.com
ratkinson@dirllp.com
ybarkai@dirllp.com
jparedes@dirllp.com
bcabranes@dirllp.com

*Admitted pro hac vice*