# EXHIBIT 42

# Whistleblower warns ICE has slashed training for recruits

pbs.org/newshour/show/whistleblower-warns-ice-has-slashed-training-for-recruits

Geoff Bennett February 26, 2026

A former ICE lawyer is warning that the agency has scaled back training hours for recruits and is instructing them to violate the Constitution. Ryan Schwank says the academy where he trained cadets is "deficient, defective and broken." He says it's part of the administration's effort to churn out new officers and increase arrests. Geoff Bennett spoke with Schwank and his attorney, David Kligerman.

A former ICE lawyer and training instructor who resigned this month is warning that the agency has scaled back training hours for new recruits and is instructing them to violate the Constitution.

Ryan Schwank told Democrats in Congress this past week that the academy where he trained cadets is -- quote -- "deficient, defective, and broken." He says it's part of an effort to turn out new officers and increase arrests as part of the Trump administration's crackdown on immigration.

Ryan Schwank is here and joins us now with his attorney, David Kligerman.

David Kligerman, Attorney for Ryan Schwank: Pleasure to be here.

**Ryan Schwank, Former ICE Academy Instructor:**

Thank you for having us.

Ryan, you have testified that ICE dramatically shortened its training program for new recruits from 72 days to 42 days. Exactly how much training was removed and what type of classes were eliminated?

**Ryan Schwank:**

So, out of a 584-hour program, they cut about 240 hours. And the classes they cut included classes on the fundamentals of the Constitution and the officers' duties within the structure of our legal system.

They cut out classes on -- multiple classes on use of force, multiple classes on how to use their firearms safely. They took out testing requirements that were set to allow us to measure whether or not the cadets that were coming out of the academy could actually exercise their authority in a safe and lawful fashion.

They took out classes that tied back to our understanding of due process within the legal system really.

DHS, in response to your testimony, issued a statement that reads in part: "No training hours have been cut. Our officers receive extensive firearm training, are taught de-escalation tactics, and receive Fourth and Fifth Amendment comprehensive instruction," to which you would say what?

**Ryan Schwank:**

Well, I would start by breaking that into a couple pieces.

They said Fourth and Fifth Amendment instruction. And that's true, there is some of that in the curriculum. But notice that they don't say anything about the removal of the First Amendment protections. They don't say anything about the due process, right? They won't deny that part in the statement they issued.

And, frankly, in that statement, they said no hours have been cut. That's simply untrue. You can look at the curriculum, which, by the testimony of Todd Lyons was 42 days out of a 72-day program, 42 days in the public statement they issued in January. And now, all of a sudden, in the same statement you're citing to, they say it's 56 days.

They suddenly added two weeks of training magically the day after I testified.

How well prepared do you believe new recruits are to distinguish between lawful enforcement activity and actions that could potentially violate constitutional protections like the Fourth Amendment?

**Ryan Schwank:**

Well, I will tell you that the cadets themselves brought their concerns with this to me. I had cadets who told me they were not sure of what their role was or what their duties were.

And to answer your question, no one can tell you right now that these cadets are fully prepared to understand the difference between a lawful and an unlawful order because no test, no measurement exists for the new cadets of how they would apply it in practice, because they specifically removed all of the testing that would have told us that.

At what point did you believe that it was necessary for you to speak out?

**Ryan Schwank:**

I realized the day I arrived at the academy and I was shown an unlawful memo that authorized officers and told me to teach officers to go into homes without a judicial warrant to make arrests that there was a serious problem.

And from that day, my goal was to make sure that I could document and track and see what was happening with that memo and then to see what was happening with the academy itself, because it was kind of like an avalanche. It started with this and then thing after step after step after step.

I just saw this massive degradation and destruction of our training requirements and the things that we owe to these cadets. We -- there's a lot of conversation and immigration law about the rights of the immigrant, and that's a very important conversation. But these law enforcement officers themselves are being done a terrible disservice, because we are sending them out into the world without the training they need to do the job they signed up to do.

Generally speaking, who are these new recruits? And I asked the question because one of the Democrats during your testimony this past week said that ICE and its recruitment is appealing to white supremacists.

**Ryan Schwank:**

When I was at the academy, certainly, there were probably people at the academy who would fit that description. But the vast majority of the cadets I worked with were first- or second-generation immigrants. They were average people from across the United States.

I had many cadets for whom English isn't even necessarily their first language. In fact, I remember one particular training scenario, I had six cadets and not one of them had English as a primary language. And it's very hard to argue that cadets coming into the academy who come from such a diverse background set are white supremacists, when most of them are in fact not white.

David, what legal protections does your client have as a whistle-blower? And are you prepared for potential retaliation?

**David Kligerman:**

Yes, unfortunately.

And we see this a lot at WhistleblowerAid.org. We have clients who come forward. And in this environment, the game has changed. It used to be that you could come forward to an inspector general or an Office of Special Counsel. But those mechanisms have been swept

away by the Trump administration. In fact, they have been weaponized against our whistle-blowers.

So clients like Ryan ordinarily could just go through the ordinary process. They could remain anonymous. There'd be an independent person within the system who was checking and balancing these.

With that gone, the only option is really to go to Congress. And that's suboptimal for a lot of reasons. First of all, it's a separate branch of government, so it becomes adversarial. And, secondly, not all the information can be revealed. There are certain things that ultimately clients have that may be privileged or there are other things that need to be protected. So they're only getting a snapshot.

And Ryan's revealed a lot, but it would be really ideal to go through the agency directly.

Were you ever reprimanded, pressured, or warned about speaking up internally before you resigned?

**Ryan Schwank:**

When I was shown the memo, it was given to me by a supervisor who made it clear that the consequence for disagreeing with it was going to be the loss of my job, loss of my position.

And you could see it in the way the academy operated. There was a culture of fear with all the officers I talked to. I could have conversations with officers about the program, about our concerns, but we wouldn't do it where other people could hear us.

You could literally see officers who wanted to talk about the way they thought training was going turn their heads, look over their shoulders, and make sure there weren't other people around to hear them. And it would be -- literally, I would have one officer do this, and then maybe the next day I'm talking to the officer, another officer, who was the officer he was worried about, right?

One looks over his shoulder and sees the guy behind him, and the next day I talk to the guy behind him, and he's looking over his shoulder at the guy I talked to the day before, right? No one trusts anyone in that academy.

No one's willing to put faith in each other to recognize the problems they have there, because I think if they did, I think a lot of the faculty would say, hey, maybe I don't know what the legal department is doing or the firearms department is doing, but I know in my unit, in practical training, we're not measuring things correctly. Or I know in my unit, where we teach the use of our computer systems, we're rushing through it too fast.

And I think if they all sat down and talked about it, they would recognize that, step by step by step, the academy's graduate and cadets who -- don't have the raw hours, the raw practice they need to do the job correctly.

Do you see a link between the training quality and the fatal shootings of Nicole Good and Alex Pretti?

**Ryan Schwank:**

I do, but it's an indirect link, and here's why I say that.

The officers involved in those shootings are not recent graduates. They're experienced officers. The officer in the Renee Good shooting is a member of the SRT team, the -- essentially the special response team that they have at ICE. That's a difficult position to get. You have to have a good deal of experience to get that.

The officers who are coming out of this academy have half the training. And yet they're being sent to some of the most contentious and difficult operations ICE has ever undertaken. Never in the history of the agency have they done what they're doing in Minneapolis.

And when you put officers who don't know the law and don't know use of force policies and don't have all the training they need on their firearms into that situation, it is a recipe for someone else to die, potentially for multiple people to die. And it's going to be done by officers who deserved better from this government.

Ryan Schwank, David Kligerman, thank you both for being here.

**David Kligerman:**

Thank you for having us.

**Ryan Schwank:**

Thank you. I appreciate it.