**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

|  |  |
|---|---|
| HUNTER DEMSTER *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States*, *et al.*, <br><br> *Defendants.* | Case No. 26–cv–02546 |

**DECLARATION OF HUNTER DEMSTER**

I, Hunter Demster, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1.      I am over the age of 18, am competent to give this declaration, and testify from my own personal knowledge regarding the facts in this declaration.

2.      I was born and raised in Memphis, Tennessee. I have lived in Memphis for the vast majority of my life. I currently reside in the Berclair neighborhood, and I operate a soup kitchen in the nearby neighborhood of Cooper-Young.

3.      I have been involved in observing, gathering information about, and recording immigration and law enforcement activity for about a decade. Through this work, I strive to provide accurate and timely information to individuals impacted by immigration and law enforcement activity and their families. I also engage in this work because I believe it helps to hold government officials, and especially immigration and law enforcement officers, accountable to the public.

1

4.      During the first Trump administration, there was an influx of immigration agents sent to Memphis. At that time, some of my Hispanic friends would call me when there were reports of immigration enforcement activity, and I would go to observe, gather information about, and record that activity. I would also provide support to impacted individuals and families, including by verbally providing Know Your Rights information, helping them navigate U.S. Immigration and Customs Enforcement's ("ICE") online detainee locator system, connecting them with attorneys or therapists, giving rides to family members, coordinating food donations, and plugging them into other volunteer service organizations.

5.      I have continued this work during the second Trump administration, including since the start of the Memphis Safe Task Force ("Task Force") in September 2025.

**Memphis Safe Task Force Activity**

6.      I go out and observe, gather information about, and record Memphis Safe Task Force activity almost daily. The Berclair neighborhood where I reside is one of the epicenters of Task Force activity. I cannot go to work or leave my home without passing Task Force stops.

7.      In observing, gathering information about, and recording Task Force activity, I have noticed that the vast majority of that activity is dominated by traffic stops involving a caravan of Task Force vehicles. Those caravans are typically led by a Tennessee Highway Patrol ("THP") vehicle followed by up to ten vehicles containing federal agents from many different agencies. THP troopers typically initiate the traffic stop and then are joined by federal agents in the ensuing caravan. I have observed agents from the following agencies:

- Department of Homeland Security ("DHS"), including Homeland Security Investigations ("HSI"), Customs and Border Protection ("CBP"), and Border Patrol
- Federal Bureau of Investigation ("FBI")
- U.S. Marshals Service ("U.S. Marshals")
- Drug Enforcement Administration ("DEA")

2

- Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")
- Diplomatic Security Service ("DSS")
- Internal Revenue Service Criminal Investigation ("IRS-CI")
- Tennessee Highway Patrol ("THP" or "state troopers")
- Memphis Police Department ("MPD")
- Shelby County Sheriff's Office ("SCSO")
- Tennessee National Guard
- Tennessee Department of Corrections ("TDOC")
- Tennessee Wildlife Resources

8. THP and MPD officers typically drive THP and MPD vehicles and wear their respective uniforms.

9. I have seen federal agents riding in state and local agency vehicles. For example, I have seen Tennessee Wildlife Resources officers driving official state vehicles with HSI agents riding along.

10. Federal agents typically drive a wide variety of unmarked vehicles. I have observed Task Force agents driving vehicles including trucks, Honda Accords, and Kia Souls. The common identifying features are that these vehicles typically have out-of-state license plates, a very dark tint on the front windows, and are closely trailing the lead of a THP, MPD, or SCSO vehicle.

11. Federal agents typically do not wear uniforms. They often wear dark clothing with body armor vests. Sometimes the vests indicate their agency, sometimes they do not. Their vests are often simply marked "Police Federal Agent," "Federal Police," or "Police." They sometimes wear masks. Some vests seem to be designed so that agency names are not easily legible from a distance or do not appear legible in photos or videos.

12. The federal agents appear to be on two-week to one-month deployments and cycle out regularly. A Border Patrol agent has confirmed this deployment cycle to me. I have repeatedly observed the same state agents at multiple encounters, especially state troopers.

3

**Observing, Gathering Information About, and Recording Task Force Activity**

13.     When I see a Task Force stop while on my way to another location or activity, I often stop and observe to assess the situation. I record the encounter if I am able, and sometimes I also verbally provide Know Your Rights information. When I record an encounter, I typically get out of my car to record on my phone, but I do also make use of a dash cam. The length of my observation depends on the situation and my availability. Sometimes, I do not have time to observe when I am on my way to other activities.

14.     My goal is to bear witness to Task Force activity and hold Task Force agents accountable to the public, including by identifying Task Force agents and agencies operating in my community. When I am observing, gathering information, or recording, I try to maintain a safe distance from my subjects, including Task Force agents, suspects, and vehicles. I do not physically interfere with, impede, or intervene in immigration or law enforcement action. I follow orders from Task Force agents to the best of my ability, including when asked to step back.

15.     I only film activity occurring in public and I document what is visible to me of officers or agents engaged in their official duties. I mostly do so from public streets and sidewalks. I avoid entering private property whenever possible. However, sometimes Task Force agents ask me to move back, including by invoking the Tennessee Halo Law, to a point where I have no vantage point and I may step into people's front yards when that happens. I sometimes, but not always, narrate what I observe. Sometimes I will try to get information about what is happening by talking to Task Force agents or bystanders.

16.     When I arrive at a scene with Task Force agents, I always try to begin filming as soon as possible, either while I am still in my car or as soon as I get out of my car. I sometimes

4

pause filming in order to update other volunteer observers. I usually stop filming when I get back to my car, unless there are further Task Force actions taking place while I am in my car.

17. My phone often runs out of space because I film Task Force activity so often. My typical practice is to film the entire incident and then edit videos down to preserve space. I often have to delete older or longer videos in order to maintain enough space on my phone to continue documenting new Task Force activity. Since receiving a litigation hold letter from the ACLU, I have retained all videos on an external hard drive provided to me by my attorneys.

18. I have witnessed many disturbing scenes, including scenes involving abuse by Task Force agents. I have at times been angered by these scenes and have criticized, heckled, or yelled at Task Force agents. However, I have never threatened them, nor have I ever physically interfered with their activities.

**Invocation of the Tennessee Halo Law**

19. I would estimate that I have had the Tennessee Halo Law invoked against me at least 40 to 50 times. I have had the Halo Law invoked against me approximately three to five times per week since the Task Force arrived in Memphis. Sometimes the Halo Law is invoked multiple times at the same scene to require observers to move back 25 feet more than once.

20. Generally, Task Force agents invoke the Halo Law by simply saying "Halo Law" or "25 feet." Both state and federal officers and agents have invoked the Halo Law against me.

21. When the Halo Law is invoked against me, I always back up at least 25 feet from where I'm standing. However, I also often ask Task Force agents "25 feet from where? From what?" because it is typically unclear what or whom I should be 25 feet from. Often the Task Force agent has no response to these questions. When they do answer, agents frequently give different answers. I have heard five to six different answers and sometimes receive different answers at the

same scene. Sometimes, for example, I am told to get 25 feet back from the agent furthest from the scene. Sometimes I am told to get 25 feet back from the area where the agents are congregating.

22.     I always try to abide by what the agents say in the moment, but it truly does seem like an arbitrary line. Sometimes agents approach me while telling me to get 25 feet back, which is all the more confusing and frightening because the agents can control my freedom of movement and potentially arrest me even when I am far away from the scene itself and am not interfering.

23.     I gauge my distances from Task Force agents based on the length of a school bus, which I believe to be around 25 feet. I also used to be a carpenter, so I have experience gauging distances by sight.

24.     It is already difficult to record clear audio at 25 feet away, so when the Halo Law is invoked to push me back further it becomes almost impossible to record clear audio. Complying with invocations of the Halo Law often means I also lose sightline to Task Force activity because Task Force agents direct me to stand in places where Task Force vehicles or solid fences are between me and the Task Force activity I am trying to record.

25.     I have been told many times to back up the second I walk up with my phone to film. Especially when the Task Force first arrived, the Halo Law tended to be invoked very quickly when officers saw my phone held up to film. I have noticed that observers without phones or cameras do not seem to have the Halo Law invoked as quickly or as frequently. Recently, I have also noticed that officers invoke the Halo Law in reaction to those who communicate Know Your Rights information to detainees.

26.     I will now describe a handful of the numerous incidents in which I have been intimidated or retaliated against, or where I have had the Halo Law invoked against me, while observing, gathering information about, or recording Task Force activity.

6

**Incidents of Retaliation and/or Invocation of the Halo Law**

**October 24, 2025**

27.    On October 24, 2025, at about 3:15 PM, I was at the Benjamin Hooks Library on Poplar Avenue. The library is near a school, and it was right around the same time as school dismissal. There were about 30 Task Force agents in the large parking lot outside the library. I identified FBI and DEA agents, but most of the agents were wearing plainclothes and many did not have identifying agency marks. I remember talking to a plainclothes agent in a camouflage vest marked "FBI" over an American flag. I also saw a plainclothes agent in a helmet and body armor marked "Police HSI," a plainclothes agent wearing a vest marked "Police U.S. Marshal," and more than ten plainclothes agents with no agency identifying marks. Some of the agents were also wearing masks. I also saw three THP troopers in the gathering.

28.    When I arrived and before I started filming, I saw lots of people gathered in the library parking lot, watching and asking what was going on. Families and children leaving the school were scared. A woman in the crowd approached me and asked if I knew what was happening. I went to engage with the agents to ask them, and an FBI agent approached me. I told him that congregating at a public library at the same time as school was letting out was scaring children.

29.     After that engagement, I walked across to the other side of the library parking lot and continued filming. The Task Force was gathered on the northern side of the parking lot and I was approximately 20 to 30 parking spaces away. There were other community members standing near me and watching the Task Force. The Task Force agents were not engaged in any form of enforcement, they just appeared to be conferring before going to a scene, but one of the THP

7

troopers said "you guys gonna go to jail for interfering, I suggest you back on that way," and gestured in a random direction. I responded that we were 25 feet away.

30.     Shortly after, the agents dispersed to at least six different unmarked vehicles clustered in one area of the parking lot. I continued to walk through the parking lot filming the vehicles leaving. I was standing near a grassy median filming the vehicles slowly driving out of the parking lot when an unmarked black Ford Expedition, driven by one of the unmarked and masked agents, sped up and swerved towards me as he approached me and then braked immediately once he passed me. The agent then continued driving away. The agents in the other vehicles continued to disperse.

31.     I had noticed the agent who was driving the Ford Expedition that swerved towards me while he was still standing in the parking lot. He was wearing an olive green hoodie, gray pants, a black facemask, and sunglasses. He put on his body armor vest before getting in the driver's side of the vehicle. I did not see any identifying marks on his vest; I had seen a badge on his belt but could not tell which agency it was for. I saw another unmarked agent wearing a shirt with a skull and crossbones on the back of it getting into the passenger side of the Ford Expedition as the agents were dispersing. When the vehicle swerved by me, I could see this agent in the passenger seat wearing a vest marked "Border Patrol." I did not specifically see him put on a vest before getting in the vehicle, but he appeared to be going through the motions of putting on a vest before getting into the Ford Expedition. I asked one of the other community members in the parking lot "did you see him haul ass and try to hit me?" She responded, "yep, sure did."

32.     I felt terrified, even though at that moment I pretended not to be. I was caught off guard and mad at myself for not being more aware. If the agent had driven the SUV two inches closer, he would have clipped me.

**November 7, 2025**

33.     On November 7, 2025, at about 9:30 PM, I heard from a friend that a mother had locked herself and her twin toddlers in a closet after Task Force agents tried to force entry into her home. I drove to her home to confirm what was going on. The house was on Macon Road, a few houses away from Jackson Avenue.

34.     When I arrived, I parked about 150 feet away from the scene and walked up. I initially counted about 40 vehicles, almost all with their lights flashing, and about 36 agents, not including the agents inside the house. I identified plainclothes federal agents wearing DHS, HSI, FBI, ATF, and IRS vests, as well as state troopers. Almost every federal agent was armed with an AR-15 rifle strapped across their front. Many of the agents were standing around in the street, sidewalk, and yard of the house in groups. About five to ten of the agents I saw were masked. After observing for more than 5 minutes, I updated my estimate to at least 100 agents present and at least 60 vehicles. This was the largest group of agents I have seen since the Task Force arrived in Memphis. Included as Exhibit A is video footage of Task Force agents surrounding the house, one of whom shines a bright light into my camera.[1]

35.     I learned from a friend that the agents had launched tear gas through the windows of the home shortly before I arrived.

36.     As I was approaching and filming, but still at least 100 to 150 feet away from the scene, a federal agent wearing an HSI vest, dark pants, a black t-shirt, a baseball cap, and with an AR-15 across his front, approached me and informed me that I needed to "get 25 feet back." I responded: "this is at least 25 feet." The agent responded: "From what? What are you referencing?" I responded by asking: "25 feet from what?" I told the agent I was "at least 25 feet back, which is

---

[1] All video exhibits are available on the USB drive provided to the Court.

the law." He told me to back up a bit more. I complied after informing him that I was "plenty back" and was not "engaging" or "interfering" but "filming the police." Included as Exhibit B is video footage of this interaction with the agent.

37.    After the HSI agent asked me to step back, he engaged with me again and I told him my friend had been on the phone with the mother. The agent responded by asking me why I didn't tell anyone that I was in touch with the family and that they had breached the door trying to talk to the family. This struck me as odd, that the agents were willing to deploy tear gas if they did not know what was going on.

38.    A state trooper with an assault rifle strapped to his chest then walked up to me and the HSI agent, said "we're good," and sort of waved at me, which I took to mean I was fine standing where I was. The state trooper then kept walking past me, and the HSI agent went with him.

39.    A few minutes later, a different state trooper approached and told me to get back 25 feet again. At first the state trooper told me to get behind a tree he indicated, which was only about a foot away. The next direction he gave me was to step back about 25 feet to behind a tow truck that was blocking the street. After I followed this direction, I was approximately 150 to 175 feet away from the house.

40.    I am still not sure what happened that led to the Task Force activity and have heard differing stories. When my friend received the call from the mother, the mother did not know what had led to the Task Force activity and was very scared. I heard that the mother asked for a search warrant when the agents arrived at the home, but the agents did not provide one. The agents then kicked in the door of the home and took the children. While I was filming, I heard the toddlers crying and later saw two ICE agents holding the two crying toddlers in the middle of the street. I

10

told an officer at the scene that the woman had asked for a search warrant and was not provided one.

41.     Because the repeated invocations of the Halo Law prevented me from getting closer to the scene, I was never able to see the entrance to the house nor how the agents were engaging with the family. By the final Halo Law invocation, I was at least 150 feet away from the house and it was difficult for me to capture video of the two crying toddlers in the middle of the street. There were many trees, vehicles, and agents between me, the house, and the toddlers which made it difficult to record. I was also too far away to capture audio documenting the interactions of the agents clustered around the crying toddlers.

**November 11, 2025**

42.     On November 11, 2025, at about 3 PM, I was driving past Macon Road and National Street and saw about ten Task Force vehicles in the Grizzly Mart gas station parking lot on the southeast corner of the intersection. I have observed and filmed many Task Force stops at this Grizzly Mart since the Task Force arrived. I saw THP, MPD, and unmarked Task Force vehicles. I saw HSI agents, as well as other plainclothes agents whose agencies I was unable to identify. I recognized one of the MPD officers on the scene: former Hispanic Liaison Officer Kathya Buruca.

43.     When I arrived, the Task Force agents were putting a young Hispanic woman in the back of one of the unmarked Task Force trucks. I was observing from the periphery in the gas station parking lot, but the scene was crowded. A plainclothes agent dressed in dark gray pants, a gray sweatshirt, a gray University of Tennessee baseball hat, and a green body armor vest marked "Police" and "DEA" approached me very aggressively. I was about 15 feet away from the agent's unmarked white Dodge Ram truck when he approached me.

11

44.    The agent walked up to me and said, "you can step back 25 feet." I started walking backwards and responded, "from what?" As I continued walking backwards, the agent continued to walk towards me and responded, "from what we're doing." I responded, "where is that?" He responded, "it's my discretion how far you go back, so keep goin' back." By the end of this conversation, I had hit the wall at the rear of the parking lot and could not continue moving back. Included as Exhibit C is video footage of this interaction.[2] Because of this invocation of the Halo Law while the DEA agent was moving towards me, I was no longer able to see the young woman they were detaining and did not have line of sight to the passenger compartment of the unmarked federal vehicle.

45.    I left the scene shortly after this interaction because there is not much more information I can gather once a person is detained and placed in a vehicle. I returned to my house three blocks away. I then saw Officer Buruca drive by my house, look at me, and grin.

46.    I recognized Officer Buruca at the scene because at the beginning of the Task Force, Memphis officials denied that they were cooperating with federal immigration agents, and Officer Buruca was frequently on the local news as MPD's Hispanic Liaison Officer. I filmed and posted a video, which subsequently went viral, of Officer Buruca driving around Memphis in her MPD vehicle with an HSI agent. After the video went viral, MPD and Officer Buruca were both under a lot of pressure from the community and the community generally lost trust in Officer Buruca.

47.    When I saw Officer Buruca drive past my house and grin at me, it struck me as an attempt at intimidation because although I live relatively close to the scene, my house is not on one of the main streets someone leaving the Grizzly Mart would be likely to use, so it felt unlikely

---

[2] Available at: ACLU, *Hunter Demster – November 11, 2025* (YouTube, May 12, 2026), https://www.youtube.com/shorts/ASCs5GfSLa4.

that it was a coincidence. I felt threatened and unsafe because I knew Officer Buruca had been personally affected by my video that went viral.

**November 23, 2025**

48.    On November 23, 2025, at around 3 or 4 PM, I was observing a Task Force traffic stop at Macon Road and Graham Street, in the parking lot of St. Stephen's Methodist Church. I remember that this incident happened about ten minutes after the start of a nearby anti-Task Force protest and that the Task Force was aware of the protest. I saw about 20 Task Force agents. There were at least three THP troopers, but there were six or seven THP vehicles present. I also saw agents with HSI, DEA, and ATF vests. The Task Force had pulled over several young Hispanic men, who were already in handcuffs in the back of the vehicles by the time I arrived. When I arrived, there were already several community members present, including the son of the pastor of St. Stephen's, who was telling the Task Force agents to get off the church's property. The agents refused to leave, and instead additional agents and THP troopers arrived.

49.    I was filming and providing Know Your Rights information verbally along with other community members. Three of the young men were taken away in ICE vehicles, and then the majority of the Task Force agents dispersed. One of the THP troopers then came up to me and threatened me with arrest. He cited the law that he was going to use to arrest me, but I cannot remember what it was now. The trooper then got in his vehicle and immediately pulled over the first Hispanic looking individual who drove by, ignoring the other drivers.

**December 1, 2025**

50.    On December 1, 2025, at about 2 or 2:30 PM, I was driving home from work and as I approached my home in my car, I saw a vehicle with its engine running on the other side of the street in front of my house. It is very unusual to see vehicles idling on my street. The vehicle

was a black four door SUV, with tinted windows and an out of state license plate, which are common characteristics for an unmarked federal Task Force vehicle. I parked in my driveway about 30 feet away and got out of my car, but I was uncomfortable and nervous going to the door of my house. I was not comfortable being in my house alone and almost immediately exited my house and got back in my car. I drove and parked a little way down the street and watched the unmarked vehicle in front of my house.

51.    When the unmarked vehicle pulled out from in front of my house, I followed it from a distance of four to five blocks, until it reached a Task Force traffic stop that was wrapping up, at which point, the vehicle turned on blue and red flashing lights in the back window and joined the traffic stop. I rolled down my window to ask the agents why they were "sitting in front of my house." The unmarked vehicle rolled down its passenger window a little bit, and I was able to see that both agents were wearing body armor vests, but I could not see any identifying agency marks. They immediately rolled the window back up.

52.    I do not have any other explanation for why the agents were sitting outside my house, aside from that they knew it was my home. The traffic stop four to five blocks away was not visible from my house, and the agents could not have been participating in or assisting with that traffic stop. I was terrified and no longer feel safe in my own home due to their presence.

**December 2, 2025 — Approximately 2:30 PM**

53.    On December 2, 2025, at about 2:30 PM, I was driving home from work, and as I approached my home in my car, I again saw a vehicle with tinted windows and an out of state license plate idling just down the road from my house. I pulled into my driveway and then decided to back up and drive down the street to confirm they were federal agents. I started filming as I was leaving my driveway. I drove towards the unmarked vehicle and then stopped next to it. My

14

passenger's side window was rolled down. I asked the agents "I'm wondering, is there something going on? Are you law enforcement?" They did not affirmatively identify themselves, roll down their window, or respond. I could see two agents in the vehicle, both were wearing vests, and the agent in the driver's seat was wearing a badge, but I could not make out any agency identifying marks.

54.    I was afraid for my safety, so I messaged some community members, told them that there were federal agents on my street, and asked them to come join me. Once another community member arrived, I got out of my car and used my bullhorn to notify my neighbors that there were federal agents and immigration enforcement on the street. After about 5 minutes, two to three THP vehicles pulled in at the end of the street, and the unmarked vehicle joined them in front of the last house on the block. I overheard them say they were looking for someone and overheard the resident say something like "they don't live here and haven't lived here for a long time."

55.    This incident, combined with the incident the previous day, have made me feel insecure being in my own house. When I am home alone and I hear a branch snap, my heart drops. The presence of these unmarked vehicles outside my home gives me a scary, uneasy feeling that has taken away my peace inside my own home.

**December 2, 2025 — Approximately 7 PM**

56.    Later that same day, at about 7 PM, I was driving down Highland Street between Summer Ave and Tutwiler Ave, when I saw a caravan of four or five Task Force cars—a THP vehicle and several unmarked vehicles—that had pulled over a young Black man in what looked like a traffic stop.

57.    I had two other people in the car with me. I parked the car about 40 feet away and we all got out, crossed the street, and began walking up towards the Task Force vehicles. I was

about 30 to 35 feet away when I started filming on my phone and was about 30 feet away when an agent wearing body armor in a vest marked U.S. Border Patrol approached me. The agent started walking up to me, shining a bright light in my face. I hadn't said a word to this agent. He got about two inches away from me and said, "how you doin, how you doin, good?"

58. The Border Patrol agent walked away and a short while later came back and started yelling, calling me derogatory names and making accusations about me. I think the agent was attempting to tarnish my reputation with other community members and bystanders at the scene. I left shortly after this exchange, and I later learned from the other community members present that, after I left, the agent repeated the same derogatory accusations about me to one of the community members still at the scene.

59. When the agent approached me both times, I got very scared. The agent was large and physically imposing, speaking aggressively, and got right up into my face. I thought he was going to hurt me. During the first exchange, I responded by taunting him because it is one of the ways that I express and manage my fear. I remember being very shaky.

60. I was angry when the agent called me a derogatory name because saying something like that can seriously harm a person's reputation even though it is a blatant lie. I fear that I will lose the trust or reputation I have built in my community when officers say things like that. It is also very taxing and emotionally draining to have to spend time warning other people that agents are making these false statements. This is hard to navigate because I do not want to look like I am trying to justify or cover something up. Having these statements yelled at me in front of other people causes turmoil, an uneasy feeling, and is a massive energy drain.

16

**December 12, 2025**

61.     On December 12, 2025, around 2 PM, I was driving down Waring Road towards Macon Road when I saw a caravan of Task Force cars consisting of a THP vehicle followed by about four unmarked vehicles do a U-Turn and pull over a car. I pulled around the block to park and got out of my car to film. A THP officer and about five federal agents got out of their cars for the stop. The THP officer was wearing a green THP uniform. The federal agents were wearing dark pants and dark shirts. One of the federal agents had an IRS-CI patch on his vest and a mask over his face.

62.     I stood about 40 feet from the scene, with a view of the front of the stopped car and began filming on my phone. I could see an older Hispanic woman in the driver's seat and a younger Hispanic woman in the passenger's seat. When I approached the scene with my phone, the trooper and one of the federal agents appeared to have a conversation. At one point, I said, "Hey, y'all, remember you have the right to remain silent. I wouldn't talk to them, they're not your friends." I did not engage with the agents. They then let the family go and the agents dispersed.

63.     After the agents left, I approached the family and asked why they had been pulled over. The daughter said the trooper said it was because the top three inches of their windshield was tinted. After this conversation, I went back to my car.

64.     About five minutes after I got back in my car, while I was editing the video I had just taken, a THP vehicle sped past me from the opposite direction with several unmarked vehicles behind it. The THP vehicle cut the corner very aggressively, and right as it was passing my car, one of the unmarked cars behind the THP vehicle slammed on its brakes. When I saw the unmarked vehicle slam on the brakes, I was immediately scared and went into fight or flight mode because it seemed like the unmarked car had braked as a reaction to seeing me in my car.

17

65.    I wanted to be in a more public setting if something bad was going to happen to me. I pulled off the side street where I was parked, onto Waring Road, and began driving towards Summer Avenue. I remember thinking that I wanted to get to the Kroger parking lot at Waring Road and Summer Avenue so there would be more people around to witness if they did something to me. I was not speeding. Because the THP vehicle had pulled past me going the other direction, it had to make a U-turn. I believe the unmarked federal vehicles waited for the THP vehicle to make the U-turn because it was the THP vehicle that pulled up immediately behind me, followed by the unmarked vehicles. About 20 to 30 seconds after I pulled off the side street, the Task Force vehicles started following me with lights and sirens and signaled for me to pull over. I knew that I had not broken any laws, and I was scared about what they would do to me, but I immediately complied and pulled over to the side of the road.

66.    At least six agents got out of their vehicles and stood next to my vehicle, at least one of them was wearing a mask over their face. A THP trooper walked up and said they had pulled me over for a broken taillight. I was shaking but gave the trooper my license and registration from where I keep them clipped to my car sun visor. The trooper told me he had stopped me because my driver's side brake light was out. I told him that it wasn't and just appeared dimmer during the daylight. The trooper went back to the THP vehicle with my information and the agents continued to stand by my car. I saw agents wearing U.S. Marshals, IRS-CI, and Police Federal Agent vests, others were not clearly marked. Included as Exhibit D is video footage of the federal agents standing next to my car.[3] The trooper wrote me a ticket for a broken taillight and let me go.

---

[3] Available at: ACLU, *Hunter Demster – December 12, 2025* (YouTube May 12, 2026), https://youtube.com/shorts/_CvAT1Z0vYU?si=ts3o_hQdKX9dJpKw.

18

67.     My taillight was not broken. My taillights do not match; I had to replace one a few years ago and the replacement is not as bright as the original. However, it is fully functioning. When I appeared in traffic court on March 9, 2026, as required on my ticket, the Assistant District Attorney ("ADA") told me that my ticket had not been entered into the system. Because my ticket had not been entered in the system, the ADA said there was no actual case against me and marked my ticket "NIS" [Not In System].

**December 17, 2025**

68.     On December 17, 2025, at about 2 PM, I was driving home from work when I received a message that the Task Force had gathered in someone's yard near the intersection of Summer Avenue and Lipford Street. I drove there and when I arrived, there were about 20 to 30 officers and agents congregated in this person's yard. I saw an MPD vehicle along with many unmarked vehicles with flashing lights. I am unsure if they were looking for someone in particular; when I arrived, they were just standing in the yard. I stayed at least 100 feet away from the agents the entire time, so I was not able to see any additional details or identify any agencies.

69.     I got out of my car and started filming. I stayed very far away, between 100 to 200 feet back from the officers and did not interact with them at all. I stayed far away because sometimes the anxiety is too much and I am too scared to film from closer. It also did not appear that they were doing anything other than standing and talking, so I did not feel it was necessary to get any closer to film in more detail. Because I did not get closer, I could not capture the details of which agencies were present or what conduct the Task Force agents were engaged in. I filmed for about five minutes and then headed back to my car as the agents started to head back to their vehicles and disperse. The first vehicle to leave was an unmarked black Nissan Titan truck driven by a federal agent. As the car drove by me as I was standing next to my car, one of the agents said

19

"good job Hunter" over the vehicle's loudspeaker. Included as Exhibit E is video footage of the truck driving past me.[4]

70.    The federal agent identifying me by name made me very nervous and anxious. It gave me pause about continuing to observe and record the Task Force. But I know the Task Force wants observers to be scared and that these tactics are designed to scare me away. I decided to post the video to my Facebook page and intentionally captioned it with the phrase, "it tickled my heart," because I did not want to give the Task Force agents the satisfaction of knowing that I was scared.

**December 23, 2025**

71.    On December 23, 2025, at about 6 PM, a friend messaged me that the Task Force was in front of a house on Owen Road near Mendenhall Road and asked me to go check it out. I drove over, parked, and got out of my vehicle. I could identify THP troopers, MPD officers, and HSI agents. There were also many plainclothes federal agents wearing generic "Police" vests. As I walked up, all of the agents were just standing in a group on the sidewalk talking and one of the agents, who I think was wearing a vest that said HSI, turned to me and said, "oh hey Hunter." I had never seen this agent before and had yet to engage with any of the agents present.

72.    It did not appear the agents had stopped or pulled anyone over; the agents and I were all just standing on the sidewalk. About 30 seconds later a THP trooper approached me and said, "hey Halo Law, back up." I responded, "What's that?" He responded, "Halo Law, back up." I responded, "From what?"  I was about 10 to 15 feet away from the agents and about 25 feet from the trooper when the trooper told me to get back. I complied. Because of this invocation of the Halo Law, I was unable to discern agency identifying marks on the other agents or see if any were

---

[4] Available at: ACLU, *Hunter Demster – December 17, 2025* (YouTube, May 12, 2026), https://www.youtube.com/watch?v=M2HWCncvoWU.

wearing badges on their belts. I was also unable to see what activities, if any, the Task Force agents were engaged in.

73.     This encounter made me extremely uncomfortable. This was not the first time I have been called by name by Task Force agents. That the agents knew my name terrified me and made me feel like a target even though I was not breaking the law. It made me question if I should continue to observe and document the Task Force at all.

**January 6, 2026**

74.     On January 6, 2026, at about 3:30 PM, I was out running errands and at the corner of Macon Road and Homer Street, when I saw the Task Force had stopped a Hispanic teenager riding a motor bike. He looked to be high school age, around 15 years old. There was a THP vehicle as well as two unmarked vehicles. One of the unmarked vehicles was parked across the street. Initially, I saw three federal agents and a THP officer out of their cars for the stop. The THP officer was wearing a green THP uniform and THP vest. The federal agents were wearing brown pants, black t-shirts, and vests, but their agencies were not identified.

75.     I pulled over and got out of my car. I was about 25 feet back from the scene and was filming on my phone. I was standing in the large parking lot on the southwest corner of the intersection of Macon and Homer.

76.     I had been filming for about ten minutes when an unmarked black Chevrolet Tahoe drove up from behind me. It drove up on my left side and I did not notice it until the last second. I stepped to the side, but the vehicle was still so close to me that the mirror nearly clipped me. I then walked around the back of the Tahoe. As I was walking around the back, the Tahoe started slowly reversing before it stopped and I thought it was going to hit me.

21

77.    A federal agent got out of the driver's seat. He was wearing gray pants, a black hooded sweatshirt, and a camouflage hat. I recognized him from the December 2, 2025 incident as the Border Patrol agent who had shone a bright light in my face and loudly called me a derogatory name in front of other community members.

78.    As soon as I recognized this agent, I felt scared. I felt a ball of anxiety in my stomach and my flight or fight response activating. It made me question whether I should continue to observe, and whether this agent in particular was going to hurt me. I felt like I had to be hyper alert.

79.    I had a short verbal exchange with this agent but did not want to engage with him because of how vile he had been on December 2. Another person I did not recognize had also pulled over to film the Task Force, so my interaction with the agent was thankfully brief. The agent called me by the same derogatory name and made the same accusations he had on December 2 again in front of this other community member who is not known to me.

80.    Eventually, the Task Force agents let the teenager go. Initially, the trooper insisted that someone with a registered trailer had to come pick up him and his motor bike. They eventually relented and allowed the teenager to walk his motor bike home.

**January 22, 2026**

81.    On January 22, 2026, at about 2 PM, I received a message that there were Task Force agents at Macon Road and Holmes Street and drove over to investigate. When I arrived, I saw many unmarked vehicles as well as at least one THP vehicle. About six officers and agents— about four MPD officers and two federal agents—got out of their cars for the stop. I saw one agent wearing a U.S. Marshals vest.

82.     I parked on a nearby cross street and began filming on my phone as I walked across the street to speak with someone I recognized who also observes, gathers information about, and records Task Force activity. While we were talking, we were about 30 to 40 feet back from the scene. I started walking towards the scene and an agent wearing all black, a vest that said "Police Federal Agent" on the front, and a mask, said "25 feet." I believe this agent was IRS-CI. I responded, "From what?" He responded, "From me." I backed up. Because this invocation of the Halo Law occurred while I was still approaching the scene, I was unable to see anything specific about the scene other than that the Task Force agents had pulled over a car and were potentially in the process of detaining individuals. It was difficult to see the individuals or to identify how many agents were present and from which agencies. Many Task Force agents flooded the sidewalk as I was filming, which further obstructed my view and ability to record.

83.     Once I was 25 feet away, I asked the agent what would happen if he walked towards me. The agent did not have an answer.

84.     Because there was another observer present, I felt comfortable leaving. I began to walk back to my car and had just crossed the street when an unmarked Chevrolet sedan sped past me from behind and stopped just past my car. It was about 30 seconds after I had left the scene. I could see one of the agents holding their phone up to the window like they were filming or taking pictures. They were positioned ahead of my car, so it felt like they were documenting me and my license plate. They never rolled down the windows or said anything to me and sped off again almost immediately.

85.     I was terrified. When the unmarked car sped past me, and then stopped suddenly, I thought the agents were going to kidnap me.

86.     The other observer later told me the driver of the Chevrolet sedan was the same IRS-CI agent who had invoked the Halo Law against me. They said the IRS-CI agent and another federal agent had jumped in their car as soon as I left and followed me to my car.

**January 29, 2026**

87.     On January 29, 2026, at 4 PM, I received a message that Task Force agents were gathering just off of Chelsea Avenue. When I arrived, I saw at least ten Task Force vehicles with at least 20 Task Force agents. I saw unmarked vehicles and plainclothes agents whose agencies I could not identify, along with vehicles and agents from HSI, Border Patrol, THP, MPD, Elite Corrections Officers from TDOC, and Wildlife Resources. The THP, MPD, TDOC, and Wildlife Resources vehicles were clearly marked as such. Two of the officers were wearing green U.S. Border Patrol vests.

88.     I pulled over a long way down the block and got out of my car. I walked about half a football field towards the scene. When I arrived, none of the agents appeared to be actively detaining anyone, they seemed to just be gathered and waiting. I began filming on my phone and started walking towards the scene. When I was about 100 feet back from the scene, one of the plainclothes unmarked federal agents said to me to "stop moving." I responded, "25 feet from what?" He responded, "25 feet." Because he invoked the Halo Law when I was so far away, I was unable to discern if the Task Force agents were engaged in any enforcement or detention activities or if they had simply gathered.

89.     Almost as soon as I arrived and began filming, the Task Force agents began to disperse. This is a common occurrence now. Many of the Task Force agents walked past me as they were leaving the scene. They were mean mugging me, giving me death stares, and walking close to me, in what I interpreted as an attempt at intimidation.

24

**February 16, 2026**

90.    On February 16, 2026, at about 2 PM, I received a message about Task Force activity near Perkins Road and Janice Circle. When I arrived, there were two THP vehicles, and several unmarked vehicles. I saw two THP troopers, three agents from HSI, one from ATF, and one who had no agency marking.

91.    I drove past the scene, parked on a cross street, and got out of my car. I started filming and approached the scene. When I arrived, there were already three people in handcuffs, two men who looked Hispanic and one woman. They were all seated on the curb next to their vehicle which had the trunk and the front passenger door open. The Task Force agents were emptying the trunk of the vehicle and putting the items into the back of one of the federal vehicles.

92.    One of the troopers turned to face me, in a manner that looked to me like he was trying to make sure I was visible on his body worn camera. I filmed the scene for about five minutes from the same spot about 25 feet away and verbally provided Know Your Rights information to the people on the curb when a THP trooper began to question them. The THP trooper threatened me with arrest for impeding and interfering in their investigation.

93.    Then, one of the HSI agents told me to get back. I responded, "This is 25 feet." The officer responded, "Do not interfere anymore." I said, "I'm not interfering, I'm filming the police." The THP trooper threatened to arrest me and send me to jail if I was not 25 feet away. Even though I was already 25 feet away, I backed up further. I was confident I was 25 feet away, but I was not confident that the agent would refrain from arresting me. Because of this invocation of the Halo Law, I was afraid to move any closer or to a different vantage point, and as a result was unable to obtain a clear line of sight to one of the three individuals who had been detained.

25

94.    The three people were arrested and the car was towed. There is very little to document after someone has been detained.

**March 3, 2026**

95.    On March 3, 2026, at about 2:30 PM, I was at Kingsbury Middle School on Graham Street filming Task Force activity involving about 30 task force agents and two MPD officers, as well as the School Resource Officer who was a Shelby County Sheriff. I often drive by schools in majority immigrant neighborhoods around school pick up and drop off times, because the Task Force frequently congregates at or near these schools during those times. I was driving by when I saw the group of Task Force agents, so I pulled over to film.

96.    I was standing on the sidewalk filming when a vehicle labeled Homeland Security Federal Protective Service Police drove up next to me. The two agents in the vehicle rolled down their window and we had a brief verbal exchange. I did not recognize the agents. One of the agents referenced a night from the prior week when I saw a THP trooper and CBP officers pulling someone over on Jackson Avenue. The agent said, "You called us Border Patrol the other night. We're not Border Patrol. We're Customs and Border Protection." Neither of the agents looked like the agents from the prior week. I inferred from this comment that the Task Force members are talking to each other about me. The exchange ended when the agent driving the vehicle said, "I dunno, Hunter," and drove away.

97.    The continued use of my name by Task Force agents I do not recognize and have never interacted with to my knowledge is frightening.

**March 4, 2026**

98.    On March 4, 2026, at about 6 PM, I received a message about a gathering of Task Force agents at Baltic Street and Pacific Avenue. As I was driving over in my car, I passed a THP

26

vehicle parked about a block from the scene. This struck me as odd because it was parked in the middle of a neighborhood on a low traffic road. When I arrived at Baltic and Pacific, I parked and took photos of the federal agents present from my car. I did not exit my car. I then drove back the way I came and pulled over for about 30 seconds to take a picture of the THP trooper on Manhattan Avenue near Hillcrest Street and then continued driving south on Hillcrest Street away from the scene and towards Summer Avenue.

99.     As I was stopped at the stop sign on Summer Ave waiting to turn, a different THP vehicle drove by heading east on Summer Avenue. The vehicle crossed very slowly in front of me, and I could see the trooper inside staring at me and preparing to make a U-turn. As soon as I made a right turn onto Summer Avenue heading west, I saw the THP trooper make an aggressive U-turn and immediately turn on his lights and sirens to signal me to pull over. I immediately turned off of Summer Avenue onto Pope Street and pulled over just after turning onto Faxon Avenue.

100.     The trooper once again wrote me a ticket for a broken taillight. My taillight was not broken and when I provided the trooper with my driver's license and registration, I told him that it was not broken. I interpreted the traffic stop as retaliatory, called in by either the Task Force agents or the other THP vehicle, because the trooper who pulled me over was preparing to pull a U-turn as he was crossing perpendicular to me and was not in a position to see my taillights at that time. There was also a federal agent riding in the THP vehicle, who got out and stood near the back of my car during the stop. His vest was marked "Police Federal Agent" and he had a badge pinned to the front that appeared to be from the U.S. Marshals. After the trooper gave me a ticket, I returned to Baltic Street and Pacific Avenue and saw that at least one unmarked Nissan sedan containing federal agents was still present. The agent driving the unmarked Nissan sedan was

27

wearing a vest marked "Police HSI" and the agent in the passenger seat was wearing a vest marked "IRS-CI."

101.    These traffic stops have instilled a level of fear in me that does not go away. As the Task Force remains in Memphis, the fear only continues.

102.    When I appeared in court on March 9, 2026 for my first broken taillight ticket—received December 12, as discussed above—I was told that the ticket was dismissed because the Assistant District Attorney could not find it in the system. I was also told that this second ticket was not in the system either because THP had not entered it.

**March 5, 2026**

103.    On March 5, 2026, at about 2 PM, I received a message about a gathering of Task Force vehicles at a house near the corner of Baltic Street and Faxon Avenue. I drove over from my house, parked, and began filming as I walked down the sidewalk towards the gathering of Task Force agents. I saw several MPD vehicles and approximately three times as many unmarked federal vehicles. I saw MPD officers as well as plainclothes agents wearing vests marked HSI, CBP, Border Patrol, and DSS, but the majority of federal agents present were in generic "Police" vests. As I approached, a Border Patrol agent told me I had to stay back 25 feet. I responded, "25 feet from what" and the agent replied, "From that officer" indicating another officer at the scene. I asked, "What happens if you walk towards me?," and the agent did not directly respond, instead telling me that I had walked up to them filming. Because of this invocation of the Halo Law, it was difficult to see the house and what was occurring in front of it. I was not able to see how many agents were present at the scene nor identify their agencies.

104.    After this exchange, an MPD officer approached the federal agents and it looked like he was identifying me to the other officers. I was too far away to hear properly but it looked

like the MPD officer pointed at me while talking to the agents. None of the agents spoke to me after that. This has recently become a common occurrence at scenes where MPD officers are present.

105. Hearing or seeing Task Force officers who I do not know or recognize use my name or otherwise identify me to federal agents at scenes is terrifying. It has given me a high level of anxiety that I carry with me 24/7 now. When I leave these scenes where Task Force officers use my name or appear to otherwise identify me, I am scared agents are going to pull me over, as they have already, and inflict harm on me.

106. The Task Force agents then broke in the door of the house they were gathered in front of and detained a woman in the back of one of the vehicles. This woman told the agents that the person they were looking for was not there. The Task Force agents had dogs and assault rifles with them. An elderly neighbor came out of her house next door with her walker and asked the Task Force agents to leave. Because I was too far away to see and hear clearly after the Halo Law invocation, I got these details from the resident of the home after the Task Force dispersed.

**March 24, 2026**

107. On March 24, 2026, at 8:45 PM, I was driving home with my girlfriend when we saw a THP vehicle with several unmarked vehicles had pulled a car over in the parking lot of the Dollar General on Summer Avenue and North Holmes Street.

108. I parked at a neighboring business and got out of my car to film. As I approached the Dollar General, I saw three people being detained by agents. The agents did not handcuff any of the individuals but patted each of them down. The agents brought in a dog to check the vehicle. I filmed for about 20 minutes from over 30 feet away and verbally provided some Know Your Rights information.

29

109.    After about 20 minutes, a plainclothes federal agent wearing a black T-shirt and no vest drove into the parking lot in an unmarked black truck. This agent appeared to be a supervisor. The agent pulled up, got out of his vehicle, and immediately held his phone up towards me. I could not see any marks identifying his agency. The agent was standing about 15 feet away from me. The agent was looking intently at his phone with his finger held up to the screen for several seconds and it appeared he was filming me or taking my photograph.

110.    I asked the agent what he was taking a picture of, and he did not respond. Instead, he slowly lowered his phone, turned his back to me, and started walking away from me. Included as Exhibit F is video footage of the agent filming or photographing me.[5]

111.    After that, the Task Force arrested the driver but let the two passengers go.

**April 2, 2026**

112.    On April 2, 2026, at about 5:00 PM, I was near the corner of Pacific Avenue and Baltic Street. It appeared that the Task Force had gathered in front of the same house the agents were parked in front of on March 4. The homeowner told the Task Force that the person they were looking for did not live there, and that this was the fourth time the Task Force had arrived at their home looking for this person. I saw two plainclothes federal agents wearing vests marked "Police DSS." I also saw four other plainclothes federal agents, but I was unable to clearly make out any agency identifying marks. I parked across the street from the scene, about 40 feet away from the house. I did not get out of my car while the Task Force was present.

113.    When I arrived at the scene, I began filming the Task Force activity from my car. Within about two to three minutes of me arriving, one of the plainclothes DSS agents, who was

---

[5] Available at: ACLU, *Hunter Demster – March 24, 2026* (YouTube, May 12, 2026), https://www.youtube.com/shorts/437pKjDG6Gw.

wearing tan boots, tan pants, a gray t-shirt, and a tan and brown baseball cap, took a picture or video of me on his phone through the front windshield of my car. He was approximately 20 feet away from my car. Included as Exhibit G is video footage of the DSS agent photographing or filming me.[6]

114.    Shortly after, I noticed a second plainclothes DSS agent standing about five feet behind my car, taking a photo of the back of my car. It seemed like the agent was taking a photo of my license plate. This agent was wearing light tan pants, a light tan short sleeved shirt with "Police" on the sleeve, and a red baseball cap. It looked like the first DSS agent had walked over to the second DSS agent and they were now standing next to each other while the second agent took the photo of my license plate.

115.    I asked the second DSS agent "what are you taking a picture of?" The agent responded, "it's public property, right?" Included as Exhibit H is video footage of the second DSS agent photographing my license plate.[7]

116.    The Task Force dispersed and I did not see the Task Force detain anyone.

117.    It is common for agents to take my picture when I am documenting Task Force activity, but it is still intimidating every time it happens. Each time a different agent takes my picture, it feels like the Task Force is discussing me more and more widely and I fear that the retaliation I have already experienced will worsen or escalate.

---

[6] Available at: ACLU, *Hunter Demster – April 2, 2026 (Part 1)* (YouTube, May 12, 2026), https://www.youtube.com/shorts/Fa8o-Lh5Zx0.

[7] Available at: ACLU, *Hunter Demster – April 2, 2026 (Part 2)* (YouTube, May 12, 2026), https://www.youtube.com/shorts/Fa8o-Lh5Zx0.

31

**April 10, 2026**

118.     On April 10, 2026, at about 5:45 PM, a friend called me and told me that the Task Force was gathering at Gateway Baptist Church just off Graham Street near Kingsbury High School. I parked across the street from the church on Macon Road and observed Task Force agents gathered at the church from inside my car. The Task Force vehicles then left the church and turned onto Graham Street. I waited for two to three minutes after the Task Force vehicles drove away before I turned onto Graham Street. Once I turned onto Graham Street, I saw the Task Force appeared to have surrounded a house down Graham Street, directly across from the High School. I parked over 40 feet away and approached the scene on foot. I saw at least one MPD cruiser with its lights on, a CBP vehicle, and eight to ten unmarked federal vehicles. I saw at least one uniformed MPD officer, at least one uniformed Shelby County Sheriff with a dog, and at least eight to ten plainclothes federal agents, at least one of whom was wearing a vest identifying them as HSI. The Task Force agents appeared to have removed the family from the house, making them wait outside while the agents appeared to search the house.

119.     I walked past the house on the other side of the street, and then as the scene appeared to be wrapping up, I began to walk past the house again to return to my car. Almost as soon as I began approaching the house, when I was about 40 feet away, a Shelby County Sheriff invoked the Halo Law by saying something like "we have someone detained in the back of the car, you have to be 25 feet back from the furthest agent away." I backed up but was surprised to hear the Halo Law invoked this way. I have had the Halo Law invoked against me at least 40 to 50 times, but it is rare that an agent tells me I have to be 25 feet back from the agent furthest from the Task Force activity. I cannot recall an exact moment when I have heard it invoked this way before.

32

120.    The HSI agent then immediately started walking towards me and said "Halo Law" again. I backed up as directed, until I was over 150 feet away from the house where the Task Force seemed to be gathered and 40 to 50 feet away from the vehicle the Sheriff had indicated held the detained individual. These multiple Halo Law invocations made it difficult to see what was happening at the house or the person who was detained.

121.    The Task Force left and appeared to return to the Gateway Baptist Church. I stayed and spoke to the family in their front yard. The family was an elderly woman who takes care of her granddaughter, who was present and crying heavily after having assault weapons pointed at her in her home and being forced outside by armed agents. The family said the warrant was for someone who did not live there. I provided them with referral information for legal and therapy services.

122.    I returned to the Gateway Baptist Church parking lot, where other community members had gathered to film the Task Force. I was scared and shaking, and when I got out of my car to film, the HSI agent came very close to me and commented that I was shaking. It is frightening to see the Task Force present in large, well-armed numbers, and seeing how the Task Force affected the elderly woman and her granddaughter really emphasized how terrifying Task Force activity can be.

**May 3, 2026**

123.    On May 3, 2026, around 9:30am, I was observing Task Force activity in the parking lot of the El Supermercado El Rey on Jackson Avenue. When I arrived, I observed two to three MPD vehicles and one unmarked gray vehicle with HSI agents. I began filming the Task Force vehicles and agents present. One of the HSI agents had salt and pepper facial hair, was wearing khaki pants, an olive green jacket with a black collar, a gray baseball cap with a badge logo, and a

33

camouflage patterned body armor vest marked "Police HSI." I saw another plainclothes federal agent, who I believe was also from HSI, wearing khaki pants, a black short sleeved shirt, and a body armor vest.

124.    I parked and exited my car while filming. About two to three minutes after I began filming, one of the HSI agents walked up to me in the parking lot, until he was about two or three feet away from me. The agent said "so you're the only guy" and asked why I was filming a Task Force vehicle's license plate. He then said, "You're just one of those guys, right?" When I asked, "what type?" he responded, "you know what type" and "why are you filming?" The HSI agent then reached for his phone and said "alright [] I'll film you too." He held up his phone about a foot from my face. When I asked him why he was filming me he replied because I was filming him, "just in case," and "you never know." I gave him my name and then he said, "that's all I need." When I asked him what for he again said, "just in case." He then walked back to his vehicle. Included as Exhibit I is video footage of this interaction.

125.    About four to five minutes later the same HSI agent got in an unmarked Task Force vehicle with other plainclothes federal agents and drove away. As the vehicle drove away, an agent said, "have a good day, commie" out of the window. Based on the voice, I believe this was the same HSI agent who had filmed me. Included as Exhibit J is video footage of the vehicle driving away.

126.    The HSI agent's mannerisms were agitated and aggressive. This incident increased my fear of surveillance. Even though I have had my photo or video taken by many Task Force agents, every time it happens my fear that the agents are entering my information into a "database" or list intensify.

34

**May 5, 2026**

127.    On May 5, 2026, around 4:30 PM, I heard about Task Force activity at Byron Road and Rock Road and drove over to observe and film. When I arrived, I saw that the Task Force had gathered at a house on the corner. I parked on Rock Road and began to approach on foot. I saw about six unmarked vehicles and four to five plainclothes federal agents. When I was still at least 40 to 50 feet away from the closest agents, a plainclothes federal agent ordered me to stay 25 feet back. When I asked from what, he ordered me to stay 25 feet from some cars parked on the street. I was too far away to see any agency identifying marks on the agent and could not see what the agents were doing or what was happening at the house. Included as Exhibit K is video footage of this interaction.

128.    I got back in my car and circled around the block to approach the house on the other street. I parked about 150 feet away from the closest agent on Byron Road, began filming, and walked towards the scene on foot. There were Task Force vehicles blocking the road. When I was still at least 40 feet away, an FBI agent started walking towards me and repeatedly told me "you are going to need to stop." When I responded that I was behind the Task Force perimeter and more than 25 feet from the scene, the FBI agent ordered me back 25 feet. When I asked what I needed to be 25 feet from he did not respond and instead told me to "stay back."

129.    As a result of this Halo Law invocation, I was unable to clearly see the scene or capture audio of the scene. I could see the front of the house, but it looked like the agents were also searching a car, which I was unable to see clearly.

**May 14, 2026**

130.    On May 14, 2026, at 7:50 PM, one day after the complaint was filed in this matter, I was at home when I heard police sirens outside. From my home, I could see MPD vehicles

35

gathered at a house six houses away on my street. I got in my car, drove past the house the MPD was gathered at, parked, and began filming from my car. The MPD officers were gathered on the sidewalk in front of the house and were not talking to any residents or community members.

131.    When I started observing and filming, there were only MPD officers and vehicles present. I saw about eight MPD officers. After about five minutes, two MPD vehicles pulled up just past my car and parked side by side next to each other, with their rear bumpers almost touching my rear bumper.

132.    About five minutes later, two unmarked federal Task Force vehicles arrived. I became scared that the Task Force was staging near my house and was going to conduct a retaliatory raid against me.

133.    I was so scared by the arrival of the two unmarked Task Force vehicles that I started to drive away, but I then reconsidered and instead drove around the block. I felt that I could not let the agents intimidate me or drive me away from my own home. I parked and got out of my car to continue filming. As I approached the gathering of agents on foot, an MPD officer who I recognized said "hey Hunter" and asked if I wanted to help them find a nine-year-old child who had allegedly gone missing. About 10 to 15 minutes later the father of the child dropped the child off at the house.

134.    Shortly thereafter, the Task Force agents began to disperse. The MPD officers left, and the two unmarked Task Force vehicles either left or repositioned in a way that meant they were no longer visible to me. The only vehicle still on the scene was an ambulance.

135.    About 10 minutes after all the Task Force agents had departed, four to five more unmarked federal Task Force vehicles showed up. As soon as the additional Task Force vehicles pulled up, other community members walked over and began filming them. I approached and

36

began filming a few minutes later. Most of the newly arrived Task Force agents stayed in their vehicles, and I was unable to see any agency identifying marks. The handful of agents that did exit their vehicles appeared to be HSI. This new set of Task Force agents did not appear to be engaged in any enforcement activity or staging. The Task Force agents began to disperse when I approached with my camera.

136.    I do not believe the initial MPD activity was connected to me. However, I have no explanation for why federal Task Force members continued to arrive other than my presence. I know at least one of the MPD officers on the scene recognized me. This incident heightened my fear that Task Force agents will continue to target me for my observation and filming and may increase their retaliation against me as a result of the complaint filing.

**The Arrest of Jessica Chodor on October 28, 2025**

137.    On October 28, 2025, at about 9 PM, I arrived at a smaller street just off Park Avenue, two blocks away from Highland Street. Jessica Chodor ("Jessy"), who I know from my work documenting Task Force activity, had responded to a message about Task Force agents in the neighborhood, and I received a subsequent message that an observer was being arrested.

138.    I arrived after Jessy had been placed in handcuffs and as she was being placed in a THP vehicle. Jessy did not resist arrest. I told her: "It's going to be ok, we've already got you attorneys, we've got it filmed."

139.    Jessy is a kind, compassionate, caring, and smart human being. My first instinct upon arriving and seeing that Jessy had been arrested was disbelief that she did anything that warranted arrest. Her arrest heightened my ongoing concerns for my own safety from Task Force agents.

140. I told the agents present that their arrest of Jessy was unjust. I did so from more than 25 feet away.

**The Impact of the Government's Retaliation Against Me**

141. My heart and my faith call me to support my community and I may look or sound brave on my videos but I'm terrified. I have become hypervigilant because of the Task Force presence and retaliation. I feel that I have to watch my back at all times because I have been filming, talking to agents, and speaking my truth. There is a constant tenseness that comes with having to watch my back.

142. The Task Force agents seem to be on two-week to one-month deployments to Memphis. But new agents, who I've never encountered before, have seen me and said, "Hey Hunter." I'm scared of being pulled over again for filming the Task Force. I'm scared of being hit by a car, beaten, or worse, for recording. I'm scared of being arrested and detained for recording. Our jails are overcrowded and the conditions are bad.

143. Recently, I have been having borderline panic attacks. My sleep has become dysfunctional. I am hypervigilant and afraid that agents will attack me. I am concerned about keeping the people I love safe. I feel like I am prevented from being fully present in the moment with them because I am worried about always having a safety plan for every situation. Particularly after Task Force agents pull me over, I have an incredibly hard time sleeping at night. My girlfriend says I disassociate to cope with the extreme stress.

144. I have scaled back my observation and filming of Task Force activity because of the anxiety and fear I experience as a result of the retaliation and intimidation I have faced. Now, more often than not, I choose not to go out and observe and film Task Force activity when I learn about it.

145.    My behavior when do I go out to observe, gather information about, and record Memphis Safe Task Force agents has also changed as a result of the incidents described above. I have been observing and filming local law enforcement for many years. I am significantly more afraid to approach and film Task Force agents than I have ever been of local law enforcement prior to the Task Force's arrival.

146.    Sometimes I now sit in my car and don't roll my window down when I'm filming. A lot of times I don't want to get out of my car anymore and won't do so unless there is a pressing issue. I have stopped providing Know Your Rights information as often.

147.    Even when I am the first community member to arrive, I will stay back in my car and wait for other community members to arrive before approaching and filming the scene. I hate that my anxiety keeps me from engaging because I know that usually the first observer at the scene can document the operation and most help the affected person, including by sharing know your rights information.

148.    When I do get out of my car now, I get stress headaches just from standing on the sidewalk and pulling out my phone. This is the first time I have consistently had physical stress reactions, even though I have been documenting law enforcement for years. Gathering information about and recording law enforcement operations is not new to me, but having such severe and consistent physical stress reactions is new.

149.    The detailed levels of recall and memory that I have about these incidents is a trauma response. Recounting and reliving these incidents for my attorneys has become more and more difficult emotionally. I have had to pause to cry at times throughout this testimony.

Executed this 25 day of May 2026.

_____
Hunter Demster

40

# EXHIBIT A

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT B

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT C

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT D

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT E

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT F

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT G

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT H

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT I

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT J

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT K

*Video exhibit submitted to the Court on USB drive*