**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

|  |  |
|---|---|
| HUNTER DEMSTER *et al.*,<br><br>    *Plaintiffs,*<br><br>v.<br><br>TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States*, et al.,<br><br>    *Defendants.* | Case No. 26–cv–02546 |

**DECLARATION OF JESSICA CHODOR**

I, Jessica Chodor, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1.	I am over the age of 18, am competent to give this declaration, and testify from my own personal knowledge regarding the facts in this declaration.

2.	I have lived in Memphis intermittently since I was seven years old. I currently reside in the Vollintine-Evergreen neighborhood of Memphis. I am a project and data manager for a nonprofit organization that provides support for parents post-partum.

3.	I have been involved in observing, gathering information about, and recording immigration and law enforcement activity since June 2025. I decided to join other members of my community in documenting this activity after I heard about an incident in which federal agents broke the door of someone's home without a warrant and assaulted a witness standing nearby. It was difficult for me to accept some of the stories I was hearing and seeing video clips of, so I wanted to bear witness myself and provide honest documentation of these interactions.

1

4.      Through this work, I aim to gather information about law enforcement and community member interactions, document any mistreatment, and advocate for change where needed. It is also important to me to be present during these interactions to offer information and support to detained people and their family members.

**Memphis Safe Task Force Activity**

5.      I go out and observe, gather information about, and record Memphis Safe Task Force ("Task Force") activity several hours a week. When I first began this work, I would do so for about four hours per week. After Task Force officers arrested me in retaliation for seeking information about and trying to record their activity, I stopped my observing altogether while there was a criminal charge against me pending. After the charge against me was dismissed, I resumed but have reduced my observing to two hours per month because of the impact that incident has had on my family and my sense of safety.

6.      Typically, I see Task Force agents operate in the following manner: Tennessee Highway Patrol ("THP") officers in a lead THP vehicle initiate a traffic stop. The THP vehicle is typically followed by a caravan of two to four additional unmarked vehicles containing federal agents, who surround the civilian car following the stop. Sometimes the unmarked vehicles are driving behind or alongside the THP vehicle prior to the traffic stop, and sometimes they arrive at the scene shortly after THP initiates the stop. I have also seen Task Force agents surround peoples' homes, bang on doors, and break a door to enter a home.

7.      I have observed agents from the following agencies:

- Department of Homeland Security ("DHS"), including Homeland Security Investigations ("HSI") and Customs and Border Patrol
- Federal Bureau of Investigation ("FBI")
- U.S. Marshals Service
- Internal Revenue Service Criminal Investigation
- Diplomatic Security Service

2

- U.S. Fish and Wildlife Service
- Tennessee Highway Patrol ("THP")
- Memphis Police Department
- Shelby County Sheriff's Office

8.      Federal agents engaged in Task Force activities typically wear plain clothes, which are often all black. Often, the only indication that they are government agents are their vests. Their vests sometimes indicate their agency, sometimes say "police", and sometimes do not say anything at all. These agents regularly wear masks.

9.      THP officers engaged in Task Force activities typically drive THP vehicles and wear their respective uniforms.

**Observing, Gathering Information about, and Recording Task Force Activity**

10.     My goal is to monitor and document Task Force activity in order to provide support to those who are detained and their families, ensure there is an independent record of the incident, and to hold immigration and law enforcement officers accountable for any abuses I witness. Sometimes I will try to get information about what is happening by talking to Task Force agents or bystanders.

11.     If I see Task Force activity while driving my car, if there is a safe and lawful place for me to park my car, I park and get out of my car to observe and record their operations. If I cannot lawfully park and exit my car, I try to record Task Force activity from my car with my phone. After I received a citation for driving with my phone in my hand while I was recording Task Force activity on October 3, 2025, I installed a phone mount on my car dashboard so I can film while I am driving, in accordance with all traffic laws. Since October 4, 2025, I have not held my phone in my hand when I am driving.

3

12.    When I am observing, gathering information, or recording, I try to maintain a safe distance from the scene. When officers ask me to step back 25 feet pursuant to the Halo Law, I always comply.

13.    I have never threatened law enforcement officers or physically interfered with their activities.

14.    I have witnessed many abuses by the Task Force. For example, in September 2025, right at the start of the Task Force, I witnessed Task Force members detain a U.S. citizen, using a warrant that was issued a year prior to the arrest, with someone else's name listed. I have personally witnessed at least ten incidents in which federal agents, often with very large guns, surround civilian vehicles at basic traffic stops.

**Invocation of the Halo Law**

15.    Task Force agents have invoked the Halo Law against me numerous times and I have always complied. Compliance has interfered with my ability to gather information about and record Task Force operations and interactions with members of my community.

16.    For example, on October 2, 2025, at around 9:50 AM, I was attempting to record a Task Force operation in the Nutbush neighborhood of Memphis. When I arrived, I saw multiple agents in plain clothes and face masks detaining a Latino man, including by shackling his hands, waist, and feet. An agent asked me to stay back and I complied and stayed 25 feet away from the officer. The officer then stood directly between my line of sight and the person the agents were detaining, blocking my camera view. When I stepped a few feet in another direction to try to get a clear view, the agent mirrored my steps and again blocked my view. I was extremely concerned because it appeared to me the agents were intentionally trying to keep me from seeing and recording what they were doing and therefore may have been behaving inappropriately, but I could

4

not get close enough to the scene to adequately record it. I tried to move up and down the block while remaining 25 feet away from the scene, and the officer also moved, to continue to obstruct my view of the arrest. Because I was so far away from the scene, I also could not hear what was being said. By complying with the Halo Law, I was not able to adequately record or gather information about the arrest.

**Incidents of Retaliation**

### September 30, 2025

17.     On September 30, 2025, a concerned neighbor alerted me to a group of Task Force agents at a neighborhood playground at 1520 East Brooks Road. I drove my car to that area and drove around the operation and filmed it. I witnessed at least 16 federal agents converging in the area. I stopped in the parking lot, on the other side of where the agents were, to continue to watch and record the operation. Two HSI agents walked across the parking lot to my car and took photographs of me and my license plate. I asked the agents about the operation in order to gather more information for the neighbor, who was concerned about the swarm of agents in his neighborhood, and discussed my concerns about immigration enforcement activities with them. The agents told me to move my car and I complied.

### October 1, 2025

18.     On October 1, 2025, I saw a THP and two unmarked vehicles pulling over a car at the intersection of Givens Avenue and Pope Street. I parked near the scene. I got out of my car and walked to the street across from the scene in order to observe and record the interaction. The officers gave me hostile looks, and then one agent wearing plain clothes, a vest without any identifying markers, and a mask, walked over to my vehicle, which was half a block away, and took a photograph of my car and my license plate.

5

**October 28, 2025: Traffic Stop**

19.    On October 28, 2025, at around 6:30 PM, I observed a THP car and an unmarked F-150 pulling over a vehicle near the intersection of Mount Moriah Road and Ridgeway Road. I was recording with my phone mounted on my dashboard. I saw one THP officer approaching the driver's side of the civilian car, two people in plain clothes and HSI vests standing at the rear of the car, and one person in plain clothes and a vest that read "POLICE" approaching the passenger side of the civilian vehicle. There was nowhere for me to safely park within view of the scene, so I turned my car around and as I drove by, I slowed down, rolled down my window and expressed my concern with the officers' activity by shouting, "It takes four agents to do a traffic stop on one man? And you're not terrorizing our city?" I then continued driving.

20.    I drove east to the stoplight, and then I turned left onto Kirby Parkway. When I turned, I noticed the THP car and the unmarked F-150 from the traffic stop following me. I was obeying all traffic laws, so I was confused by why they were following me. I did a U-Turn at the Bill Morris Parkway intersection, and the government vehicles also did a U-turn to continue following me. At around 6:40 PM, near the intersection of Kirby Parkway and Mount Moriah Road, the THP vehicle turned on its lights and siren, indicating that I should pull over. I immediately complied and pulled over to the side of the highway, and both the THP vehicle and the unmarked F-150 stopped behind me. After I pulled over, I began recording with my phone, which was still mounted to my dashboard. Included as Exhibit A is video footage of the traffic stop.[1]

---

[1] Also available at: ACLU, *Jessica Chodor – October 28, 2025 (Pullover)* (YouTube, May 12, 2026), https://www.youtube.com/shorts/a6pqsDE6V8I. All video exhibits are available on the USB drive provided to the Court.

6

21.     An officer came to my driver's side window and identified himself as THP. He then asked me if there was an issue or a problem. I was confused and replied: "You pulled me over—is there an issue or a problem?" The officer said that I had passed by screaming out the window. I asked him: "Is that illegal? Is that the reason why you pulled me over?" The officer told me: "Yeah, you were impeding my investigation and the traffic stop I was on." He asked me if everything was okay, to which I asked: "In general? Or with me and my driving?" He replied: "With you in general. It's not every day that any reasonable person wouldn't drive by and see somebody pulled over and yell." Since it was clear that there was no valid reason to stop me, and that under the law I should have been free to go, I told the officer that I did not have time. The officer then told me: "Well, you're going to have time right now." I asked him why and asserted that he needed to have a reason to pull me over. He told me that he did have a reason, and I asked if it was because I yelled out my window. He replied: "Because I'm concerned about you. It's not every day that any reasonable person wouldn't drive by a trooper screaming out the window." He told me that he was making sure I was okay, to which I told him: "I'm okay. Thanks for checking on me."

22.     The officer asked me again if there was an issue, to which I responded: "There is a big issue in our city. I'm not spending my time here talking to you right now about it though. I think it's ridiculous that you are driving around with HSI and making traffic stops with multiple officers surrounding a vehicle in a city that's already been terrorized by police brutality and misconduct. It's not helping; it's making our situation worse. And I have to live here and deal with the crime and the safety issues and I'm really, really frustrated that our resources are being put to terrorize our community members that are already marginalized for generations now." The THP officer replied: "I appreciate your opinion, I do. But do you think driving by us screaming out the

7

window is doing any good?" I responded: "If I didn't, then I wouldn't do it. But I really, I don't have any more time, I got things to do, so can I please leave?"

23.     The THP officer still refused to let me leave and told me that he needed to see my driver's license. I asked him why he needed to see my license and he said: "Because I'm asking you for it. You're detained right now on a valid traffic stop." I asked him once again: "What is the traffic stop for? For yelling out the window?" The THP officer responded: "For yelling out the window," and then he added a new, false accusation that I was using my phone to record while I was driving. I knew that I did not have my phone in my hand, as it was mounted on my dashboard, and that he was lying. I told him that I had not used my phone, and he said: "You had your phone up recording us. I seen you with it." I told him again that he did not see me with my phone up and gestured to my phone which was clearly mounted on my dashboard. The officer told me that he was not going to argue with me and demanded to see my driver's license. I was frustrated and scared because he was falsely accusing me of breaking the law. Out of concern for my safety, I complied with his order and pulled out my driver's license. As I handed him my license, I told him: "You're making shit up. You know that, and that's why the community is pissed at you and nobody trusts you guys, because you pull people over for things that aren't true."

24.     The THP officer took my license back to his car. A few minutes later, he returned my license to me and indicated that I was free to go.

25.     I was stunned and deeply troubled by this stop and the THP officer's false accusation that I was driving while using my phone. I was distressed by the stop, and further disturbed that the officer was willing to lie in order to justify stopping me and taking my personal information. I pulled into a nearby parking lot to give myself an opportunity to calm my nerves. I knew that this is the kind of abuse of power that other members of my community regularly

experience; although it was deeply upsetting, it reinforced to me why it is important to document Task Force operations—to make sure the truth is protected.

**October 28, 2025: Arrest**

26.     At around 7:24 PM, when I was on my way home, I received a message from a friend that the Task Force had pulled over two people at Pendleton Street and Park Avenue. I was told that they needed someone with a driver's license to come to the scene and drive their vehicle home. I was a few minutes away from the scene, so I decided to go help.

27.     At around 7:40 PM, I arrived at the scene and saw a Hispanic couple in a truck, with a THP vehicle and at least three unmarked vehicles in front of and behind the truck. I parked about one block behind the scene, got out of my car, and walked toward the scene with my phone.

28.     I walked up to the scene from the rear end of the cars. I walked past a group of at least three agents in plain clothes and vests. The agents were looking at their phones. They looked up at me as I approached, and then they looked back down at their phones.

29.     I walked over to a THP officer, who was standing in front of his vehicle, behind the truck they had pulled over. According to the government's post-arrest affidavit of complaint, this THP officer was Trooper Ronald Suzore. Attached as Exhibit B is the affidavit of complaint.

30.     I intended to film my interaction and had my phone out and pointed up at Trooper Suzore. I told him: "This is a friend of a friend and I wanted to see what's going on and if they need any help." Suzore told me: "They don't need any help, they're good." Because my friend had told me that the agent said someone could come get the vehicle, I was confused by Suzore's response. I told him I just wanted to make sure they don't need any help and asked him if he could tell me what was going on. He refused to give me any information and told me to go back to my vehicle, which was too far away to view or record the traffic stop.

9

31.    I told Trooper Suzore I was not going to go back to my car but would stand across the street to see what was going on. He then claimed I was interfering and threatened to arrest me if I did not go back to my vehicle, even though all I had done was hold my phone up to record him and talk to him briefly, and I was at least 15 feet away from the detainees or any officer interacting with the detainees. When Trooper Suzore claimed I was interfering, I started backing away.

32.    Because of his agitated tone and claims that I was interfering, I felt nervous, so I looked at my phone to make sure I had him in the video frame. At that point, I realized I had mistakenly neglected to press the record button on my phone, and so I pressed the record button to begin filming.

33.    As I began to move across the street from the scene, I responded: "How am I interfering? I am going to walk across the street, which I am legally allowed to, and you're going to stop being an ass." As I said these words and continued moving away, he again demanded that I go back to my car, which was down the street from him, and which was too far away from the scene for me to view or record the traffic stop. I responded: "25 feet, I can stand anywhere 25 feet away from your scene" as I walked across the street. Trooper Suzore began aggressively approaching me at a brisk pace and told me to go all the way back toward my car. I said: "Enough with it. I'm not going in that direction," and continued to move away from Trooper Suzore to cross the street. There were other state troopers and federal agents nearby, watching the encounter. I felt extreme fear as Trooper Suzore continued to approach me because I was not breaking any laws yet none of the multiple agents near me seemed willing to protect my rights. As I was backing away, I remember seeing an agent wearing all black plain clothes with no agency marking that I could see also start to approach me. Trooper Suzore pointed in the direction of my car and said: "You're going back there to your car or you're going to jail." As I continued to back away across the street

10

from the scene, I told him again that I was not going to my car and that I was not legally obligated to go to my car. Included as Exhibit C is the video footage of this interaction.[2]

34.    After this, I remember Trooper Suzore touching me—I believe he grabbed my arm. I said something to the effect of "don't touch me" or "get your hands off of me" and asked him why he was doing this. I exclaimed to him: "you're on Live" which means being recorded and broadcast to social media in real time. When I told him that, Trooper Suzore tackled me to the ground with immense force. Once I was on the ground, he and another person pinned me to the ground facedown. I was shocked and scared. I did not know what was happening or understand that they were arresting me, because I hadn't broken any laws and they did not tell me I was under arrest.

35.    While they pinned me to the ground, the officers put such a forceful weight on my back that I could not breathe. The amount of force they were using terrified me and I worried I could be killed. My mind flooded with the videos of George Floyd and Tyre Nichols.

36.    My right arm was pinned to the ground underneath my body, and they grabbed my left arm and pulled it behind me. One of the officers shouted at me that I was about to be tased. They shouted at me to give them my other arm, but my right arm was underneath me, and the weight was so strong on my body that it was impossible for me to comply with his order. I told them they were holding me down so I couldn't give my other arm to them. They shifted the forceful weight off of me and I was finally able to give them my other arm, and they handcuffed both my hands.

---

[2] Also available at: ACLU, *Jessica Chodor – October 28, 2025 (Arrest)* (YouTube, May 12, 2026), https://www.youtube.com/shorts/V8AvcoHXIik.

37.     I was so terrified by the aggression, I screamed: "Help! Help!" in hopes of calling witnesses. It was dark out, and all I could see were many agents standing in the street. I did not see any civilians, so I was worried I was all alone with no civilian witnesses.

38.     After they pulled me up off the ground, the officer then communicated to me that I was under arrest.

39.     The officers aggressively walked me to the THP vehicle. They lifted my handcuffed arms high behind me and forced me forward toward the back of the THP vehicle. Included as Exhibit D is the bodycam footage of the incident, from when I walked up to Trooper Suzore to my detention in the THP vehicle.[3]

40.     I was terrified and disoriented and kept screaming for help, hoping that someone could hear me through the car to help me. I shouted: "Help! My name is Jessy! Tell them I've been arrested!" as loudly as I could.

41.     I was in pain from the assault. My arms were handcuffed behind my back, and the handcuffs were very tight, cutting my skin and digging into my wrist bones. My pants were falling down because they had been pulled down when they tackled me, and part of my backside was exposed.

42.     Trooper Suzore then came to the backseat door and opened it with another agent, a large man dressed in plain clothes wearing a face mask. The agent asked me: "What's going on here?" I asked him if I was required to talk, and he said no. I told him I did not know what was going on. He then asked me if I was a U.S. citizen. I told him that I did not want to talk and he walked away.

---

[3] ACLU, *Jessica Chodor – October 28, 2025 (Bodycam footage)* (YouTube, May 12, 2026), https://www.youtube.com/watch?v=goDCot13rjM.

43.     Trooper Suzore came back to the car and told me I was going to jail. He asked me if I wanted to call someone to move my car or if I wanted them to tow it. I told him I wanted to call my husband to pick it up. Trooper Suzore asked me to give him the passcode to my cell phone so that he could unlock it to make the call. I declined to give them my passcode, because I was worried about what the officers would do with my phone and my personal data. Trooper Suzore refused to remove the handcuffs so I asked him to hand me my phone behind my back with my hands still in handcuffs so I could unlock the phone. He called my husband on my phone and put it on speaker phone. I told my husband that I had been arrested and to pick up my car so it would not get towed. Since the officers were in the car listening to the conversation, I did not discuss anything else with him. My husband told me that my attorney was on the way, but Trooper Suzore told my husband that there was nothing an attorney could do at that point and that he would likely leave to take me to the jail by the time my attorney arrived.

44.     I sat in the back of the police vehicle for some time with my pants sagging and in pain with the handcuffs extremely tight. Trooper Suzore opened the back door and offered to loosen my handcuffs. An FBI officer stood at the other back door of the car. Trooper Suzore asked me to turn so the handcuffs were facing him. I warned him if I did he may see my backside since my pants had been pulled down in the tackle. He directed me to instead step out of the vehicle. He then took off one handcuff, let me pull up my pants, and then put the handcuffs back on me, while the FBI officer stood over me shining a bright light on my face. The handcuffs were looser, but still tight and digging into my wrists, ultimately leaving bruises and cuts. They then put me back into the back of the THP vehicle.

45.     At around 8:15 PM, Trooper Suzore drove me to Shelby County Jail East. On the ride there, I was still in shock, flooded with fear, and disoriented. I was in great physical pain and

13

I had snot running into my mouth from the cold and from crying with no way to clean it away due to my hands being cuffed behind my back. I was panicked and scared because I realized the Task Force agents were operating outside the law, and I had no idea what would happen to me next.

46.     I was booked into the facility at around 9:30 or 10:00 PM.

47.     I was detained for 27 hours. While I was in jail, I was unable to sleep due to overcrowding, harsh fluorescent lights, constant noise including shouting, and severe cold with lack of warm clothing or blankets. The toilet was broken and leaking on the floor. No bed or bedding was provided and there was no space to lay down other than on the dirty concrete floor and a concrete bench. Even on the floor, there was only space for about three women to lay down at a time and there were over 30 women detained in the cell. I was denied water for eight hours and food for nine hours. I hadn't eaten since lunch before the arrest, so was without food for 18 hours total. The food they eventually provided did not accommodate my allergies. I was so hungry I had to eat most of it anyways, causing digestion pain and excessive bathroom use. I had serious injuries from the assault, and I was in severe pain. My neck and back were swelling, my ribs were hurting, and my wrists were bruised and swollen from the handcuffs. I was also experiencing severe cramping in my abdomen and nausea from having just started my menstrual cycle. The jail staff refused to give me pain relievers, and when I requested access to my prescription medication, I was shouted at to be quiet. The staff were hostile and would not allow me to communicate with them or ask questions. I had no idea when I would be released, and I was extremely scared about what the Task Force agents would claim about the incident and what would happen to me.

48.     Throughout my detention, I could not stop replaying the assault in my mind. It was shocking to be attacked like that, even though I had read so many reports and seen videos of police brutality. I had been out there that night filming the Task Force precisely because so many other

14

people in the community are afraid of police brutality and want it to be documented when it occurs. It was still difficult to process that I had directly experienced such brutality while I was there to document it.

49.     On October 30, 2025, between 1:00 or 2:00 AM, I was released from detention on a Release on Recognizance ("ROR"). Attached as Exhibit E is a document evidencing my ROR.

50.     I was scheduled to appear in court at 8:00 AM that same day. I attended court, and my date was postponed to December 5, 2025.

51.     I was charged with Resisting Official Detention. Attached as Exhibit F are Certificates of Disposition reflecting that charge.

52.     On December 5, 2025, the government dropped its charge against me, and my case was dismissed. *See* Exhibit F.

53.     On May 6, 2026, I filed a complaint with the Tennessee Office of Professional Accountability regarding the retaliatory traffic stop and arrest.

**The Impact of the Government's Retaliation against Me**

54.     After my release from jail, I continued to experience severe physical pain from the assault. I suffered from neck pain and extreme swelling, rib contusions, and bruised wrists.

55.     In addition to the physical pain, I continued to feel extremely fearful and disoriented. For days, my body was involuntarily shaking and I could not leave my house because I was scared of interacting with other people. After being assaulted by officers who were supposed to protect me, and after being yelled at, ignored, and demeaned by staff with authority over me at the jail for 27 hours straight, I felt too scared to risk interacting with anyone else. I was afraid to go to the doctor and even to interact with the receptionist. I had unrelenting flashbacks of the

15

assault and my detention in the jail. I was so mentally distracted, I was afraid to drive a vehicle safely. I was deeply fatigued and unable to focus. I was not able to work.

56.     My family urged me to seek medical care, but I was too nervous to leave my house and talk about what happened to me. I also did not think I had the mental capacity to fill out basic paperwork at the hospital. I stayed in my bedroom for the first 24 hours after my release from detention. This kind of fear and incapacitation is completely out of my character; I had never experienced anything like it before the incident.

57.     On October 31, 2025, I was still in severe physical pain. My sister insisted again that I seek medical care, and she helped make it feel safer for me to leave the house. She picked me up from my house and accompanied me to Methodist Hospital Emergency Care where she checked me in and filled out my paperwork. The medical providers took x-rays, a thyroid test because my neck was so swollen, and issued multiple prescription medications for my pain. They told me to return for a follow-up appointment with my primary care doctor on November 3, 2025. At my follow-up appointment, the doctor encouraged me to consistently take the prescription medication and focused on the impact on my mental health. I continue to see this doctor as I recover from the incident, and I also began working with a professional therapist for additional mental health treatment and support.

58.     Due to the arrest, time in jail, and my recovery, I had to miss work for seven days. My doctor directed me to rest and not return to work until November 6, 2025. Upon my return, my work performance suffered due to ongoing pain, mental fog, and fatigue. To this day, I continue to struggle to focus or perform in the way I could prior to the incident.

59.     I continue to experience fear, panic, and flashbacks from the incidents described above, especially when I am driving. When I drive, I am scared that I will be stopped and subjected

16

to similar abuses again. I continue to struggle to focus. I have experienced a series of unprovoked anxiety attacks since the attack, which I never experienced prior to the incident.

60.    My behavior when I go out to observe, gather information about, and record Task Force agents has changed as a result of the incidents described above. While my criminal charge was pending, between October 29 and December 5, 2025, I ceased my recording activities entirely. After my charge was dropped on December 5, 2025, I resumed my observation and filming work, but I have reduced the amount of time because of the psychological toll the assault and arrest have taken on me and my family.

61.    These incidents of retaliation by the Task Force were not only traumatic for me, but also for my family. My husband has a chronic medical condition that is triggered by stress, and he had an extended episode of poor health due to what happened to me. He continues to be very worried about me anytime I leave the house alone.

62.    It is still important to me to hold the government accountable for its abuses, so when I am mentally able to push through the fear, I try my best to record Task Force agents operating in my community. When I manage to record them, I am incredibly anxious and scared that they will retaliate against me again, but I refuse to let their intimidation tactics stop me from exercising my rights and supporting my community members who are even more often victimized by their abuses of power.

17

Executed this 22nd day of May 2026.

_____
Jessica Chodor

# EXHIBIT A

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT B

## AFFIDAVIT OF COMPLAINT

**STATE OF TENNESSEE**
**COUNTY of SHELBY**

*Jessica Ghodor*

Personally appeared before me **Trp. R. Suzore** and made oath that on or about the __28th__ day of October **2025**, in said County, and within the jurisdiction of the Criminal Court Shelby County, Tennessee, one **white**, age **36**, sex **female**, whose last known address is ▮▮▮▮▮▮▮▮▮▮ did unlawfully commit the offense(s) **Obstruction of Justice: Resisting Stop/Frisk/Halt (T.C.A. 39-16-602)**, and the essential facts constituting said offense(s) and the source of the affiant's information are as follows:

Pursuant T.C.A 40-6-204 (b) advised that if your charge(s) are dismissed, a no true bill is returned by a grand jury, you are arrested and released without being charged with an offense, or the court enters a nolle prosequi in your case, you are entitled, upon petition by you to the court having jurisdiction over the action, to the removal and destruction of all public records relating to the case without cost to you.

**Narrative:**
**On 10/28/2025 at approximately 1940 hours, while assisting Trooper Fair with a traffic stop, Trooper R. Suzore observed a female white approaching the traffic stop location. The female white passed one marked patrol unit with lights activated and stated that she was a friend of a friend of the people who were involved in the traffic stop. Trooper Suzore advised the female white that the occupants were fine and that the female white needed to step away from the traffic stop back towards her vehicle. The female white stated that she did not have to go back towards her vehicle. Trooper Suzore advised the female white that if she did not step further away from the traffic stop she would be arrested for obstruction. The female white then walked into the street getting closer to the traffic stop. Trooper Suzore told the female white to stop and as he approached her to detain her, the female white began to walk faster away from Trooper Suzore. As Trooper Suzore was going hands on with the female white she began to pull away from Trooper Suzore. After a short struggle the female white was placed into handcuffs and into the back of the patrol unit. The female white was identified as Jessica Chodor by TNDL ▮▮▮▮▮. Chodor was then transported to Jail East without further incident. The incident did occur in Shelby County.**

_____
Affiant

6348 Summer Ave, Memphis, TN 38134
_____
Address

Sworn to and subscribed before me this __28th__ day of ___October____, 2025 *Kenya Smith* KS
_____
General Sessions Judge/Judicial Commissioner

BOOKING NO. 2520555 2▮▮▮▮▮▮▮▮▮▮

# EXHIBIT C

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT D

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT E

25022787

## STATE OF TENNESSEE, COUNTY OF SHELBY
## WRITTEN UNDERTAKING

Know all men by these presents that __JESSICA CHODOR_____

Agrees to appear in court having jurisdiction of the Charges of: _____

RESISTING OFFICIAL _____

DETENTION _____

_____

presently pending against him/her as directed by that court. If you fail to appear, your bond of $ ROR

will be forfeited to the State of Tennessee or Shelby County. Further legal action will be taken as directed by the

court of your nonappearance.

Signed this _____ day of_____ , _____

## NOTICE

TO PERSON MAKING CASH DEPOSITS ON APPEARANCE BONDS

PURSUANT 10 TENNESSEE CODE ANNOTATED 40-11-12

Judgement for fine and cost-Deposit applied to payment.

If a judgement for fine and court cost or either entered in the

prosecution of a cause in which a deposit has been made by

defendant, the deposit shall be applied to the payment.

In making the cash deposit as an appearance bond for the

defendant, I do understand and agree that the cash deposit will

be applied to pay any judgement for the fine and court cost

entered in the prosecution of the defendant in this case.

_____
Defendant

_____
Address

_____
City

Know all men by these presents, that JESSICA CHODOR

agrees to insure that the above named individual will appear in the court having jurisdiction of the charges against

him/her, as directed by the court or pay $ __ROR_____ to the

State of Tennessee for his/her nonappearance.

Given under our hands and seal, this 29 day of October, 2025.

_____
Surety

_____
Surety Company

_____
Surety Seal

Sealed, Signed and acknowledged before me

_____

_____
Clerk / Sheriff

By: _____

_____
Deputy Clerk / Sheriff

INITIAL COURT DATE:

General Sessions Criminal / City Court / Criminal Court/ Division 13

on the 10/30/2025     at _____9:00 AM

## FAILURE TO COMPLY CAN RESULT IN CONTEMPT OF COURT CHARGES T.C.A. 29.9.104.

# EXHIBIT F



**TAMARA A.**
**SAWYER**
GENERAL SESSIONS COURT CLERK | SHELBY COUNTY, TN

### Shelby County Government

### General Sessions Criminal Court Division

---

#### CERTIFICATES OF DISPOSITION

---

To Whom It May Concern:

This is to certify that an examination of the records of General Sessions Criminal Court Clerk's Office reveals that

Defendant JESSICA CHODOR appeared in Division 13 of the General Sessions Criminal Court, Memphis, Tennessee, before Judge

on the following charge(s) with the resulting disposition(s):

| Docket Number | Charge | Disposition |
|---|---|---|
| 25022787 | RESISTING OFFICIAL DETENTION | Nolle Prosequi no Court Costs |

| Date of Disposition: | 12/05/2025 | Financial Bal: | 7.00 |
|---|---|---|---|

General Sessions Criminal Court Clerk (Signature)

yenifer harbert

901-222-3500

Contact Phone Number

---

201 Poplar Avenue * LL-81 * Memphis, Tennessee 38103 * (901) 222-3500 *

http://gs4.shelbycountytn.gov/index.aspx?NID=31

Rev. 2/12/2025

Page 1 of 1

The State of Tennessee vs. CHODOR, JESSICA

Status **Disposed**
Filed  10/28/2025
Type  **Misdemeanor Arrest**
Court  Division 13
Judicial Officer  Montesi, Louis J., Jr.

**Charges**

1. RESISTING OFFICIAL DETENTION
   SCN **790025205552** Sequence **1**    (MB)  10/28/2025    Disposition    **Dispositions**
   Nolle Prosequi no Court Costs

**Most Recent Events & Hearings**    Case Summary

| | |
|---|---|
| 12/05/2025 | Final Disposition |
| 12/05/2025 | **Disposition** (Judicial Officer: Montesi, Louis J., Jr. ) |
| | Defendant CHODOR, JESSICA |
| 12/05/2025 | **Report to Court** (Judicial Officer: Montesi, Louis J., Jr.) |
| 9:00 AM | Result: Nolle Prosequi |
| 10/30/2025 | **Arraignment** (Judicial Officer: Montesi, Louis J., Jr.) |
| 9:00 AM | Result: Continued |
| 10/29/2025 | Bond Set By Pretrial Services |
| | D.ROBINSON |
| 10/29/2025 | Bail Screening/Setting-24HCO |
| 10/29/2025 | Bail Screening Form-24HCO |
| 10/29/2025 | Active Bond Set |
| 10/29/2025 | Bond Posted |
| | View more events |

**statistical closure**

12/05/2025    Disposed

**defendant demographics**

DOB ▮▮▮▮    White Female
               ▮▮
           hair ▮▮
           Eyes ▮▮

**case cross reference**

OMSE Booking Number

OMSE Case Id
▮▮▮▮

Records and Identification Number
▮▮▮

Unverified Records And Identification Number
▮▮▮

**flags & actions due**

⚑ 0-Unknown Precinct
⚑ Active Bond Set
⚑ Bond Setting
⚑ Verified RNI