**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

|  |  |
|---|---|
| HUNTER DEMSTER *et al.*,<br><br>　　　　*Plaintiffs*,<br><br>v.<br><br>TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States*, *et al.*,<br><br>　　　　*Defendants*. | Civil Action No. 26–cv–02546 |

**DECLARATION OF KENNETH HALT**

I, Kenneth Halt, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1.　　　I am over the age of 18, am competent to give this declaration, and testify from my own personal knowledge regarding the facts in this declaration.

2.　　　I was born and raised in Pittsburgh, Pennsylvania. I have lived in Memphis for about five years. I currently reside in South Memphis and work as a community builder at a joint city-county agency.

3.　　　When I first heard about the formation of the Memphis Safe Task Force ("Task Force") in the fall of 2025, I immediately asked myself what I could do to help the people of Memphis. I had seen reports of individuals being victimized by federal agents in other parts of the country and decided that I wanted to exercise my constitutional rights in service of my neighbors. To that end, I have been involved in observing, gathering information about, and recording immigration and law enforcement activity for about six months. I want to help keep my community

1

safe and bear witness to the violations of the rights of others in the face of law enforcement-led abuses.

**Memphis Safe Task Force Activity**

4.      I go out to observe, gather information about, and record Task Force activity several times a week. I sometimes drive to a particular location to observe when I receive calls from community members telling me about Task Force activity. I also stop to gather information about Task Force activity when I see it occurring in the course of my daily life.

5.      I have noticed that the vast majority of Task Force activity consists of traffic stops involving a caravan of law enforcement vehicles. These caravans are typically led by a single Tennessee Highway Patrol ("THP") vehicle, followed by, in my experience, between three and six cars containing officers and agents from different state and federal agencies. On one occasion, I observed up to ten vehicles following a THP cruiser.

6.      In my experience, THP officers, also known as state troopers, typically initiate the traffic stop. After THP has initiated the stop and approached the stopped car, additional law enforcement officials—almost always including federal agents—emerge from the other cars in the caravan.

7.      I have frequently seen agents from the Department of Homeland Security ("DHS"), including Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and Customs and Border Protection ("CBP") taking part in these traffic stops.

8.      I have also observed officers and agents from the Federal Bureau of Investigation ("FBI"); U.S. Marshals Service ("Marshals"); Internal Revenue Service ("IRS"); Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"); Drug Enforcement Administration ("DEA");

Diplomatic Security Service ("DSS"); Tennessee Bureau of Investigation ("TBI"); THP; Memphis Police Department ("MPD"); and Shelby County Sheriff's Office.

9. THP and MPD officers typically drive marked and clearly identifiable THP and MPD vehicles and wear their respective uniforms.

10. Federal agents typically drive unmarked vehicles. Those vehicles are often new-looking SUVs with tinted windows and out-of-state license plates. I have also observed federal agents driving in unmarked Chrysler Pacifica vans and large pickup trucks.

11. Federal agents usually do not wear uniforms, though they often wear dark-colored clothing and almost always wear vests. Their vests sometimes show their agency affiliation; other times, the vests are simply labeled "POLICE" or "FEDERAL AGENT."

12. Occasionally, federal agents wear masks that cover their faces.

**Observing, Gathering Information About, and Recording Task Force Activity**

13. When I arrive at a scene of Task Force activity, I park my car at a safe distance and make a point not to interfere with Task Force agents. I am aware of the fact that Tennessee is a hands-free driving state, so early on in my documentation work, I installed dashcams on the front and rear of my truck so that I could safely record while driving.

14. Once I have parked at the scene of Task Force activity, I also typically use my phone to record, with the goal of being just close enough to the Task Force to be able to record their activity on video. I typically stand just outside my own car on public streets and in parking lots when I record. I sometimes narrate what I observe, and I do my best to discern the agency affiliations of the Task Force members I see.

15. My goal is to bear witness to Task Force activity and to create a record of what I and so many others in our community are seeing and experiencing. Filming helps me do this.

3

16.     I have witnessed many disturbing incidents involving abuse by the Task Force, including violent harassment of minors and evident racial profiling. However, I always try to maintain a safe distance from individuals, law enforcement personnel, and law enforcement vehicles involved in the scenes I record. I do not physically interfere with, impede, or intervene in immigration or law enforcement action. I always follow orders given by law enforcement, including when I am told to step back.

17.     I film only activity occurring in public, and I document officers or agents engaged in their official duties.

18.     Whenever I see someone being detained, I try to speak to them—while remaining a safe distance away—to remind them of their rights and obtain relevant personal information so that I can alert and help to coordinate communication with their families where possible.

**Specific Incidents with Memphis Safe Task Force Agents**

*November 6, 2025*

19.     On November 6, 2025, at about 4:36 PM, I was standing on Breedlove Street and Jackson Avenue, where there had been a traffic stop and a subsequent detention. I stood with a few other observers on the opposite side of the street as I recorded the scene on my cell phone.

20.     There were multiple law enforcement agencies present, including HSI, THP, and TBI. I could tell that some of the agents belonged to those agencies because they were wearing vests with labels showing those affiliations.

21.     There were at least two law enforcement vehicles at the scene: an unmarked gray RAM truck with police lights on and a THP car.

22.     At one point, an agent in the driver's seat of the unmarked gray RAM truck took out his phone. His window was rolled down. He pointed the phone at me and the other observers

4

standing across the street and, on information and belief, he took a picture of us. I was unable to identify the agent's affiliation because he leaned back in his seat, such that we could not see what he was wearing, as he stuck his phone out the window and pointed it towards us. Included as Exhibit A is video footage of the agent pointing the phone at me.[1]

***November 21, 2025***

23.    On November 21, 2025, at approximately 8:57 PM, I spotted a caravan that included a THP cruiser and at least one unmarked vehicle. I followed them north on North Highland Street and eventually rolled down my window and began yelling "La migra" out the window of my truck.

24.    Shortly thereafter, the vehicles in the convoy turned on their police lights and pulled someone over who was turning left onto Given Avenue. I began driving through the intersection of Given and North Highland and prepared to turn left as well, with the intention of parking on the northwest corner of Given to document the traffic stop from several car lengths away.

25.    As I was passing through the intersection and beginning to turn left onto Given, the unmarked vehicle at the rear of the law enforcement caravan, which was directly in front of me, abruptly stopped. I slammed on the brakes and had to swerve to the passenger side of the vehicle to avoid a collision.

26.    The person on the passenger side, who was wearing a U.S. Marshal vest, threw open his door, into the path of my truck, and exited his vehicle. The Marshal walked briskly over to my driver's side window and asked me what I had been yelling, and I told him, "La migra." He asked what that meant. I said it was a reference to ICE. The Marshal asked "so what" if ICE was

_____

[1] All video exhibits are available on the USB drive provided to the Court.

present, and I said I did not agree with what they were doing. He did not respond but appeared to be angry.

27.    I told the Marshal that their sudden stop, which had forced me to brake before I had been able to fully cross the intersection, had caused me to stop with my truck jutting into oncoming traffic, and that this was unsafe. He replied that it was my fault for trying to "pull up on" their stop and that I needed to move. He then turned and walked back to the stopped vehicle.

28.    I put my car back into drive and attempted to maneuver around the unmarked vehicle to continue down Given Avenue. As I did so, the vehicle abruptly cut across the street in front of me, blocking the road and preventing me from passing.

29.    I then reversed, turned around, and parked on the left side of North Highland Street, south of the traffic stop and the intersection of Given and North Highland. I exited my car and filmed the stop from at least 100 feet away. I was afraid to try to film from closer range given my interaction with the Marshal.

30.    After a couple of minutes, the stop concluded, and I drove to the parking lot of a vacant Walgreens at 3502 Summer Avenue and waited for a friend to come meet me. I needed a moment to collect myself, as the unmarked vehicle's aggressive and dangerous maneuver, coupled with how visibly angry the Marshal had been during our conversation, had made me fearful that he or others in the caravan were willing to hurt or arrest me, or both.

31.    I exited my vehicle and stood in the parking lot. Over the course of the next five minutes, at least half a dozen THP and unmarked vehicles drove past the lot. Almost all of those vehicles had their windows down, and I could see there were multiple agents inside each car. As they drove past, the agents sustained eye contact with me, scowling.

32.     I was frightened and deeply unsettled by this experience. Because of the behavior of the Marshal and the passing THP and federal agents, I no longer yell anything from the window of my vehicle when I observe law enforcement convoys or traffic stops. The Marshal, troopers, and agents appeared to have such angry and aggressive reactions to my yelling "La migra." I worry I could be arrested or seriously harmed if I were to yell anything else they might not want to hear, and if another agent were to react as the Marshal did.

**November 28, 2025**

33.     On November 28, 2025, at about 1:40 PM, I was standing in a gas station lot at 1372 Elvis Presley Boulevard. There were approximately five agents detaining a man whom they had seated on the curb at the edge of the lot. I could see that at least two agents were in plainclothes, without any visible indication of their agency affiliations. There was also one agent wearing an HSI vest and one agent wearing a DEA vest. There were at least two THP troopers at the scene as well.

34.     I was standing in front of the convenience store at the center of the gas station lot and facing north across the lot, where the stop was occurring. I was more than 25 feet away from the agents and the person they were detaining.

35.     As I was observing the stop, one of the plainclothes agents—whom I recognized as one of the five agents who had been detaining the man at the curb—came around the side of the convenience store. From where I was standing, I could not see the agent coming until he popped out from behind the far wall of the store, at which point he was about 15 feet away from me. The agent was not wearing a vest or anything else indicating his agency affiliation. He held up his cell phone and, with one hand, tapped the lower part of his screen. On information and belief, he took

7

a picture of me. He then walked away from me, towards the detention occurring on the other side of the lot.

36.    I was too startled and confused to immediately ask the agent why he had taken my picture. The agent's behavior was so strange and unsettling that I was worried that, if I asked why he had done what he did, the agent might escalate the situation.

37.    After a few minutes, however, I became increasingly concerned about why the agent had taken my picture and what he might do with it, and I gathered the courage to ask him to explain. I called out to the agent from across the gas station lot, asking why he had taken a picture of me. He just laughed.

38.    At the conclusion of the stop, the agent who had taken my picture got into an unmarked vehicle.

39.    As the rest of the law enforcement officers were preparing to leave, an FBI agent and I engaged in a brief conversation. I told him that one of his colleagues had taken a picture of my face. I asked the FBI agent why his colleague would do that, and he replied that he did not know. I explained that this type of behavior—taking pictures of observers—is a poor way to build trust with the community.

40.    I also asked one of the THP troopers at the scene why her colleague had taken a picture of me. The trooper replied that she did not know why the agent had taken my picture.

41.    The fact that none of the other agents seemed to know or care about why the plainclothes agent had taken my picture made me feel even more concerned. I had not been particularly close to their stop and certainly had not interfered with what they were doing. I felt as though the only reason the agent could have had for taking my picture was to document who I was,

8

perhaps because the Task Force was starting to recognize me from my observation and recording activity. I did not yet have a sense of what they might do with that information, but it worried me.

### December 6, 2025

42.     On December 6, 2025, at about 7:53 PM, I was standing on the sidewalk at 3608 Macon Road, across the street from a car that had been pulled over by a caravan including a THP cruiser and an unmarked Chevy Tahoe with its police lights on. I was silently recording the scene.

43.     The unmarked Tahoe—inside of which were at least two agents, one in the driver's seat and one in the front passenger seat—began shining a bright spotlight at me. Because of where I was standing on the sidewalk, which was at least 50 to 75 feet down the street from the Tahoe, the spotlight was also shining into oncoming traffic.

44.     The agent in the passenger seat raised his phone, pointed it toward me from inside the Tahoe, and began recording me with his phone flashlight on. The agent maintained eye contact with me as he recorded.

45.     The agents inside the car were visibly laughing as they were filming and shining the spotlight on me.

46.     The light was distracting and created a glare that interfered with my filming.

47.     The agents then turned the spotlight onto a strobe setting. They turned the strobe off after about 30 seconds. Included as Exhibit B is video footage of the agents photographing or filming me and shining a spotlight at me.[2]

---

[2] Also available at: ACLU, *Kenneth Halt – December 6, 2025* (YouTube, May 12, 2026), https://www.youtube.com/watch?v=yilRvOznbX8.

*December 12, 2025*

48.     On December 12, 2025, at about 9:40 PM, shortly after turning onto Winchester Road from Riverdale Road, I noticed a THP SUV driving ahead of me. The SUV made a dramatic lane change, so I decided to follow the vehicle to document it. As I followed, I maintained a safe distance from the SUV and obeyed all traffic laws.

49.     After several minutes, we arrived at a red light at the intersection of Brownbark Drive and Winchester Road. The THP vehicle then made a sudden U-turn at a high speed, and then a second U-turn to position itself behind me at the intersection.

50.     I was frightened by this maneuver, and I started looking for a parking lot to pull into, thinking that if I stopped my car then the THP vehicle would stop tailing me. I saw a parking lot at 6706 Winchester Road and turned right to enter the lot. The THP vehicle followed me into the parking lot.

51.     I parked in an empty part of the large lot, and I pulled out my phone to begin filming. Almost immediately thereafter, four more THP cruisers pulled into the parking lot, followed by an unmarked vehicle. One of the THP cruisers drove at my truck, then turned away at the last second to rejoin the other vehicles driving into the lot. All six vehicles—the initial THP vehicle, the four additional THP vehicles, and the unmarked vehicle—then arranged themselves in a line approximately 25 feet from my truck.

52.     I remained in my truck as this was happening, hoping the THP cruisers and unmarked vehicle would leave. They did not. I became increasingly concerned that their objective was to arrest or hurt me, as it seemed implausible that no fewer than six law enforcement vehicles—with perhaps as many as a dozen officers—would abandon their posts to follow me for any other reason.

10

53.     I felt that I was in imminent danger. I knew I had not violated any traffic laws and I had been following the original THP vehicle from a safe distance. I began to fear for my life. The agents' behavior up until this point had been so bizarre and so threatening that it was hard to know how much further they might go.

54.     I began recording on Facebook Live to document what was happening and to let as many people as possible know my location in case something happened to me.

55.     After about five to ten minutes, I decided to get out of my car, feeling I was in imminent danger if I remained in my truck and the troopers and agents decided to approach, and feeling that it would also be dangerous if they in any way perceived me to be approaching their line of vehicles. I walked, calmly, to the other end of the parking lot, away from the line of THP and unmarked vehicles. I then coordinated with my housemate, Benjamin Reese ("Ben"), to come pick me up. The troopers and agents remained in their vehicles as I did this.

56.     I crossed the street to wait at a gas station for Ben to arrive. After about thirty minutes, Ben arrived, and I got into his car. We then drove past the lot where I had left my truck. The line of THP and unmarked vehicles had not moved. When we drove past the lot again, about 10 minutes later, we saw that the THP cruisers and unmarked vehicle had left. I then retrieved my truck from the lot.

### *December 26, 2025*

57.     On December 26, 2025, at approximately 7:33 PM, I was observing a scene involving a Border Patrol agent, a THP K-9-unit officer, and a Marshal in a Top Notch Market parking lot at 3022 Park Avenue. I was standing at least 25 feet away from the scene. I leaned against the bed of my truck and recorded on my phone as the agents questioned a man and searched

his car. I recognized the Border Patrol agent from two prior stops I had observed. I had also seen him losing his temper in videos taken by other observers.

58.    The Border Patrol agent stood beside an unmarked Chevy Tahoe and shined a bright light at me. I said, "Why are you shining that light at me?" and "I'm not bothering you."

59.    The Border Patrol agent seemed not to hear what I said, responding, "*What?* You want to hump my *what*?"

60.    I replied, "I said, 'I'm not bothering you.' You shined your light at me for no reason."

61.    The agent yelled, "I don't know who you are; you're standing over there holding a black object in your hand. That's why."

62.    I said, "A black object? You can't identify a phone?" He replied, "No, I can't, not from 25 fucking feet!" The agent kept the light trained on me throughout this exchange. Included as Exhibit C is video footage of the agent shining a spotlight at me and accusing me of holding up a black object.[3]

63.    The light was distracting and created a glare that interfered with my filming.

64.    The agent got into the driver's seat of the Tahoe and we exchanged some more words before he closed the door.

65.    I got back into my own car. The agent in the Tahoe pulled up toward my vehicle and parked in such a way that I was boxed in between the store and other cars.

---

[3] Also available at: ACLU, *Kenneth Halt – December 26, 2025* (YouTube, May 12, 2026), https://www.youtube.com/watch?v=eJvtIlQ9rbw.

66.     For several minutes, I was unable to leave the parking lot while the Border Patrol agent boxed me into my parking spot. Eventually, the agent drove away, which allowed me to leave the parking lot.

**December 30, 2025**

67.     On December 30, 2025, at approximately 8:38 PM, Ben and I observed a group of THP, MPD, HSI, and DEA agents on Lamphier Avenue. This is a narrow residential street, and it was not cordoned off. I drove past the scene and turned the corner onto National Street to park my car.

68.     I have since consulted Google Maps and confirmed that I had parked at least 150 feet away from where the agents were stopped.

69.     I exited my car and prepared to record the agents from afar, but they were already getting back into their vehicles and preparing to leave by the time I was ready to record. Ben and I decided to continue driving.

70.     Within seconds, we realized we were being followed by an MPD cruiser. I told Ben to start recording on Facebook Live to document what was happening.

71.     The cruiser followed us—without turning its police lights on—down various side streets. It stayed about one to three car lengths behind my vehicle. We were getting increasingly afraid, and we started to look for a populated area so that there would be other people around to witness whatever might happen next. After several minutes, we pulled into the Valero gas station at 3541 Jackson Avenue and parked facing the brick façade of the station's convenience store. The

13

cruiser pulled up behind us, effectively blocking us into the parking spot. Included as Exhibit D is video footage of this stop and interaction.[4]

72.    Two law enforcement officials got out of the car—one MPD officer in uniform, and one in plainclothes wearing a vest that said "SPECIAL AGENT," who I believe, based on my experience observing the Task Force and the way he was dressed, was a federal agent.

73.    The officer walked to my driver's side window, and the agent walked to the passenger side window of my vehicle.

74.    I rolled down my window and asked the officer why he was following us.

75.    The officer said, "Well I'm curious why you're pulling up on our scenes." I said that we were just driving around and asked whether there was anything illegal about what we did.

76.    The officer replied, "No, but when it's an investigation, you could be charged with impeding an investigation, if you're haltering [sic] what we're doing. Were you haltering [sic] what we were doing or you were not?"

77.    It was notable to me that the officer said "haltering" an investigation because my last name is "Halt," and my truck is registered in my name. As described above, I had had my face photographed by Task Force agents on multiple prior occasions. I thought that the officer's use of the word "haltering" was his way of communicating that he knew my name. I also considered it possible that he had run my license plate and seen that the truck was registered under the name "Halt."

78.    I said calmly, "If I'm not impeding an investigation, I don't have anything to say to you." The officer said again, "I want to know why you're pulling up on our scene."

---

[4] Also available at: ACLU, *Kenneth Halt – December 30, 2025* (YouTube, May 12, 2026), https://www.youtube.com/watch?v=8j_uRUDE79c.

14

79.    I replied, "Am I obligated to tell you, legally?" He said "No," so I said, "Okay, then I think we're done."

80.    As the interaction concluded, the officer said, "From now on, you stay 25 feet from us, understand that?" I replied that I had in fact been at least 25 feet away. The officer said, "Understand that? We on the same page?" I said, "Yes, we are." The officer and the federal agent then got back into their cruiser and drove away.

***January 2, 2026***

81.    On January 2, 2026, at approximately 4:47 PM, I convened with other community members at Los Primos Market, at 3746 Townes Avenue, to watch from a distance as a large group of Task Force agents conducted a raid of the market.

82.    There were at least 11 law enforcement vehicles at the scene of the raid. I could tell from the agents' uniforms and cars that they were from a variety of different agencies, including HSI, FBI, ATF, and MPD.

83.    As the raid was concluding, another observer and I started walking toward the entrance of the store to check on the people who were inside. As we approached the store, an HSI agent gestured at me from the front passenger seat of an unmarked SUV with an Ohio license plate. He pointed his index finger at me, with his thumb to the side, and slowly moved his hand back and forth. It looked like he was miming shooting a gun.

84.    I turned around to see if the HSI agent was pointing at something or someone behind me. There was nothing behind me.

85.    I turned back to the SUV. The agent in the driver's seat was waving at me and laughing.

*January 3, 2026*

86.     The following day, on January 3, 2026, at approximately 3:20 PM, I was driving with Ben and another passenger towards Jackson Avenue when we saw a state trooper and an unmarked vehicle conducting a traffic stop. We parked across the street and filmed the stop from there. After the stop concluded, the THP and unmarked vehicles went west on Jackson Avenue. We were heading to Macon Avenue, so we turned west onto Jackson as well. We were approximately 100 feet behind the THP and unmarked vehicles. At one point, we lost sight of the vehicles entirely.

87.     Soon after we lost sight of the vehicles, we saw the THP vehicle coming back the other way, heading east on Jackson. The THP vehicle went past us and then made a U-turn to position itself behind my truck, and it began to follow us. We soon realized that the unmarked vehicle had done the same, and that it was following us as well.

88.     I pulled into the parking lot of a strip mall at 3224 Jackson Avenue and began driving slowly in circles through the lot. The two vehicles followed me as I did so. Then, I saw the cruiser and the unmarked vehicle position themselves to face each of the lot's two exits, such that they could easily follow me out of either one. I felt trapped, feeling certain that if I were to try to leave the lot, they would follow me and try to pull me over. We decided to park and grab lunch at McDonald's in the strip mall to see whether that would make them go away. The two vehicles stayed in the parking lot for about 10 minutes. By the time we exited McDonald's, both vehicles were gone.

*January 5, 2026*

89.     On January 5, 2026, at around 10:00 PM, Ben and I were in my truck heading toward our house in South Memphis. A few hours earlier, we had been out with a couple of other

16

friends and had observed three THP vehicles initiate a traffic stop; at least two of those THP vehicles had seen us and seen my truck, and the troopers appeared to abruptly end the stop and leave the scene as soon as we began to approach to record.

90.     As we approached our house in my truck, we saw a silver vehicle, with blacked-out windows and what appeared to be Colorado license plates, parked at the curb directly in front of our house. We were approximately 50 to 100 feet away from our house when we saw this vehicle. It appeared to us that the vehicle sped off when the occupants of the vehicle saw us coming down the street in my truck.

91.     Prior to this incident, I had noticed unmarked vehicles around our house more than once. Neighbors had also told us that they had seen federal agents "casing" the house.

92.     By this time, we had installed a security camera, which I check whenever I get a notification of activity near the front door or on the street in front of our house. This incident affirmed my suspicion that we were being watched.

93.     The behavior of these unmarked vehicles differs from the behavior of vehicles that we typically see in the neighborhood. The unmarked law enforcement vehicles usually have tinted windows and out-of-state license plates and are much newer and clearly more expensive than the cars belonging to the residents of our neighborhood. They typically park facing against traffic, within a couple houses of my house, for roughly 15 to 30 minutes. I have never seen, either personally or on our front-door camera footage, any of the agents get out of the car. I believe that they are doing this to intimidate me, Ben, and our neighbors.

94.     Our neighborhood is a predominantly Black neighborhood, with a long history of oppression and civil rights violations committed by law enforcement against the residents; Ben and I are some of the only white residents of the neighborhood. The surveillance of our home

frightens me as I think about my own safety, but it also makes me fearful for our neighbors. I am afraid that our presence in the neighborhood and the attention we have drawn from federal law enforcement may result in greater scrutiny of our neighbors. I am afraid that federal agents may do something to our neighbors to punish them, and us, for our Task Force observation and recording activities. Knowing that our work is putting our neighbors at risk of the very same kind of intimidation and overreach that has long plagued this community weighs on me heavily.

**February 5, 2026**

95.    On February 5, 2026, just after 8:50 PM, I left my home to pick up pizza from Little Caesars. As I began driving down my street, I noticed a new-looking pickup truck idling on my side of the street but facing the wrong way, against traffic, just a couple houses away from mine. The truck had tinted windows and Texas license plates.

96.    I had never seen this vehicle on my block before.

97.    My residential street gets very little through traffic, and it is unusual to see parked cars that do not belong to residents, especially at night.

98.    After I drove past the pickup truck, I pulled over as soon as I could do so safely and opened the app on my phone that is connected to the home security camera on my front door. The truck was visible in the camera footage. I observed that the truck remained parked, with its headlights on, for a few more minutes before it drove away.

99.    Having been tailed in my car after observing Task Force activity and having observed the same types of unmarked vehicles with tinted windows and out-of-state license plates outside my home on a number of occasions, I believe that this vehicle contained Task Force agents. I believe that they were outside my home because they know that I frequently observe and record Task Force activity, and they wanted to intimidate me by showing me that they know where I live.

18

*February 25, 2026*

100.    On February 25, 2026, at approximately 11:30 AM, I received a text from my neighbor with a picture of three vehicles parked on our street. She said they had been outside our houses for approximately 10 minutes and that she thought they were undercover federal law enforcement vehicles. I was at work at the time.

101.    I opened the app on my phone that is connected to the security camera on my front door and confirmed for myself that there were three vehicles—a white pickup truck, a black SUV, and a gray sedan—parked on our street, close enough to my house that they were visible on my front-door camera. Included as Exhibits E and F are video footage of the three unmarked vehicles outside of my home.[5]

102.    I was able to determine that the vehicles belonged to undercover federal agents for several reasons:

    a.  All the vehicles had tinted windows and appeared to have out-of-state license plates.

    b.  As I mentioned previously, my block is a quiet residential street with little through traffic. Usually, the only cars parked on the street are those that belong to residents.

---

[5] Also available at: ACLU, *Kenneth Halt – February 25, 2026 (Part 1)* (YouTube, May 12, 2026), https://www.youtube.com/watch?v=GHJ_ma6t2as; ACLU, *Kenneth Halt – February 25, 2026 (Part 2)* (YouTube, May 12, 2026), https://youtu.be/rjTowXttWRQ.

19

c.  At least one person in the group of vehicles—the driver of the white pickup truck—appeared to be wearing a tactical vest. I could not determine his agency affiliation from my camera footage. A still photo taken and texted to me by my neighbor is below:



d.  The footage showed that the three vehicles arrived in front of my house at the same time, moved in tandem, and sometimes repositioned themselves in parallel to one another on the street so that the drivers could speak to each other through their open windows.

e.  The vehicles remained on my street for approximately 20 minutes and then simply left, all at the same time.

20

103. At no point did the vehicle occupants appear to get out of their vehicles on my front-door camera footage. However, about five minutes after they arrived in front of my house, my front-door camera inexplicably cut out and was down for roughly five to six minutes, showing an "offline" status when I tried to access the camera through my phone app. After the camera came back online, it was facing straight down, rather than towards the street as it had been before. It then began turning back and forth, left to right, still facing down. At no point during this process did I interact with the camera's controls. A screenshot of the camera angle, as viewed on my phone, is below:



104. I do not know what the vehicles or their occupants did while the camera was down.

105. I felt this incident once again confirmed that the Task Force knows who I am and where I live. Even after the footage showed them leaving, I was terrified that they might be waiting somewhere nearby to arrest or hurt me when I came home from work.

*March 19, 2026*

106.    On March 19, 2026, at approximately 7:00 PM, I drove my truck to a Mobil gas station at 850 Third Street to fill my tank and shop at the convenience store.

107.    After pumping my gas, I saw a sedan that had been stopped by two MPD cruisers at an exit onto E.H. Crump Boulevard. I began recording the stop from at least 25 feet away, but the officers were standing out of my line of sight behind an adjacent building. On occasion, over the course of the next 10 to 20 minutes, one officer would emerge from behind the building to see if I was still there, look me in the eyes, and then retreat behind the building so I could no longer see what they were doing. Eventually, the two officers—one male, one female—shined their flashlights into the sedan and let the driver go without a ticket or even a warning, as far as I could tell.

108.    Once the driver had safely departed, I walked back to where I had parked my truck and prepared to leave the gas station.

109.    Within seconds, the two MPD cruisers approached my vehicle and parked approximately 15 feet away from me on either side, at angles that effectively cornered me into the lot. Included as Exhibit G is video footage of the two MPD cruisers boxing me in.

110.    I did not believe that they would let me leave if I tried to drive away. I started recording on Facebook Live, pointing my phone camera at one cruiser on the right side of me, and then at the other cruiser on the left. The female officer in one of the cruisers then turned her spotlight on and shined it directly into my truck.

111.    I called out my window to them, asking if there was a problem. They did not respond.

22

112. The spotlight caused considerable glare that obscured much of what I was filming. On information and belief, the officer turned on the spotlight to harass me, retaliate against me for filming their original stop of the sedan, and prevent me from continuing to film. I was terrified that they were going to arrest me.

113. The male officer exited his cruiser and went into the convenience store. When he returned, he called out to me and asked if I was planning on shopping.

114. I said that I wanted to leave but that they had blocked me in.

115. The male officer insisted that it should be obvious to me that I was free to go, because the cruisers had not turned on their police lights. I asked him why the female officer was shining the spotlight at me, but he refused to answer. Frustrated, I said I knew I was being harassed for filming them earlier. After a brief exchange, I carefully maneuvered around the MPD cruisers to exit the gas station.

116. This incident and others like it have caused me to look over my shoulder constantly in my daily life. I have seen this officer before and continue to see him frequently. I believe that he knows where I live, since I live close to the gas station and my truck is easily identifiable.

**The Impact of the Government's Retaliation Against Me**

117. I feel a strong and enduring obligation to show up to sites of Task Force activity, both to bear witness and to show my fellow community members targeted by the Task Force that I am with them and I support them.

118. I do my best to hide my fear from the Task Force whenever they follow me or act aggressively towards me. I feel trapped between this fear, which makes me not want to go out and observe, and the belief that I have to go out because to stop going out would be to set the precedent that their intimidation tactics are working.

23

119.     My physical health has deteriorated over the course of the months I have spent observing Task Force activity. I have constant stress headaches that last for weeks at a time. I am routinely afraid that the Task Force will harass, punish, or even shoot me when I record their activity, especially after the incident at 3022 Park Avenue when a Border Patrol agent appeared to pretend that he couldn't identify the "black object"—my personal cell phone—that I was holding and implied that I might have been threatening him with it.

120.     My mental health has also deteriorated. Many people in my life have reached out to me or pulled me aside and told me that they are afraid I am going to be thrown in jail, hurt, or killed for observing and recording the Task Force as I have been. I have these fears for myself sometimes, as well. And it weighs heavily on me to know that I am causing so many people in my life so much fear by doing what I am doing.

121.     Especially since the Task Force started following me in my car and parking outside my house, I have struggled to trust myself, worried that I might be paranoid. But I know—because of my recordings and because other people in my life are seeing and, in some cases, experiencing the same things—that the things the Task Force is doing to me are real. The Task Force follows me when I am in my car. The Task Force knows where I live. And, at the same time, whenever I see another Task Force vehicle following me, I wonder whether this can really be happening to me again. Even when I am not being followed, I am anxious and on high alert, because I know I might be followed, or that agents might appear outside my home, at any moment. I believe that this psychological impact is part of the Task Force's strategy to intimidate me into no longer observing or recording their activity, so I try to manage the anxiety and stress as best I can.

122.     I also worry about my immediate neighbors. I worry that, since the Task Force has started parking vehicles outside my house, my presence in the neighborhood is putting my

24

neighbors at greater risk. I worry that my observation work and presence in the neighborhood will cause my neighbors to be more exposed to law enforcement than they otherwise might be, and that the Task Force will find some reason to arrest my neighbors to punish me. I worry that it would be my fault if this happened; I worry that my neighbors might agree, and that they would blame me. This is especially true after the incident on February 25, 2026, when the three unmarked vehicles were parked on the street outside my home.

Executed this __26__ day of May, 2026.

_____

Kenneth Halt

# EXHIBIT A

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT B

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT C

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT D

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT E

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT F

*Video exhibit submitted to the Court on USB drive*

# EXHIBIT G

*Video exhibit submitted to the Court on USB drive*