| | |
|---|---|
| HUNTER DEMSTER *et al.*,<br><br>　　　　*Plaintiffs*,<br><br>v.<br><br>TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States*, *et al.*,<br><br>　　　　*Defendants*. | Case No. 26–cv–02546 |

### DECLARATION OF MELISSA PEELER

I, Melissa Peeler, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I am over the age of 18, am competent to give this declaration, and testify from my own personal knowledge regarding the facts in this declaration.

2. I was born and raised in Memphis, Tennessee. I have lived in Memphis for most of my life and currently reside in East Memphis. I have been retired since 2012. Prior to my retirement, I worked as an admissions officer at a school in Memphis. Since my retirement, I have engaged in significant volunteer work, mostly with refugees and often through my church.

3. I am a Presbyterian, and I believe everyone is made in the image of God and should be loved and treated equally. I am particularly invested in fighting for the rights of immigrants and refugees. For the last decade, I have been helping refugees relocate and settle into new homes through a volunteer program organized by World Relief. In 2016, I joined a "Good Neighbor Team," which is a group of folks who meet a refugee family at the airport upon arrival and "walk alongside" them throughout the initial phase of their resettlement in Memphis. To "walk alongside"

1

an individual or family means to be paired with them and to support them in any way possible as they integrate into the Memphis community. For example, I helped one refugee family arrange doctor's appointments, enroll their children in school, and otherwise get oriented and settled in Memphis. We became very close. Because World Relief helped many African refugees find apartments in the same complex in Memphis, I also began to informally meet and assist other refugees. The more I worked with immigrants and refugees—through shared meals and community building—the more the work began to matter to me.

4. In 2020, my church formed a ministry that I chair called "No Longer Strangers." Through this program, I have walked alongside three additional refugee families. I continue to work with one of those families today.

5. In addition to walking alongside refugee families, I have also assisted World Relief with fundraisers and mobile food drives. I have also served as a "Road Runner," which is an "on call" driver for refugees who need to get to doctor's appointments, English classes, and other appointments. Over the years, I've worked with eight to ten families and 40 to 50 refugees very closely.

6. I recognize that I have certain privileges because of my race. I believe it would be a waste of this privilege not to fight for marginalized communities. I feel a particular responsibility to contribute to this cause being from Memphis, especially after Memphis law enforcement officers killed Tyre Nichols in January 2023. I believe that Tyre Nichols would be alive today if law enforcement officers did not make the initial, pretextual traffic stop. I have been deeply upset and disgusted by how immigrants and Black people have been treated in this country—especially in Memphis, a majority minority city.

7.     I am also deeply concerned with crime in Memphis. My family and I have been victims of crimes on several occasions. My car was stolen during the COVID-19 pandemic. And in 2002, my stepfather was robbed and beaten. He was a doctor, but after he was hurt, he struggled to engage in everyday activities and was unable to return to his normal lifestyle. But most of the law enforcement conduct I have observed in Memphis recently, particularly by the Memphis Safe Task Force ("Task Force"), has little to do with trying to reduce crime.

**How I Started Observing, Gathering Information About, and Recording Immigration and Law Enforcement Activity**

8.     I have been involved in observing, gathering information about, and recording immigration and law enforcement activity for about a decade. Through this work, I hope to provide accurate and timely information about the unjust conduct of law enforcement officers and to hold government officials accountable.

9.     During the first Trump administration, I started observing and gathering information about law enforcement's monitoring of the immigrant community. I wanted primarily to be a witness to law enforcement conduct. I engaged in these activities only a few times a month.

10.     When Trump won a second term, I knew I wanted to be more involved with observing, gathering information about, and recording immigration and law enforcement activity occurring in Memphis.

11.     In February 2025, I began driving around and waiting in or around areas that tend to have heavy immigration and law enforcement activity, as well as responding to messages from other community members about such activity. During this initial period, I saw and interacted with the same group of U.S. Immigrations and Customs Enforcement ("ICE") agents repeatedly. I recognized them, and they recognized me. Although I objected to their work, I knew who I was dealing with and what to expect.

12. In April 2025, my work ramped up exponentially due to the increased presence of ICE agents in Memphis, in connection with Operation Viper, although I didn't know it was a named operation at the time. During this time, I continued observing, gathering information about, and recording their activities.

13. One day in April 2025, in the late afternoon into the evening, I observed my first large-scale, coordinated, and mass traffic stop operation. The traffic stop was set up on Macon Road, in an area that is well-known to be a predominantly Hispanic neighborhood. I live near where the operation occurred. I believe that the operation lasted for about four to five hours, and I observed and recorded Task Force activity for almost all of that time.

14. I was driving around the area and observing from my car, although I would occasionally park and get out and try to make eye contact with a stopped driver if they were also outside of their car to see if they were okay. I was often one of the first observers to arrive at a traffic stop. As soon as one stop ended and I started driving, I would almost immediately see another stop. At times while I was observing a stop, I could see at least two or three other stops occurring in the area around me.

15. In the several hours I was observing the traffic stop operation, I saw a total of approximately 25 to 30 traffic stops.

16. Specifically, I observed Tennessee Highway Patrol ("THP") officers issuing tickets for small infractions, such as expired tags, broken lights, and failing to turn on car blinkers. It appeared to me that the THP officers were conducting mass traffic stops.

17. The vast majority of drivers stopped were Hispanic, although I did see a few Black drivers. I also heard that there was one white driver who was stopped.

18. It was extremely overwhelming, and I struggled to record all the incidents. At this time, such a large-scale traffic stop operation was relatively unusual in Memphis.

19. I continued to engage in observing, gathering information about, and recording immigration and law enforcement activity throughout 2025. When I first started in February 2025, I was pretty scared of interacting with law enforcement. But I gained confidence as I gained experience. By June 2025, I felt very confident interacting with law enforcement officers, including by approaching them at a scene and asking questions to gather information about what was occurring.

**Observing, Gathering Information About, and Recording Memphis Safe Task Force Activity**

20. Everything changed when the Task Force arrived in Memphis in September 2025. The number of law enforcement officers and violent incidents increased significantly. For example, I now routinely see up to 20 officers perform a single traffic stop, whereas I previously saw only three to four officers at any traffic stop. Officers also more routinely wear tactical gear and carry long military-style guns. Now when I see an officer or agent in tactical gear, I associate them with the Task Force, and I start looking for federal agency names or logo patches to confirm.

21. These changes are shocking. I nonetheless continue my work observing, gathering information about, and recording Task Force activity.

22. My residence is ten minutes away from Macon Road and North Graham Street, one of the epicenters of Task Force activity.

23. Some weeks in October, November, and December 2025, I would drive around or sit in neighborhoods with heavy Task Force presence five days a week for a couple hours each day, as well as respond to messages from community members regarding Task Force activity each day.

24. Around the holidays, I pulled back from driving around or sitting in neighborhoods with heavy Task Force presence due to stress, including from the incidents described below, and burnout. But I continued responding to messages from community members regarding Task Force activity, approximately five or six times a week.

25. My goal in engaging in this work is to bear witness to and document Task Force activity, especially through photography and filming. It is also important to me to gather information on scenes such as the names of detained people and the names of tow-truck companies so that I can share with the family members of the detained. Often, I am the only witness to an incident, and so my priority is to accurately capture the entire scene and the Task Force officers' conduct. I believe the Task Force's conduct is unjust and that recording their conduct could lead to accountability.

26. When I am observing, gathering information, or recording, I try to maintain a safe distance from my subjects, including law enforcement officers, suspects, and vehicles. I do not physically interfere with, impede, or intervene in immigration or law enforcement action. I follow orders by government officers or agents, including when asked to step back.

27. I only film activity occurring in public and document what is visible to me of officers or agents engaged in their official duties. I mostly do so from public streets and sidewalks.

28. I often try to talk to Task Force agents to get information about what is happening. I also try to engage their conscience by reminding them to "love thy neighbor" and encouraging them to consider the moral implications and practical effects of their conduct.

29. I have been yelled at, screamed at, and cursed at by Task Force agents in the course of my information gathering. A few agents now know me and call me by my name. They have also

taken photos and videos of me and have tried to box me in using their cars, which I find scary. I believe that this is all part of their effort to intimidate me.

**Invocation of the Tennessee Halo Law**

30.     I have had the Halo Law invoked against me approximately ten times. But Task Force agents have been incredibly inconsistent in their invocation of the Halo Law against me. Sometimes, I am a few feet away from incidents, albeit maintaining what seems to me a safe and reasonable distance, and nobody cares. Other times, I am more than 25 feet away and still get yelled at.

31.     Generally, Task Force agents invoke the Halo Law by simply saying "Halo Law" or "25 feet." But I am often confused by how Task Force agents are measuring the 25-foot zone. In any case, when the Halo Law is invoked against me, I try to comply by backing up from where I'm standing. I also typically respond "I know my rights," "I know what 25 feet is," and "I'm way past 25 feet." Usually, the officer or agent has no response to this assertion.

32.     Moving back always makes it harder to see and hear what is going on and more difficult to interact with Task Force officers, such as by asking them what agencies they are with and what is happening. Moving back also makes it harder to take clear photos and videos. For example, I often take photos of license plates of cars that are towed in connection with traffic stops and arrests, in order to help the detained person or their family locate their car later. When I am asked to move back pursuant to the Halo Law, it is harder to take clear and readable photos of license plates.

33.     I was scared the first time the Halo Law was invoked against me. I am also usually annoyed, including because backing up almost always affects my ability to gather information, record, and speak with law enforcement officers. I recognize that it just takes one incident for

7

things to go terribly wrong, like what happened to Renee Good in Minnesota. And so, the extent of my fear of Task Force officers ebbs and flows.

**Incidents of Retaliation and/or Invocation of Halo Law**

*October 5, 2025*

34.     On October 5, 2025, around mid-day, I was observing a group of Task Force officers conduct several traffic stops around the city. The most memorable incident was a traffic stop on Summer Avenue by Central BBQ and Regions Bank. I had received a message from a community member regarding Task Force activity in this area. I arrived within five minutes of receiving the message, parked my car in a parking lot across the street from the traffic stop, and immediately started filming and taking photos from my car using my cellphone.

35.     By the time I arrived at the scene, the car that was subject to the traffic stop had already been pulled over by Task Force officers. There were approximately three unmarked vehicles, one THP vehicle, and one white ICE van.

36.     I drove across the street and got out of my car to move closer to the scene but was still approximately 25 feet away. I watched the officers arrest a young Hispanic man.

37.     At some point, a Homeland Security Investigations ("HSI") agent, wearing a vest that said "HSI" and a cowboy hat, approached me and told me to move back from the scene. I responded, "I'm well beyond 25 feet," and stayed and continued to film. The officer then said in a threatening way, "I can arrest you for loitering." I told him that I knew my rights and that he could not arrest me here.

38.     I recall this exchange occurring in the parking lot where my car was parked. The threat of arrest didn't make any sense to me. I was in a parking lot during business hours. I felt that if anyone should be threatening loitering, it should be the property owner. Plus, I was familiar with

Central BBQ because my husband knows the owner. It just didn't make any sense. But when I heard the words "I can arrest you," my heart skipped a beat, and I was scared because of the threatening way in which the HSI agent spoke to me.

39. After this exchange, the HSI agent and I continued to speak. I told him that I recognized him from other traffic stops because of his cowboy hat. He told me that he had recently been in Texas for two weeks but was from Baltimore, Maryland and had been in Memphis for the past week "riding with" THP officers. He said that they had been conducting traffic stops all week and that he had not "seen too many people walk away without a ticket." The HSI agent informed me that he had "never worked anything like this before."

40. I tried to tell him that what he was doing was wrong because everyone should be treated equally. I emphasized that the person they had just arrested was "just a kid."

41. When the traffic stop was wrapping up, I noticed a black pickup truck in the parking lot. I believe this vehicle was there the whole time and that I didn't notice it right away because I was focused on the traffic stop. It looked similar to other unmarked Task Force vehicles I had seen, including because it had dark tinted windows. The driver's side window was rolled down, and the driver was holding his phone vertically towards me, like he was taking a photo or a video. I was scared when I noticed him. I asked him, "Dude, have you been taping me the whole time?" He did not respond and simply rolled up his window and drove away.

42. This incident was not the first time I have had my face photographed. I have had my face and license plate photographed at other scenes. It happens frequently, especially when Task Force agents notice me filming them or the stop they are making.

43. The traffic stop involving the arrest of the Hispanic teenager took an hour. This is longer than most incidents I had observed to that point and have observed since. The incident

9

occurred in one of the first weeks Task Force agents were in Memphis. It seemed like the agents did not really know what they were doing.

***Early October 2025 – Name Calling***

44.　In or around early October 2025, I was observing a Task Force traffic stop in the Berclair neighborhood. I can't recall the exact street, but I believe it was where a road dead-ended into another street. There were approximately two to three law enforcement vehicles and five to seven Task Force officers present at the traffic stop.

45.　When I arrived, I recognized one of the vehicles—a royal blue Ram pickup truck with Mississippi plates. This truck is famous in the Berclair area because it is so distinct and has been present at so many traffic stops. I also recognized the agent, who I believe is an ICE agent, from several previous stops. He has distinct arm tattoos and usually wears a backwards baseball hat. Because this agent was so prevalent at traffic stops during this time period, other community members and I gave him a name, "Ken," to make it easier to refer to him when speaking with each other.

46.　I drove up to the traffic stop with my window rolled all the way down, stopped, and began taking photos with my phone out of my car window. I remember feeling like I was late to the scene and that they were finishing up with the stop.

47.　As I approached, the ICE agent said something like, "Hey Melissa, you're late." Hearing him call my name was chilling. I knew my photo had been taken at prior scenes and suspected my license plate had been photographed too. But for him to connect me to those other scenes and call me by my name was truly frightening.

*Early October 2025 – Boxing In*

48. In or around early October 2025, I received a message about "undercover vehicles" parked near a church on Grey Road. As I was driving east down Grey Road, I saw several unmarked vehicles with tinted windows parked by a small church on Grey Road. I was most suspicious of the two vehicles that were parked in the very small church lot, and so I stopped my car almost directly across from these two vehicles and began to take photos with my phone from my car. Nobody commented on my photo taking.

49. All of a sudden, an SUV drove up and parked in front of me, and another one drove quickly up behind me, such that I was boxed in and could not have pulled away. The vehicles came up very fast, unexpectedly, and out of nowhere. I was very scared and thought they must be boxing me in because they saw me with my phone taking photos.

50. A male agent from the SUV in front of me came over to my window. I was initially hesitant to roll my window down but did so to comply with the agent's instruction.

51. The agent told me that he was there in connection with a criminal investigation and "not immigration" reasons. But I was distrustful of this statement. And so, I said something like, "Yeah, but you can lie to my face."

52. The agent responded by asking me "to leave so you don't blow our cover." He gave me his name, and I believe he informed me that he was with MPD and a special unit. He then asked me again to leave.

53. Even though the agent said he didn't want me to blow his cover, it was obvious that Task Force activity was occurring on the street. I came to observe because other individuals had messaged me about what looked like unmarked Task Force vehicles. And when I arrived, there were two cars that immediately jumped out to me as Task Force vehicles.

54. Once the agent moved his car from in front of me, I left the scene.

55. I was very scared when the vehicles boxed me in and when the agent approached my car. I wanted to get out of the situation as quickly as possible regardless of whether he was telling the truth about the situation.

***December 9, 2025***

56. On December 9, 2025, at about 11:00 AM, I observed a traffic stop and arrest involving several Drug Enforcement Administration ("DEA") and THP officers. I saw two to three marked law enforcement cars, and one to two cars with tinted windows that I believe were unmarked Task Force cars. I do not recall the exact location, but I recall it was one of the northbound streets from Macon, like Graham, Wells Station, or Perkins.

57. I was the first observer on the scene. I parked my car behind the convoy of Task Force vehicles.

58. After I parked, I immediately began taking photos and videos of the traffic stop out of my window. I observed the Task Force agents handcuff and arrest the young man they stopped. The incident occurred less than ten feet away from me.

59. The officers did not speak to me. Nor did they object to my presence.

60. Around ten minutes later, two journalists from the Dutch news outlet *NOS* came to the scene and began filming the arrest with a large shoulder-held video camera. When they arrived, I got out of my car and stood beside them on the sidewalk.

61. The officers began to yell at all three of us to move back. They yelled, "25 feet." But they did not specify—and I did not know—what defined the boundary of where the active scene was and where 25 feet should begin and end. It could have, for example, been where the young man was sitting handcuffed or where the law enforcement vehicles were parked.

62.     We moved back to what appeared to us to be 25 feet. As a result, my ability to see and hear what was going on, speak with law enforcement officers, and record video and sound from the scene, was significantly impaired.

***February 5, 2026***

63.     On February 5, 2026, at about 2:25 PM, I was with my husband on Macon Road, when we saw a large crowd of vehicles and Task Force agents, including several THP officers and Federal Bureau of Investigation ("FBI") agents. I saw more than five vehicles and more than ten agents, who were each wearing large vests and packs. The officers were crowded near a house. I drove past the house and the law enforcement vehicles.

64.     After I parked my car down the road, I walked back towards the scene and began taking videos with my cellphone. An officer with a white and black beard, who I recognized from other scenes I had been at, warned me to stay back. He seemed to be reacting to the fact that I was recording, because his warning came after I lifted my cellphone and started recording. I tried to ask him questions and figure out what was happening. He told me to stand behind the line of cars parked on the curb, which was more than 25 feet away from the house.

65.     I moved back behind the line of cars, where the officer told me to stand. As a result, my ability to see and hear what was going on, speak with law enforcement officers, and record video and sound from the scene, was significantly impaired. In particular, there were shrubs along the sidewalk that impeded my view of the house where the action was happening.

66.     I watched as agents brought a Black man out of the house, handcuffed.

67.     The agents then started leaving the scene. When the car I was supposed to stay behind left, I moved closer to the scene but remained more than 25 feet away. The same officer as

13

before said, "I told you to stay back there." I told the officer that "I'm still way past 25 feet" and that "I [could] barely see the house." I moved back anyways.

**Invocation of the Halo Law against Hunter Demster**

*February 16, 2026*

68.     On February 16, 2026, at around 1:45 PM, Hunter Demster and I observed a traffic stop and arrest at Perkins Road and North Janice Circle. We arrived at the scene separately. When I arrived, I saw people arrested on the sidewalk. Task Force officers were searching the stopped vehicle.

69.     At the height of the incident, there were three or four law enforcement vehicles present, positioned in front of and behind the stopped vehicle. The vehicles were both THP and unmarked vehicles. I saw seven to eight Task Force officers on the scene, but officers were coming and going throughout the incident. I saw several THP officers and several HSI officers.

70.     During the incident, I stood on the sidewalk on the opposite side of the street to the stopped car and was recording. I was approximately 50 feet away from the traffic stop. Task Force officers never spoke to me.

71.     Hunter was also filming nearby. He was more than 25 feet away from the vehicles and the people who had been arrested. At one point, he provided the people who had been arrested with some "Know Your Rights" information. He also informed the law enforcement officers that he was "not interfering," was more than 25 feet away, and was simply exercising his First Amendment "right to film the police" and share "Know Your Rights" information.

72.     Several Task Force agents told Hunter to get back. Hunter reiterated that he was 25 feet away. Hunter continued to film and provide "Know Your Rights" information.

73. I was confused by the officers' "25 feet" instruction to Hunter. Specifically, I did not understand where the Task Force agents were measuring 25 feet from. I was closer to some of the vehicles than Hunter was, but the agents never said anything to me.

**The Impact of the Government's Retaliation against Me**

74. By going out and observing, gathering information about, and recording Task Force agents, I'm just trying to stand up to injustice. I want a free and fair democracy for all of us.

75. I think about four to five specific incidents frequently for different reasons. I am haunted by them. Some haunt me because I drive by the scene of the stop often, others because I remember details about the aftermath, about what devastation looks like to the families left behind.

76. I never feared law enforcement before I started observing, gathering information about, and recording the Task Force. Now I think about how it takes just one officer to hurt or even kill someone. Of course, my mind goes to Minneapolis and the shootings there. That could be me, could have been any of us. I cried when I saw the video of the Renee Good shooting. All I could think of is how confrontational the agents are. And we don't have as many witnesses at any one stop in Memphis as they did in Minneapolis. It just takes one stop.

77. I continue to observe, gather information about, and record Task Force agents. I know my rights to be a witness and to take photos and videos, and I have not stopped engaging in these activities. But I approach scenes more carefully now.

78. Because I fear retaliation by Task Force officers, I now stay in my car more often instead of standing by the sidewalk. I also speak with officers less frequently now.

79. Because of the frequent and inconsistent invocations of the Halo Law against me, I now remain further away from law enforcement than before—and certainly further than the 25

15

feet the Halo Law requires when invoked. As a result, I often struggle to see and hear what is going on, to speak with law enforcement officers, and to take clear photos and videos.

80. I also observe, gather information about, and record the Task Force less often than before because of the incidents described above. Around the holidays, I was seeing so many heartbreaking things, and Task Force agents were becoming more and more combative. I was consumed with despair at all the horrible things happening. I was more scared because the Task Force agents seemed harsher. I was also more overwhelmed with the bigger picture, including all the incidents I've experienced adding up. Around that time, a lot of people were losing their homes if they or their families were taken. I focused more on pantry deliveries for immigrant families. I call that my therapy.

Executed this 21st day of May 2026.

_____
Melissa Peeler