**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

|  |  |
|---|---|
| HUNTER DEMSTER *et al.*,<br><br>　　　　*Plaintiffs*,<br><br>v.<br><br>TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States*, *et al.*,<br><br>　　　　*Defendants*. | Case No. 26–cv–02546 |

**DECLARATION OF DAVID VAUGHN MASON**

I, David Vaughn Mason, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1.　　I am over the age of 18, am competent to give this declaration, and testify from my own personal knowledge regarding the facts in this declaration.

2.　　I have lived in Memphis for nearly twenty-two years, since 2004. I currently reside in Memphis and I am an Associate Professor of Theatre at Rhodes College.

3.　　I have been involved in observing, gathering information about, and photographing immigration and law enforcement activity since October 2025, around the time of the official inception of the Memphis Safe Task Force ("Task Force").

**Memphis Safe Task Force Activity**

4.　　From October 2025 through the first week of December 2025, I went out almost daily to observe, gather information about, and photograph Task Force activity. My house in midtown Memphis is not far from houses Task Force agents regularly target in the nearby Berclair

1

neighborhood. During this period, I sometimes went out three to four times a day when I would hear from community members about Task Force activity while working at home.

5.    From December 2025 through February 2026, I observed, gathered information about, and photographed Task Force activity less often because of other commitments. During this period, I went out two to three times a week in response to messages from community members, primarily in the evenings.

6.    By March 2026, as the weather improved, I resumed going out a few times each week to observe and photograph Task Force activity.

7.    In observing, gathering information about, and photographing Task Force activity, I have noticed that most of the activity is dominated by traffic stops involving a caravan of Task Force vehicles. These caravans are typically led by a Tennessee Highway Patrol ("THP") vehicle followed by one or more unmarked vehicles containing federal agents from a variety of agencies.

8.    While observing Task Force activity, I have observed agents from the following agencies:

- Department of Homeland Security ("DHS"), including Homeland Security Investigations ("HSI"), Customs and Border Protection ("CBP"), and Border Patrol
- Federal Bureau of Investigation ("FBI")
- U.S. Marshals Service ("U.S. Marshals")
- Diplomatic Security Service ("DSS")
- Internal Revenue Service Criminal Investigation ("IRS-CI")
- Drug Enforcement Administration ("DEA")
- Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")
- Tennessee Highway Patrol ("THP" or "state troopers")
- Memphis Police Department ("MPD")
- Shelby County Sheriff's Office ("SCSO")
- Tennessee National Guard
- Tennessee Department of Corrections ("TDOC")
- Tennessee Bureau of Investigations ("TBI")
- Tennessee Wildlife Resources

2

9.      I have not seen federal agents with vests marked "ICE." But I understand many of the federal agents to be informally conducting the work of ICE.

10.      THP and MPD officers typically drive THP and MPD vehicles and wear their respective uniforms.

11.      Federal agents typically drive a variety of unmarked vehicles. The majority of these vehicles are black or gray in color. They are usually trucks or SUVs with out-of-state license plates. Small sedans are also not uncommon. And there are exceptions to this pattern. For example, I have seen a brown mini-van carrying federal agents from various agencies. Additionally, Border Patrol agents sometimes drive trucks identifying their agency.

12.      It is common for federal agents to wear vests marked "Police Federal Agent," "Federal Police," or "Police" in large lettering with the agency insignia in smaller lettering lower down. Sometimes I cannot tell what agencies the federal agents are from until I get home and download my photographs where I can more easily see the small agency lettering. HSI is the exception: it is common to see officers with HSI written in large lettering on their vests.

13.      The federal agents sometimes wear masks. It is most common to see Border Patrol agents wearing masks. Only a small percentage of agents from other federal agencies wear masks. The federal agents are armed more often than not. They are typically armed with sidearms.

14.      I have seen federal agents riding in state and local agency vehicles alongside state and local agents. This practice has become more common. Last October I did not observe with such frequency state trooper vehicles driven by a state trooper with a federal agent in the passenger seat. By the end of November, it became common to see one federal agent riding with a state trooper.

3

15. Other times, I have seen state troopers pull someone over, and shortly thereafter, one to three unmarked vehicles with federal agents arrive to join the stop.

16. I also have photographs of MPD officers and federal officers collaborating during traffic stops. For example, in mid-March 2026, my wife and I were stopped at a red light and saw a MPD vehicle just beyond the intersection with its lights flashing at a traffic stop. While we watched, a plainclothes agent in a tactical vest walked to the passenger side of the MPD vehicle, opened the door, got in, and closed the door. The MPD vehicle then drove away with the federal agent riding in the passenger seat. I also have many photographs showing federal and state officers together at the same scene.

**Observing, Gathering Information About, and Photographing Task Force Activity**

17. I typically go out to observe and photograph Task Force activity after receiving messages from community members about Task Force activity. Sometimes I also stumble upon Task Force activity when on my way elsewhere. I tend to observe the full length of an incident and to document it through photographs until the agents disperse. I feel an obligation to watch what Task Force agents do until all agents have left the scene.

18. My goals are to bear witness to Task Force activity and to create a historical record through photographs. Through my presence and photography, I also strive to let the agents know they are being watched and recorded. This is important because it shows agents who are ignoring the Constitution that somebody is paying attention and making a record. My hope is that the agents might be incentivized to act lawfully if they know they are being watched and photographed. I also believe a photographic record could make a difference in the future if political changes allow for some accountability for Task Force actions. I believe an expanded archive of photographs serves the immediate and future purpose of making society more just.

19.     During daylight hours, when the weather is good, I typically arrive at a scene with Task Force agents on my red Vespa scooter. After dark and when the weather is bad, I only go out if a car is available. My wife and I only have one car, which we share.

20.     I always photograph Task Force activity with two large cameras. Because my cameras are large and valuable, I typically secure them to my body immediately after getting off my scooter to avoid the risk of dropping and breaking them. This means that, when I park within line-of-sight of an incident, I typically start photographing wherever I park my scooter. After parking, I tend to move around as much as possible to vary the composition of my images and to pick up as many details as possible. I typically try to get within about 25 feet of a scene. I often photograph while approaching Task Force activity in order to secure some information from the earliest possible point in time and in order to make whatever adjustments to my cameras that are necessary for the conditions. I often continue to photograph while the agents are leaving a scene to document them leaving the scene.

21.     When I show up to the location of Task Force activity and take my cameras out, agents sometimes think I am a journalist. It is common for agents to notice me and catch my eye as soon as I have my cameras set up because it is unusual for observers to show up with large cameras. But sometimes I manage to make photographs before I notice the agents perceiving my presence.

22.     When I am observing, gathering information, or photographing, I maintain a safe distance from my subjects, including Task Force officers, suspects, and vehicles. I do not physically interfere with, impede, or intervene in immigration or law enforcement action. I do my best to follow lawful and reasonable orders from government officers or agents, including when

5

asked to step back. My rule of thumb is to avoid escalating situations for the safety of those who are particularly at risk.

23. I only photograph activity occurring in public and I document what is visible to me of officers or agents engaged in their official duties. I mostly do so from public streets, sidewalks, and parking lots. I typically do not speak with the agents when I observe. This is partly due to autism, which I discuss at more length below.

24. Although I do not have positive evidence that Task Force agents recognize me, I suspect they do because observing with two large cameras is unusual; I walk with one camera secured to me with a belt clip that I have not seen any of the professional photographers in Memphis use; and I typically arrive to observe on a 2005 red Vespa scooter, which seems to be unique in Memphis.

**Invocation of the Tennessee Halo Law**

25. I would estimate that I have had the Tennessee Halo Law invoked against me approximately 30–50 times.

26. These days, Task Force agents are cagey with the words they use to invoke the Halo Law. They tend to just say: "you gotta get back," "this is our scene, you gotta get back further," or "I want you to get back." In the early months of the Task Force, it was more common for agents to say, "You have to get back 25 feet."

27. I have had multiple agents invoke the Halo Law against me at the same scene.

28. When the Halo Law has been invoked against me, I have typically already been at least 25 feet away from Task Force activity—as some of the examples described below illustrate. When the Halo Law is invoked, from what point I must be 25 feet is never clear. I typically step back when an agent tells me to step back, but I have never been told from what I must be 25 feet.

6

Agents seem to use the term "25 feet" to indicate whatever arbitrary place they want observers to be. I have heard agents say at least once, "I'm not going to measure 25 feet for you." I have never seen agents make any effort to measure 25 feet. In fact, I think they avoid any step toward measurement in order to avoid identifying a point from which a 25-foot measurement would proceed.

29.    When I am forced to back up from a scene, my ability to photograph Task Force activity is negatively impacted. Sometimes I lose vantage point of the scene and am not able to capture details in my photographs. At night this is especially true because I do not use a flash. My cameras are high quality, and I have software to bring out details, but every step back from a scene where light is minimal means a significant reduction of what a camera can capture.

30.    I am confident that I typically maintain a distance of at least around 25 feet from a scene because I am autistic, and my autism impacts how close I generally get to Task Force activity. I approach to the limit of my autistic comfort, which always involves some distance. Some of my professional photographer friends have told me I photograph from too far away. But the distance I keep is a function of autistic comfort, and rather than work against that inclination I've owned my "distant" photographs as an expression of how I experience the world, which is from a distance, behind and between other people, and always a bit "separate" from things. My natural inclination, as it happens, is to approach law enforcement activity to about 25 feet. At around 25 feet from anything unfamiliar, my body starts telling me that I am too close.

31.    When I know I am already at least 25 feet from a scene, and an officer instructs me to get back even further, I feel a strong sense of injustice. Due to my neurodivergence, I tend to not speak unless I am spoken to. I rarely initiate interaction with *anyone*. At the same time, I feel strongly that truth should prevail. So, when an officer tells me to get back, if I am already back

more than 25 feet, I experience an officer trying to make me into a constitutive part of an un-truth, and *that* aggravates parts of my neurobiology in the way that poison ivy causes most peoples' skin to burn. As a result, I may verbalize to an officer that I'm already standing more than 25 feet away and that they don't have any justification for trying to move me further back.

32.    I will now describe a handful of the incidents in which I have been intimidated or retaliated against, or where I have had the Halo Law invoked against me, while observing, gathering information about, or photographing Task Force activity.

**Incidents of Intimidation, Retaliation, and/or Invocation of the Halo Law**

*October 8, 2025*

33.    On October 8, 2025, around 8am, I responded to notice of Task Force activity on Jackson Avenue. When I arrived, I saw a small corner parking area, crowded with vehicles, including a tow truck, and a few federal agents. I parked my scooter about 60 feet away and on the opposite side of one street that passed alongside this lot.

34.    Almost immediately as I approached, an FBI agent, who was standing in the middle of this small parking lot, and, from my approaching perspective, behind several vehicles, so that only his shoulders and head were visible to me, shouted at me at the top of his lungs that I had to stay back 25 feet, as pictured below. I was more than 60 feet away at this time. Apparently, it did not occur to this agent that if he had to shout that loudly, his audience must be much more than 25 feet away. I kept myself on the far side of the street and continued taking photographs.



35.      Given the number of cars in this small lot—a few of which were the vehicles of federal agents, my view of the activity in the lot from the far side of the street was severely limited. I was unable to see or to record in photographs what might have indicated some of the agents' affiliations.

***October 16, 2025***

36.      On October 16, 2025, at about 5:20 PM, I had stopped in a gas station parking lot, roughly one mile from my home, when I saw a THP trooper's SUV at the curb on the same side of the street as myself, pointed north on Trezevant Street, behind which was parked an unmarked Ford F-150 with Tennessee plates. A black sedan was just driving away from the curb, indicating that a traffic stop that the THP trooper had initiated had just concluded.

37.      I walked up the street a few yards with my cameras and photographed a federal agent wearing a tactical vest marked "Police" exit the F-150's driver's seat to speak briefly with the trooper. I did not capture what agency he was from. The trooper drove away shortly thereafter.

38.      I returned to my scooter, stowed my cameras in the top box, and checked my phone. I then looked up from my phone to see the F-150 performing a U-turn about 150 feet up on

9

Trezevant and then driving back, south on Trezevant, in my direction, on the opposite side of the street. When the F-150 came to rest in the line of traffic stopped at the red light of the Summer Avenue/Trezevant Street intersection, I was facing it directly from my parked scooter in the lot that came up against Trezevant's east side. I watched the F-150's vested driver point a cell phone camera towards my face and hold it up facing me for several seconds, presumably to photograph or video record me.

### October 19, 2025—approximately 7 PM

39.     On October 19, 2025, at about 7 PM, my wife and I were parked in the Volentine-Springdale area, about a mile away from my house when we saw a convoy of five or six unmarked black and gray vehicles blow past us on a side street. We did a U-turn and began following the convoy, but quickly got caught behind a traffic light through which the convoy passed. After the light turned green, we continued driving down the main street (going east on Chelsea) and caught up with the convoy after 3–5 minutes, just before the Chelsea Avenue/Springdale Street intersection. We saw the convoy stopped on a side street as we passed. So, we drove around the block, came back to the side street, and parked about 60 to 90 feet away from the convoy of vehicles we had seen, which were now parked on both sides of this side street, the name of which is Hyde Park Boulevard.

40.     The agents appeared to have targeted a specific house on Hyde Park. After I parked my car and got out, I saw the agents had handcuffed a Black man, who was standing in the street. It looked like the agents had pulled this man from a house on the east side of the street. There were several people (presumably the man's family and friends) in the front yard of this tiny house on a benign suburban lane.

41.    I saw about 20 agents milling around in the street. The majority of the agents were U.S. Marshals, as identified by their vests. I also saw one agent wearing an HSI vest, a few state troopers, and a few MPD officers. Some of the agents were just standing and some were walking back and forth talking to each other. A U.S. Marshal I later identified to be Gadyaces Serralta—the Director of the U.S. Marshals Service—was filling out paperwork on the hood of a vehicle near the handcuffed man, whom they had moved to the side of the road, as pictured below.



42.    I stood photographing about 90 feet away. I gradually moved closer until I was within 30 feet of the nearest law enforcement vehicle. I never got closer than about 75 feet from where the man was handcuffed. After about 25 minutes, the agents uncuffed the man, let him go, and started packing up their gear, as pictured below. I then returned to my car to pack up my cameras. About half the agents were still on the street, some wandering around, it seemed, aimlessly.



43.     When I went back to my car to start packing it up, I saw the man I'd seen attending to paperwork approaching me with three other U.S. Marshals. I took photographs of their approach, as pictured below. I later learned this man was U.S. Marshal Service Director Serralta when a journalist friend identified him in one of my photographs from the scene. Serralta and the U.S. Marshals were all armed with sidearms in holsters. Before they reached my car, one of the U.S. Marshals turned back. My wife was in our car's front passenger seat, with the door closed, and I was standing by the driver's side door when the three U.S. Marshals (including Serralta) reached us.



44.    When Serralta reached me, he held his phone out about six inches from my face for 5 to 10 seconds. I understood him to be photographing my face. While he was holding his phone up to my face, the other two U.S. Marshals positioned themselves along the passenger side of the car looking at me over the roof. I was two feet from the driver's side door this entire time. After presumably photographing me, Serralta walked between me and the car and made a big show of taking pictures of my license plate. My wife remained in the passenger seat of the car with the door closed this entire time.

45.    While standing at the back of my car photographing my license plate, Serralta asked me who we were. I responded we were with a neighborhood watch group. Putting on, as it seemed to me, a very steely voice, Serralta told me to "get your priorities straight." I responded: "What priorities would those be?" Serralta then said, while walking away: "Saving lives." The two other U.S. Marshals followed him back to where their vehicles were parked.

46.    As I was getting in my car to drive away, an unmarked black vehicle leaving the scene pulled up alongside me, facing the opposite way, so that the driver's window was abreast of me. Through the lowered window, the driver, wearing a U.S. Marshal vest and thinking, perhaps,

that I was a journalist, asked: "Who are you with?" I responded: "I'm not with anyone. I'm just me." The vehicle then went to the end of the street, pulled up perpendicular to it, and sat there, perhaps 60 feet from us, as pictured below. To leave the street, I had to drive past this parked officer.



47.    Serralta seemed to be intentionally putting on a tough-guy act. He walked 60 feet out of his way only to engage with me. This was clearly an effort to intimidate me. His behavior agitated me—what did he think he was doing? Did he think photographing my face would scare me so much that I'd never observe law enforcement again?

***October 19, 2025—approximately 7:45 PM***

48.    Immediately following the incident with Serralta, my wife and I drove to the location of a different Task Force scene on Wales Avenue and arrived around 8:00pm. The incident was underway by the time we arrived. Upon arrival, I saw 20–30 officers, including from HSI, the U.S. Marshals, FBI, THP, and MPD, as pictured below.[1] It was a big crowd. I learned from the

---

[1] These photographs show only part of the crowd of federal agents at the scene.

other observers present that the agents had arrived at the house under the pretense of serving a warrant on someone who did not live there, and upon arrival, they seized two married adults. MPD had blocked off the road well past the 25-foot line, probably 90–150 feet away from the detention. I recall seeing two MPD vehicles blocking the street. The light was failing and the officers were trying to keep observers at a significant distance.





49.    I parked more than 150 feet away and walked up with my cameras past where the MPD vehicles were blocking traffic to join a small group of other observers. The observers were speaking with MPD officers. The observers were telling a U.S. Marshal that due process doesn't allow officers to detain and deport an individual whose name is not on the warrant that is the premise for searching a house. That U.S. Marshal responded: "Due process is only for citizens." I did not engage in the conversation and focused on photographing as much as possible.

50.    As the U.S. Marshal and other observers were interacting, I tried to move closer to the scene to capture details of the scene. As I tried to get closer, I was stopped by an FBI agent. At this point, I was 60 feet away from the scene, on the opposite side of the street. I don't recall what the agent said to me, but I remember responding: "I'm not even close to 25 feet." The agent then repeatedly said: "25 feet isn't a thing" and "you have to get back to where I want you." I responded: "I'm moving back, but 25 feet is most certainly a thing." The agent then responded: "Maybe it is in Memphis." I think he was a new Task Force agent.

51.    I spent two hours watching this horde of federal officers, until it was late at night. Because it was dark and the agents prevented me from getting within 25 feet, I was not able to capture many details of the officers' identities and their activity. I managed to raise some details out of my files digitally, but at the scene, everything was dark and I was just pointing my camera and clicking without really being able to see what was going on.

52.    The officers ended up taking one of the adults away. My last photographs from the incident record the agents putting the man (whom they separated from his wife) into a vehicle and driving him away. Some observers stayed behind with his wife to figure out support and services. I returned to my car and drove home.

16

*November 7, 2025*

53.     On November 7, 2025, at about 8:30–9 PM, I drove to the intersection of Macon Road and Holmes Street after hearing about an incident there. I arrived at the scene about 15 to 20 minutes after agents had thrown explosive ordinance into a house about 500 feet from Jackson Avenue, which I thought must have been flash bangs because I looked into the window of the house after the agents left and didn't see any residue or traces of tear gas. I heard before I arrived that federal agents had chased someone in their vehicles and ended up at this house, into which the driver of the vehicle being chased had fled. The agents then besieged the house, threw in an explosive, broke into the house, and extracted the driver of the vehicle. By the time I arrived this man was already in custody and perhaps even off site. A family with small children was left inside.

54.     When I arrived at the scene, I saw about 20 to 30 agents milling about in the street, on the sidewalk, and in the yard of the house, as pictured below. I observed state troopers, MPD officers, and a variety of federal agents, including HSI, Border Patrol, FBI, DEA, and DSS agents. I also observed federal agents wearing vests marked "Police" on the back whose agency affiliation I could not identify.





55.     At first, I attempted to approach the scene from the back side walking north on the

west side of Holmes Street, toward Macon Road. The house was on the corner, and I approached,

coming up on the same side of Holmes Street that ran alongside the house. As I approached, I was

stopped by a state trooper or an MPD officer, I cannot recall which. I was no closer than 90 feet from the house when the agent stopped me.

56.     I then crossed to the opposite side of the street, moving away from the besieged house, to try to move up the street towards the intersection. My wife and I were then approached by a Hispanic boy, perhaps 16 years old, who identified himself as an extended member of the besieged family. He told me he was trying to secure the family's car before the agents handed it to a towing company, which would incur a significant expense. The boy was terrified and asked us to help him interact with the federal officers.

57.     All three of us crossed the street at the intersection so that we were standing on the sidewalk at the southwest corner of the Macon-Holmes intersection that formed the corner of the besieged lot. An agent wearing a vest marked HSI approached and told us we had to move back across the street. We explained what we understood from the boy about the car. The HSI agent said that no one could take the car at that time, but that he would try to arrange for a family member to remove the car rather than turning the car over to a towing company. He then insisted that we move across the street.

58.     We went north across Macon and joined a small crowd of people, including a few observers. As I began photographing from this location on the north side of Macon, an agent at the besieged house on the south side of Macon began shining a powerful flashlight at the small group of which I was a part, apparently in an attempt to blind our cameras, as pictured below. The light was much more powerful than a phone light. The agent shining the light was probably 30 to 45 feet from me. To make some variety of photos, I crouched, from time to time. But it became clear the agent was intentionally angling his light towards my cameras. Because the crowd around me

19

was standing, when this agent's light hit me while I was crouched, it was clear it did not hit me accidentally or arbitrarily.



59.    The bright light shining towards me prevented me from identifying what agency the agent shining the light belonged to. I have studied my photographs and can identify him in earlier photographs only as a federal agent wearing a vest, on the back of which was written "Federal Agent."

60.    A tow truck then appeared about 120 feet down Macon to the west. I walked down to the tow truck. After a few minutes, I heard a commotion, including my wife's voice, and I hurried back to the scene, where I found that, on the front lawn of the besieged house, agents had surrounded the Hispanic boy who'd asked us for help. I overheard bystanders shouting that the agents had taken the boy's driver's license and were going to detain this boy. Later, my wife told me that agents had asked for his driver's license, and when he showed it to them, one agent said, "That's not real," and grabbed the license from the boy. To reach the boy, I walked across the street, from the north towards the besieged house on the south side of Macon, and two agents came from

the yard of the besieged house to stop me in the street, just after I had crossed the street's midpoint.

One of these agents was a state trooper. The second agent was carrying a rifle but I was not able

to identify his agency. I explained that I was trying to facilitate this boy's interaction with federal

officers, at the boy's request, but these agents insisted that I return to the crowd on the far side of

the street. I backed up enough to satisfy them and took several photos of the boy with several

federal agents. While I was taking these photographs, an agent—the same agent as earlier, it

seemed—shone a flashlight at my camera, as pictured below.





61.    About an hour after I arrived, a new vehicle—a minivan—arrived. I saw agents set up child safety seats in this van and secure twin toddlers from the besieged house in this van, as pictured below.



62.    Over the course of this incident, I must have been told to get back by 5 to 10 different agents, including HSI and Border Patrol agents and state troopers. There were a few times

I felt I needed to get closer in order to photograph effectively, but agents with holstered guns told me to get back across the street.

63.     I stayed on site for about an hour after the agents left and continued to photograph. Myself and other observers remained to discuss how to provide for the family that had just been broken apart.

*November 19, 2025*

64.     On November 19, 2025, I arrived to Angelus Street, just north of Poplar Avenue, at 11:30 PM, after receiving a message from a community member. Upon my arrival, I saw a state trooper, several HSI agents, and at least one DSS agent out of their vehicles. I later saw the DSS agent leave the scene in a THP vehicle. Two people who were visibly not white were already in handcuffs.

65.     As I approached to photograph with my cameras out, one of the HSI agents asked me: "Are you press?" When I told her I was not, she said to me: "In Tennessee we have a Halo Law, which means you have to be back 25 feet." I responded that I was already further than 25 feet from the scene—the four or five agents clustered around one of the cuffed men—to which the agent responded: "You're not 25 feet from me." The agent was, at this moment, at least 30 feet from the cluster of agents behind her, and I was 10 to 15 feet from her. In response to her declaration that I wasn't 25 feet from *her*, I reiterated that I was already more than 25 feet from the concentration of agent activity at the scene. I didn't move forward at all while this agent was speaking to me. She then said something to the effect of: "The law doesn't identify that (activity) as the point from which you must be back 25 feet." To which I responded: "The law doesn't identify *you* as that point, either."

23

66.    At that point the agent simply shouted: "Back! Back! Back! Back!" several times, making a pushing motion with her hands and stepping towards me. When she needed to take a breath, I was able to interject: "I *heard* you. Shouting 'back!' over and over again doesn't change the situation that you and I are in." Then I said to the agent: "Look, I'm gonna back up a few steps, but you haven't read the law that you've cited." This interaction negatively impacted what I was able to photograph at this scene; under low-light conditions, proximity is everything.

***January 18, 2026***

67.    On January 18, 2026, at about 10:30 PM, I was in the car with my adult son, driving someone home from work. I drove past a gathering of law enforcement vehicles on the east side of Rangeline, a major street, including two state trooper SUVs, two MPD SUVs, and three or four unmarked vehicles, some of which were equipped with emergency lights. I dropped the individual off about a mile further and returned to the scene by 10:45 PM. I parked in an alley adjoining Rangeline's west side and walked 90 to 120 feet north on Rangeline to approach the scene (which was on the opposite side). Given that Rangeline has two lanes of traffic in each direction and a center emergency lane, I was at least 120 feet from the scene.

68.    From there, I saw two MPD vehicles and two THP vehicles, along with at least four unmarked black and gray vehicles. I also observed state troopers, MPD officers, and at least six federal agents, including from HSI, U.S. Marshals, and DEA. As I was photographing, officers brought someone who was visibly not white out of a house, handcuffed, and placed him in an MPD vehicle. The vehicles then started to leave the scene while my son and I were still standing across the street.

69.    One of the unmarked federal vehicles—a black Dodge Charger with a "Government" plate—drove about 180 feet north on Rangeline and then did a U-turn, so as to

24

come back towards me. The vehicle drove in the right lane of Rangeline's two southbound lanes, so that he approached right up against the curb on the sidewalk on which my son and I were standing (Rangeline, here, has no bike lane or designated parking space). As the Charger approached me, its passenger window was down and through it I was hit with a beam of light in my face, starting when the Charger was about 45 feet down the road. I was holding my camera up by my face, actively prepared to photograph the next interesting or informative image. The officer kept the beam of light on me as he passed by slowly—he was driving around 10mph where the speed limit is at least 40mph. This light was brighter than one might expect from a general-issue flashlight. Because of the light, my son and I could not see the driver, and thus I do not know what agency he was aligned with.

### *April 18, 2026*

70.    On April 18, 2026, between 2 and 3 PM, I heard that Task Force agents from HSI and MPD were at a home in the Berclair neighborhood and drove over with my wife to the Watts Avenue and Walter Street intersection to observe and photograph the activity. When I arrived, I observed several Task Force vehicles, including at least three MPD vehicles, at least two unmarked vehicles, and a large white truck marked "Memphis Animal Services." The vehicles were positioned around a blue house on the intersection's southeast corner.

71.    I walked to the southeast corner of the intersection to photograph the Task Force activity and positioned myself between two empty MPD vehicles. From that spot, looking through a chain link fence and tree branches, I could see the blue house's front porch, which was at least 60 feet away. I photographed from that spot and observed the agents bring several people out of the house in a hurry, including several children who were not dressed for the outdoors. The agents directed the people towards the house's driveway, which was 100 feet east of where I was standing.

25

72.     An HSI officer standing 100 feet to the south of me walked towards me on the sidewalk and shouted: "The Halo Law says you have to be back 25 feet," as pictured below. I asked the officer: "25 feet from what?" The HSI officer then turned his attention to a woman who stepped between the HSI officer and myself to express concern about a dog. The HSI agent spoke with the woman briefly and then again told me to back up "25 feet." I asked again: "25 feet from what"? The agent replied that I had to be 25 feet back from an empty blue MPD vehicle. When I asked for clarification about the point from which I had to be back 25 feet, the agent replied: "It is where I say it is." I stepped back and lost my line of sight to the blue house. I then went up the street to the east towards the blue house's driveway, which was behind a tall chain link fence and gate, anticipating that the agents in the yard would have to exit through the gate.



73.     I continued walking 30 feet past the blue house's driveway looking for a new vantage point and observed a group of agents, including two U.S. Marshals and a few MPD officers, bring a man in handcuffs to the gate at the end of the driveway. As they approached the gate, an MPD officer began shouting at me about "25 feet." As he stepped through the gate, the

26

officer turned away from the other officers, stepped towards me, and reiterated: "You have to be 25 feet away." I responded that I was 25 feet away and when the officer said I was not I asked him: "From what am I not 25 feet away?" The officer pointed towards the blue house and said: "from that house." I was well over 25 feet away from the house at this point.

74.    I continued observing and photographing until the Task Force vehicles left, as is my practice.

***May 5, 2026***

75.    On May 5, 2026, beginning at 4:45 PM, I observed Task Force activity at the corner of Rock Road and Byron Road in the Berclair neighborhood. When I arrived, I observed about 10 agents, including at least two agents marked as U.S. Marshals, an agent with a tactical vest marked "FBI," agents with vests marked "Sheriff," and agents wearing plainclothes without vests. Many of the agents had sleeve masks covering their nose, mouth, and neck. At least one was wearing a sock mask leaving only his eyes exposed. All of the agents were armed with handguns in holsters. The agents had parked their vehicles crossways across the street, at least 60 feet away in each drivable direction from a house they appeared to be targeting.

76.    My wife and I parked about 40 feet back from the Task Force vehicles blocking the street. I got my cameras from the trunk of my car, and we walked across the street toward the vehicles. As soon as I reached the rear end of a Task Force vehicle blocking the street, all of the agents in a crowd of six or seven agents in the street just in front of the targeted house—nearly 100 feet away—began loudly shouting "25 feet" at me. One U.S. Marshal charged across the intersection to stand very close to us, on the outside of the cordon made by the agents' vehicles, to yell at us about the Halo Law. I pointed out to this Marshal that the Halo Law did not identify his

27

vehicle as a 25-feet origin point. The Marshal then went to the cab of a black SUV to retrieve a

phone, saying "if you film me, I'll film you."

77.    Another observer near me shouted, "he's filming us!" At the moment I did not know

to whom this other observer was referring. I later found a photograph I had made of a plainclothes

agent with a hand-held video camera with a strap around his neck, as pictured below.



78.    I tried to move around to photograph as I typically do, and two agents then shouted

at me and moved into position to block me from walking on the sidewalk even one step beyond an

imaginary line from the rear bumper of one of the Task Force vehicles. This meant that I could

only observe and photograph from a 15-foot-wide area. Much of the scene was not visible from

this 15-foot-wide box. Given all the vehicles crammed into the converging streets, from the box

out of which the agents would not allow me to step, I was not able to see what seemed to be the

central activity at the scene.

79.    While I was photographing from the 15-foot-wide area, a plainclothes agent

wearing a sock mask stared at me from about 100 feet away for thirty seconds to a minute, giving

28

me a thumbs up. When I later looked through my photographs, I also saw that a sheriff in the same group of agents had been staring right at me through binoculars, as pictured below.



80.    I photographed the scene for about 30 minutes. After all of the agents left, I briefly spoke with another observer on the scene and then drove home.

**The Impact of the Government's Retaliation and Intimidation Against Me**

81.    The incidents described above are a subset of the incidents in which an agent has photographed me, shined a bright light into my camera, or invoked the Halo Law against me. It is clear to me that the agents who shine lights at me are doing it to obstruct photography. I have observed that agents shine lights at observers who are holding their phones or cameras up but not at other observers.

82.    I understand that the interactions I have had with law enforcement could intimidate or frighten many people; however, my autism impacts my perceptions of intimidation. I often do not really know when a person intends to intimidate me. It is not possible for me to understand how people without neurodivergence feel when law enforcement officers approach them. I get the

impression that I do not sense the kind of danger that other people sense. Given what I have heard from other observers, I acknowledge that somebody might follow me, and perhaps *has* followed me. But I do not know how or why to be afraid of that.

83.    Fairness and lack of fairness impact me differently than they do other people. In autistic terms, I get dysregulated by encounters of injustice or when I perceive that a situation is not fair. Dysregulation affects my functionality. Significant dysregulation can negatively impact my ability to speak, to associate, to take basic care of myself, and my interest in continuing to exist. Because I sense the Task Force's work as generally *un-just*, going out to observe and to document that work on a daily basis helps me feel like I'm contributing to some measure of a "re-justicing" force in Memphis, which helps keep me functional.

84.    Dysregulation is, for me, akin to anxiety. When I am dysregulated, I experience myself as being out of balance, or out of control, in the way that a motorboat will meander if someone's hand is not on the rudder or on the wheel. In this condition, impulses shape my behavior into forms that neurotypical people can't read. That is: I'm less able, when dysregulated, to put on the skin of a neurotypical person and act in ways that neurotypical people expect.

85.    For example, during the November 7 incident, I made a commitment to help a teenager interact with federal agents, and a commitment like that rests in me with the physical reality of bones. So, when that teenager suddenly came into jeopardy, I was moved by sensation as real and as forceful as the panic that tear gas can cause. Notwithstanding the agents' badges and guns and tough-guy demeanors, I felt compelled to fulfill the commitment I'd made to that teenager. Those agents' abject refusal to listen to an articulation of the "truth" and their insistence that I return to the other side of the street without any explanation or rationale operated on me as

30

a kind of torture. There's no way, probably, to impress on someone who is not autistic the nature of the suffering that follows from this sort of interaction.

86.     I am better regulated when I am able to observe Task Force activity peacefully, so as to contribute to a more just city and country.

Executed this __23_ day of May, 2026.

_____
David Vaughn Mason