**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

HUNTER DEMSTER *et al.*,

   *Plaintiffs*,

v.

TODD BLANCHE, *in his official capacity as
Acting Attorney General of the United States, et al.*,

   *Defendants*.

Case No. 26–cv–02546

### DECLARATION OF JAMES MITCHELL WEST

I, James Mitchell West, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I am over the age of 18, am competent to give this declaration, and testify from my own personal knowledge regarding the facts in this declaration.

2. I currently reside in East Memphis. I have lived in the Memphis area for my entire life.

3. I am a retired physician. I have been officially retired since 2024. Prior to my retirement, I was the Director of Liver Transplant Anesthesiology at the Methodist Healthcare Transplant Institute in Memphis. I also served as an anesthesiologist at St. Jude Children's Research Hospital. I am past chair of the ethics committee of both the American Society of Anesthesiologists and Methodist-LeBonheur Healthcare. I have also traveled to Peru and Haiti to train other physicians and provide routine medical care to those in need. In addition to my work overseas, I have also used my fortunate position as a successful physician to contribute to charitable causes here in Memphis by supporting children with cancer through Make-A-Wish of

the Mid-South and by helping women experiencing domestic violence through the Young Women's Christian Association. I sometimes summarize my beliefs with the phrase "to whom much is given, much is expected." I believe that it is important to give back to those in need and that protecting and supporting vulnerable people is a civic obligation.

4.    I have been involved in observing, gathering information about, and recording immigration and law enforcement activity since approximately April 2025. Through this work, I strive to gather information on law enforcement activities, both for my own awareness and for the larger community. I think it is important to document law enforcement activities to prevent abuse of power and to create a record of any abuses that might occur.

5.    I was inspired to begin this work due to my deep sense that I have an obligation to help others. I believe that inspiration is put forward most clearly in Matthew 25:40 and 45, which read "whatever you did for one of the least of these brothers and sisters of mine, you did for me," and "whatever you did not do for one of the least of these, you did not do for me." During my professional career, I put that ethos into action by practicing medicine. In retirement, I do so by gathering information about potential abuses of power by the government. I believe that the government is currently vilifying and taking advantage of a whole population of vulnerable people, and I began filming law enforcement officers' actions in Memphis out of the conviction that doing so could bring attention to that fact.

**Memphis Safe Task Force Activity**

6.    I have been observing, gathering information about, and recording Memphis Safe Task Force ("Task Force") activity regularly since the Task Force arrived in Memphis in September 2025.

7.     In my retirement, I travel abroad frequently, but when I am in Memphis, I observe, gather information about, and record Task Force activity almost daily. Because I am retired, I am able to engage in these activities during the day when most people are working. Most of my work involves responding to calls and messages from other community members who have spotted Task Force activity.

8.     Most of the Task Force activity I observe occurs at traffic stops, but I also observe Task Force agents searching people's homes. I typically see Task Force agents travelling in caravans of vehicles featuring a Tennessee Highway Patrol ("THP") cruiser and unmarked SUVs. In my experience, the number of vehicles in these caravans spans from three to over half a dozen.

9.     When I see Task Force agents outside their vehicles on a given scene, I see that THP troopers wear recognizable uniforms while federal agents wear irregular clothing under bullet proof vests. I often see well over a dozen agents on the scene of a Task Force operation. Sometimes text on the vests indicates with which federal agency they are affiliated, but sometimes the text simply reads "police" (or even nothing at all). Sometimes the agents wear masks to obscure their identities. The federal agents often bear what appear to be semiautomatic rifles rather than the sidearms carried by local law enforcement. Their attitudes are often hostile toward me and other Memphians. I get the sense that the Task Force's aim is to intimidate the public, which I find to be deeply disturbing.

**Observing, Gathering Information About, and Recording Immigration and Law Enforcement Activity, including the Memphis Safe Task Force**

10.     My general practice when observing, gathering information about, and recording immigration and law enforcement activity depends on the situation.

11.     If I am observing a traffic stop, I play it by ear so as not to antagonize agents and risk making the situation worse for the person who has been stopped. For example, if it looks like the agents are going to let the person go, I often just stand silently and observe. But if it looks like Task Force agents are harassing or detaining the person, I try to speak up more and ask questions so I can help the detainee and their family access the support they may need following detention. For example, I try to gather information so as to help prevent the person's car from being towed, get them in touch with their family, or put them in touch with an attorney.

12.     If I am on foot in a neighborhood, I usually approach the Task Force agents and ask them whether they are going to detain the individual and why the person was stopped.

13.     I try to record when I go up to talk to agents, though I do not always do so. I usually put my phone on record and keep it in a holster when I approach agents to talk, so I have some video recordings, but most of my recordings are audio. I also take photographs.

14.     I do not physically interfere with, impede, or intervene in immigration or law enforcement action. I always follow orders by government officers or agents, including when asked to step back.

15.     I only film activity occurring in public and document what is visible to me of officers or agents engaged in their official duties.

**Invocation of the Tennessee Halo Law**

16.     I would estimate that I have had the Halo Law invoked against me over a dozen times. The manner of enforcement is inconsistent.

17.     Sometimes Task Force agents will talk to me for a while and then tell me to get back 25 feet partway through the conversation. But many times, Task Force agents immediately tell me to get back 25 feet when they see me approach, before I can even talk to them.

4

18.     I usually respond that I know about the 25-foot rule and that I just want to know what is going on. Sometimes agents will tell me something; other times they will simply say "get back" or tell me it is "an ongoing investigation."

19.     Based on my observations, Task Force agents appear to have their own interpretation of the 25-foot rule. I have observed law enforcement agents tell me to get 25 feet away from them, rather than from the scene. Sometimes they have demanded that I get back 25 feet when I was already back considerably more than 25 feet.

20.     When the Halo Law is invoked against me, I always back up. Depending on where the incident is occurring, I can lose my vantage point of the scene when I back up 25 feet. It is also usually hard to interact with agents once I have moved back 25 feet.

**Incidents of Retaliation and/or Invocation of the Halo Law**
   *Pressure to Delete Photo of Federal Enforcement Activity*

21.     In or around late June or early July of 2025, I responded to a call from a community member about immigration enforcement activity in the late afternoon at or near the corner of Jackson Avenue and Macon Road. I arrived after taking my granddaughter to see the Disney movie *Lilo & Stitch* earlier in the afternoon. When I arrived at the scene there were several other observers in the vicinity. It was near a McDonald's restaurant. I saw two to three unmarked vehicles sitting in a parking lot that seemed to be affiliated with federal law enforcement. The vehicles were large SUVs with dark tinted windows and out-of-state license plates. I drove up alongside one of the vehicles, and an agent rolled the window down. I saw that he was wearing a tactical vest. The agents observed me photographing their vehicles in the parking lot.

22.     Approximately 30 minutes to an hour after I arrived, I observed the SUVs leaving the parking lot. I decided to follow one of the vehicles because I believed it might be going to a raid, and I wanted to be sure to observe any such action.

5

23.    I followed the vehicle for about 15 minutes before it pulled into a police precinct off Stage Road in Memphis. I did not know the building was a police precinct at the time. I observed an agent speak with a Memphis Police Department ("MPD") officer, and then the MPD officer came to speak with me. The MPD officer checked my identification and said the agent reported that I had taken a photograph of his car. The officer asked me to delete the photo. I deleted the photograph from my phone and left.

### *U.S. Customs and Border Protection Revokes My Global Entry Status*

24.    On July 18, 2025, U.S. Customs and Border Protection ("CBP") revoked my Global Entry status. I previously maintained Global Entry status for over a decade without incident. I discovered the revocation when my wife and I were preparing to travel to Europe in August 2025 when I printed out our boarding passes and noticed that I didn't have TSA pre-check.

25.    Although I didn't see it until later, I'd received an email from CBP on July 18, 2025 stating that I no longer met the eligibility requirements for Global Entry. While I was not given an exact reason for the revocation, the notice indicated that it may have been because I am subject to a law enforcement investigation and/or that I am suspected of being or having been engaged in conduct constituting, in preparation for, in aid of, or related to terrorism. The email stated that if I wanted more information, I could file a request under the Freedom of Information Act ("FOIA"). The notice also stated that I could submit a challenge to the Federal Bureau of Investigation ("FBI").

26.    I believe the revocation of my Global Entry status is connected to my observation and recording of immigration and law enforcement activity. I am not aware of being the subject of any law enforcement investigation or of being suspected of conduct related to terrorism.

6

27.    I re-applied for Global Entry, but my application has been pending for approximately eight months.

***Task Force Agent Asks Me to Stop Filming***

28.    On or about the early evening of November 2, 2025, at the corner of Leawood Street and Fairoaks Avenue, I observed four individuals sitting on grass being detained following a minor automobile accident. They appeared to be handcuffed. Nobody appeared to be seriously hurt. When I arrived, I observed a THP trooper, a U.S. Marshal, four U.S. Border Patrol agents, two IRS Criminal Investigation agents, two FBI agents, an HSI agent, and several other law enforcement officers on the scene. There were also about half a dozen unmarked cars and a THP SUV present. I stood across the street from the agents and the four detained people to avoid getting in the way.

29.    I started to record the scene. While I filmed, the agents started to take the four individuals into custody. A couple minutes after I started filming, a U.S. Marshal approached me. When he approached me, I asked "Is this just Customs and Border Patrol detaining these people?" The U.S. Marshal responded, "If you turn your camera off, I will talk to you." At the Marshal's request, I stopped recording. I asked the Marshal whether this was an immigration enforcement action and, rather than responding directly, he replied with something to the effect of "what does it look like to you?"

30.    I spent another hour or so observing the scene before leaving.

***Task Force Agent Invokes Halo Law***

31.    On or around the afternoon of November 21, 2025, I arrived at a home on or near Basswood Street in the Parkway Village area of Memphis where I saw a gathering of over half a dozen law enforcement officers congregating under the house's carport. I recall seeing an MPD

7

cruiser and at least one unmarked law enforcement vehicle parked in front of the house. I also saw agents wearing tactical vests that read "HSI" and "POLICE ICE." An Enforcement and Removal Operations ("ERO") vehicle arrived after I did. On the scene, I learned that local authorities executed an arrest warrant at the house for issues unrelated to immigration and discovered an undocumented person in the residence. Task Force agents then detained and later removed the undocumented person from the scene.

32.    I started videorecording the scene from the neighbors' lawn, which was much further than 25 feet away from the scene. I recall standing about 30 to 40 feet from the carport where most of the officers and the detainees were congregated. I was also over 25 feet away from other agents and officers milling about and chatting in the street. Prior to recording, I spoke with the neighbors who allowed me onto their property.

33.    An MPD officer approached me and angrily told me I was on private property and I had to get back. But because the neighbors had previously given me permission to be on their property, I responded, "They let me on their property." The officer said I still had to get back. I was considerably more than 25 feet away from the scene at that point but still moved back. I could not see what was happening on the scene from the vantage point that the officer forced me to assume.

*Task Force Agent Photographs Me*

34.    On or about December 3, 2025, in the late morning, I arrived at or near the corner of Macon Road and Graham Street and observed a group of Tennessee Highway Patrolmen and federal agents detaining an individual. I observed at least one vehicle at the scene and approximately six agents and troopers total. It appeared to me that a federal agent was riding with

8

local law enforcement, and I observed additional unmarked law enforcement vehicles present. The action was largely over when I arrived.

35.    Another volunteer and I stood across the street, at least 50 feet away from the scene. I pulled out my phone to record the scene. However, before I could start recording, an agent wearing a vest marked DSS, which I understood to be an acronym for Diplomatic Security Service, abruptly walked all the way across the street to where we were standing and took photographs of both of us. He was standing very close to us during the interaction—no more than two feet away. The officer could tell we were stunned and said something to the effect of, "well y'all were filming us." I replied, "I was about to" and explained that I wanted to film the group of officers talking, laughing, and kidding around at the scene of the incident.

36.    When we asked the agent why he took our picture, the agent answered he had to take our photographs to make sure we were not wanted criminals and that we were not dangerous people. The agent treated us rudely. He did not specifically say he was going to use facial recognition technology, but I inferred that possibility from his statement that he needed to use our photographs to verify we were not dangerous.

37.    The agent and I then began discussing immigration enforcement. The agent asserted that it is a felony to simply cross the border without authorization. I explained to him that crossing the border is not necessarily a felony. After continuing to argue for a short time, the agent walked back across the street and got in the car with a THP trooper. I found this interaction with the Task Force agent unnerving.

### Task Force Agent Tells Me to Stop Recording

38.    On or about the morning of December 22, 2025, I arrived at the scene of a Task Force traffic stop on I-40, just past the exit to Jackson. There were two THP SUVs on the scene.

9

It appeared that THP had stopped a red pickup truck towing a trailer. I suspected that the stop may have been a pretextual immigration-related stop, and I wanted to observe and record the events in case the troopers or agents engaged in misconduct. I pulled over and got out of my car.

39.     After arriving on the scene, I spoke with a relative of the man that had been stopped. She informed me that THP said they pulled him over for, among other things, driving on a bald tire. She told me that another relative was on the way with a new tire

40.     At first, it looked like the agents were going to let the driver go, so I didn't intervene. I stood off to the side of the road and continued talking to the woman who was also present. I understood her to be either the driver's sister or wife, and she had come in her own car. We were optimistic that the driver would be released.

41.     After I had been on the scene for some time, I noticed a dark colored law enforcement vehicle arrive. Federal agents wearing tactical vests exited the vehicle and began to speak to the driver.

42.     At this point, I pulled out my phone and started recording the law enforcement officers on the scene. Several seconds after I started recording, a THP trooper briskly approached me and asked me, "Why are you here now?" in a hostile tone. I said, "I'm here because she called a friend of hers who called me." With a threatening tone, the trooper responded, "Well, I'm about to call a friend and say you need to get off . . ." I did not hear the end of the sentence, but I stopped recording immediately because the trooper seemed aggressive and belligerent. After I stopped recording, the trooper began to walk away.

43.     I attempted to resume recording the scene after the THP officer walked away, but when he noticed I was recording, he loudly demanded that I stop and started following me toward my car. Again, I immediately stopped recording.

44.     I then got into my car and drove away before looping back to keep an eye on the situation. I looped around twice. When I returned to the spot of the traffic stop for the second time, about 20 minutes later, the scene had been cleared.

**The Impact of the Government's Retaliation Against Me**

45.     After these incidents, I have a lot more fear whenever I go to observe, gather information about, or record Task Force activity. I now feel a deep sense of unease in the pit of my stomach whenever I arrive at the scene of a Task Force action to exercise my right to gather information about their conduct. After how I have been treated and what I have observed, the intensity of my fear of mistreatment by the Task Force has steadily increased. Now, I really have to embolden myself to do this work.

46.     As a result of these incidents, I am less likely to approach Task Force agents and ask what is going on. In order to engage law enforcement in conversation and inquire about their activity, I have to talk myself into going up to agents more and more each time.

47.     My wife has expressed a deep sense of worry about my safety when gathering information about and filming Task Force operations. She is afraid that I will be hurt or arrested. She frequently messages me when I am on the scene of Task Force activity to make sure I am okay. She has asked me to engage in this work less frequently due to these concerns. I feel that this has affected our relationship.

48.     I have also experienced psychological and physiological harm due to the Task Force's conduct. I am often on edge or anxious when I think about what the Task Force might do to me for recording them. I often wake up in the middle of the night worrying about it and cannot fall back asleep. I'm concerned about how this sleeplessness will affect my health. My mind is often occupied by thoughts of the danger Task Force agents pose to me and the people of Memphis.

11

Executed this 16th day of May, 2026.

_____

James Mitchell West