**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

|  |  |
|---|---|
| HUNTER DEMSTER *et al.*,<br><br>　　　　*Plaintiffs*,<br><br>v.<br><br>TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States*, *et al.*,<br><br>　　　　*Defendants*. | Case No. 26-cv-02546 |

**DECLARATION OF CHRISTOPHER KERSEY**

I, Christopher Kersey, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1.　　I am over the age of 18, am competent to give this declaration, and testify from my own personal knowledge regarding the facts in this declaration.

2.　　I was born and primarily raised in Memphis, Tennessee. Although I have lived elsewhere, I consider Memphis to be home and have lived here for the last three years. I currently reside in the Hickory Hill neighborhood. I work at Whole Foods in the Germantown neighborhood and am a student at Southwest Community College.

3.　　I have been involved in observing, gathering information about, and recording immigration and law enforcement activity since early October 2025, shortly after the Memphis Safe Task Force ("Task Force") began operations in Memphis. My hope is that I will be able to help my neighbors who have been adversely impacted by the Task Force by providing accurate and timely information to the loved ones of individuals who have been stopped or detained by the

1

Task Force and to hold government officials, especially immigration and law enforcement officers, accountable to the public by documenting their activities.

**Memphis Safe Task Force Activity**

4.      From early October 2025 to late December 2025, I observed, gathered information about, and recorded Task Force activity approximately two to three times a week for about two hours each time. I paused observing and recording Task Force activity in late December 2025 after personally experiencing retaliation and because I was afraid to continue after learning that an observer had been shot. The pattern of intimidation that I experienced, as well as the increase in intimidating and retaliatory actions against individuals observing and recording law enforcement activity across the country, frightened me and my loved ones. The statements made by various agents involved in similar immigration enforcement surges across the country about photographing observers and adding them to a database frightened me because I have had my picture taken while observing and know others in Memphis who have been photographed while observing. When Renee Macklin Good and Alex Pretti were killed in Minneapolis, my first thought was that could have been me or any of my friends who also observe the Task Force. It was easy to imagine how the retaliation and intimidation I had experienced could escalate to physical harm. Friends and family told me they thought of me when they saw the news.

5.      I was unable to focus on my academic courses and full-time work schedule while experiencing retaliation and intimidation by the Task Force. I plan to resume observing, gathering information about, and recording the Task Force when my semester ends in May 2026.

6.      In observing, gathering information about, and recording Task Force activity, I have noticed that the majority of that activity is dominated by traffic stops involving a caravan of Task Force vehicles. Those caravans are typically led by a Tennessee Highway Patrol ("THP") or Memphis Police Department ("MPD") vehicle followed by up to four vehicles containing federal

agents from many different agencies. THP state troopers typically initiate the traffic stop and then are joined by federal agents from the ensuing caravan. I have observed agents from the following agencies:

- Department of Homeland Security ("DHS"), including Homeland Security Investigations ("HSI"), Customs and Border Protection ("CBP"), and Border Patrol
- Federal Bureau of Investigation ("FBI")
- U.S. Marshals Service ("U.S. Marshals")
- Drug Enforcement Administration ("DEA")
- Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")
- Tennessee Highway Patrol ("THP" or "state troopers")
- Memphis Police Department ("MPD")
- Shelby County Sheriff's Office ("SCSO")

7.      THP officers typically drive THP vehicles and wear THP uniforms. Likewise, MPD officers and Shelby County Sheriffs typically drive vehicles and wear uniforms marked accordingly. In my experience, THP troopers tend to be some of the most aggressive members of the Task Force.

8.      I have seen federal agents riding in state agency vehicles. For example, I have seen THP state troopers driving official state vehicles with HSI agents riding along.

9.      Federal agents typically drive a wide variety of unmarked vehicles. The majority of these vehicles are SUVs. The common identifying features are that these vehicles typically have out of state license plates, a very dark tint on the front windows, tend to be very clean, and are closely trailing the lead THP or MPD vehicle. Once at a scene, the unmarked vehicles often activate flashing light bars that are mounted inside the front grill of the vehicle or inside the front windshield of the vehicle.

10.     Federal agents typically do not wear uniforms. They often wear dark clothing with body armor vests. Sometimes the vests indicate their agency, sometimes they do not. Their vests

3

are often simply marked "Police Federal Agent," "Federal Police," or "Police." They sometimes wear masks.

**Observing, Gathering Information About, and Recording Memphis Safe Task Force Activity**

11.     My goal is to document Task Force activity. When I am observing, gathering information, taking pictures or recording, I try to maintain a safe distance from the Task Force members, their vehicles, and any community members they may have stopped or detained. I keep my distance to comply with the orders of law enforcement officers and agents, and also for my own sense of safety. I do not want to get close to any of the Task Force agents. I do my best to comply with directions from officers and agents, including when asked to move away from them. I do not physically interfere with, impede, or intervene in immigration or law enforcement action. I only film or take photos of activity occurring in public. I document what I can see of Task Force agents carrying out official activities. I mostly do so from public streets and sidewalks. I avoid entering private property whenever possible.

12.     I typically use my digital single lens reflex ("DSLR") Canon camera when I observe Task Force activity. I often use a telephoto lens attachment as well. The telephoto lens is larger than the camera and very visible. I am not a professional photographer, but I always have my camera out and visible when I arrive at a Task Force scene. I sometimes also record Task Force activity on my phone. I have noticed that agents are more likely to photograph me when I am carrying my camera, rather than just my phone. During some of the most intense periods of Task Force activity in the fall, I started carrying my camera with me everywhere because I encountered the Task Force so frequently just going about my day-to-day life. I noticed that Task Force agents will sometimes relocate or disperse when they notice they are being filmed or photographed.

13.     I have seen many incidents that disturbed or upset me, including abuses by Task Force agents. I have witnessed Task Force agents execute a warrant on outdated information and

4

use it to threaten the residents of neighboring houses with arrest or detention. I have sometimes criticized, heckled, or yelled at Task Force agents as a result of the disturbing things I have witnessed. However, I have never threatened them, nor have I ever physically interfered with their activities.

**Invocation of the Tennessee Halo Law**

14.     I would estimate that I have had the Tennessee Halo Law invoked against me at least five to ten times.

15.     Generally, Task Force agents invoke the Halo Law by simply saying "Halo Law" or "25 feet." When the Halo Law is invoked against me, I back up as the invoking agent or officer directs. Sometimes the invoking Task Force member does not direct me to move 25 feet away; sometimes they just direct me to move a little bit in a certain direction or they invoke the Halo Law to keep me from coming closer. I have rarely heard a Halo invocation specify 25 feet from a particular point or agent; usually it is unclear exactly what they mean.

16.     I have observed that officers visibly react to my camera. When officers see my camera, the Halo Law is invoked very quickly or officers attempt to position themselves so their faces are not visible. I have seen officers lower their hat brims to avoid my camera or invoke the Halo Law in order to move me to a position without direct line of sight to their faces. It also seems that officers tend to invoke the Halo Law when I get within 50 feet of them while I am carrying my telephoto lens. It seems Task Force agents are immediately antagonized by the presence of my camera, as though the camera itself is a provocation. Because of my telephoto lens, when the Halo Law is invoked, the distance alone does not usually make it more difficult for me to document Task Force activities, but when agents and officers specify a direction other than just backing up, it often means I lose my vantage point of the scene.

5

17.     I will now describe a handful of incidents in which I have been intimidated or retaliated against, or where I have had the Halo Law invoked against me, while observing, gathering information about, or recording Task Force activity.

**Incidents of Retaliation and/or Invocation of the Halo Law**

**October 16, 2025**

18.     On October 16, 2025, at about 3pm, I was driving home when I saw an official THP-marked SUV being closely followed by an unmarked silver GMC SUV while I was stopped at the intersection of Kirby Parkway and either Split Oak Drive or Monticello Lane. The agent driving the silver GMC made prolonged eye contact with me after he saw that I had noticed them. Almost immediately after, I saw these Task Force agents pull someone over on the very southeastern edge of the parking lot for the Kirby Parkway Office Center, a small shopping center, near the corner of Knight Arnold Road and Kirby Parkway. I saw one THP trooper, one plainclothes agent wearing a vest marked "ATF Police," and at least two plainclothes agents wearing vests marked HSI or "Police HSI." I also saw a plainclothes agent without any agency affiliation on his vest, but who appeared to have a U.S. Marshals badge on his belt.

19.     I pulled in and parked on the northern end of the large lot and began taking pictures from my car. Even though I was across the lot from the stop, the Task Force agents noticed me as I was pulling in because the lot was mostly empty. From the first photo I took while I was still in my car, the agent that may have been a U.S. Marshal was watching me. I got out of my car and walked along the front of the buildings in the shopping center towards the traffic stop in order to get a better vantage point. I sat down on the curb in front of one of the stores about 75 to 100 feet away from the stop and continued taking photos using my telephoto lens. I was about half the

6

length of the parking lot away from the stop. The Task Force agents concluded the traffic stop without detaining anyone and began to disperse.

20.    As the Task Force began to disperse, the silver GMC driven by one of the federal agents drove slowly by me as I was still sitting on the curb and I could tell they were watching me. They pulled around and parked the GMC so it was nose to nose with my car, in a position that meant they were facing me and made it clear that they knew which vehicle was mine. I felt uncertain about returning to my car with the agents parked there. As I approached my car, an HSI agent in the GMC waved at me. I believe the agent took my photo as I walked up because I remember seeing a phone in the agent's hand, but I cannot say for certain. I continued taking photos of the agent. The agent lowered his head so that the brim of his black baseball cap obscured his face. There was a logo on his cap, but I did not recognize it.

21.    I got back in my car and pulled out of the parking lot. The silver GMC pulled out immediately after me and began following me. I drove north on Kirby Parkway and took the onramp onto the Bill Morris Parkway highway because I did not want to drive back to my house only a few blocks away while being followed by the agent. The agent followed me for over five minutes and exited the highway after about two exits. I did not record or take photos of this because I did not want to pull my phone out while driving.

22.    I felt scared and intimidated. I felt paranoid for days after this incident, I was afraid that I would look out my window one day and see Task Force agents outside my house. After this incident, I tried to park far enough away from Task Force agents that they would not be able to tell which car was mine or follow me. I am just a guy with a camera who works at a grocery store; it is overwhelming to be followed by Homeland Security agents. I started shaking and sweating while I recounted this incident for this declaration.

7

**October 23, 2025**

23.     On October 23, 2025, around 7pm, I was approaching La Michoacana on Winchester Road between Kirby Parkway and Ross Road. La Michoacana is a store that sells ice cream and Mexican desserts. I had walked over from my house to get a churro, but as I approached, I saw a group of Task Force agents standing next to a THP SUV with its lights on. The group included what appeared to be three plainclothes federal agents and one uniformed THP trooper. I saw one agent in a vest marked HSI wearing a black shirt and tan pants, with a gray mask over his nose and mouth and a black backwards baseball cap. I saw what appeared to be another plainclothes federal agent wearing a black shirt and pants and a vest marked "Police Dept. Indian Task Force." I was unable to identify any agency identifying marks on the third plainclothes agent who was wearing a mask and a black and red baseball cap. I later saw a plainclothes ATF agent coming out of the store as well.

24.     I was taking photos as I approached the group of Task Force agents. I had a brief verbal exchange with the masked HSI agent, who then pulled out his phone and took a photo of me.

25.     After this incident, I felt scared and like the Task Force could retaliate against me at any time for observing or documenting their activities. I was frustrated on behalf of my neighbors who were scared and whose businesses were suffering from decreased foot traffic. Task Force agents had taken my picture several times before this. It felt like it must be a policy for the Task Force to take a photo of anyone who interacted with them because every time I interacted with them, they photographed me. It felt like a systematic response.

**October 31, 2025**

26.     On October 31, 2025, at around 5:30pm, I received a message from an acquaintance that the Task Force was possibly making an immigration detention in the parking lot of the Shell

8

gas station on the northeastern corner of Shelby Drive and Mendenhall Road. I saw a plainclothes federal agent wearing a vest marked "Police HSI," over a gray shirt and tan pants, with a black balaclava and sunglasses. I saw a second plainclothes agent wearing a balaclava, a gray shirt, khaki cargo pants and a vest marked "Police," and who I believe was an HSI agent. The HSI agents are pictured below.



27.    I saw a third plainclothes agent with a salt and pepper beard, a black shirt, and jeans wearing a vest marked "ATF Police." The plainclothes agents were accompanied by a uniformed THP trooper. When I arrived, I saw a THP SUV and a black unmarked coupe-style vehicle. Later, an unmarked silver Ford also arrived at the scene. There was a fourth plainclothes agent in the passenger seat of the silver Ford, and I believe his vest was marked HSI, but I was unable to see

the agency marks on his vest clearly. I believe there was a fifth plainclothes agent driving the silver Ford but I cannot recall for certain.

28. When I arrived, I parked four or five spaces away from the THP vehicle. Although I usually prefer to park further away, the gas station parking lot was not large enough to park out of sight of the Task Force agents. Looking around, I saw a car that looked like it had been left behind. It appeared that the individual driving the car had already been detained in the back of the THP SUV. While I was observing, a friend of the person who had been detained arrived to pick up the abandoned car.

29. I got out of my car and began photographing the agents. I was standing in front of the THP SUV, and I could tell that my telephoto lens was making the trooper uncomfortable because he kept looking up at me and my camera and then back down. The trooper then got out of his vehicle and said something like he was "concerned for my safety." This statement felt odd because the parking lot around us was empty and there did not seem to be any risk from cars pulling into the parking lot.

30. The trooper then invoked the Halo Law and I responded that I was 25 feet away and just taking pictures. The THP trooper asked, "Do you really want to play that way?" I backed up a little bit, maybe five feet, in response but I mostly moved to the side, so I no longer had a direct vantage point to the trooper's face.

31. While this exchange with the THP trooper was happening, or slightly after, I also had a heated verbal exchange with the HSI agent in the balaclava and sunglasses, who began

10

puffing up his chest and walking closer to me in response. I interpreted this as an attempt at physical intimidation. The HSI agent is pictured below.



32.     As the Task Force agents began to disperse, the unmarked silver Ford with the ATF agents and at least one other plainclothes agent drove past me and slowed down as they pulled up beside me. I saw the agent, who I believe to be an HSI agent, in the passenger seat lift their phone to take a photo as they drove past.

33.     After this interaction, I felt both scared and bewildered. The tone of the trooper's comments felt like an attempt to intimidate me, rather than express any genuine concern for my safety. Combined with the HSI agent's attempt at physical intimidation and the ATF agent photographing me, I felt like they were threatening me with the risk of future, more forceful, retaliation. It was also very difficult for me emotionally to witness the immediate aftermath of the immigration detention.

11

**December 19, 2025**

34.      On December 19, 2025, at about 4pm, I was driving around my neighborhood with my friend, when we saw a Task Force traffic stop occurring near the intersection of Winchester Road and Clarke Road. I saw a THP SUV and an unmarked black GMC SUV with flashing lights in the front grill and at the inside top of the windshield. I saw one uniformed THP trooper and two plainclothes federal agents. One agent remained standing next to the rear driver's side of the THP vehicle for the entire time I was observing; he was wearing jeans, a dark gray long sleeve shirt, a black and gray baseball cap, and a vest marked "Police." The other plainclothes agent was wearing jeans, a black baseball cap, and a tan and black jacket with a vest marked "Police HSI" over the top. We had already seen these same officers engage in what looked like the very tail end of another traffic stop earlier in the afternoon.

35.      When we spotted the Task Force agents beginning another stop, my friend parked a block away and around the corner, out of sight of the THP and unmarked vehicles. I had told my friend about being followed by the HSI agent on October 16, 2025, so after that incident, we both tried to park where Task Force agents could not see us when we stopped to observe their activity. I got out of the car first, while my friend finished parking and then observed from farther away. I began recording on my phone while walking towards the scene. When I began recording on my phone, the THP trooper was at the driver's window of a dark gray Chevy sedan, while the HSI agent was on the passenger side. As I walked towards the front of the Chevy sedan from where I had parked, the HSI agent turned to me and invoked the Halo Law by saying, "Hey man, remember the 25 feet," and gestured for me to step back. The HSI agent and the trooper then both returned to the THP vehicle and got in and closed the doors, although they appeared to have their windows at least partially rolled down. I acknowledged the request and walked farther back until I was level

with the THP vehicle, and then back to be level with the front passenger side window of the Chevy sedan.

36.    Once I was level with the passenger's side of the Chevy, I asked the three occupants of the vehicle, "What they pull y'all over for?" They could not hear me, so I repeated my question. The THP trooper and HSI agent then immediately opened the doors of the THP vehicle, got partially out of their respective sides, and the trooper yelled, "You don't want to get locked up, don't interfere!" I responded, "I'm not interfering." The trooper told me to get back 25 feet; I told the officer I was complying, and we had a short exchange while I backed up. The trooper and HSI agent got back into the vehicle and shut their doors again.

37.    I continued to back up, past where the THP and unmarked vehicles were parked, and eventually crossed the street to get more distance from the scene and to get a different angle to observe the Task Force activity. As the Task Force was dispersing, I had another brief exchange with the THP trooper who responded with something like "Keep talking and you're going to end up in jail." The Task Force left without detaining anyone.

38.    Immediately after this interaction, my primary emotion was exhaustion, I just wanted the interaction to end so that my friend and I could get home safe. This was one of the last times I recorded Task Force activity before I started my college classes. Being threatened with arrest simply for documenting Task Force activities really frightened me.

**The Impact of the Government's Retaliation against Me**

39.    I feel a duty to document and observe the Task Force in order to help my community. Especially seeing the way Task Force agents would change their behavior when they saw an observer taking photos or recording them, it felt like an important way to make sure the Task Force was accountable and help keep me and my neighbors safe. But I paused observing, gathering information about, photographing, and filming Task Force agents at the start of this year

13

because I became too afraid as a result of the incidents described above. These incidents made me feel like I could be a target just for trying to exercise my rights and help my community. My experiences affected my friends who observe and document Task Force activity as well; my friend and girlfriend both altered their behavior after I was followed on October 16, 2025. After October 16, I was scared I would be retaliated against at my home, and we all tried to observe Task Force activity with another person whenever possible. After the killings in Minneapolis, I felt like the intimidation and retaliation against observers in Memphis could escalate to physical harm or violence at any time. I feel that the only reason I did not experience more severe retaliatory incidents was because I was lucky. I could not balance my fear with my schoolwork.

40.     I feel guilty that I am now too scared and too busy to observe. I plan to resume observing, gathering information about, and recording the Task Force regularly again when my semester ends in May 2026. But I worry about experiencing further retaliation. In the middle of February 2026, my girlfriend mentioned the possibility of observing the Task Force and the primary emotion I felt was fear. Being followed by the HSI agent was overwhelming, and I am scared that the retaliation I have already experienced will escalate into physical violence or arrest and detention.

Executed this **25th** day of May 2026.

Christopher Kersey

14