**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

|  |  |
|---|---|
| HUNTER DEMSTER *et al.*,<br><br>      *Plaintiffs*,<br><br>v.<br><br>TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States*, *et al.*,<br><br>      *Defendants*. | Case No. 26–cv–02546 |

**DECLARATION OF JORDYN GUALDANI**

I, Jordyn Gualdani, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I am over the age of 18, am competent to give this declaration, and testify from my own personal knowledge regarding the facts in this declaration.

2. I currently reside in Morrison, Tennessee, which is approximately a four-hour drive from Memphis. I live in a rural area on a property with a microfarm where I raise goats, ducks, and quails. I am a photojournalist and travel around Tennessee regularly to report. When I travel to Memphis to report, I typically stay for one to two weeks at a time.

3. I have a genetic condition similar to multiple sclerosis that causes chronic pain and usually requires me to use a wheelchair. My condition has created lesions on my brain and spine. I recently started walking again this past summer with the help of a physical therapist after finding a medication that worked.

1

### *My Journalism*

4.      I am a photojournalist by profession and am a member of the National Press Photographers Association. I also have a background as a mental health professional, with a focus on individuals who have survived trauma and situations where safety is a concern.

5.      My work has appeared or will appear in *Folhetim Carambola*, *Platform9* (which cross-publishes with *Le Monde*), *The Philadelphia Inquirer*, *SIPA USA*, *The Mighty*, *Uncomfortable Revolution*, and *[your]NEWS*.

6.      I take my work as a journalist seriously. When engaged in newsgathering, photographing, or filming of law enforcement activities, I follow standard reporting practices and strive to maintain my independence as a journalist. I always carry my press credentials, and my general practice is to have my credentials visible, my camera visible, and my press-labeled backpack on. I also keep a "Press" vest in my car. I try to maintain a safe distance from my subjects, including law enforcement officers, suspects, and vehicles. I do not physically or verbally interfere with or intervene in law enforcement action. I always follow lawful police orders.

7.      When photographing law enforcement activities, I document what is visible to me of officers engaged in their official duties. I only photograph or film activity occurring in public. I mostly do so from public streets, sidewalks, and parks.

### *Memphis Safe Task Force Activity*

8.      I have traveled to Memphis several times to report on the Memphis Safe Task Force ("Task Force"). I am still investigating Task Force activity in Memphis. Footage I recorded in Memphis will be included in a forthcoming documentary entitled *State of Fear: Inside Tennessee's War on Immigrants*.

2

9.      In gathering news about and photographing Task Force activity, I have noticed that the vast majority of that activity is dominated by traffic stops involving a caravan of Task Force vehicles, typically led by a Tennessee Highway Patrol ("THP") vehicle.

10.      In covering Task Force activity, I have seen officers, agents, and vehicles from the following agencies:

- Department of Homeland Security ("DHS"), including Homeland Security Investigations ("HSI"), Customs and Border Protection ("CBP") and Border Patrol
- Federal Bureau of Investigation ("FBI")
- Drug Enforcement Administration ("DEA")
- Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")
- Internal Revenue Service Criminal Investigation ("IRS-CI")
- U.S. Marshals Service ("USMS")
- Tennessee Highway Patrol ("THP" or "state troopers")
- Memphis Police Department ("MPD")

11.      Federal agents typically do not wear uniforms. They often wear dark clothing with body armor vests. Sometimes the vests display text indicating the law enforcement officers' agencies, but sometimes they do not. Their vests are often simply marked "Police Federal Agent," "Federal Police," or "Police" with no clearly ascertainable agency affiliation. They sometimes wear masks.

12.      THP and MPD officers typically drive THP and MPD vehicles and wear their respective uniforms.

13.      I have seen federal agents also riding in these state and local agency vehicles.

14.      Federal agents typically drive a wide variety of unmarked vehicles. I have observed Task Force members driving vehicles including trucks and sports utility vehicles ("SUVs"). The common identifying features are that these vehicles typically have out-of-state license plates, a very dark tint on the front windows, and are closely trailing the lead THP or MPD vehicle. The unmarked vehicles are often on the scene of Task Force activities. The federal agents appear to be

3

on two-week to one-month deployments and cycle out of the area regularly. I have repeatedly observed the same state agents at multiple encounters, especially state troopers.

15.     I have documented a couple of stops that I found to be groundless and disturbing. At one traffic stop, an agent went up to a vehicle's driver-side door holding a rifle on his shoulder.

**Incidents of Retaliation and/or Invocation of the Halo Law**

*Invocation of the Halo Law*

16.     I have had the Tennessee Halo Law invoked against me on multiple occasions while covering the Task Force. I often find the Halo Law to be invoked arbitrarily and confusingly, and invocations of the law are therefore difficult to follow.

17.     Generally, Task Force agents invoke the Halo Law by shouting "Halo Act" or referencing the Halo Law in another fashion. They sometimes say things to the effect of "get back" or simply "25 feet." It is not clear exactly what I have to do when they invoke the law. When the Halo Law is invoked, I attempt to comply and back up. However, in my experience, the 25-foot buffer zone is often a moving target. I have never seen an agent invoke the Halo Law and stay where they are. Instead, agents will keep citing the Halo Law as they keep advancing toward me, effectively pushing me further and further back from the scene.

18.     In the first few days of October 2025, I was driving with another photojournalist, when we saw Task Force agents gathered near their vehicles. We quickly pulled into a parking spot, got out, and started photographing the scene. When we arrived, Task Force agents had already pulled a young individual out of a car and detained him. There were at least four Task Force agents. I identified HSI and FBI agents, as well as THP troopers. I remember seeing two THP cars and an unmarked pickup truck.

19.      The agents loaded the young individual into the back of a regular pickup truck with agents sitting on either side of him, which struck me as odd because it seemed like the agents were

4

using physical proximity to physically intimidate him. It also seemed strange that the Task Force would undertake enforcement actions using vehicles without a secure rear compartment if they needed to detain someone.

20.    After I exited my vehicle, one of the federal agents invoked the Halo Law by yelling "Halo Act" and forcefully telling me to get back. I was already more than 25 feet from the actual scene where the individual had been detained by the agents, but I was approximately eight feet from the closest agents. I stated that I was press and had a First Amendment right to document the encounter. The agents kept repeating "25 feet" as they advanced toward me so as to continue pushing us back from the scene. They were effectively using the Halo Law to prevent me from having a vantage point of the scene. At this point, I was attempting to get a photograph of the detained individual's face before the agents loaded him into their vehicle, but the distance made it difficult to do so.

21.    I also heard several of the agents discussing the Halo Law with each other during this incident. A few of the agents were discussing their understanding that Tennessee has something called the Halo Law. I recall one agent saying something to the effect of, "When we say 'Halo Law,' they have to get back," and that the person agents direct that statement toward cannot advance.

***Gas Station Incident***

22.    On the night of October 4, 2025, I was traveling around Memphis to gather news and take photographs with a group of three other photojournalists. We were traveling in two cars, two journalists per car. At approximately 10 p.m., we saw a swarm of Task Force agents and vehicles surrounding a vehicle in the parking lot of the Marathon gas station at the intersection of

Knight Arnold Road and South Perkins Road. We parked our cars and walked towards the gas station.

23. When I arrived at the gas station, there were two young Latino men on the scene interacting with the agents. One of the men, who seemed to be the driver, was already out of the car and had handed his ID to the agents while the other man was still in the vehicle. I saw agents from HSI, the U.S. Marshals Service, FBI, and DEA; THP troopers; and agents wearing vests that just said "Police" at the scene.

24. On the scene, I also saw two agents who later menaced me on the road by bumper rushing my vehicle while they drove a dark silver Ford F-150. One agent wore a green FBI vest and glasses. He had a tribal-style tattoo on his arm. The other agent had a dark beard and wore a backwards cap. I took a photograph of the agents.



25. All four of us walked up toward the vehicle surrounded by Task Force agents with our cameras and arrived right as an agent was about to break the vehicle's window. One of the

6

agents, who appeared to be some kind of supervisor, put his arm out to the agent trying to break the window, said "leave it," looked at us, and then walked away. At that point, the agents departed.

26.     One of my colleagues and I spoke to the driver, who informed me that the stop was an ID check. The driver's cousin had refused to speak with the law enforcement officers on the scene and locked himself in the vehicle. The agents had threatened to break the window, but as we witnessed, they departed without doing so. After we spoke to the driver, the driver and his cousin were ultimately able to drive away safely.

27.     After these events, my colleagues and I went back to our vehicles. I was planning to return home, so the colleague who was riding with me grabbed her belongings from my car and joined the two other colleagues in their car.

28.     Once I got into my car, I attempted to upload the photos that I had just taken on my camera to my iPhone. Typically, my camera will connect to my iPhone on either Bluetooth or Wi-Fi, whichever is the faster connection. My camera attempted to connect with my iPhone but then kept cancelling out.

29.     Separately, I recall that my iPhone was also having trouble connecting to my car. I regularly transfer photos from my camera to my iPhone while in my car, and the photo transfer does not typically impact my iPhone's connection to the car. I also rarely ever have difficulty connecting my iPhone to my car.

30.     I started looking through my iPhone settings, when I noticed that my iPhone was connected to a network that I did not recognize. When I tried to disconnect from that network, my phone would reestablish the connection with that unrecognized network. This happened multiple times over the next several minutes.

7

31.    I decided to head home and deal with these issues later. As I was driving, the photojournalists who had been at the gas station with me called me from their car. They were on speaker and I could hear all three of them. They said that while they were sitting in their car, two unmarked vehicles containing Task Force agents boxed them in—one pulled up to the driver's side door and one pulled up to the passenger's side door—and started taking photographs of everyone in the car. One of the photojournalists had his laptop out and was trying to upload his photographs and the agents also tried to photograph his laptop screen. One of my colleagues in the other car informed me that he was also experiencing difficulties with his cell phone's connectivity.

32.    I believe our devices may have been targeted by a cell-site simulator or some other similar technology.

**Bumper Rushing**

33.    Over the next few days, I was the target of several incidents of bumper rushing by a silver Ford F-150 pickup truck containing Task Force agents who I first saw at the Marathon gas station on October 4, 2025. I saw what seemed to be the same truck on numerous occasions while reporting on Task Force activities in Memphis during this period.

34.    When I say the agents bumper rushed me, I mean that the agents positioned their truck behind my vehicle on the road and accelerated to get so close to the back of my car that I thought the truck was going to hit my bumper before backing off. This caused me to fear that the agents were going to crash into my car. Sometimes the truck would repeat this multiple times in a row.

35.    I found it odd that I encountered the same F-150 so many times during my time reporting in Memphis. Other journalists have told me that they encountered the same truck while

8

reporting in Memphis and said that it engaged in the same sort of aggressive tactics with them as well.

36.    On one occasion, around dusk, I was driving my car in the right-hand lane of the highway, going the speed limit, when I noticed the F-150 come barreling towards me very fast. I had spent the day reporting on the Task Force activity at multiple scenes. I had just left a scene where I was reporting on Task Force activity and was not paying attention to whether I was being followed as I left.

37.    As the F-150 sped up towards my car, it bumper rushed my car several times and got so close that at one point, I couldn't even see its headlights. It then swerved out into the left lane so it was driving next to my car. I could see that there were three or four agents in the car, at least one of whom was masked. I recall that one of the agents was wearing an HSI vest and another was wearing an FBI vest. I recognized two of the agents from the gas station traffic stop. One of the two had some kind of tribal tattoo on his arm. As the agents drove past my car, the agents rolled down their windows and glared at me. They then zoomed off ahead of me.

38.    During this incident, I started to panic and called one of my photojournalist colleagues because I was shocked by the agents' reckless conduct and wanted someone to know where I was if something bad happened to me. I was worried that they were going to hit my car and drag me out of the vehicle—something I had recently seen happen to a journalist while reporting in Portland. My phone was on a hands-free dashboard mount when I made the call. My colleague told me to try and film the incident, but I told her that I feared being pulled over for having my phone in my hand while driving.

9

39. On another occasion, several days later, I was driving on the same expressway in Memphis when I encountered the same silver F-150 pickup truck. It was nighttime. I had again spent the day reporting on Task Force activity at multiple scenes and had just left one such scene.

40. The F-150 again came barreling up behind me. As the truck approached my vehicle, I dropped my speed in an effort to defuse the situation. The pickup truck came closer and started to bumper rush me. I then decided to speed up, and the F-150 sped up too. It then again swerved into the lane next to me and then veered toward my lane, so close that I thought it was going to sideswipe me or run me off the road. I laid on the horn of my car. I slammed the brakes, and they slowed down with me. I then drove off to the side of the road to avoid a collision, and the truck sped off.

41. I was terrified. I was also concerned that the agents had damaged my car by pushing me off the road. After calming down, I drove back onto the road and continued on my way.

42. These bumper rushing incidents put my safety at risk. I understood the Task Force's use of cowboy tactics like bumper rushing against journalists as an attempt to intimidate us into stopping our coverage of their operations.

***The Impact of the Government's Retaliation Against Me***

43. The retaliation I have experienced has had a profound impact on my ability to do my work and my sense of safety. My biggest concern is my ability to continue reporting, including taking photographs and speaking with sources in Memphis.

44. I use a single phone and laptop for everything—personal and work-related. As a result of the surveillance I believe I may have experienced, including the use of the cell site simulator on my devices, I have serious concerns about the safety and privacy of my data. I have two teen daughters, and I worry about the security of their information as well.

10

45.    I worry that future retaliation could affect my health. Given my disability, which causes chronic pain, I am especially concerned about being arrested or detained while reporting. I have a pacemaker and another medical implant called an InterStim, both of which I fear could be damaged or malfunction if I am tackled, thrown to the ground, tased, shot, or otherwise treated roughly by law enforcement. These things heighten my concern that officers might seriously injure me or harm my health if they use force against me or arrest me in retaliation for my reporting.

46.    As a journalist, these experiences have forced me to consider whether it is wise to continue to do my job by reporting on the Memphis Safe Task Force. Some of my colleagues believe that participating in litigation like this puts journalists at risk in terms of access and reporting. Despite that, I believe this case is important because the retaliation I have experienced is designed to deter me and other journalists from gathering that information. I believe it is important for the public to have accurate and timely information about what the Task Force is doing, and I want to make sure the public receives the information it needs to make informed decisions about our government's conduct.

Executed this 20th day of May, 2026.

_____
Jordyn Gualdani

12