**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

| | |
|---|---|
| HUNTER DEMSTER *et al.*, <br><br>   *Plaintiffs*, <br> v. <br><br>TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States, et al.*, <br><br>   *Defendants*. | Civil Action No. 26–cv–02546 |

**DECLARATION OF BENJAMIN REESE**

I, Benjamin Reese, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I am over the age of 18, am competent to give this declaration, and testify from my own personal knowledge regarding the facts in this declaration.

2. I have lived in Memphis since August 2022. I am self-employed and own a music venue in downtown Memphis. I also recently completed a nine-month computer coding "boot-camp," where I studied programming fundamentals such as HTML, as well as more advanced topics like machine learning.

3. I served in the United States Navy for nine years (July 2015–April 2024) as a Hospital Corpsman, working as a medical technician and administrator. My duty stations included Walter Reed National Military Medical Center (January 2016–January 2018), Camp Lejeune, North Carolina (March 2018–April 2021), Pittsburgh, Pennsylvania (May 2021–August 2022), and Millington, Tennessee (August 2022–April 2024). During my service, I worked alongside

combat engineers and infantry marines, providing medical care to wounded service members, and later transitioned to medical administrative roles.

4. Just as a desire to be of public service led me to serve in the U.S. Navy, I have similarly felt a sense of duty to bear witness to law enforcement abuses of my neighbors, despite the risks of doing so. Having taken an oath to defend the U.S. Constitution when I joined the Navy, I have reflected deeply on that commitment and feel a continuing duty to uphold it.

5. Additionally, as a Jewish person, when I observe the types of racialized abuses being perpetrated by the Memphis Safe Task Force ("Task Force") against my fellow Memphians, I see echoes of the persecution my ancestors suffered before coming to the United States. Their sacrifice and the lengths they went to in coming to this country so that their descendants, including myself, would be safe, instill in me a firm sense of obligation to stand in solidarity with those currently experiencing the types of racialized persecution my ancestors fled. I feel I owe it to them to try to do something.

6. My primary goal in observing the Task Force's activity is to do what I can to keep my fellow Memphians safe and to ensure that their rights are protected.

**Observing, Gathering Information About, and Recording Memphis Safe Task Force Activity**

7. I used to go out to observe, gather information about, and record Task Force activity roughly twice a week. I generally did this with Kenneth Halt ("Kenny"), my housemate.

8. When Kenny and I arrived at a scene of Task Force activity, we would park his truck at a safe distance and use dashcams on the front and rear to record. I also used my phone from a safe distance—typically at least a street length away. I did not physically interfere with, impede, or intervene in any immigration or law enforcement action, and I always complied with orders from Task Force officers or agents, including requests to step back. When I saw someone

2

being detained, my primary goal was always to bear witness to the detention, including any potential abuses or procedural violations. If possible, I would try to speak to the detained individual—while maintaining a safe distance—to remind them of their rights and obtain personal information so I could alert their family of their whereabouts.

9.     I only filmed activity occurring in public, documenting what was visible to me of officers or agents engaged in their official duties. I typically did so from within or just outside Kenny's parked truck, on public streets, and in parking lots. I sometimes narrated what I observed and occasionally spoke to the agents.

10.     Through my recording, I sought to bear witness to Task Force activity and to identify the agencies with which Task Force members were affiliated. I have witnessed many disturbing scenes involving abuse by Task Force agents. However, I have never threatened them or physically interfered with their activities.

11.     I have observed that the vast majority of Task Force activity consists of traffic stops. These usually involve a caravan of Task Force vehicles led by a Tennessee Highway Patrol ("THP") vehicle, followed by multiple vehicles containing federal agents from various agencies. The Memphis Police Department ("MPD") is also sometimes involved, and their vehicles are usually identifiable. The THP troopers and MPD officers are also usually in uniform. I have observed that THP troopers typically initiate the traffic stop and are then joined by federal agents from the caravan.

12.     Federal agents typically drive unmarked vehicles—often black SUVs with tinted windows and out-of-state license plates—but sometimes ride along in THP or MPD vehicles. The federal agents generally do not wear uniforms. Instead, they tend to wear dark clothing or fatigues with tactical vests and gear, and sometimes they wear masks. Their vests may display an agency

3

affiliation. I have observed agents from the following federal agencies: Department of Homeland Security ("DHS"); Immigration and Customs Enforcement ("ICE"); Enforcement and Removal Operations ("ERO"); Homeland Security Investigations ("HSI"); United States Marshals Service ("U.S. Marshals"); Federal Bureau of Investigation ("FBI"); Drug Enforcement Administration ("DEA"); Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"); Internal Revenue Service Criminal Investigation ("IRS-CI"); and Diplomatic Security Service ("DSS").

**Specific Incidents with Memphis Safe Task Force Agents**

*December 30, 2025*

13.     On December 30, 2025, just before 9 pm, Kenny and I were driving down Lamphier Avenue, a residential street, when we saw flashing blue lights up ahead. As we got closer, we noticed a dark, unmarked car on the side of the road with a THP car behind it and an MPD cruiser in front. Both the THP and MPD vehicles had their police lights flashing. There were roughly eight Task Force agents at the scene. Some wore MPD and THP uniforms; the rest wore mostly dark clothes and protective vests. I believe some were HSI and DEA agents.

14.     We drove past the scene, stopped at the corner of Lamphier Avenue and National Street, turned right, and pulled over. Thinking the agents might be preparing to engage in some sort of enforcement activity, we prepared to record. At that point, we were over 75 feet away from the agents. The only time we came within 25 feet of them was as we were driving by in Kenny's truck, before we realized that there might be some Task Force activity underway.

15.     By the time we were ready to record, the Task Force agents were leaving the scene. We decided to leave, too. We had not interacted with any of the agents. We got back into Kenny's truck and continued driving.

16.     Shortly after we resumed driving, we noticed an MPD vehicle behind us. The rest of the cars from the scene had gone north on Lamphier, but we had gone south. The MPD cruiser

4

continued to follow us but did not put its overhead police lights on. We stopped at the next intersection and took a right. The cruiser did the same. We kept driving and turned down another side street. This was a residential neighborhood, and it was pretty dark and quiet at night. The cruiser continued to follow us, and we became increasingly nervous. This continued for approximately five minutes. Kenny told me to document what was happening on Facebook Live, and I did. Included as Exhibit A is the Facebook Live footage of the cruiser following us and our subsequent interaction with Task Force agents after they boxed us in.[1]

17.    We decided to find a well-populated place to pull over so that we would have witnesses to whatever happened next. Kenny pulled into the Valero gas station at 3541 Jackson Avenue. It was well lit. The cruiser followed us into the gas station.

18.    We pulled headfirst into a parking spot facing the façade of the Wava convenience store at the gas station. The cruiser stopped behind us and blocked us in. Then the cruiser's police lights turned on. I knew we had not done anything illegal, but I thought we were going to get arrested. I felt that we were getting pulled over because we had been trying to document their activity occurring in a public place. I felt like I was at their mercy.

19.    One MPD officer got out of the cruiser and walked up to Kenny's window. A second law enforcement officer, who had been in the passenger seat of the MPD vehicle, also got out and came around to my side. He motioned for me to roll down my window. This second law enforcement officer wore a vest marked "SPECIAL AGENT" or "POLICE," and was wearing the green fatigues and pseudo-tactical gear that I have seen many federal agents wear. I believe he was a federal agent. I cracked my window a little. Kenny did the same. The federal agent stood about a foot away from my window. He was armed.

---

[1] All video exhibits are available on the USB drive provided to the Court.

20.     The officer at Kenny's window asked how we were doing. Kenny said fine and asked why he had been following us. The officer responded by asking what we were doing "at his scene." Kenny said we had just driven by it. The officer kept pressing, wanting to know why we had stopped and why we had gotten out of the truck. Kenny tried to explain that we were not interfering with any law enforcement activity, but the officer kept talking over him. Kenny then asked if there was anything illegal about what we were doing. The officer said no, but that it could be illegal if we were "haltering" what law enforcement officers were doing, although he also clarified that we had not, in fact, been "haltering" or impeding anything that evening. Kenny and I later discussed this, and suspected that the officer may have been trying to communicate to Kenny that they knew his name, as his last name is Halt.

21.     Kenny told the officer that if we were not impeding his investigation, then we did not have anything more to say to him. The officer continued to ask why we had pulled up. Kenny asked if we were legally obligated to tell him. The officer said no, so Kenny said, "Okay, then I think we're done."

22.     The officer then said we had to stay 25 feet away from them. Kenny said we had been 25 feet away. The officer spoke over him, repeating the 25-feet-away requirement. Kenny said he understood. Both officers went back to the MPD cruiser and drove off. I understood the officer's repeated reference to "25 feet" to be a reference to the Halo Law.

23.     After they left, I texted my girlfriend and my parents to let them know what had happened. I also shared my location with a friend so that if something happened to me or if I got arrested, someone would become aware as quickly as possible.

24.     Although I had been afraid before while observing Task Force activity, this incident was the first time things felt out of my control. I felt that we were completely in the hands of

6

these two men, and that they were trying to scare or hurt us solely because we had been trying to document public law enforcement activity.

***January 3, 2026***

25.    On January 3, 2026, at approximately 3:20 pm, Kenny, a law student observer who wanted to accompany us, and I were driving towards Jackson Avenue when we saw a THP vehicle and an unmarked car conducting a traffic stop. We parked across the street and filmed from there. After the stop ended, the THP and unmarked vehicles drove west on Jackson Avenue. We followed, staying approximately 100 feet behind them as we did so. At one point, we could no longer see either of the vehicles.

26.    Soon after we lost sight of the THP vehicle and unmarked car, we saw the THP vehicle coming back the other way, now driving east on Jackson. The THP vehicle went past us, and then it made a U-turn, positioning itself right behind Kenny's truck. It then began to follow us. We could see one state trooper and one IRS agent in the cruiser. Soon after that, we realized that the unmarked vehicle had also doubled back, and that it was following us as well.

27.    Both the THP and unmarked vehicles followed us for five to ten minutes and then followed us into the parking lot of a strip mall. We got out of Kenny's truck and went into a McDonald's. We wanted to stop the truck and get out before they had a chance to pull us over. By the time we came out of McDonald's, the vehicles were gone.

***January 5, 2026***

28.    On January 5, 2026, at around 10 pm, Kenny and I were in his truck heading toward our house in South Memphis. As we approached our house, we saw a vehicle with what appeared to be Colorado license plates parked at the curb directly in front of our house. We were approximately 50 to 100 feet away from our house when we saw this vehicle. It was a silver SUV

7

with tinted windows. The vehicle sped off as soon as its occupants saw us coming down the street in Kenny's truck.

29. Prior to this incident, I had noticed unmarked vehicles around our house more than once. Neighbors had also told us that they had seen federal agents "casing" the house when Kenny and I were out.

30. This incident affirmed my suspicion that we were being watched. We had installed a security camera, which Kenny checked regularly.

31. The behavior of these unmarked vehicles differed from the behavior of the other law enforcement vehicles that we would periodically see in the neighborhood. These unmarked vehicles have typically parked either directly outside or across the street from our house for roughly 30 minutes, and sometimes longer. I have never seen, either personally or on our front-door camera's footage, any of the agents get out of the car. I believe that they are doing this to intimidate me, Kenny, and our neighbors.

32. Our neighborhood is a predominantly Black neighborhood, with a long history of oppression and civil rights violations committed by law enforcement against the residents; Kenny and I are some of the only white residents of the neighborhood. The surveillance of our home makes me fear not only for my own safety, but also for that of our neighbors. I am afraid that the attention we have drawn from the Task Force may result in greater law enforcement scrutiny of them and that federal agents may do something to them to punish us for our Task Force observation and recording activities.

*January 19, 2026*

33.      On January 19, 2026, I went to Java Cabana, a coffee shop, with my business partner for a meeting. After our meeting, we went to a shop a few doors down from the coffee shop to get lunch. We then returned to my car.

34.      There is parallel street parking in front of Java Cabana. I had parked about twenty feet from Java Cabana, and my car had been there for about an hour and a half by the time I returned to it after lunch. When I returned to my car, I noticed a black SUV parked in front of it that had not been there before. Inside, I could see a man wearing a vest that said "HSI" and full tactical gear.

35.      I went back to Java Cabana to tell the employees that there was a federal agent parked outside. As I spoke to the person working the cash register, there was a woman a few feet away from me, on the customer side of the counter. She was wearing ordinary clothes—no uniform, vest, insignia, or utility belt with a holstered weapon.

36.      The woman then left the coffee shop and got into the SUV with the HSI agent. The SUV then pulled out of the spot where it had been parked, directly in front of my car. The HSI agent was driving. As he pulled out, he waved at me.

37.      Because federal agents have repeatedly parked outside my house and followed me and Kenny, and because these agents were parked immediately in front of my car at a coffee shop I frequent, I felt that these agents had possibly followed me there, or that they had seen my car and parked in front of it deliberately to signal to me that they knew where I was.

38.      During and after this incident, I was extremely anxious and hypervigilant. Any time I left my house or got into my car, I was afraid that I would be followed and then arrested.

9

**Impact of the Government's Retaliation Against Me**

39.     I have been thinking a lot about my heritage since the Task Force deployed to Memphis. I have been thinking about what the non-Jewish people around my relatives could or should have done to help them when Jewish people in Europe were being harassed, followed, surveilled, taken from their homes, and killed. Now that I am in a position of relative safety and privilege, I want to act in a way that honors my ancestors and show my neighbors that I will not be silent in the face of injustice.

40.     After being surveilled and intimidated by Task Force agents on multiple occasions, however, I am afraid to continue observing and recording the Task Force's activities. I am afraid that the Task Force agents will hurt me. My girlfriend is also concerned for my safety when I go out, as we have both heard stories of bystanders being injured by law enforcement. When I was going out frequently, my mother would text me every day, expressing fear for my safety.

41.     I also feel that Task Force agents have become emboldened since federal agents shot Renee Good and Alex Pretti in Minneapolis. I have considered purchasing a reflective vest or reflective tape for my phone to indicate to law enforcement, even from afar, that I am present simply to record and document.

42.     I am a camera operator. I am not a threat. I have no weapons. I am a veteran. I used to feel that all of this would keep me safe. Now, I feel as though neither my lack of a criminal record, nor the fact that I have never threatened agents or impeded their activities, nor my military service to this country, will keep me safe from the Task Force if I continue to observe and record.

43.     In significant part because of the Task Force's repeated surveillance of the house I share with Kenny, I have essentially moved out of the house and moved in with my partner. I feel I can no longer stay at my house safely and without fear. If not for the surveillance, I would still spend some of my nights in the house I share with Kenny.

10

44.     If not for the pattern of law enforcement following and harming people who observe or record Task Force activity, I would continue to go out to observe and record Task Force activity. I want to serve as a witness and, through my recording, alert people both in Memphis and beyond about Task Force activity, which I feel is largely ignored in national media. As things stand, however, I feel that I cannot go out to observe and risk the safety of myself and so many others. I am willing to sacrifice a lot personally, but I have employees who depend upon me to be there to provide them employment and pay their salaries; I have immigrants in my life who I fear the Task Force might target as retribution for my work; I have a family that worries about me and fears for my life because of the Task Force's surveillance of my home. The risks not only to myself, but also to those around me, weigh heavily on me.

Executed this 25th day of May 2026.

Benjamin Reese

11

# EXHIBIT A

*Video exhibit submitted to the Court on USB drive*