**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

|  |  |
|---|---|
| HUNTER DEMSTER *et al.*,<br><br>           *Plaintiffs*,<br>v.<br><br>TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States, et al.*,<br><br>           *Defendants*. | Case No. 26–cv–02546 |

**EXPERT DECLARATION OF JIM PUGEL**

I, Jim Pugel, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge:

**I.      Summary of Opinions**

1.      I am the former Police Chief of Seattle and Chief Deputy at the King County Sheriff's Office and am an expert in police procedure. I have worked in law enforcement for 37 years.

2.      I have been asked to render an opinion about the enforcement of Section 5 of Tennessee's Protecting Everyone Against Crime and Extremism Act ("TN Halo Law") in this case. I have come to the following conclusions:

3.      The TN Halo Law is broader than necessary to protect legitimate law enforcement interests, at least as applied to Plaintiffs in this case. Only a minority of jurisdictions have laws that criminalize or otherwise prevent civilians from approaching law enforcement officers or scenes within a certain distance (hereinafter referred to as "halo laws"). During the course of my

career, I have performed and supervised thousands of traffic stops, outdoor crime scene investigations, and arrests without having any halo law in place. I have had extensive experience with volatile and rapidly evolving law enforcement situations, including protests with over 50,000 demonstrators. In most if not all of those situations, we were able to safely and effectively enforce the law without needing a 25-foot buffer.

4.      In my policing career, to the extent that a reporter, civilian, or bystander was physically obstructing or otherwise interfering with law enforcement operations, we would ask them to move to a spot where they were not in the way but would still be able to continue to observe, listen, and/or record our actions. If they refused to move to a reasonable location, and if it was safe to do so, we would again ask the individual(s) to back away to a reasonable location to allow us to complete our legitimate law enforcement function. If they again refused, we could arrest them under laws prohibiting interference with police activities that are similar to laws in effect in Tennessee.

5.      We did not need a halo law to protect our officers or the public. In the context of this case, which generally involves static arrests and traffic stops, it is particularly unnecessary to have a *per se* 25-foot buffer as applied to Plaintiffs, who have not interfered with law enforcement, and who do not intend to do so while gathering information about and recording law enforcement officers. Not enforcing the TN Halo Law as to Plaintiffs would not endanger officers or interfere with any legitimate law enforcement interests.

## II.      Qualifications

### A.      Relevant Prior Experience

6.      I started work at the Seattle Police Department as a reserve police officer in 1981. I served at all ranks including Officer, Sergeant, Commander of the Washington State Criminal Justice Training Commission, Lieutenant, Administrative Aide/Lieutenant to Chief of Police,

Precinct Ccaptain, Assistant Chief for Investigations, Assistant Chief of Police, and then Chief of Police.

7.      As Assistant Chief for Investigations, I was responsible for both civilian and sworn staff, rendering support to the investigations of auto theft, internet crimes against children, human trafficking, vice, narcotics, homicide, assault, robbery, sexual assault, domestic violence, financial crimes, fraud, and forgery, among other crimes. I was also responsible for the Seattle Police Department personnel assigned to numerous federal task forces, including task forces organized by the Federal Bureau of Investigation ("FBI"); the United States Marshals Service; the Drug Enforcement Administration; the Bureau of Alcohol, Tobacco, Firearms and Explosives; the Secret Service; and the Tom Wales Task Force (a group of prosecutors, detectives and federal agents created after Thomas Wales, an Assistant United States Attorney, was murdered at his home in Seattle, Washington on October 11, 2011).

8.      Prior to my work with the Investigation Bureau, I commanded the Operations Bureau. I was responsible for the day-to-day operations and oversight of 510 uniformed and plain clothed officers who patrol the city on a 24/7 basis. The tasks performed by these officers include routine uniformed patrol, response to emergency events, investigations at the primary level of all crimes, and the response to planned and unplanned "short-notice" events, including demonstrations and protests, as well as reviewing arrest reports generated by personnel assigned to the bureau.

9.      In 2014, the year I retired as Chief of Police, the Seattle Police Department had 1,274 sworn employees and 625 civilian employees. The budget was about $195,000,000.

10.      In 2011, I collaborated with the King County Prosecutor's Office, the Public Defender Association, the University of Washington, the ACLU of Washington, and several other

3

organizations in the creation of a pre-arrest diversion program for low-level, non-violent drug sellers, possessors, and consumers. This was a police/public partnership that implemented concepts of harm reduction into policework. This initiative was known as Law Enforcement Assisted Diversion ("LEAD").

11.    After leaving the Seattle Police Department, I consulted with non-governmental organizations regarding policing and harm reduction in the United States and in various parts of the world. I have also been invited to speak publicly about policing and harm reduction, including to United States Representatives, Senators, and their staff in Washington, D.C., in August 2013, and to the United Nations in New York City on November 5, 2013.

12.    In August of 2014, I was hired as the second-ranking person with the King County Sheriff's Office, headquartered in Seattle, Washington. As the Chief Deputy (undersheriff), I was responsible for the day-to-day operations of the department. During that time, I worked with the King County Department of Health, the King County Prosecutor's Office, and Non-Governmental Organizations to integrate the LEAD program into the Sheriff's Office.

13.    While I was the Chief Deputy at the King County Sheriff's Office, I regularly responded to scenes where deputies were investigating crimes, making arrests, and working with the community on various issues, as well as to events that included work with numerous federal police and investigative agencies.

14.    When I retired in 2018, the King County Sheriff's office had about 900 sworn and civilian employees and a budget of about $200,000,000.

15.    In July of 2015, I was invited to the White House by the Domestic Policy Council to address leaders from 30 states and cities about the design, implementation, and sustainment of

4

LEAD in Seattle and King County. During my tenure with King County, I was invited to and presented on LEAD in Malaysia, Singapore, and Qatar.

16. Between 2019 and 2021, I worked as a consultant for the Public Defender Association, focusing on harm reduction. I worked in Seattle and other government jurisdictions throughout the nation to replicate LEAD.

17. I continue to work with domestic and international law enforcement agencies to introduce harm reduction principles into daily police work, with the goal of alleviating racial disparities and achieving more sustainable public safety and public health outcomes.

18. I currently co-present a monthly, two-hour class to newly hired Seattle Police Department recruits. This presentation involves discussion of the creation of LEAD, the concept of harm reduction, and personal experiences with people experiencing substance use disorder.

19. I was a commission member for three years at the Kennedy School of Government at Harvard University, working on national reform in incarceration and post-incarceration. I have also presented and lectured at FBI Headquarters and the FBI Academy.

**B.    Education and Other Relevant Biographical Information**

20. I have a bachelor's degree in English and Political Science from the University of Washington; have attended the Daniel Evans School of Public Policy and Governance at the University of Washington; graduated from the FBI academy in Quantico, Virginia; and attended the Senior Management Institute for Police at Boston University.

21. I regularly work with and consult with lawyers and prosecutors reviewing the work of police officers.  I continue to remain as current as possible with the ever-evolving court opinions, policies, laws and best practices in the profession of constitutional policing.

### III.    Overview of Declaration

#### A.    Purpose and Scope of Work

22.    I have been asked to evaluate whether the TN Halo Law—which criminalizes or otherwise prevents civilians from approaching law enforcement officers within 25 feet after one warning, even if they are not impeding, interfering with, or obstructing officers' duties—is necessary to ensure law enforcement safety and efficacy when applied to individuals observing, gathering information about, or recording officers. I conclude it is not.

23.    My rate of compensation for the expert work provided in review and writing is (1) a $2,500 retainer, (2) $375 an hour for review, writing, and meeting, and (3) $375 an hour for deposition and in-person testimony ($1,400 minimum).

#### B.    Basis for Opinions

24.    I base this declaration on my 37 years of law enforcement experience, including my experience as Chief of Police in Seattle and as Chief Deputy with the King County Sheriff's Office.

25.    In addition to my other duties throughout my police career, I helped manage myriad large protests, both peaceful and chaotic, in Seattle. We had at least 25 protests every year when I was there. When I served as Chief of Police in Seattle, I was responsible for making sure that my officers and the public were safe. Throughout my career, I also helped formulate and execute the strategic plans for how we would manage each protest. These plans included how to treat journalists, legal observers, protesters, and other people who were trying to observe, gather information about, or record police operations.

#### C.    Materials Reviewed

26.    The materials I reviewed in connection with preparing this declaration include the Complaint; the declarations of Plaintiffs Jessica Chodor, Hunter Demster, and Melissa Peeler; and

the declarations of Jim West, David Mason, Christopher Kersey, and Jordyn Gualdani. I also reviewed the TN Halo Law-related photographs and videos linked to and attached as exhibits to those documents.

**IV.    Halo Laws**

27.    Most states do not have halo laws.

28.    In states that do have halo laws, the buffer zone is sometimes tighter than 25 feet. For example, Arizona's halo law imposed an 8-foot buffer but was struck down as unconstitutional. *See Ariz. Broads. Ass'n v. Brnovich*, 626 F. Supp. 3d 1102 (D. Ariz. 2022); Order for a Permanent Inj & Declaratory J., *Ariz. Broads. Ass'n v. Brnovich*, No. 2:22-cv-01431-JJT, ECF No. 68 (D. Ariz. July 21, 2023).

29.    Halo laws also frequently require that a person must actually obstruct or otherwise interfere with law enforcement activity in order to be found liable under the statute.

30.    I am aware that courts have struck down some states' halo laws as unconstitutional.

31.    For example, Indiana passed a halo law that was struck down by the Seventh Circuit. *See Reps. Comm. for Freedom of the Press v. Rokita*, 147 F.4th 720 (7th Cir. 2025).

*32.*    Louisiana is currently enjoined from enforcing its halo law. *See Deep S. Today v. Murrill*, 779 F.Supp.3d 782 (M.D. La. 2025), *appeal docketed*, No. 25-30128 (5th Cir. Mar. 7, 2025).

33.    Without opining on their validity, I note that other states' halo laws require a nexus to obstruction or interference with law enforcement activity—that is, civilians who do not obstruct law enforcement are not subject to liability. The halo laws in Florida and Oklahoma have intent-to-impede elements. Fla. Stat. § 843.31; Okla. Stat. tit. 21, § 540D. Indiana's revised halo law similarly requires the law enforcement officer to reasonably believe that the person against whom

the law is enforced will interfere with the officer's performance of her duties. Ind. Code § 35-44.1-2-15.

### V.    Tennessee's Halo Law

34.    As applied to the Plaintiffs in this case, the TN Halo Law is broader than necessary to protect legitimate law enforcement interests.

35.    Based on my experience, a 25-foot buffer zone is not necessary to protect the integrity of the vast majority of law enforcement operations and the safety of officers.

36.    In the course of my career, I have served at all ranks as a police officer. I have made and supervised arrests in a wide variety of situations, from static arrests and traffic stops to volatile protests. Having a statutorily mandated 25-foot buffer between police and bystanders or reporters was not necessary in any of these situations. Ordinary obstruction statutes are more than sufficient to prevent individuals from interfering with law enforcement functions, including making arrests, conducting crime scene investigations, and protecting public safety.

37.    *Traffic stops.* When making a traffic stop, it is generally not necessary to have a buffer zone unless there is a clear and specific threat to the public (armed driver/passenger in the car with shots/threat of shots fired, etc.), and in that case the size of the necessary buffer will depend on specific facts pertinent to the situation. While no traffic stop is routine and each presents the police officer with its unique set of facts, there are generally accepted norms and police practices that are observed to ensure that the interaction between the police and driver/vehicle occupants is safe and that the police officer can discharge his duties in a reasonable amount of time. The officer needs to place their car at a safe distance from the driver's vehicle to protect himself from oncoming traffic and to ensure he has sufficient reaction time should the driver/occupant of the car present a potential threat. The officer needs a reasonable amount of clearance around the vehicle to move freely. It is not uncommon for pedestrians to slow or stop

8

their movement for whatever reason to "see" what is going on. It is not uncommon for vehicles to slow when approaching a police vehicle/officer involved in a stop. As long as the police officer is unimpeded in completing his legitimate law enforcement function without a threat to her safety or the safety of the person(s) being stopped, there is no reason to prevent non-threatening community members from watching, listening, or recording the actions of their government. With traffic stops, having a standard, statutorily imposed 25-foot buffer zone between police and civilians is not necessary to protect law enforcement.

38.    *Arrests.* When making an arrest, it is not necessary to have a 25-foot buffer zone in the vast majority of incidents I have experienced. The majority of the hundreds of arrests I have made, as well as several hundred others I have observed in my career, were accomplished with verbal persuasion and *de minimis* physical force. I accomplished the vast majority of these arrests on my own or with one or two other officers present. All of these arrests were completed within a relatively small square foot area. I do not mean to imply that I, or the arresting officer, was in any way complacent—one is always alert and prepared for the worst—but one does not have to telegraph that or otherwise inflame the event with unwarranted words or behavior.

39.    Sometimes members of the public try to talk to, yell at, or heckle officers during an arrest. Properly trained officers do not respond to these provocations or let them impede their work regardless of whether the individual attempting to engage the officers is standing less than 25 feet away. If a person was truly impeding an arrest through his or her engagement with or extreme proximity to officers, we would ask them to move to a spot where they were no longer doing so but where they could still witness the arrest.

40.    If there was a pre-planned arrest of a person who was known or likely known to resist or present a threat to the officer(s), extra precautions were taken. We would bring extra

9

equipment, wear extra protection, bring extra officers, and make every effort to determine the location and time that the arrest would occur. In making these arrests, it was less likely that members of the public were present, and we tried to plan them at times to avoid public danger. But even in those situations, we managed risk through planning, training and sufficient police presence, such that having a standard, statutorily imposed 25-foot buffer zone would not have been necessary.

41.     In the material I have reviewed pertaining to this specific complaint, it appears that there was an overabundance of police officers present, and that many of the agents were equipped with far more weapons, protective gear (e.g., heavy duty body armor), and military equipment (e.g., night vision devices) than is commonly used in civilian police operations. In the videos, photos, and declarations documenting interactions I reviewed, there did not appear to be any obvious threat or resistance to the officers' actions. There appeared to be more than enough officers to address the arrest or investigation in which they were engaged, as well as plenty of other agents to respond as needed to any persons who may attempt to physically interfere with their duties. I did not observe any actual interference. Under these circumstances, a 25-foot buffer zone was not necessary to achieve any legitimate law enforcement objective.

42.     ***Protests.*** When preparing for and managing protests, it is usually not necessary to have a buffer zone of any kind unless there is a demonstrated public safety interest, such as the need to ensure the physical security of the President of the United States (or other public officials) or the need to prevent altercations between protesters and counterprotesters, and in such cases the size and location of the necessary buffer zone will depend on facts specific to the situation. Even though some of these situations are tense and even hostile, we effectively policed protests for decades in Seattle without employing any 25-foot buffer zone, even for volatile protest situations

10

or massive demonstrations involving over 50,000 people. During that time, we made arrests and managed crowds safely using standard crowd management techniques similar to those used by other police forces around the country.

43.     In the other law enforcement contexts I have dealt with, civilians can approach law enforcement activity—far closer than 25 feet—without actually interfering with such activity in any way. In times where civilians are in a location that interferes with operations, the correct procedure is to ask them to move. Even when directing people to move, absent highly unusual circumstances, it is generally possible to allow the person to remain close enough to hear and observe police operations.

44.     After reviewing Plaintiffs' allegations in the Complaint and their respective declarations, I do not believe it is necessary for law enforcement to invoke Tennessee's Halo Law against them. *See, e.g.*, Demster Decl. ¶¶36, 39, 44, 72, 82, 88, 93, 103, 119, 127–128; Chodor Decl. ¶16; Peeler Decl. ¶¶37, 61. In all applicable examples, Plaintiffs were not obstructing or interfering with law enforcement in any way, and the invocation of the Halo Law served no legitimate law enforcement purpose. While Plaintiffs sometimes criticized Task Force agents, criticism of law enforcement officers is protected by the First Amendment and does not constitute interference that would justify the application of any sort of buffer zone. Given my background and experience, I conclude that the TN Halo Law was unnecessarily—and also arbitrarily and ambiguously—applied and enforced against Plaintiffs.

45.     Washington, like virtually every other jurisdiction, has laws that prevent people from obstructing law enforcement activities. *See, e.g.*, Wash. Rev. Code Ann. § 9A.76.020 (criminalizing willful obstruction of a law enforcement officer). In my experience, proper

application of this law was sufficient to ensure that law enforcement officers could effectively conduct their duties.

46. Tennessee has similar laws against obstruction of law enforcement officers, disorderly conduct, and refusal to comply with lawful orders concerning the direction of traffic. *See* Tenn. Code Ann. § 39-16-602; *id.* § 39-17-305; *see also id.* § 55-8-104. To the extent that members of the public engage in conduct that impedes officers' duties, these statutes are sufficient to adequately protect legitimate law enforcement interests.

47. Other jurisdictions also provide affirmative protections for newsgathering—for example, certain jurisdictions have policies that exempt photojournalists from dispersal orders or statutes providing that officers must allow members of the press to go behind police lines. In all these situations, which are much more dynamic than a traffic stop or arrest, police can reposition people as necessary to prevent actual interference with police operations, and do not need a 25-foot buffer zone that applies regardless of the threatened interference with law enforcement interests or the burden on First Amendment activities.

48. Rather than serving a legitimate law enforcement purpose, halo laws (and specifically Tennessee's Halo Law) have, in practice, become a means by which law enforcement can suppress First Amendment-protected activities. Under the broad terms of TN's Halo Law, officers are permitted to impose a 25-foot buffer zone in many common law enforcement scenarios, such as at any traffic stop, even when civilians are engaged in protected expressive activities like information-gathering and recording and pose no risk to the execution of their duties or to the integrity of law enforcement operations.

49. As I have seen in the videos linked to in the Complaint and attached to the declarations I reviewed, law enforcement officers invoke the TN Halo Law while continuously

12

walking toward civilians—and away from the site of law enforcement activity—in order to expand the "buffer" zone well beyond 25 feet, thereby effectively preventing civilians from observing and recording public law enforcement activity.

50.     Particularly where the buffer zone "floats" in this manner, neither law enforcement nor civilians engaging in First Amendment-protected activity can reliably estimate the distance of 25 feet, leaving significant ambiguity in interpretation and enforcement.

51.     In short, in my experience and based on the materials I have reviewed in connection with this case, halo laws undermine transparency, erode public trust, delegitimize police officers engaged in constitutional policing, and create unnecessary conflict between law enforcement and the people they are charged with protecting and serving.

Executed this 27th day of May, 2026.

_____

Jim Pugel

14