### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

HUNTER DEMSTER, JESSICA CHODOR,
KENNETH HALT, and MELISSA PEELER

     Plaintiffs,

v.

TODD BLANCHE, in his official capacity as
Acting Attorney General of the United States;
GADYACES SERRALTA, in his official capacity
as Director of the U.S. Marshals Service and Chair
of the Memphis Safe Task Force; TYREECE L.
MILLER, in his official capacity as U.S. Marshal
for the Western District of Tennessee; CHAD
HUNT, in his official capacity as Chief Inspector
for the U.S. Marshals Service and Commander of
the Memphis Safe Task Force; MARKWAYNE
MULLIN, in his official capacity as Secretary of
the U.S. Department of Homeland Security; TODD
LYONS, in his official capacity as Senior Official
Performing the Duties of the Director of U.S.
Immigration and Customs Enforcement; JOHN
CONDON, in his official capacity as Acting
Executive Associate Director of Homeland Security
Investigations; COLIN JACKSON, in his official
capacity as Acting Special Agent in Charge for
HSI Nashville; RODNEY SCOTT, in his official
capacity as Commissioner of U.S. Customs and
Border Protection;  MICHAEL BANKS[1], in his
official capacity as Chief of the U.S. Border Patrol;
MATT PERRY, in his official capacity as head of
the Tennessee Highway Patrol; and STEPHEN
MULROY, in his official capacity as District
Attorney for Shelby County, Tennessee

     Defendants.

Case No. 2:26-cv-02546-MSN-atc

### FEDERAL DEFENDANTS'[2] RESPONSE IN OPPOSITION TO
### PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................... 1

BACKGROUND ...................................................................................................... 3

LEGAL STANDARD ............................................................................................... 5

ARGUMENT............................................................................................................ 6

CONCLUSION ....................................................................................................... 31

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court should substitute Rosario Vasquez for Michael Banks, as the defendant, in his official capacity, as the current Chief of the U.S. Border Patrol.

[2] "Federal Defendants" refers to Todd Blanche, in his official capacity as Acting Attorney General of the United States; Gadyaces Serralta, in his official capacity as Director of the U.S. Marshals Service ("USMS") and Chair of the Memphis Safe Task Force; Tyreece L. Miller, in his official capacity as U.S. Marshal for the Western District of Tennessee; Chad Hunt, in his official capacity as Chief Inspector for the U.S. Marshals Service and Commander of the Memphis Safe Task Force; Markwayne Mullin, in his official capacity as Secretary of the U.S. Department of Homeland Security ("DHS"); Todd Lyons, in his official capacity as Senior Official Performing the Duties of the Director of U.S. Immigration and Customs Enforcement ("ICE"); John Condon, in his official capacity as Acting Executive Associate Director of Homeland Security Investigations ("HSI"); Colin Jackson, in his official capacity as Acting Special Agent in Charge for HSI Nashville; Rodney Scott, in his official capacity as Commissioner of U.S. Customs and Border Protection ("CBP"); and Rosario Vasquez, who should be substituted for Michael Banks, in his official capacity as Chief of the U.S. Border Patrol ("Border Patrol").

**INTRODUCTION**

Since September 2025, the Memphis Safe Task Force ("Task Force"[3]), a multi-agency initiative composed of federal, state, and local law enforcement, has been operating in Memphis, Tennessee. Its focus has been to address the extensive and pervasive criminal activity and to reduce crime in Memphis. This has involved the arrest of violent criminals, clearing warrants, seizing firearms, and locating missing children, as well as the enforcement of traffic violations to make Memphis safe and secure again.

Plaintiffs are four individuals who allege that they frequently approach Task Force agents to "observe, gather information about, and record the Task Force to share information with their community, help detained people, and hold agents accountable for misconduct and abuse." Pls' Memo of Law, RE 16-2, PageID 206. Plaintiffs further allege that, on a handful of occasions, Task Force agents retaliated against them for exercising their First Amendment rights. *Id.* Plaintiffs urge this Court to enter a preliminary injunction that would prohibit federal agents from engaging in all manner of vague and subjectively defined conduct (such as approaching Plaintiffs in a manner they find "[v]erbally threatening" or "[p]hysically intimidating"), from conducting ordinary law-enforcement activities (such as stopping and questioning them), and even from "[s]hining lights" at them at night. Proposed Order, RE 16-1, PageID 196-97.

Plaintiffs' motion for such extraordinary relief should be denied. As an initial matter, Plaintiffs lack standing to pursue injunctive relief. Alleged past harms from purportedly unlawful encounters with law enforcement do not give the Plaintiffs standing to obtain an injunction prohibiting speculative future instances of such conduct. To have standing for such prospective

---

[3] Various officers and agents within law enforcement participate in the Task Force, but for consistency will all be referred to generally as "agents."

1

relief, a plaintiff must show an immediate threat that he or she will be wronged again in the future. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). "'[T]hreatened injury must be *certainly impending* to constitute injury in fact,' and … '[a]llegations of *possible* future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Even if Plaintiffs' claims based on past incidents had merit (and they do not), it is entirely speculative that Plaintiffs will experience similar incidents in the future. Furthermore, they have not shown that the Federal Defendants have a policy, pattern, or practice of retaliation. In fact, the factually distinct nature of the alleged encounters between Plaintiffs and Task Force agents shows that there is no pattern or practice of retaliation, because agents responded differently to different conduct by Plaintiffs.

In addition, Plaintiffs are unlikely to prevail on their First Amendment claims. Plaintiffs claim that from late September 2025 to March 2026, and only five times in April and May 2026, the Task Force agents' conduct violated Plaintiffs' First Amendment rights because their conduct was in retaliation for Plaintiffs' actions in gathering information about and recording the activities of Task Force agents. *See* Compl., RE 1, PageID 19, ¶ 59; *see also generally*, Demster Decl., RE 16-49; Chodor Decl., RE 16-50; Halt Decl., RE 16-51; Peeler Decl., RE 16-52. They are wrong. Plaintiffs' own declarations evidence that their so-called "observations" frequently involve efforts to interfere with and impede law-enforcement operations, including repeatedly disregarding orders, refusing multiple orders to step back from established perimeters, stalking law enforcement agents in their vehicles, and one Plaintiff even resisting arrest while calling for bystander interference with her arrest. *See* Peeler Decl., ¶ 51; Halt Decl., ¶¶ 23, 26; Demster Decl., ¶¶ 50-51, 59; Chodor Decl., ¶¶ 19, 29-33.

Impeding, interfering with, or obstructing law enforcement operations is not protected

2

speech. Furthermore, the Task Force agents' conduct was not such that would chill a person of ordinary firmness from continuing to engage in the protected activity. Finally, to prevail, Plaintiffs "must plead facts that, if true, . . . rule out 'obvious alternative explanation[s]' for the defendant's conduct." *Hikma Pharmaceuticals USA Inc. v. Amarin Pharma, Inc.*, 608 U.S. ----, 146 S. Ct. 1391, 1399 (2026) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 567 (2007)). Plaintiffs fail to carry that burden because the "obvious alternative explanation[s]" for federal agents' conduct was to respond to obstructive conduct and perform their law-enforcement duties, not to retaliate against Plaintiffs for any First Amendment expressive conduct. And even if agents misjudged Plaintiffs' conduct as presenting such interference, their mistaken determination would not evidence improper subjective retaliatory animus.

Finally, Plaintiffs' requested injunction is substantially unworkable and overbroad. The injunction terms are hopelessly vague, impose follow-the-law edicts, prohibit a host of lawful law enforcement conduct, and thereby violate the separation of powers. In addition, the injunction terms are overbroad because they restrict Task Force agents from engaging in conduct that is not tied to the alleged First Amendment injuries.

Therefore, this Court should deny Plaintiffs' Motion for Preliminary Injunction.

## BACKGROUND

### The Memphis Safe Task Force

On September 15, 2025, the President established the Memphis Safe Task Force, a multi-agency effort to combat the "tremendous levels of violent crime" in Memphis, Tennessee. Presidential Memoranda, Donald J. Trump, "Restoring Law and Order in Memphis," § 1 (Sept. 15, 2025) (RE 16-13, PageID 302-305). The Task Force's objective is "to end street and violent crime in Memphis to the greatest possible extent through the promotion and facilitation of hypervigilant policing, aggressive prosecution, complex investigations, financial enforcement, and

3

large-scale saturation of besieged neighborhoods with law enforcement personnel…." *Id.* The Task Force coordinates and ensures "effective integrated action by Federal, State, and local law enforcement authorities to address extensive and pervasive criminal activity and reduce crime in Memphis [and] enforce Federal immigration law[.]" *Id.* at § 2(d).

As of June 24, 2026, Task Force agents have made "10,441 arrests, including 97 for homicide, 1,162 for controlled substances, 1,004 for firearms violations, and 105 for sex offenses."[4] 304 of those arrested were juveniles, and 1,122 were known gang members. *Id.* The Task Force has also seized 1,784 illegal firearms. *Id.* "These enforcement actions reflect a sustained commitment to reducing violent crime and removing dangerous weapons from Memphis neighborhoods." *Id.*

The Presidential Memorandum directed the U.S. Attorney General to appoint a chair who has the responsibility of directing all Task Force functions and who is to coordinate with the Assistant to the President and Homeland Security Advisor. "Restoring Law and Order in Memphis," § 2. Director Gadyaces S. Serralta of the USMS was selected to chair the Task Force. Declaration of Daryl Diamond (Diamond Decl.), ¶ 3 (attached hereto as Exhibit A). As a result, USMS has taken the lead in coordinating the Task Force efforts, to include assigning personnel to various enforcement and support groups. *Id.*

Federal agencies provide investigative and intelligence support to the Task Force. *Id.* at ¶ 8. Among those federal agencies is the Department of Homeland Security (DHS), which includes ICE and CBP, and those personnel assist in intelligence analysis, immigration enforcement

---

[4] U.S. Marshals Service, Press Release, 37 MSTF Arrests Tuesday Include Juvenile Wanted on 2nd Degree Murder Charge, Man for Child Sex Assault, (June 24, 2026), https://www.usmarshals.gov/news/press-release/37-mstf-arrests-tuesday-include-juvenile-wanted-2nd-degree-murder-charge-man

4

operations, and investigations. *Id.* In addition, all federal personnel taking part in the Task Force provide visible presence for crime suppression. *Id.*

In addition to federal agencies, several state and local agencies participate in and/or provide support to the Task Force. *Id.* at ¶ 9. Among these are the Memphis Police Department (MPD), Shelby County Sheriff's Office (SCSO), the Tennessee Bureau of Investigation (TBI), Tennessee Department of Safety and Homeland Security (TDSHS), the Tennessee Highway Patrol (THP), the Tennessee National Guard (T-NG), and the Shelby County District Attorney's Office (SCDA). *Id.* Participants are assigned to assist in narcotic-related offenses, fugitive investigations, crime suppression, traffic enforcement, and general investigations. *Id.* at ¶ 11. As the primary enforcement agencies, MPD and SCSO also respond to calls for service and may request the assistance of the Task Force. *Id.*

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, a plaintiff must demonstrate: (1) the moving party's likelihood of success on the merits; (2) the irreparable harm to the moving party without an injunction; (3) that the balance of equities tips in the moving party's favor; and (4) whether an injunction would serve the public's interest. *Id.* at 20. Here, because the government is a party, the final two factors for a preliminary injunction (harm to the opposing party and the public interest) merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

If a plaintiff has no likelihood of success on the merits, courts should deny a preliminary injunction. *S. Glazer's Distrib. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017). "[I]n order to obtain preliminary injunctive relief, [Plaintiffs] must have a viable claim." *Martin v. Calhoun Cnty. Sheriff*, No. 1:15-CV-210, 2016 WL 922790, at *1 (W.D. Mich.

5

Mar. 11, 2016). At this stage of the case, Plaintiffs "must 'state a claim to relief that is plausible on its face,'" which requires "more than a sheer possibility that a defendant has acted unlawfully." *Hikma*, 608 U.S. ----, 146 S. Ct. at 1399 (first quoting *Twombly*, 550 U.S. at 567; and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plaintiffs "must plead facts that, if true, . . . rule out 'obvious alternative explanation[s]' for the defendant's conduct." *Id.* (quoting *Twombly*, 550 U.S. at 567). Where a plaintiff does not raise a valid claim against a defendant in their complaint, the plaintiff has no likelihood of success on the merits, and a preliminary injunction is not appropriate. *Winter*, 555 U.S. at 20, 22; *see also Trudell v. Carrington Mortgage Services, LLC*, 2016 WL 6080822, *10 (E.D. Mich. Sept. 27, 2016), *report and recommendation adopted,* No. 16-CV-10441, 2016 WL 6070124, at *1 (E.D. Mich. Oct. 17, 2016) (finding a preliminary injunction not appropriate when the plaintiff had not raised a single valid claim against the defendants, and thus had no likelihood of success on the merits); "[A] preliminary injunction issued where there is simply no likelihood of success on the merits must be reversed." *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010) (quoting *Mich. State AFL-CIO v. Miller*, 103 F3d 1240, 1249 (6th Cir. 1997).

## ARGUMENT

**I.**    **Plaintiffs are unlikely to prevail on the merits of any of their asserted claims.**

    **A.**    **Plaintiffs lack standing to seek prospective relief.**

        **1.**    **Plaintiffs cannot show a likelihood of substantial and immediate threat of future harm.**

Plaintiffs lack standing to seek prospective injunctive relief based on past allegations that certain individual Task Force agents violated their First Amendment rights. *See Lyons*, 461 U.S. at 111. Standing "does not exist merely because plaintiffs experienced past harm and fear its recurrence." *Noem v. Vasquez Perdomo*, 222 L.Ed.2d 1213 at 1215 (Kavanaugh, J., concurring in

6

grant of stay application) (citing *Lyons*, 461 U.S. 95). "An injunction is 'unavailable absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again—a likelihood of substantial and immediate irreparable injury.'" *Gas Natural, Inc. v. Osborne*, 624 Fed. Appx. 944, 949 (6th Cir. 2015) (quoting *Lyons*, 461 U.S. at 111) (internal quotations omitted). In fact, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing present adverse effects." *Lyons,* 461 U.S. 95, 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974). Thus, Plaintiffs must establish that they themselves face an immediate threat of future harm and may not rely on a "speculative chain of possibilities." *Clapper*, 568 U.S. at 410.

The Supreme Court has consistently held that individual plaintiffs lack standing to seek forward-looking and programmatic relief based on isolated incidents of alleged unlawful behavior by law enforcement. In *Lyons*, police officers stopped the plaintiff for a traffic violation, seized him, and placed him in a chokehold. 461 U.S. at 97. The Court held that the plaintiff had not shown that "he was likely to suffer future injury from the use of the chokeholds" because no "immediate threat" existed that the plaintiff would be subjected to another chokehold "without any provocation or resistance on his part," even though the police department allegedly had a policy of "routinely apply[ing] chokeholds in situations where they are not threatened by the use of deadly force." *Id.* at 105. It is to be assumed that a plaintiff "will conduct their activities within the law and so avoid … exposure to the challenged course of conduct said to be followed by petitioners." *Lyons*, 461 U.S. at 103 (citing *O'Shea*, 414 U.S. at 497. Applying *Lyons*, the Sixth Circuit has recognized that plaintiffs lack standing to seek prospective injunctive relief merely because they were subject to allegedly improper law enforcement conduct in the past. *See Sumpter v. Wayne Cnty.*, 868 F.3d

7

473, 491 (6th Cir. 2017) (finding no standing to obtain an injunction against future strip searches based on speculation and conjecture).

These precedents foreclose Plaintiffs' standing on all claims. Determining the chances of Plaintiffs' alleged injuries recurring would take the Court "into the area of speculation and conjecture," *O'Shea*, 414 U.S. at 497. The so-called retaliation at issue in this case involves the result of Plaintiffs' attempts to interpose themselves in situations where law enforcement agents are actively engaged in law enforcement operations and the responses by law enforcement to Plaintiffs' interference with active investigations.

The crux of Plaintiffs' claims is that, on prior occasions, when they have approached law enforcement agents actively engaged in law enforcement operations—for example, by approaching agents conducting traffic stops and following law enforcement vehicles—those agents have responded in a variety of ways based on the particular circumstances of the given interaction. Those responses include Plaintiffs' allegations that:

- they *suspected* agents were present in vehicles on the street where they lived (Plaintiffs Demster and Halt);

- they were confronted by agents for shouting at the agents while they were conducting traffic stops (Plaintiffs Chodor and Halt);

- they were confronted by agents after Plaintiffs followed them in vehicles and/or approached traffic stops (Plaintiffs Demster, Chodor, and Halt);

- agents called them by their name or identified the Plaintiff to other agents (Plaintiffs Demster and Peeler);

- agents took pictures of them and/or their vehicles while the Plaintiffs were filming or taking pictures (Plaintiffs Demster, Chodor, Halt, and Peeler);

- agents shined lights at them at night while they were filming the agents (Plaintiff Halt);

- agents asked them to move their vehicles (Plaintiff Chodor);

- agents gave the Plaintiffs hostile looks (Plaintiffs Demster and Chodor);

8

- agents walked close to or drove close to the Plaintiff (Plaintiff Demster);

- agents "boxed in" Plaintiffs' vehicles (Plaintiffs Halt and Peeler);

- agents requested the Plaintiff's name (Plaintiff Demster);

- agents gestured or waved at the Plaintiff (Plaintiff Halt);

- agents told Plaintiffs to move back 25 feet (Plaintiffs Demster, Chodor, Halt, and Peeler);

- agents threatened to arrest a Plaintiff for loitering (Plaintiff Peeler); and

- an agent arrested a Plaintiff while actively attempting to approach a traffic stop and ignoring orders to move back behind law enforcement vehicles away from the active scene (Plaintiff Chodor).

Thus, given these ad hoc, in the field, and proximity-dependent occurrences, the likelihood of the same Plaintiffs' alleged injuries recurring is even more tenuous than Plaintiffs making similar claims in other jurisdictions. *See Chicago Headline Club v. Noem*, No. 25-3023, Dkt. No. 28, Page 2 (7th Cir. Nov. 19, 2025) (Order, *Chicago Headline Club*) (granting stay of injunction and expressing reservations about Article III standing under *Lyons*) (attached hereto as Exhibit B). Indeed, the happenstance manner in which each of those alleged encounters occurred—Plaintiffs sought out Task Force operations, each of which involved unique facts and circumstances— underscores that it is unlikely Plaintiffs will be injured in a similar way in the future. That is especially true given that the Task Force has made over 10,000 arrests (*see supra* note 3), and countless traffic stops have occurred since September 2025, and Plaintiffs allege that they were present for and retaliated against at only a handful of those. Simply put, there is no indication that any Plaintiff will encounter law-enforcement agents again and that "the same" events would occur in any such encounter. *See Lyons*, 461 U.S. at 111; *Gas Natural Inc.*, 624 Fed.Appx. at 949.

As *Lyons* makes clear, it is not enough to show that allegedly improper conduct occurs "routinely," or that "the 'odds'" are high that plaintiffs' constitutional rights will be violated again,

9

or even that the conduct was pursuant to a government "policy." 461 U.S. at 105-06, 108. Instead, Plaintiffs must show that *they personally*—not others—face a concrete, "realistic threat" of the allegedly improper conduct occurring again. *Id.* at 106 n.7. They have failed to carry that burden.

> **2.    Plaintiffs have not shown that the Federal Defendants have a policy, pattern, or practice of retaliation.**

Plaintiffs' claims arise from a series of discrete incidents where Plaintiffs have interfered with or impeded Task Force law enforcement operations. Plaintiffs have failed to show that the Federal Defendants have a policy, pattern, or practice of First Amendment retaliation. In fact, depending on the conduct of the particular Plaintiff, the record reveals that the Task Force agents' reactions have differed–further proving that there is no pattern or practice of retaliation. For example, Plaintiffs Demster and Peeler alleged that *they were both filming* the same Task Force activity on February 16, 2026; however, Plaintiff Demster alleges that he was talking to people in handcuffs on the curb and was told to back up 25 feet, whereas Plaintiff Peeler on the opposite side of the street was never approached by the Task Force agents. Compl., RE 1, PageID 27. Further, on October 28, 2025, Plaintiff Chodor was arrested after refusing to stop approaching a traffic stop (Chodor Decl., ¶¶ 30-33), but Plaintiff Demster, who was also present, was not arrested, nor does he allege that he was threatened with arrest. Demster Decl., ¶¶ 137-138.

In short, Plaintiffs have "failed to plausibly allege the existence of the claimed … policy pursuant to which they allege constitutional violations." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 372-73 (6th Cir. 2011) (finding failure to state a claim for First Amendment retaliation based, in part, on the plaintiff's vague and conclusory allegations and arguments about a DHS policy, practice, procedure, and/or custom, where the plaintiffs identified no document, policy directive, or anything else that would constitute a policy). As in *Ctr. for Bio-Ethical Reform, Inc.*, Plaintiffs have failed to identify any document, policy directive, or anything

10

else that would constitute such a policy. That is because no such policies exist.

In fact, DHS has a policy instructing its employees and all components, which include Federal Defendants ICE, HSI, CBP, and Border Patrol, about the importance of respecting activities protected by the First Amendment[5] (attached hereto as Exhibit C). "DHS does not profile, target, or discriminate against any individual for exercising his or her First Amendment rights." *Id.* at 1. The Court of Appeals for the Ninth Circuit, in *Dickinson v. Trump*, 174 F.4th 634, 643 (9th Cir. 2026), acknowledged this DHS policy as proof of an express policy *against* retaliation. The Court stated,

> [E]ven assuming subjective retaliatory intent in some cases, the plaintiffs have not shown an unwritten policy, pattern, or practice of First Amendment retaliation. The district court did not identify any direct evidence that DHS, as an agency, intentionally targeted the plaintiffs for their First Amendment activities. To the contrary, DHS policies expressly prohibit its officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." Any officer who retaliates against protesters would violate these policies.

*Id.* The Court stayed the injunction that had been granted, finding that the district court "incorrectly concluded the five plaintiffs were likely being intentionally targeted for their First Amendment rights because there purportedly was no valid reason for the government to use tear gas and other non-lethal munitions[,]" that "the plaintiffs have not shown an unwritten policy, pattern, or practice of First Amendment retaliation[,]" and the district court "did not identify any direct evidence that DHS, as an agency, intentionally targeted the plaintiffs for their First Amendment activities." *Id.* The district court improperly "inferred an unwritten DHS policy of retaliation based on individual DHS officers who used crowd-control munitions." *Id.* at 643, 650.

---

[5] Memorandum from Kevin K. McAleenan, Acting Sec'y, Dep't of Homeland Sec., to All DHS employees, Information Regarding First Amendment Protected Activities, (May 17, 2019), https://www.dhs.gov/sites/default/files/2026-03/info_regarding_first_amendment_protected_activities_as1_signed_05.17.2019-508.pdf.

In addition, Federal Defendant USMS provides training to its personnel regarding First Amendment rights of people engaged in recognized First Amendment activities. Diamond Decl., ¶ 14.

What Plaintiffs refer to are not policies of retaliation or knowledge or official sanction of a pattern or practice of retaliation (*see* Pls' Memo of Law, RE 16-2, PageID 215-217); they are instances where law enforcement responded to particular conduct that could lead to safety issues for both the agents and the public when people interfere with or impede law enforcement. *See* Diamond Decl., ¶¶ 18-22, 28-29.

Plaintiffs also argue that, even if there is no such policy of retaliation or endorsement of a pattern and practice of retaliation by the Task Force, the Defendants have failed to properly train their agents to not retaliate against individuals gathering information. Pls.' Memo of Law, RE 16-2, PageID 218-19. Plaintiffs' allegations are insufficient. That the training program of one of the many federal agencies involved in the Task Force "has been cut by 40%" does not show that the federal officers involved in the Task Force have been inadequately trained on the First Amendment. *Id.* at PageID 219. As stated above, DHS instructs all of their employees and components on the importance of First Amendment rights (DHS Policy, Ex. C), and the USMS employees and personnel receive training on First Amendment rights. Diamond Decl., ¶ 14.

Moreover, Plaintiffs' allegations do not establish that they would again be subjected to retaliation even if such a policy existed. *See Lyons*, 461 U.S. at 105. Since the Task Force began, there have been over 10,000 arrests and countless traffic stops. Yet Plaintiffs have identified only a comparatively miniscule number of encounters with law enforcement (45)[6] many of which are

---

[6] The breakdown of the incidents is as follows:  Demster – 23, Chodor – 4, Halt – 13, Peeler – 5. *See generally* Plaintiffs Declarations, RE 16-49, RE 16-50, RE 16-51, and RE 16-52.

unconfirmed to be affiliated with the Task Force at all.[7] Thus, even if Plaintiffs intend to continue their activities as observers, there is nothing to suggest that *they* will face such similar responses in the future. *See Lyons*, 461 U.S. at 105-06, 108. In addition, the vast majority of the incidents described by Plaintiffs occurred from September 2025 until March 2026; only five events (described by Plaintiff Demster) occurred in April or May 2026.[8] The fact that the overwhelming majority of Plaintiffs' allegations relate to encounters from *months ago* highlights the speculative nature of potential future injury. *See Grenell v. Ohio Supreme Ct.*, 252 F.3d 828, 832 (6th Cir. 2001) (quoting *Lyons*, 461 U.S. at 102 for the proposition that an allegation of past injury is insufficient in itself to "show a present case or controversy regarding injunctive relief … if unaccompanied by any continuing, present adverse effects").

Therefore, because Plaintiffs cannot show a likelihood of substantial and immediate threat of future harm and because they have failed to establish a policy, pattern, or practice of retaliation for First Amendment activity, they lack standing to seek prospective relief.

**B.      Plaintiffs are unlikely to prevail on their First Amendment retaliation claims.**

Plaintiffs are unlikely to succeed on their claim that the Federal Defendants violated the First Amendment by retaliating against them for protected First Amendment activity.

A plaintiff making a retaliation claim must make three showings:

(1) he 'engaged in constitutionally protected activity,' (2) defendant took an adverse action that 'caused the plaintiff to suffer an injury that would likely chill one of ordinary firmness from continuing to engage in that activity,' and (3) 'the adverse action was motivated at least in part as a response to the exercise of the

---

[7] Plaintiffs also allege incidents involving non-parties. The Court should give non-party declarations no weight because they do not shed light on whether *Plaintiffs* are likely to succeed on the merits of their claims. *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 n.6 (2016).

[8] Plaintiff Chodor's most recent allegation relates to her arrest in October 2025; Plaintiff Halt's most recent allegation stems from having a light flash at him when he stopped to approach a traffic stop by Memphis police officers in mid-March 2026; Plaintiff Peeler's most recent allegation stems from observing a law enforcement operation where she was told to stand back in early February 2026.

plaintiff's constitutional rights.'

*Anders v. Cuevas*, 984 F.3d 1166, 1183 (6th Cir. 2021) (quoting *Paige v. Coyner*, 614 F.3d 273, 277 (6th Cir. 2010) (citations omitted)); *see also Lulgjuraj v. Huron-Clinton Metropolitan Authority*, 2026 WL 432702, *12 (E.D. Mich. Feb. 16, 2026) (slip copy). To prevail on a retaliation claim, Plaintiffs "must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Nieves v. Bartlett,* 587 U.S. 391, 398 (2019) (citations omitted). "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury." *Id.* "Specifically, it must be a "but-for" cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.* at 399.

As an initial matter, the retaliation "framework, with its focus on subjective causation, is a poor fit" for cases, like this, which raise general challenges to how agents respond to people "observing" law-enforcement operations, because applying the retaliation framework "will often raise 'particularly difficult' causation questions." *Puente v. City of Phoenix*, 123 F.4th 1035, 1063 (9th Cir. 2024) (doubting that "a First Amendment retaliation claim may be properly asserted in the crowd-dispersal context"). Because a First Amendment retaliation claim focuses on the subjective motivation of the individual defendant, it is a poor fit for allegations of wrongdoing by law enforcement agents, which typically require an objective analysis. *See id.* at 1051 ("[In the Fourth Amendment context,] the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for the courts rarely probe the subjective motivations of police officers in the Fourth Amendment context." (quoting *Torres v. Madrid*, 592 U.S. 306, 317 (2021))). As the Supreme Court explained in *Nieves*, 587 U.S. 391, for retaliatory arrest and retaliatory prosecution claims, "it is particularly difficult to determine whether the adverse government action was caused by the officer's malice or the plaintiff's potentially criminal

14

conduct," and, therefore, the plaintiff "must plead and prove the absence of probable cause," which "speaks to the objective reasonableness" of the arrest or prosecution. *Id.* at 402. In addition, assessing subjective motivation does not work when a plaintiff is seeking prospective relief; it would be pure speculation to assume to know what the motivation of the Task Force agents will be in the future.

Each Plaintiff fails to make at least one of the showings for a First Amendment retaliation claim and is, therefore, unlikely to succeed. In part, Plaintiffs were not engaged in protected First Amendment activity but instead were engaged in conduct disruptive to an active investigation, such as chasing Task Force vehicles and impeding investigations. Diamond Decl., ¶¶ 19-20. To the extent they were engaged in First Amendment activity, the actions of the Task Force agents would not chill a person of ordinary firmness from continuing to engage in First Amendment activity, and any actions taken by agents were motivated not by retaliatory animus but by agents attempting to fulfill their official duties in enforcing federal, state, and local laws while Plaintiffs engaged in obstructive and potentially dangerous activity. *See* Diamond Decl., ¶¶ 21, 30.

> 1. **Plaintiffs' purported efforts to observe, record, and gather information about Task Force law-enforcement operations were not protected by the First Amendment.**

Plaintiffs claim a First Amendment right to observe, record, and gather information about law-enforcement operations. Compl., RE 1, ¶¶ 57-58, PageID 18-19. The Supreme Court has rejected such a right. Individuals have "no constitutional right to observe the issuance of a traffic ticket or to engage the issuing officer in conversation at that time. The State has a legitimate interest in enforcing its traffic laws and its officers were entitled to enforce them free from possible interference or interruption from bystanders, even those claiming a third-party interest in the transaction." *Colten v. Kentucky*, 407 U.S. 104, 109 (1972)).

15

Plaintiffs cite cases holding, in vastly different circumstances, that there is a First Amendment right to gather information about government activities, or to record or disseminate videos. *See* Pls' Memo of Law, RE 16-2, PageID 208-09. But none of those cases support a First Amendment right to chase law enforcement in a vehicle (*see* Demster Decl,, ¶¶ 53-54; Halt Decl., ¶¶ 23, 27-28) or interfere with and impede law enforcement operations (*see* Chodor Decl., ¶ 19; Demster Decl., ¶ 42-44, Ex. C video footage; Halt Decl., ¶¶ 27-28).

The First Amendment protects someone's right to film law enforcement "*subject to reasonable restrictions*." *Freeman v. Spoljaric*, 667 F. Supp. 3d 636, 661 (S.D. Ohio 2023) (emphasis added). "But there is no First Amendment right to criminally trespass, impede law enforcement efforts, [or] block traffic…." *Dickinson*, 174 F.4th at 647. Thus, Plaintiffs following Task Force vehicles and interfering with and impeding law enforcement operations have failed to show that they engaged in protected First Amendment activity.

> **2.      Plaintiffs have not shown that the actions of the Task Force agents would chill a person of ordinary firmness from continuing to engage in First Amendment activity.**

Many of Plaintiffs' allegations are not of a nature that would likely chill a person of ordinary firmness from continuing to engage in exercising their First Amendment rights. These include allegations that agents took pictures of the Plaintiffs, their vehicles, and/or license plates (Demster Decl., ¶ 84, 109, 113-14, 124, 133; Chodor Decl., ¶ 18; Halt Decl., ¶¶ 22, 35, 44; Peeler Decl., ¶ 41); called the Plaintiffs by their names (Demster Decl., ¶¶ 69, 71, 79, 96; Peeler Decl. ¶ 47); used the word "haltering"[9] while speaking with a Plaintiff (Halt Decl., ¶ 76); glared at the Plaintiffs or walked or drove closely by them (Demster Decl., ¶¶ 30, 76, 89; Halt Decl., ¶ 31); drove by the Plaintiff's house and allegedly smiled (Demster Decl., ¶ 45); parked or idled on the

---

[9] Meaning "to put restraint upon" or hamper. https://www.merriam-webster.com/dictionary/halter.

street where the Plaintiff lived (Demster Decl., ¶¶ 50, 54, 130; Halt Decl., ¶¶ 90, 93, 95, 100);  or shined lights at the Plaintiff (Halt Decl., ¶¶ 43, 58, 110).

The Sixth Circuit has held that "the harassment necessary to rise to a level sufficient to deter an individual is not extreme," but, "although it is a low standard, the plaintiff must still establish some relatively strong action." *Perkins v. Township of Clayton*, 411 Fed. App'x. 810, 814 (6th Cir. 2011) (quotations and citations omitted). "The objective inquiry into whether the actions taken against an individual rise to the level of an adverse action is highly dependent on context … ." *Id.* at 814. A review of the context shows that these actions are not "relatively strong" and do not rise to the level of an adverse action. *Id.*  Identifying people who are at an investigative scene and occasionally speaking to them is an important part of law enforcement. Diamond Decl., ¶ 25. If an agent sees a Plaintiff approaching him or her with a dark object in their hand, it is reasonable for that agent to shine a light at the Plaintiff to determine, for their own safety and the safety of everyone in the area, that the dark object is not a weapon. Diamond Decl., ¶ 17; *see also* Halt Decl. at ¶¶  60-61. Parking on a street or in a nearby parking lot in preparation to go to a law enforcement operation occurs on a regular basis. Diamond Decl., ¶ 16. Simply because Task Force agents might be in a Plaintiff's neighborhood or on their street does not mean they are there to intimidate anyone, and Plaintiffs have not presented any such proof that that is the motive. Plaintiff Demster complains about Task Force agents calling him by name; however, he has volunteered his name to an agent without even being asked. Demster Decl., ¶ 124. The Task Force agent using the word "haltering" was not in reference to Plaintiff Halt's name. *See supra*, p. 16. None of these chronicled encounters with law enforcement rose to the level of deterring a person of reasonable firmness from continuing to observe, monitor, photograph, or film the agents who were performing their duties in the public eye.

17

In one situation, Plaintiff Demster arrived at a scene where he says Task Force agents were gathering. Demster Decl., ¶¶ 87-88. He walked toward the scene as he recorded with his phone but was asked by an agent to stay 25 feet back from the scene. *Id.* at ¶ 88. The Task Force agents started to leave, and Demster claims they were "mean mugging [him], giving [him] death stares, and walking close to [him]." *Id.* at ¶ 89. In addition, Plaintiff Peeler discussed an encounter from October 2025, when she filmed a traffic stop and was told to move back from the scene when she got closer. Peeler Decl., ¶¶ 34-37. She continued filming and claims an HSI agent said he could arrest her for loitering. *Id.* at ¶ 37. She claims this scared her but then states she had a full conversation with the agent–learned about his recent travels, where he was from, and how she told him what was happening was wrong and that everyone should be treated equally. *Id*. at ¶¶ 38-40. These instances demonstrate how preposterous some of Plaintiffs' claims are and how these encounters are certainly not enough to deter a person of reasonable firmness from continuing to observe, monitor, photograph, or film the agents while performing their duties in the public eye.

### 3.    Task Force agents did not retaliate against Plaintiffs for engaging in First Amendment protected speech.

Plaintiffs cannot show that the actions by the Task Force were motivated by a subjective retaliatory intent to the exercise of their First Amendment rights. To meet the third requirement – that the adverse action was motivated at least in part as a response to the exercise of Plaintiff's constitutional rights – Plaintiffs "must show that the defendant had (1) subjective retaliatory intent and (2) a policy, pattern, or practice of First Amendment retaliation" because Plaintiffs sued the Federal Defendants in their official capacities, not any individual Task Force agent, for allegedly violating their First Amendment rights. *Dickinson*, 174 F.4th at 642.

Plaintiffs allege multiple times that they were told to move their vehicles or told to back away a certain distance from active law enforcement operations. *See generally*, Demster Decl.,

18

Chodor Decl., Halt Decl., Peeler Decl. However, Plaintiffs cannot show that any adverse action was caused by retaliatory animus toward protected First Amendment activity, rather than the "obvious alternative explanation[]," (*Hikma*, 146 S. Ct. at 1399), that agents were concerned that Plaintiffs were impeding their law enforcement efforts and causing a safety hazard by following them or distracting them from their official duties. Law enforcement agents must work in close contact with the public, and, at times, with people who are not on their best behavior while making a traffic stop, arresting someone, serving a warrant, or when generally carrying out their law enforcement duties. The "risk of harm to both the police and [others] is minimized" when agents take steps to secure the scene or otherwise take "command of the situation" while investigating criminal activity. *United States v. Coleman*, 2025 WL 2391391, at \*2 (6th Cir. Aug. 18, 2025), *cert. denied*, 224 L. Ed. 2d 177 (Mar. 9, 2026) (*quoting Michigan v. Summers*, 452 U.S. 692, 702–03 (1981)).

In the vehicular incidents raised by Plaintiffs, after Task Force agents approached Plaintiffs in their vehicles, the agents consistently advised the drivers that, through their conduct of following vehicles, they were impeding, interfering, or causing a safety hazard. Diamond Decl., ¶ 22. This demonstrates that the agents approached and admonished the drivers because they believed that the drivers' conduct impeded law enforcement or caused a danger, not because of any retaliatory animus toward protected First Amendment activity.

Plaintiffs may quibble about whether any particular following action crossed the line from lawful observation to dangerous or illegal activity, but retaliation claims turn on the agents' motives. And the "obvious alternative explanation[]" for retaliatory animus, *Hikma* 146 S. Ct. at 1399, is that agents responded to Plaintiffs' conduct based on their understanding of their official duties in carrying out law enforcement actions. *See Mitchell v. Kirchmeier*, 28 F.4th 888, 896 (8th

19

Cir. 2022)) ("If the response was driven not by 'animus' but by the defendant's understanding—however mistaken—of his official duties, then it was not 'retaliatory.'"). "Instead, to nudge a claim 'across the line from conceivable to plausible,' a plaintiff must plead facts that, if true, 'allo[w] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged,' and to rule out "obvious alternative explanation[s]" for the defendant's conduct." *Hikma*, 146 S. Ct. at 1399 (citations omitted).

As the Supreme Court has recognized, law-enforcement agents may disperse protestors "[w]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears." *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940). Under that objective standard, a court could conclude that an agent wrongfully responded to observers because, notwithstanding his "subjective apprehension," the circumstances did not objectively "present[] a clear and present danger." *Puente*, 123 F.4th at 1062. A court might also conclude that the agent used too much force because he misperceived "the tenor of [a] demonstration" as being more "infected with violence or obstruction" than it was. *Id.* (quotation marks omitted). But neither would compel the conclusion that, for purposes of a First Amendment retaliation claim, the agent acted due to subjective antipathy to the First Amendment activity at issue. Thus, Plaintiffs' allegations that agents misjudged their conduct as impeding or obstructing law-enforcement operations do not show subjective retaliatory animus. The record makes clear that the agents were motivated by their understanding of their official duties, rather than retaliatory animus, which defeats the retaliation claim. *See Grady v. Cratsenburg*, 170 F.4th 995, 1001 (6th Cir. 2026); *see also Aldridge v. City of St. Louis, Missouri*, 75 F.4th 895, 899 (8th Cir. 2023).

In addition, as stated above, *supra* pp. 10-13, Plaintiffs have failed to show that there was

a policy, pattern, or practice of First Amendment retaliation by the Task Force agents. Thus, they

have failed to satisfy the third requirement of a First Amendment retaliation claim. *See Dickinson*,

174 F.4th 634.[10]

> **4.    Plaintiff Chodor's First Amendment retaliation claim is unlikely to succeed because agents had probable cause to arrest her.**

Plaintiff Chodor's First Amendment retaliation claim is unlikely to succeed because agents

had probable cause to arrest her for resisting and obstructing law enforcement. For First

Amendment retaliatory arrest claims, a general "no-probable cause rule" applies. *Nieves*, 587 U.S.

at 404. Under this rule, "[a]bsent . . . a showing" that agents lacked probable cause for the arrest,

"a retaliatory arrest claim fails." *Id.*[11] Here, bodycam footage shows that Chodor approached the

perimeter established to perform a law enforcement operation (a traffic stop), was asked multiple

times to turn around and back up to behind the law enforcement vehicles, verbally refused, and

---

[10] Plaintiffs separately urge this Court to enjoin federal agents from applying the Halo Law to them. Compl., RE 1, PageID 82-83. The Halo Law is a Tennessee statute making it a misdemeanor offense to "intentionally approach[], within twenty-five feet . . . , a law enforcement officer after the officer has ordered the person to stop approaching or to retreat and the officer is lawfully engaged in the execution of official duties involving: (1) A lawful traffic stop; (2) An active investigation of the scene of an alleged crime; or (3) An ongoing and immediate threat to public safety." Tenn. Code Ann. § 39-16-612(a). But Plaintiffs' motion has failed to prove a policy or pattern of Task Force agents applying the Halo Law to them, much less that the Task Force agents are imminently likely to do so in the future (as necessary to support their standing to seek the forward-looking relief they have demanded). *See Lyons*, 461 U.S. at 111. Moreover, as explained above and below, *supra* pp. 15-16, 18-24, Task Force agents did not transgress the First Amendment by ordering Plaintiffs to stop impeding active law-enforcement operations by moving back a certain distance and by arresting a Plaintiff who failed to comply. Plaintiffs cannot reasonably dispute that Task Force agents possess such authority irrespective of the Halo Law. And even if some agents mentioned the Halo Law during a handful of their interactions with Plaintiffs, Plaintiffs have not cited any precedent holding that federal agents violate the First Amendment merely by noting the existence of a state statute imposing consequences for violating lawful orders to disperse.
[11] A "narrow" exception to this rule applies in situations where agents "typically exercise their discretion not to" make arrests, such as situations in which "jaywalking is endemic but rarely results in arrest." *Nieves, 587 U.S.* at 406-07. But Plaintiffs do not and cannot claim that federal agents rarely make arrests under 18 U.S.C. § 111, for assaulting, impeding, or interfering with federal agents.

21

expressed her continued intent to get closer to the law enforcement activity. Then, she attempted to walk across the street, past the agent and closer to the traffic stop after having been warned several times, telling the agent that he had no authority over her. Chodor Decl., Ex. C. This conduct—attempting to impede a law enforcement operation by breaching the perimeter established by agents—gave the agents probable cause to arrest her. Plaintiff claims she was backing away from the scene at the time she was arrested (Pls.' Memo of Law, RE 16-2, PageID 213, fn 3); however, the video submitted by Plaintiff Chodor shows this is clearly not the case.

Choder asserts that she was simply legally crossing the street (Chodor Decl. ¶ 33) and does not acknowledge attempting to get closer to the scene as opposed to moving back when she was already "at least 15 feet away from the detainees." *Id.* at ¶ 31. Even if the Court credits her declaration, the declaration tends to undermine, rather than support, her retaliatory arrest claim. It is undisputed that the agents had formed a perimeter around a traffic stop (*id*. at ¶ 27), where they were carrying out a law enforcement action. Chodor approached very close to the perimeter and kept moving towards the scene, as opposed to away from it. She disobeyed commands to return to her car and to get back behind the law enforcement vehicles to move away from the active scene. Only then was she detained and handcuffed. *Id.* at ¶¶ 34, 36, 38. While she was resisting arrest, she began calling for bystander interference with her arrest. *See* Chodor Decl., Ex. C. Even crediting Plaintiff's version of events, the most plausible inference is that Chodor was arrested because she ignored multiple commands to back up from the perimeter that the agents had established to handle an active investigation for the safety of the agents and the public. The agent did not tell Chodor that she could not record. He simply told her to stay behind the active investigation area behind the law enforcement vehicles. Chodor Decl., ¶¶ 30-31, 33.

Plaintiffs argue that Chodor's arrest was retaliatory given the closeness in time between

Chodor's expression and arrest, and the lack of any legitimate law enforcement purpose for arresting her. Pls.' Memo of Law, RE 16-2, PageID 213. But "'[i]n analyzing the facts in temporal proximity cases, [the Sixth Circuit has] always looked at the totality of the circumstances to determine whether an inference of retaliatory motive could be drawn.'" *Holzemer v. City of Memphis*, 621 F.3d 512, 526 (6th Cir. 2010) (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010). Further "temporal proximity, standing alone, is insufficient to establish a causal connection for a retaliation claim." *Tuttle v. Metro Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007). While Chodor's arrest was close in time to her speaking to the agent and beginning to record the scene, it was also close in time to her (undisputedly) approaching the perimeter, disobeying multiple orders to back up, and attempting to skirt around an agent into the perimeter. *See* Chodor Decl., Ex. C. In addition, loudly expressing one's political views or recording a law enforcement scene does not entitle that person to be able to disregard the lawful commands of law enforcement and claim retaliation when the agent does not tolerate that person's behavior.

Second, as shown above, Defendants had a legitimate law enforcement purpose for arresting her, to stop her efforts to impede their operation, and "[t]he presence of probable cause to arrest generally defeats a First Amendment retaliatory arrest claim." *Grady*, 170 F.4th at 1001 (citing *Nieves,* 587 U.S. at 405). As noted in *Grady*, "giving probable cause a gatekeeping role reflects the Supreme Court's calculation that a lack of probable cause will often 'provide weighty evidence that the officer's animus caused the arrest, whereas the presence of probable cause will suggest the opposite.'" *Id.*; see also *Aldridge,* 75 F.4th at 899 (quoting *Mitchell*, 28 F.4th at 896. ("If the response was driven not by 'animus' but by the defendant's understanding—however mistaken—of his official duties, then it was not 'retaliatory.'")). Even if one posits that the agents

23

were mistaken that she was impeding their efforts, that does not establish a retaliation claim. Chodor is not likely to succeed in showing that her arrest was motivated by retaliatory animus to her appearance on the scene and request to see if the detainees needed help, rather than agents' efforts to perform their official duties by arresting someone they believed was impeding their operation.

## C.    The remaining equitable factors decisively favor the Government.

The Court should also deny Plaintiffs' motion for preliminary injunction because Plaintiffs face no threat of immediate and irreparable harm, and the balance of the equities decisively favors the government. As explained above, *supra* pp. 6-13, Plaintiffs' claims of past harm do not give them standing to seek sweeping prospective relief, much less demonstrate an imminent threat of irreparable harm that would justify the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 22. Plaintiffs offer only speculation that they will have another encounter with law enforcement officials that will result in an alleged violation of their First Amendment rights. The failure to offer anything more than a smattering of isolated past incidents that are largely months old fatally undermines any claim by Plaintiffs that a preliminary injunction is necessary to prevent an immediate threat of harm recurring while the Court resolves the merits of their claims.

By contrast, an injunction would irreparably harm the government and the public interest. *See* Order, *Chicago Headline Club* at 2 (Ex. B) ("[D]efendants face irreparable harm" (citing *Trump v. CASA, Inc.*, 606 U.S. 831, 860-61 (2025)) "[a]ny time that Government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (quoting *Vasquez Perdomo*, 2025 WL 2585637, at *3 (citation modified))); *see also Dickinson*, 174 F.4th at 648 (staying the district court's preliminary injunction because it irreparably harmed the government); *Tincher v. Noem*, 164 F.4th 1097, 1100 (8th Cir. 2026) (per

24

curiam) ("[T]o the extent the injunction's breadth and vagueness cause federal agents to hesitate in performing their lawful duties, it threatens to irreparably harm the government and undermine public interest.")

Plaintiffs' proposed injunction improperly constrains Task Force agents' ability to engage in their law enforcement duties and activities, thereby endangering the safety of agents, the Plaintiffs, and the public alike. Accordingly, the balance of equities strongly counsels in favor of denying a preliminary injunction.

## II.    The proposed injunction is unworkable and overbroad.

Even if the Court were to grant relief, Plaintiffs' proposed preliminary injunction should be denied. The injunction suffers from two primary flaws. First, the injunction is practically unworkable, because its terms are impermissibly vague, direct Federal Defendants to "follow the law," prohibit a host of lawful law enforcement conduct, and, by casting the District Court as the overseer of Task Force operations, violates the separation of powers. Second, the injunction is overbroad because its restrictions are not tied to the alleged First Amendment injuries. The Courts of Appeals in the Seventh, Eighth, and Ninth Circuits have all stayed similar injunctions for these reasons. *See* Order, *Chicago Headline Club* (Ex. B); *Dickinson*, 174 F.4th 634; and *Tincher*, 164 F.4th 1100.

### A.    The proposed injunction is unworkable.

In assessing whether to grant injunctive relief, the Court must consider "what is workable," as foundational principles of equity demand. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (citation omitted). Plaintiffs' proposed injunction terms are unworkable because they are vague, impose follow-the-law edicts, prohibit a host of law-enforcement conduct that does not violate the First Amendment, and, by asking the District Court to exercise continuous oversight of Task Force operations, violates the separation of powers.

25

First, several of the proposed preliminary injunction terms are hopelessly vague. Rule 65 requires that an injunction "state its terms specifically" and "describe in reasonable detail … the … acts sought to be restrained." Fed. R. Civ. P. 65(d)(1)(B), (C). The proposed preliminary injunction does not satisfy that standard. For instance, the proposed preliminary injunction would prohibit agents from "[v]erbally threatening Plaintiffs" and "[p]hysically intimidating Plaintiffs," without defining what constitutes a verbal threat or physical intimidation. Compounding that confusion, Plaintiffs seem to allege that by saying Plaintiffs' names, Task Force agents verbally threatened them, and by looking at Plaintiffs for too long, Task Force agents physically intimidated them. Demster Decl., ¶¶ 47, 69-71, 73, 84, 89, 96-97, 133, 142; Halt Decl., ¶¶ 31, 107; Peeler Decl., ¶¶ 29, 42, 47. The proposed preliminary injunction also prohibits Task Force agents from "[s]itting outside Plaintiffs' homes," but does not specify how close is too close to a Plaintiff's home, leaving it to Task Force agents to guess what distance the Court would deem to be "outside" of a Plaintiff's home in contempt proceedings.

"An injunctive order is an extraordinary writ, enforceable by the power of contempt. 'The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one. Congress responded to that danger by requiring that a federal court frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid.'" *Gunn v. University Committee to End the War in Viet Nam*, 399 U.S. 383, 389 (1970) (quoting *International Longshoremen's Assn. Local 1291 v. Philadelphia Marine Trade Assn.*, 389 U.S. 64, 76 (1967). The Ninth Circuit vacated a similarly vague injunction, which "prohibit[ed] the use of crowd control weapons without first giving two separate audible warnings," because that "necessarily subjective requirement for audibility of warnings invites strategic or near-frivolous contempt proceedings against the government's responsible law

26

enforcement agents." *Los Angeles Press Club v. Noem*, 171 F.4th 1179, 1191-92 (9th Cir. 2026). Such vaguely worded injunctive decrees that create contempt traps for federal agents "further burden[] the government, while . . . do[ing] little to gift Plaintiffs their desired relief." *Id.* at 1192; *see also Dickinson*, 174 F.4th at 650 (staying injunction with "vague terms—such as whether a protester engaged in 'active resistance' or whether the officer's actions were 'reasonably necessary' or 'legally sufficient' in the eyes of the court").

Second, the proposed preliminary injunction terms would essentially order Task Force agents to comply with the First Amendment and the Fourth Amendment by, for example, not retaliating against Plaintiffs for their First Amendment protected speech and not "[a]rresting Plaintiffs without probable cause." Thus, Plaintiffs' proposed injunction is unworkable because it "does no more than prohibit any and all conduct in contravention of already existing law[.]" *Perez v. Ohio Bell Tel. Co.*, 655 F. App'x 404, 412 (6th Cir. 2016). Courts routinely reject such injunctions as illusory and inadequate because they do not provide fair notice as to the specific conduct that is enjoined, as required by Rule 65(d). *See, e.g., Tincher*, 164 F.4th at 1099 (granting the government's motion to stay the preliminary injunction on multiple grounds, including the fact that the injunction was too broad and vague, as it essentially commanded defendants to "obey the law," which was not specific enough); *Calvin Klein Cosms. Corp. v. Parfums de Coeur, Ltd.*, 824 F.2d 665, 669 (8th Cir. 1987); *Daniels v. Woodbury Cnty.*, 742 F.2d 1128, 1134 (8th Cir. 1984).

Third, the proposed preliminary injunction terms would prohibit Task Force agents from performing a host of common law-enforcement duties, like "[s]topping and questioning," "shining lights at," and collecting information about people who approach agents while they are conducting law-enforcement operations and chase law-enforcement vehicles. For one thing, those restrictions are "too prescriptive" and "resemble[] a federal regulation." Order, *Chicago Headline Club* at 2

27

(Ex. B). Indeed, the injunction is so granular it governs where federal agents can park their vehicles on a public street. For another, those restrictions would apply proscriptively to any interaction between Task Force agents and Plaintiffs, regardless of the circumstances, leading to second-guessing of agents' in-the-moment decisions and potential contempt allegations. Limiting agents' ability to control dangerous situations is untenable. And Plaintiffs' First Amendment claims, which require an analysis of the specific facts and circumstances of an encounter, are ill-suited to remediation by way of a one-size-fits-all injunction.

Lastly, the injunction provides no room for any reasonable exercise of discretionary law enforcement judgment without the chilling fear of contempt. *See Vasquez Perdomo*, 222 L.Ed.2d at 1216 (Kavanaugh, J., concurring) ("The prospect of . . . after-the-fact judicial second-guessing and contempt proceedings will inevitably chill lawful immigration enforcement efforts."). Agents must "act decisively and . . . show restraint at the same moment, and their decisions have to be made 'in haste, under pressure, and frequently without the luxury of a second chance.'" *Cnty of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998) (citation omitted). The proposed injunction impermissibly undermines agents' ability to perform these vital law-enforcement functions. *See* Diamond Decl., ¶¶ 24-29.

By both ordering Federal Defendants to follow the law and limiting Task Force agent's ability to perform ordinary law-enforcement duties, the proposed injunction places the Court in the untenable position of superintending agents' day-to-day decision-making, "impermissibly infringing on principles of separation of powers." Order, *Chicago Headline Club* at 2 (Ex. B,);

> Federal courts may have the authority to require narrow tailoring of governmental policies, but we are not the tailors of the executive branch. *See Chicago Headline Club v. Noem*, 168 F.4th 1033, 1037 (7th Cir. 2026) (noting that the Seventh Circuit stayed a similar injunction because, by "enumerat[ing] and proscrib[ing] the use of scores of riot control weapons and other devices in a way that resembles a federal regulation," the district court exceeded its authority (citation omitted)).

28

*Dickinson*, 174 F.4th at 648.

It is the role of the Executive, not the federal courts, to oversee the execution of the laws. Federal courts "do not possess a roving commission" to "exercise general legal oversight of the ... Executive Branch[]." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423, 423-24 (2021); *see also Dickinson*, 174 F.4th at 549-50. That principle applies with special force to law enforcement activities responding to safety risks, which inevitably involve "split-second judgments" and a balancing of factors in "tense, uncertain, and rapidly evolving situations." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam) (citation omitted). Article III does not "transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453 (1990). And "the scope of federal equity power" cannot "be extended to the fashioning of prophylactic procedures for a [government] agency designed to minimize this kind of [alleged] misconduct on the part of a handful of its employees." *Rizzo v. Goode*, 423 U.S. 362, 378 (1976). "[I]t is one thing to dissect and scrutinize an officer's actions with the '20/20 vision of hindsight,' 'in the peace of a judge's chambers.' It is quite another to make 'split-second judgments' on the ground, 'in circumstances that are tense, uncertain, and rapidly evolving.'" *Barnes v. Felix*, 605 U.S. 73, 89-90 (2025) (Kavanaugh, J., concurring) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)). The separation of powers and the impropriety of subjecting law enforcement agents' decisions to judicial second-guessing on pain of contempt weighs heavily against the kind of injunction that Plaintiffs seek here. *See United States v. Patane*, 542 U.S. 630, 642 (2004) ("It is not for this Court to impose its preferred police practices on either federal law enforcement officials or their state counterparts.").

29

**B.      The proposed injunction is overbroad.**

Plaintiffs' proposed preliminary injunction is overbroad because it allows Plaintiffs to use the First Amendment as both a shield and a sword.

The proposed injunction prohibits Federal Defendants and Task Force agents from taking certain actions if they are motivated in part by Plaintiffs' purported First Amendment protected conduct. Proposed Order, RE 16-1, PageID 196. Put differently, if Plaintiffs are engaged in both First Amendment protected speech and conduct that is not protected by the First Amendment, the proposed preliminary injunction would prohibit Task Force agents from performing routine law-enforcement duties with respect to Plaintiffs.

Plaintiffs thus seek to use the First Amendment as a defensive tool, allowing them to disobey lawful dispersal orders and interfere with law enforcement operations, so long as they also engage in First Amendment protected speech. "This is not merely unworkable—it is also extremely dangerous to both federal officers and the public." *Dickinson*, 174 F.4th at 649. But, as explained, the First Amendment does not protect Plaintiffs' efforts to interfere with law-enforcement operations. As a result, the proposed injunction would protect conduct that is not protected by the First Amendment, rendering it overbroad.

Plaintiffs also employ the First Amendment offensively, by transforming a host of ordinary law-enforcement conduct into First Amendment violations based on Plaintiffs' allegations that such conduct chills their speech. Yet law-enforcement agents do not violate the First Amendment by "[s]topping and questioning" people; parking their cars on public streets; "[s]hining lights" at people's "faces, phones, and cameras"; using reasonable force; or "[c]ollecting information" about people. At most, such conduct would be actionable under the Fourth Amendment.

In both respects, the proposed preliminary injunction is unmoored from Plaintiffs' alleged

30

First Amendment harms. It is black-letter law that the First Amendment does not provide a "constitutional right to observe" law-enforcement operations or "engage [law-enforcement] officer[s] in conversation" while they conduct such operations. *Colten*, 407 U.S. at 109. And the First Amendment does not prohibit law-enforcement agents from "enfor[cing the law] . . . free from possible interference or interruption from bystanders." *Id.* Accordingly, Plaintiffs' retaliation claims do not justify the categorical restrictions in the proposed preliminary injunction.

**III.    Stay pending appeal and bond**

To the extent the Court issues any injunctive relief, Federal Defendants request that such relief be stayed pending the disposition of any appeal that is authorized by the Solicitor General, or at a minimum, administratively stayed for seven days to allow the United States to seek emergency relief if appeal is authorized. Federal Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal. *See Nken*, 556 U.S. at 434; *Dickinson*, 174 F.4th 634; *Tincher*, 164 F.4th 1098; Order, *Chicago Headline Club* at 1 (Ex. B).

Finally, if the Court grants an injunction, it should require a bond commensurate with the scope of any injunction pursuant to Rule 65(c).

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Date:   July 6, 2026                                    Respectfully submitted,

                                                        D. MICHAEL DUNAVANT
                                                        United States Attorney
                                                        Western District of Tennessee

                                                        By: *s/ Melanie R. Dunlap*
                                                        Melanie R. Dunlap (TN BPR #22477)
                                                        Jennifer H. Collins (TN BPR #27985)
                                                        Assistant United States Attorney
                                                        167 North Main St., Ste. 800
                                                        Memphis, Tennessee 38103
                                                        Phone: 901-544-4231
                                                        Fax: 901-544-4230
                                                        melanie.dunlap@usdoj.gov
                                                        jennifer.collins2@usdoj.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing was filed via the Court's CM/ECF system and thereby served on this 6th day of July 2026, upon all counsel of record.

                                                        *s/ Melanie R. Dunlap*
                                                        Assistant United States Attorney

32