**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

**HUNTER DEMSTER, JESSICA CHODOR,
KENNETH HALT, and MELISSA PEELER,**

**Plaintiffs,**

**v.** **Case No. 2:26-cv-02546-MSN-atc**

**TODD BLANCHE, in his official capacity as
Acting Attorney General of the United States, *et al.*,**

**Defendants.**

# DECLARATION OF DARYL DIAMOND

In accordance with the provisions of 28 U.S.C. § 1746, I, Daryl Diamond, do hereby make the following declaration pertinent to the above-styled cause of action:

1. I am employed by the United States Marshals Service (USMS) and am currently the Commander of the Florida Caribbean Regional Fugitive Task Force (FCRFTF). I have been employed by USMS since February of 2017. While employed by the USMS, I have held numerous positions to include Deputy U.S. Marshal in the District of Maryland, where I managed court security for the federal courts in Baltimore, Maryland, and conducted enforcement operations to locate and arrest violent fugitives wanted for federal crimes. I also served as a Senior Inspector with the Capital Area Regional Fugitive Task Force (CARFTF) where I managed and led a team of Deputy U.S. Marshals (DUSM) and Task Force Officers (TFO) to locate and arrest violent fugitives in the area in and around Baltimore, Maryland. Additionally, I served as Deputy Commander with the CARFTF where I managed, supervised, and led DUSMs, Senior Inspectors and TFOs as they attempted to locate and arrest violent offenders. I also served as the Deputy

Commander with the FCRFTF, before recently being promoted to Commander/Chief of the FCRFTF where I manage and lead all USMS operations for state/local violent offenders, manage the operating budget and the distribution of a Joint Law Enforcement Operations overtime reimbursement budget for our state and local TFOs.

2. Before working for USMS, I was employed with the U.S. Secret Service from June of 2008 until February of 2017, and the Carrollton Police Department in Carrollton, Georgia from July of 1996 until June of 2008.

3. The Memphis Safe Task Force (Task Force) was established on September 15. 2025, and was created by President Trump via a Presidential Memorandum.[1] The Memorandum called for multi-agency federal law enforcement officers (LEOs) to support the state and local law enforcement in Memphis, Tennessee to combat violent crime by locating and arresting violent fugitives, locating and seizing illegal firearms, and restoring public order. The Presidential Memorandum directed the U.S. Attorney General to appoint a chair who has the responsibility of directing all Task Force functions and who is to coordinate with the Assistant to the President and Homeland Security Advisor. Director Gadyaces S. Serralta of the USMS was selected to chair the Task Force. As a result, USMS has taken the lead in coordinating the Task Force efforts, to include assigning personnel to various enforcement and support groups.

4. I served as a Divisional Supervisor at the Task Force on four separate occasions - September 26 – October 9, 2025, December 3 – 20, 2025, March 3 – 18, 2026, and May 11 – 26, 2026. I was responsible for supervising multiple multi-agency teams during day-to-day operations. Some of the teams were enforcement teams responsible for locating and arresting violent fugitives while other teams assisted local law enforcement in their endeavor to investigate drug offenses,

---

[1] https://www.whitehouse.gov/presidential-actions/2025/09/restoring-law-and-order-in-memphis/

and others were assigned to investigate federal criminal charges related to seized illegal firearms.

5. This declaration is submitted in support of the Federal Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction.

6. The statements contained in this declaration are based upon my personal knowledge, reasonable inquiry, and information made available to me in the course of my official duties from information obtained from records, systems, databases, and other people involved with the Task Force.

**Background**

7. There are multiple federal agencies involved in the Task Force. Included among them are USMS, Federal Bureau of Investigations (FBI), the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Drug Enforcement Administration (DEA), Homeland Security Investigations (HSI), Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), Diplomatic Security Services (DSS), Department of Housing and Urban Development (HUD), Internal Revenue Service (IRS), and the U.S. Attorney's Office for the Western District of Tennessee (USAO-WDTN).

8. Federal agencies provide investigative and intelligence support to the Task Force. ATF special agents assist in the investigation of firearm-related offenses. DEA agents provide assistance in narcotics-related offenses. FBI agents assist in criminal investigations. USMS participants support and supervise the Task Force overall and participate in fugitive investigations and apprehensions. Personnel from the U.S. Department of Homeland Security (DHS), which includes ICE and CBP, assist in intelligence analysis, immigration enforcement operations, and investigations. HUD personnel assist in investigations. In addition, all personnel provide visible

presence for crime suppression. The USAO-WDTN provides investigation, litigation, and prosecution support to the Task Force.

9. In addition to federal agencies, several state and local agencies participate in and/or provide support to the Task Force. Among these are the Memphis Police Department (MPD), Shelby County Sheriff's Office (SCSO), the Tennessee Bureau of Investigation (TBI), Tennessee Department of Safety and Homeland Security (TDSHS), the Tennessee Highway Patrol (THP), the Tennessee National Guard (T-NG), and the Shelby County District Attorney's Office (SCDA).

10. State and local agencies provide support for investigations. The MPD, SCSO, and THP provide support to the Task Force by assisting in conducting traffic stops with marked vehicles. Additionally, agencies with emergency equipment assist in police pursuits per their policies.

11. Participants are assigned to assist in narcotic-related offenses, fugitive investigations, crime suppression, traffic enforcement, and general investigations. The T-NG has provided first-aid to a person involved in a shooting, and otherwise supported enforcement efforts.[2] As the primary enforcement agencies, MPD and SCSO also respond to calls for service and may request the assistance of the Task Force. MPD and SCSO also provide work and training space for Task Force participants. The SCDA provides investigation, litigation, and prosecution support to the Task Force.

[2] https://www.nationalguard.mil/News/Article-View/Article/4463046/tennessee-guardsmen-provide-aid-secure-evidence-in-shooting/



EXHIBIT A

12. Outside of the Task Force, USMS has a history of partnering with state and local law enforcement to address high crime rates, gang violence, and the apprehension of violent offenders in Memphis, Tennessee.[3, 4, 5, 6, 7]

13. Since its inception, the Task Force has had a significant impact on violent crime, unlawful firearm possession, and the presence of fugitives in Memphis. For instance, the Task Force arrested four individuals for weapon and narcotics offenses.[8] In October 2025, the Task Force arrested an armed gang member,[9] an armed felon with a pending homicide charge,[10] and a fugitive with a pending attempted murder charge.[11] During that same month, while responding to support local officers who had been assaulted or injured during an investigation at a deadly shooting, Task Force participants located a possible suspect of the incident and discovered a second, deceased victim.[12] Task Force participants also interdicted 20 kilograms of suspected methamphetamine in October 2025.[13] The impact of the Task Force on crime continues. For

---

[3] https://www.usmarshals.gov/news/press-release/operation-memphis-streets-aims-reduce-gang-violence

[4] https://www.usmarshals.gov/news/press-release/memphis-first-degree-murder-suspect-surrenders-us-marshals

[5] https://www.usmarshals.gov/news/press-release/us-marshals-and-memphis-police-arrest-fugitive-wanted-2018-murder

[6] https://www.usmarshals.gov/news/press-release/arkansas-first-degree-murder-suspect-captured-memphis-us-marshals

[7] https://www.usmarshals.gov/news/press-release/us-marshals-arrest-two-memphis-first-degree-murder-fugitives-different-states

[8] https://www.usmarshals.gov/news/press-release/memphis-safe-task-force-targets-armed-and-dangerous-arresting-four-violent

[9] https://www.usmarshals.gov/news/press-release/safer-streets-stronger-memphis-memphis-safe-task-force-arrests-armed-gang-member

[10] https://www.usmarshals.gov/news/press-release/interagency-precision-memphis-safe-task-force-arrests-high-risk-fugitive

[11] https://www.usmarshals.gov/news/press-release/relentless-pursuit-memphis-task-force-pressure-forces-surrender-violent-assault

[12] https://www.usmarshals.gov/news/press-release/memphis-safe-task-force-responds-fatal-shooting-and-subsequent-discovery-memphis

[13] https://www.usmarshals.gov/news/press-release/memphis-safe-task-force-traffic-stop-leads-major-drug-seizure-and-two-arrests

instance, on June 10, 2026, the Task Force made 44 arrests, including two men charged with attempted murders, and seized 13 firearms.[14] Overall, the Task Force has announced the arrest of more than 10,000 individuals and the seizure of over 1,000 firearms since September of 2025.[15] The Task Force participants have done so with great risks to their personal safety.

14. The USMS personnel receive training that includes, among other things, First Amendment rights of people engaged in recognized First Amendment activities. I am aware that DEA conducts a briefing for all incoming Task Force agents, which also includes firearms qualifications, and HSI conducts a briefing for all incoming Task Force agents.

**Task Force Operations**

15. In carrying out Task Force operations, law enforcement officers must be aware of their surroundings in order to protect both themselves and others (including the Plaintiffs) in the areas where law enforcement operations are occurring. They check the surrounding area of an active scene, to include nearby buildings and vehicles. Often, when a Task Force participant is engaged in an enforcement operation, other Task Force participants will respond to provide support. Additionally, when state or local law enforcement is on the scene of a traffic stop or other law enforcement operation, Task Force personnel will respond to provide support for public and officer safety. These incidents may involve speaking to citizens in the area. Consensual contact with the public is not uncommon and can provide law enforcement with information about the area, the offense under investigation, other offenses, or about other people in contact with law enforcement.

16. Often, during the preparation and planning phase of an operation, law enforcement

---

[14] https://www.usmarshals.gov/news/press-release/mstf-arrests-44-wednesday-recovers-13-guns
[15] https://www.usmarshals.gov/news/press-release/memphis-safe-task-force-surpasses-10000-arrests-removes-more-1700-firearms-city

may gather with other Task Force participants in parking lots or other areas prior to engaging in an enforcement operation. As a result, it is not uncommon for several law enforcement vehicles to be seen in large groups while in the parking lots of a business or even on the side of a public road.

17. Since its creation, the Task Force has engaged in operations in Memphis 24 hours a day, every day. As a result, operations may take place before sunrise, after sundown, or in low-light areas. Task Force law enforcement who are encountering citizens during nighttime or low-light operations may use items such as flashlights, vehicle mounted spotlights, and other equipment to illuminate the immediate and surrounding area, to include the illumination of those persons who are visible to enforcement personnel. This is done to ensure that there are no weapons present inside or outside of the immediate area of concern and to illuminate the path to exit the area. For example, it was reasonable for the agent to shine a light at Plaintiff Halt on December 26, 2025, to determine, for his own safety and the safety of everyone in the area, that the dark object in Plaintiff Halt's hand was not a weapon.

18. Task Force agents may also request persons not involved in the enforcement operation to step back to a safe distance to avoid distracting law enforcement who are in contact with the person(s) who are the focus of the contact. This is both to allow the Task Force agents to focus and do their jobs safely, and to keep observers from potential harm. It is not done to retaliate against the Plaintiffs. Such a request may also be to allow a conversation with a person in contact to disclose personally identifying information without disclosure to the public or otherwise make statements that should not be publicly disclosed such as statements in cooperation of law enforcement.

19. The specific incidents recounted by Plaintiffs have not included any officer telling them not to record a scene; the officers have only had to ask them to move back if they began to

interfere with or impede their operation, thus creating a dangerous situation, at which point the Plaintiffs are not exercising their First Amendment rights.

20. When Plaintiffs were engaged in conduct disruptive to an active investigation, such as chasing Task Force vehicles and impeding investigations, they were not engaged in protected First Amendment activity.

21. To the extent Plaintiffs were engaged in First Amendment activity, any actions taken by officers were motivated, not by retaliation for First Amendment activity, but by officers attempting to fulfill their official duties in enforcing the federal, state, and local laws while the Plaintiffs engaged in obstructive and potentially dangerous activity.

22. I understand that Plaintiffs make allegations of Task Force officers being involved in confrontations with Plaintiffs after Plaintiffs followed government vehicles. Federal law enforcement officers are trained and instructed to follow all traffic laws and to otherwise drive in a safe manner, even when operating in emergency responses. In these vehicular incidents, after Task Force officers approached Plaintiffs in their vehicles, the officers consistently advised the drivers that, through their conduct of following vehicles, they were impeding, interfering, or causing a safety hazard.

23. Task Force agents have observed on multiple operations citizens who are attempting to deter, interfere with, and/or obstruct Task Force operations.

**<u>Impact of Plaintiffs' Requested Relief</u>**

24. If the Court grants Plaintiffs' motion for preliminary injunction, such an injunction would be unworkable, unnecessary, and further endanger the safety of law enforcement personnel and the public.

25. I am aware that Plaintiffs seek an Order from the Court to prohibit Task Force from

engaging in contact with persons who have placed themselves within an investigation, or from using flashlights to identify persons in the surrounding area of the investigation. Doing so reduces the safety of the public and law enforcement engaged in an enforcement operation. Identifying people who are at an investigative scene and occasionally speaking to them is an important part of law enforcement, including, but not limited to, allowing Task Force officers to identify people if there is a question as to whether they might be a threat to safety. Task Force officers might also need to stop and question people that are at a law enforcement operation to ask if they saw something that might be relevant to the investigation.

26. Additionally, prohibiting the Task Force from relocating persons who have inserted themselves in the area of an investigation to a reasonable distance away from the scene may result in the disclosure of personally identifying information of the person(s) in contact with law enforcement, the disclosure of confidential information that may assist in an investigation, and would be distracting to law enforcement who are in contact with a potentially armed and dangerous person. Task Force officers must be able to concentrate on the operation at hand and not be distracted by people walking into an active law enforcement scene and thus interfering in their operation and risking the safety of that person, the Task Force officers, and anyone else in the area. Additionally, the use of deadly force is not uncommon during enforcement operations. A person inserting themselves into a scene, thus interfering with and impeding an investigation, may be seriously injured or killed if they are too close to an enforcement scene.

27. Plaintiffs' proposed injunction would also infringe on Task Force officers' ability to carry out their duties and provides no room for any reasonable exercise of discretionary law enforcement judgment without the chilling fear of contempt.

28. There may be instances where the officers request people to back away from an

active crime scene, but that is typically when it violates some other restriction or if such actions put the officer or others in potential danger. Further, there may be times when law enforcement actions are being conducted that Task Force officers may block or direct traffic. Task Force officers do not tell people to cease lawful activity in retaliation. Restrictions or requests to move only typically occur when the activity strays into interference with an operation, endangers officer or public safety, or may cause destruction or disruption to physical evidence at a scene.

29. No one knows how someone might react when they are being pulled over for a traffic stop, being served a warrant, or being arrested for a crime; a Task Force agent must be allowed to focus and do their job safely, but they cannot do that if someone goes to the extent of interfering with or impeding their operation, thus turning it into a dangerous situation.

30. During my tenure as a Division Supervisor of the Task Force, I did not witness, nor am I aware of, any Task Force officer knowingly targeting or retaliating against Plaintiffs for exercising their First Amendment rights.

Pursuant to the provisions of 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this 02 day of July 2026.

Daryl Diamond
Commander of Florida Caribbean Regional Fugitive Task Force



EXHIBIT A