**UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| HUNTER DEMSTER, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as ACTING ATTORNEY GENERAL OF THE UNITED STATES, *et al.*,<br><br>*Defendants*. | Case No. 2:26-cv-2546<br>District Judge Mark S. Norris<br>Magistrate Judge Annie T. Christoff |

# STATE DEFENDANTS'[1] RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

[1] "State Defendants" refers to Matt Perry, in his official capacity as head of the Tennessee Highway Patrol, and Steven J. Mulroy, in his official capacity as District Attorney for Shelby County, Tennessee.

# TABLE OF CONTENTS

Introduction .......... 1
Background .......... 2
Argument .......... 4
I. Plaintiffs will eventually lose this lawsuit. .......... 4
A. There is no viable claim concerning retaliation for speech. .......... 5
B. There is no viable pre-enforcement claim concerning the Bystander Interference Act. .......... 8
3. Plaintiffs lack standing to sue DA Mulroy. .......... 18
II. The equities do not favor preliminary injunctive relief. .......... 20
Conclusion .......... 20

## INTRODUCTION

This lawsuit attempts to manufacture a controversy; there is no sound basis for preliminary relief. Entering Fall 2025, Memphis had the highest violent crime rate in the country. *See* Chasity Maynard, *This Tennessee city has highest violent crime rate in the* country, WSMV4 (Sept. 9, 2025) (attached as Ex. 1). Much of that violence stemmed from organized crime, with at least four-dozen gangs operating in the city. *See* Imani Williams, *At least 48 gangs are active in Memphis, according to MPD's Multi-Agency Gang Unit* (Nov. 26, 2024) (attached as Ex. 2). To protect the people of Memphis—particularly those in high-crime communities—the Tennessee Highway Patrol has been bolstering the city's law-enforcement manpower as part of the Memphis Safe Task Force. *See* Compl., D.1 at 3.[2]

Plaintiffs in this lawsuit object to the Task Force, which they characterize as "part of a broader federal initiative…to dramatically escalate immigration arrests, detentions, and deportations." Compl., D.1 at 11. Recounting examples from Los Angeles to Maine and decrying the "devastating" local impact of federal immigration policies with which they disagree, Plaintiffs have sued a host of high-ranking federal officials. Compl., D.1 at 6-10, 11-18, 71,73. They have also sued two Tennessee officials, saying they want to "gather information about" the Highway Patrol's "activities." *Id.* at 10-11. Specifically, they want to "observe[]" and "record[]" police actively conducting investigations and making arrests. *Id.* at 20. That is all well and good, but there "is no constitutional right to" do that. *Colten v. Kentucky*, 407 U.S. 104, 109 (1972). Nor does the Highway Patrol have any official, State-sanctioned "pattern [or] practice" of allowing State Troopers to retaliate for the exercise of constitutional rights. Prelim. Inj. Br., D.16-2 at 206.

[2] Pincites to docket entries use the Page ID file-stamp pagination.

## BACKGROUND

In Tennessee, as elsewhere, the public expects a lot from police. Tennessee's police officers have the "statutory responsibility to suppress breaches of the peace." *Cantrell v. DeKalb Cnty.*, 78 S.W.3d 902, 907 (Tenn. Ct. App. 2001) (citing Tenn. Code Ann. §§ 38-3-102, 108). While they do so by arresting individuals suspected of crime, police also work to prevent crime by directing traffic and diffusing hostilities as well as performing other functions aptly described as "community caretaking." *Tennessee v. McCormick*, 494 S.W.3d 673, 681 (Tenn. 2016) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)); see *Colten*, 407 U.S. at 109; *Tenn. ex rel. Thompson v. Reichman*, 188 S.W. 225, 227–28 (Tenn. 1916).

This work brings police into close contact with people who are not on their best behavior. The ability to "exercise unquestioned" control in such situations lies at the heart of this case. *Maryland v. Wilson*, 519 U.S. 408, 414 (1997) (quoting *Michigan v. Summers*, 452 U.S. 692, 703 (1981)).

***Police Orders.*** Rather than using force as their only means of coercion, police officers in Tennessee, as elsewhere, have the traditional power to issue "verbal commands." *Grady v. Cratsenburg*, 170 F.4th 995, 998 (6th Cir. 2026). This is "not just common to policing"—it is an "essential" policing tool arising from "the duties and powers that create policing." Rachel Harmon, *Law and Orders*, 123 Colum. L. Rev. 943, 968 (2023). Thus, the "power to stop, arrest, and search" has long been understood to "include[]" some "authority to issue enforceable commands." *Id.* at 974; *cf. Grady*, 170 F.4th at 996 (concerning the disregard of reasonable commands).

***The Bystander Interference Act.*** In several provisions of the code, Tennessee law prohibits interference with ongoing police work. As in most States, no statute lays out what may justify a "lawful [police] order." *Oregon v. Illig-Renn*, 142 P.3d 62, 70–71 (Or. 2006). But statutes

prohibit "obstruction" of policing, Tenn. Code Ann. § 39-17-305(a)(2), and the "fail[ure] or refus[al] to comply" with commands, *id.* § 55-8-104(a).

Last year, Tennessee's legislature passed another such statute, hoping to help address ongoing challenges in modern policing. Tenn. Code Ann. § 39-16-612 (attached as Ex. 3). Specifically, police officers engaging in "traffic stop[s]," "active[ly] investigat[ing] . . . crime scene[s]," and addressing "ongoing and immediate threat[s] to public safety" needed the ability to "deescalate the situation" by ensuring bystanders would "sta[y] back" from "active[]" police business. Legislative Debates at p. 7 (attached as Ex. 4) (statement of Sen. Pody). Although officers could issue step-back orders "already," existing obstruction laws lacked bright-line rules. *Id.* So lawmakers drafted a bill that would keep bystanders twenty-five feet from police officers with the same clarity as "put[ting] . . . yellow police tape around" an officer's work. *Id.*

Following a full airing of the policy arguments for and against this bill, both houses of the General Assembly passed the Bystander Interference Act by wide margins. *See id.* at p. 38 (Senate vote), p. 55 (House vote). The Governor then signed it into law, and it was promptly challenged in federal court. *See Gannett Co. v. Long*, No. 3:25-cv-830 (filed July 22, 2025). Last February, the U.S. District Court for the Middle District of Tennessee rejected the challengers' motion for preliminary injunctive relief. *See* Order, *Gannett*, D.40 at 331. The challengers now have an ongoing appeal pending before the Sixth Circuit. *See* 6th Cir. Case No. 26-5182.

***This Lawsuit*.** A separate set of plaintiffs brought this second pre-enforcement constitutional challenge to the Bystander Interference Act. *See* Compl., D.1 at 82–83. As in the first case, Plaintiffs here assert that the Act violates the "First Amendment [right to] gather information." *Id.* at 82. And they claim separately that the Highway Patrol has an official "policy" of "retaliati[ng]" against the exercise of First Amendment rights. *Id.* at 81. Now, eager to get relief before judgment,

Plaintiffs have moved for a preliminary injunction. *See* Prelim. Inj. Mot., D.16 at 188–92. Neither their brief nor their mountain of extraneous exhibits justify a grant of that extraordinary and "tightly guarded remedy." *Doe v. Lee* (*Lee II*), 137 F.4th 569, 575 (6th Cir. 2025).

**ARGUMENT**

The preliminary injunction is a "drastic remedy," and those who want it must clear a high bar. *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024) (quoting *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008)). Specifically, they "must make a 'clear showing'" that four separate factors *all* weigh heavily in their favor. *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874, 883 (6th Cir. 2025) (quoting *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345–46 (2024) and discussing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)). They must show that (1) they will likely succeed on the merits, (2) they will suffer irreparable harm in the interim, and that neither (3) the potential harm to others, nor (4) the public interest, counsel against preliminary relief. *See Oswald*, 98 F.4th at 672. The instant motion fails to carry the plaintiffs over any of those high hurdles.

**I. Plaintiffs will eventually lose this lawsuit.**

Likelihood of ultimate success is "the most important part of th[e preliminary injunction] analysis." *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020). And for multiple, overlapping reasons, Plaintiffs cannot prove they are "likely to succeed." *Winter*, 555 U.S. at 20.

The Federal Defendants have filed a detailed response opposing Plaintiffs' motion for preliminary injunction explaining why Plaintiffs are not entitled to any such relief and will not prevail on the merits. Fed. Def. Resp. in Opp. to Pl. Mot. Prel. Inj., D.34. The State Defendants adopt and incorporate by reference the various arguments made by the Federal Defendants in their response and will not repeat those arguments in this response. *Id.* at 890-915. Instead, the State

Defendants will focus their response on legal arguments that bear more of a relation to the allegations against the State of Tennessee, particularly the constitutionality of the Bystander Interference Act, Tenn. Code Ann. § 39-16-612.

**A. There is no viable claim concerning retaliation for speech.**

Before addressing the First Amendment retaliation issues, one must account for this lawsuit's limitations. Those limitations flow mainly from Plaintiffs' decision to sue Defendant Perry in his official capacity. Compl., D.1 at 10. Having brought such a claim, Plaintiffs bear the burden of establishing this Court's jurisdiction over it. *White's Landing Fisheries, Inc. v. Ohio Dep't. of Nat. Res.*, 174 F.4th 493, 497 (6th Cir. 2026) ("[W]e need not presume the truth of facts pertinent to our jurisdiction because the plaintiff bears the burden of establishing that jurisdiction exists.")

**1. No Tennessee law authorizes a policy of retaliation.**

A claim for relief against a state officer acting "in . . . official capacity" is a claim for relief against the State, which is "jurisdictional[ly] bar[red]" by state sovereign immunity. *Id.* at 500 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100, (1984)). Plaintiffs appear to evade that jurisdictional limit by seeking "[*prohibitory*] injunctive relief," as permitted primarily by *Ex Parte Young*, 209 U.S. 123 (1908). Prelim. Inj. Br., D.16-2 at 215. But such injunctive relief may only be prospective and will lie only when a plaintiff demonstrates that it is necessary to end a State officer's ongoing violation of federal law. *Green v. Mansour*, 474 U.S. 64, 68 (1985).

This oft-utilized exception to state sovereign immunity "applies only where the . . . *authorization* upon which the named official acts is" itself "illegal." *Child.'s Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1417 (6th Cir. 1996) (emphasis added) (emphasis omitted) (quoting *Papasan v. Allain*, 478 U.S. 265, 276 (1986)). The underlying logic holds "that an unconstitutional state enactment is void," so "any action" it "purport[s to] authorize[] . . . cannot be taken in an official capacity." *Id.* at 1415 (quoting *Papasan*, 478 U.S. at 276). But that logic does not allow suits "to *compel*" official action. *Pennoyer v. McConnaughy*, 140 U.S. 1, 9 (1891); *see Hawaii v. Gordon*, 373 U.S. 57, 58 (1963); *Hagood v. Southern*, 117 U.S. 52, 67 (1886). Nor does it permit challenges to "polic[ies]" unauthorized by state law. Prelim. Inj. Br., D.16-2 at 213; *see Deters*, 92 F.3d at 1417.

Here Colonel Perry cannot act on behalf of the State except in ways that the State has "authori[zed]" by law. *Papasan*, 478 U.S. at 276. Plaintiffs have identified no Tennessee law that purportedly empowers Colonel Perry to "maintain a policy . . . of retaliation" for the exercise of "First Amendment rights." Compl., D.1 at 81. Thus, *Ex Parte Young*'s exception does not apply. Under these circumstances, Plaintiffs have not demonstrated that sovereign immunity does not bar their official capacity claim against Colonel Perry.

### 2. Plaintiffs have not pled a viable First Amendment retaliation claim against Colonel Perry.

Plaintiffs have also failed to properly plead an ongoing violation of federal law, let alone make a clear showing of one that would entitle them to relief before judgment. To be sure, "'the First Amendment prohibits government officials from [taking] retaliatory actions' based on the exercise of protected speech rights." *Grady*, 170 F.4th at 1000 (quoting *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019)). But the Civil Rights Act, which provides the right of action here, does not

impose liability on government officials like Colonel Perry merely because individual Highway Patrol officers may have violated Plaintiffs' First Amendment rights. *See Guptill v. City of Chattanooga*, 160 F.4th 768, 782 (6th Cir. 2025). Put differently, Plaintiffs cannot state a First Amendment retaliation claim against Colonel Perry simply by reciting a litany of allegations claiming that various State Troopers took adverse action against them based on their recording activities. After all, those State Troopers are not defendants in this action. Instead, Plaintiffs must plead and prove that Colonel Perry, "through [his] deliberate conduct," maintains a policy or custom that caused, and indeed "was the moving force" behind, those violations. *Guptill*, 160 F.4th at 782. (quoting *Alman v. Reed*, 703 F.3d, 887, 903 (6th Cir. 2013)).

And that's not all. The claim of First Amendment retaliation pressed here is not as simple as a garden-variety direct First Amendment claim, where a government actor unlawfully curtails a claimant's protected activity or expression. Here, Plaintiffs must plead and "prove that 1) [they] engaged in protected conduct, 2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct, and 3) the adverse action was taken at least in part because of the exercise of the protected conduct." *Holzemer v. City of Memphis*, 621 F.3d 512, 521 (6th Cir. 2010). The Supreme Court has interpreted the third element to require a showing that the government defendant's "retaliatory animus" was the "but-for" cause, of both the adverse action and the plaintiff's injury. *Nieves*, 587 U.S. at 398-99.

Plaintiffs' motion and briefing offer nothing to indicate that Colonel Perry has ever enacted a policy of retaliation motivated by hostility to their protected expression, let alone one that exists to this day in ongoing defiance of federal law. Their evidentiary burden on that showing is "more stringent than" what is "required to survive a [motion for] summary judgment." *Enchantment Christmas Lights Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020) (quoting

*Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000)). And yet, their motion papers—like their complaint—are content to recite legal tests, *see* Prelim. Inj. Br. D. 16-2 at 215, while devoting hardly any attention to Colonel Perry's conduct.

Instead, they have simply flooded the record with one-sided accounts of police work that may or may not have involved constitutional violations. *See, e.g.*, Compl., D.1 at 14–63; Prelim. Inj. Br., D.16-2 at 208-10, 212-13. They have then asserted that "the *federal government* has a policy of retaliating against individuals gathering information about and recording *federal* immigration and law enforcement officers." Compl., D.1 at 64 (capitalization omitted) (emphasis added). Although they also claim that Colonel Perry "has endorsed and adopted[] this federal policy," *id.* at 69, they offer no evidence to move that assertion beyond the realm of sheer speculation. Contrary to Plaintiffs' assertions, the Highway Patrol's Office of Professional Accountability is indeed "investigat[ing]" the circumstances of Plaintiff Chodor's arrest after the American Civil Liberties Union on her behalf submitted a formal complaint exactly one week before filing this lawsuit. *See* Declaration of Matt Perry, ¶ 4. And it is beyond the pale to suggest that, by expressing concern for officer safety, Colonel Perry has demonstrated animus toward protected expression or endorsed unconstitutional police work. *See* Prelim. Inj. Br., D.16-2 at 218; Compl., D.1 at 69–70.

In the absence of a plausible claim of an ongoing violation of federal law, sovereign immunity bars this court from exercising jurisdiction over Colonel Perry.

### B. There is no viable pre-enforcement claim concerning the Bystander Interference Act.

Plaintiffs' attempt to invalidate the Bystander Interference Act is plagued by a similar sort of confusion: they think the Act authorizes police orders that violate First Amendment rights. They

are wrong, and they misrepresent their First Amendment rights.

**1. The Bystander Interference Act does not authorize police orders.**

Any coherent First Amendment analysis must account for what the Bystander Interference Act actually does. Critically, nothing in the statute's text purports to grant the police any new authority to issue "Halo" orders. The text assumes that police officers "can . . . already" issue orders while carrying out their duties. Legislative Debates at p. 7 (statement of Sen. Pody). The statute then creates a new "offense" for "intentionally approach[ing] within twenty-five feet" of an officer "*after* the officer has ordered the person to stop approaching or to retreat." Tenn. Code Ann. § 39-16-612(a) (emphasis added).

This language mirrors the format adopted by several other Tennessee laws—laws that Plaintiffs affirmatively argue *do not* violate the First Amendment. Take for instance "Tennessee's disorderly conduct statute," Prelim. Inj. Br., D.16-2 at 222, which makes it "an offense" to "[dis]obey an . . . order to disperse" issued to "maintain public safety," Tenn. Code Ann. § 39-17-305(a)(2). Or compare the Bystander Interference Act to Tennessee's traffic-control laws, which make it "a . . . misdemeanor" to "willfully fail or refuse to comply with [the] lawful order" of an officer "authori[zed] to . . . regulate traffic." *Id.* § 55-8-104, *cited by* Prelim. Inj. Br., D.16-2 at 222. All three statutes explicitly punish some form of failure to obey a "lawful order." *Id.* § 39-16-612(b). None attempts to "establish[] buffer zones" preventing "expressive activities" for the sake of regulating speech. Prelim. Inj. Br., D.16-2 at 220.

This is because the power to issue orders derives incidentally from the powers and "official duties" of police, which include "arresting offenders," "preventing crime," and "preserving the peace." *United States v. Baldwin*, 745 F.3d 1027, 1033 (10th Cir. 2014); *see Reichman*, 188 S.W. at 227–28; *Cantrell*, 78 S.W.3d at 908. As a matter of longstanding custom, this role entails the

use of "physical coercion *or* threat thereof." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (emphasis added). And sometimes that means "exercis[ing] unquestioned command of [a] situation" through the use of reasonable orders. *Wilson*, 519 U.S. at 414 (quoting *Summers*, 452 U.S. at 703); *see Illinois v. McArthur*, 531 U.S. 326, 336–37 (2001); *Colten*, 407 U.S. at 109–10; *see also Weed v. Jenkins*, 873 F.3d 1023, 1028 (8th Cir. 2017) (traffic safety); *Hensley v. Gassman*, 693 F.3d 681, 692 (6th Cir. 2012) ("peacekeeping"); *United States v. Garzon*, 119 F.3d 1446, 1450–51 & n.2 (10th Cir. 1997) (investigation). Because of this pedigree, police-order power has its own inherent limits. *See Illig-Renn*, 142 P.3d at 70–71. Those limits prohibit police from issuing orders for the purpose of violating First Amendment rights. *See Garzon*, 119 F.3d at 1450.

Indeed, when a police officer conveys to a "person that he . . . [i]s not at liberty to . . . go about his . . . business," it "amounts to a seizure of th[at] person," which can only be lawful to the extent it is reasonable. *Cantrell*, 78 S.W.3d at 907–08; *see* U.S. Const. amend. IV; *Wilson*, 519 U.S. at 411. Depending on the circumstances, it can be reasonable to tell a bystander "to 'step back'" and warn "that he w[ill] be arrested if he d[oes] not." *Haggerty*, 391 F.3d at 657; *see Ehlers*, 846 F.3d at 1009; *see also McArthur*, 531 U.S. at 336–37 (concerning an order that "prevented [a] man from entering [his] home for about two hours" but not otherwise restraining him, *id.* at 328). The Bystander Interference Act does not authorize such "order[s]"; it merely assumes stay-back "order[s]" will issue. Tenn. Code Ann. § 39-16-612(b).

The Eighth Circuit's recent opinion in *Edwards v. City of Florissant*, 58 F.4th 372 (8th Cir. 2023), is instructive on this point. There, protestors sued a municipality over police "order[s] . . . to disperse" that the protestors alleged to be "arbitrar[y]." *Id.* at 375. The protestors claimed the power to issue such orders was "tethered" to a state law punishing "failure[s] to disperse." *Id.* at 376 (citing Mo. Rev. Stat. §§ 574.040, 574.060). But the Eighth Circuit held that "a municipality's

'substantial interest in . . . ensuring the . . . flow of traffic' . . . can without more justify dispersal orders." *Id.* at 376–77 (quoting *Duhe v. City of Little Rock*, 902 F.3d 858, 865 (8th Cir. 2018)). The challenged statute merely specified a consequence for the "fail[ure] to comply with a[n] . . . order . . . issued under *another* [source of authority]." *Weed*, 873 F.3d at 1028; *see Edwards*, 58 F.4th at 377. The Bystander Interference Act works the same way: it relies on preexisting power to issue reasonable—or "lawful"—commands. Tenn. Code Ann. § 39-16-612(a).

**2. The Bystander Interference Act does not abridge freedom of speech.**

Taken for what it actually does, the Bystander Interference Act should get rational-basis review. *See S.H.A.R.K. v. Metro. Parks Serving Summit Cnty.*, 499 F.3d 553, 560–61 (6th Cir. 2007). And even if the Court applied heightened scrutiny, the Act would still pass that test.

**a. The Act does not attempt to regulate speech.**

The Bystander Inference Act does not "target[] 'speech as speech.'" *McLemore v. Gumucio* (*McLemore II*), 149 F.4th 859, 865 (6th Cir. 2025); *see Lichtenstein v. Hargett*, 83 F.4th 575, 584 (6th Cir. 2023). By its plain terms, it regulates "conduct": approaching a police officer "after being directed [not] to do so." *Colten*, 407 U.S. at 109; *see* Tenn. Code Ann. § 39-16-612(a). Such conduct is not "protected by the First Amendment" just because a bystander wants to "receiv[e] information." *Colten*, 407 U.S. at 109. The Supreme Court rejected that "near-frivolous contention" more than five decades ago. *Id.*

There is thus "no [First Amendment] right to observe" police work or "interfere[]" with enforcement of the laws. *Id.* And "generally applicable laws . . . that prohibit interference" with police business may lawfully impede efforts "'to gather the news.'" *Lund v. City of Rockford*, 956 F.3d 938, 947 (7th Cir. 2020) (quoting *Cohen v. Cowles Media Co.*, 501 U.S. 663, 669 (1991)). Indeed, "[t]here are few restrictions on action which could not be clothed by ingenious argument

in the garb of decreased data flow." *Zemel v. Rusk*, 381 U.S. 1, 16–17 (1965). That does not mean "[t]he right to speak and publish" includes an "unrestrained right to gather information." *Id.* at 17.

Attempting to argue otherwise, Plaintiffs assert a First Amendment right to "gather information and record." Prelim. Inj. Br., D.16-2 at 220. This expansively conceived right does not actually exist within the Sixth Circuit or Supreme Court caselaw.

To be sure, precedent recognizes that government cannot *target* "*public*[*ation*]" by eliminating "sources of information." *CBS Inc. v. Young*, 522 F.2d 234, 237–38 (6th Cir. 1975) (per curiam) (emphasis added); *see also Lichtenstein*, 83 F.4th at 585–86 (discussing the "speech input" cases). But the Sixth Circuit has also clarified that the only newsgathering "right" is a "right to gather news . . . 'by means within the law.'" *S.H.A.R.K.*, 499 F.3d at 560 (quoting *Houchins v. KQED, Inc.*, 438 U.S. 1, 11 (1978)); *accord Lund*, 956 F.3d at 947. And in evaluating whether a law permissibly restricts newsgathering, precedent asks only whether it is "reasonably related to the government's [stated] interest." *S.H.A.R.K.*, 499 F.3d at 561.

The Bystander Interference Act clears that sensible bar, as illustrated by multiple binding precedents. For example, in *Colten v. Kentucky*, 407 U.S. 104 (1972), the Supreme Court rejected a free speech argument raised by a defendant who defied police orders to disperse. *See id.* at 109–10. The Court noted the State's "legitimate interest in enforcing its traffic laws" and the dispersal order's contribution to reducing "the risk of [a traffic] accident." *Id.* In *King v. Ambs*, 519 F.3d 607 (6th Cir. 2008), the Sixth Circuit recognized a similar state interest in preventing obstruction of a police investigation. *Id.* at 613. That interest justified arrest of a bystander to prevent "'contentious and abusive' speech." *Id.* (quoting *Houston v. Hill*, 482 U.S. 451, 463 n.11 (1987)). In both cases, First Amendment rights were limited by obstruction laws "reasonably related to the government's interest" in police work. *S.H.A.R.K.*, 499 F.3d at 561. If such laws are "properly

tailored" despite their impact on *speech*, the Bystander Interference Act must be "properly tailored" despite its impact on recording. *King*, 519 F.3d at 613; *see Lund*, 956 F.3d at 947.

Indeed, the safety and obstruction concerns behind this law were well documented in the legislative record. *See* Legislative Debates at p. 7, 10-11, 32-33. And the law applies to all members of the public; it does not "selectively" target those who gather information. *S.H.A.R.K.*, 499 F.3d at 561. So, the only question is whether the State's safety "interest reasonably relates to the [twenty-five-foot] rule." *Id.* And a bystander's ability to "approach[] within twenty-five feet" of police work—in violation of police orders—raises critical safety concerns. Tenn. Code Ann. § 39-16-612(a).

To begin, an "order[] . . . to stop approaching or to retreat" cannot lawfully issue without objectively reasonable basis. *Id*. And generally, that basis will be to protect officers and bystanders from harm and prevent interference with official police business. Tenn. Code Ann. § 39-16-612(a); *see Colten*, 407 U.S. at 109–10; *Lund*, 956 F.3d at 947; *Ehlers*, 846 F.3d at 1009; *Haggerty*, 391 F.3d at 657; *cf. Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 685–88 (4th Cir. 2023) (Niemeyer, J., concurring in the judgment) (arguing that the lawfulness of an "order . . . to cease using a cell phone" during a traffic stop "is regulated by the Fourth Amendment," *id.* at 685). Members of the public may have differing ideas about what conduct puts them, and officers, at risk. *See* Compl., D.1 at 18–63. The Tennessee legislature settled that debate by adopting a clear, bright-line rule. *See* Legislative Debates at p. 7.

**b. The "buffer zone" caselaw is inapposite.**

Plaintiffs resist this conclusion by claiming "buffer zone[]" caselaw, like *McCullen v. Coakley*, 573 U.S. 464 (2014), "is instructive." Prelim. Inj. Br., D.16-2 at 221. But that would only be true if the Bystander Protection Act itself "restrict[ed] access to traditional public fora" for

speech. *McCullen*, 573 U.S. at 476. This law does not prevent Plaintiffs—or anyone else—from speaking in any traditional public fora. They say they want to "gather information" (not speak). *See* Prelim. Inj. Br., D.16-2 at 222. And they want to do it in space *not* traditionally open to the public for purposes of speech. Indeed, Plaintiffs want to "receiv[e] information" while "possibl[y] infer[ing]" with or "interrupti[ng]" ongoing police business. *Colten*, 407 U.S. at 109. To claim this is "protected by the First Amendment" buffer-zone caselaw is a "near-frivolous contention" that this Court should reject. *Id.*

**c. The "right to record" caselaw is inapposite.**

Hitting somewhat closer to the mark, Plaintiffs invoke the "right to record" caselaw from circuits that do not bind this Court. *See, e.g.*, Prelim. Inj. Br., D.16-2 at 209, 220 (citing cases). That maneuver does not work either, for two independent reasons.

*First*, the Sixth Circuit has already foreclosed the idea of a broadly conceived First Amendment "right to record." *Hils v. Davis*, 52 F.4th 997, 1001 (6th Cir. 2022). "[T]he text of the First Amendment" protects "'freedom of speech [and] press,'" not the "conduct" of making a recording. *Id.* (quoting U.S. Const. amend. I); *see Colten*, 407 U.S. at 109; *Zemel*, 381 U.S. at 17. And "[a] prohibition on recording speech is not a prohibition on speaking." *Hils*, 52 F.4th at 1001. "American tradition" likewise "cut[s against]" Plaintiffs' argument by giving law enforcement the power to issue reasonable directives. *Id.* And binding "[p]recedent" recognizes an information-gathering right only "as far as the government" will allow. *Hils*, 52 F.4th at 1003; *see S.H.A.R.K.*, 499 F.3d at 560.

*Second*, even under the "sister[-]circuit[]" caselaw purportedly recognizing a "right to record," Plaintiffs' attempt at a pre-enforcement challenge to the Bystander Interference Act would still fail. *Hils*, 52 F.4th at 1005. The Act neither prohibits recording itself nor authorizes police

to prohibit recording. So a "person" lawfully "ordered . . . to stop approaching or to retreat" may continue to record police. Tenn. Code Ann. § 39-16-612(a). In the out-of-circuit "right to record" cases, by contrast, the challenged government action actually prohibited recording. In fact, most cases address bans on recording imposed for the *specific purpose* of preventing future publication and public scrutiny. *See, e.g.*, *Jordan v. Jenkins*, 73 F.4th 1162, 1169–70 (10th Cir. 2023), *cited by* Prelim. Inj. Br., D.16-2 at 220; *Irizarry v. Yehia*, 38 F.4th 1282, 1293 (10th Cir. 2022), *cited by* Prelim. Inj. Br., D.16-2 at 209; *Turner v. Lieutenant Driver*, 848 F.3d 678, 683 (5th Cir. 2017), *cited by* Prelim. Inj. Br., D.16-2 at 209; *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 586 (7th Cir. 2012), *cited by* Prelim. Inj. Br., D.16-2 at 209; *Glik v. Cunniffe*, 655 F.3d 78, 79–80 (1st Cir. 2011); *see also Brown v. Kemp*, 86 F.4th 745, 779 (7th Cir. 2023) (relying on *Alvarez* to address recording as an input to speech).

This distinction is consistent with Sixth Circuit precedent, which distinguishes neutral conduct rules from rules "target[ing] 'speech.'" *McLemore II*, 149 F.4th at 865. Under that caselaw, the Bystander Interference Act regulates "conduct" and carries minimal First Amendment implications. *Colten*, 407 U.S. at 109; *see McLemore II*, 149 F.4th at 865; *Johnson v. Estate of Laccheo*, 935 F.2d 109, 112 (6th Cir. 1991). It would only require heightened First Amendment scrutiny if it surreptitiously targeted "[t]he protected right to publish." *CBS*, 522 F.2d at 238; *see Lichtenstein*, 83 F.4th at 585–86. But the Act's twenty-five-foot rule does not prevent publication or choke off all "significant and meaningful sources of information." *CBS*, 522 F.2d at 239.

**d. The Act clears intermediate scrutiny regardless.**

If the Court nonetheless engages in a heightened-scrutiny analysis, it should still uphold the Bystander Interference Act as a "reasonable time, place, and manner restriction[]." *Kelly*, 622 F.3d at 262. Such restrictions pass constitutional muster if they (1) are "content-neutral,"

(2) "'further . . . legitimate interests,'" (3) do not "restrict 'substantially more speech than is necessary,'" and (4) "'leave open ample alternative channels' for speaking." *Lichtenstein*, 83 F.4th at 597–98 (quoting *McCullen*, 573 U.S. at 477, 486). Based on the legislative and litigation record, the Bystander Interference Act satisfies all four requirements.

***Content Neutrality.*** "Government regulations of speech are content neutral if they are 'justified without reference to the content or viewpoint of the regulated speech.'" *Blankenship v. Louisville-Jefferson Cnty.*, 162 F.4th 644, 655 (6th Cir. 2025) (quoting *Saieg v. City of Dearborn*, 641 F.3d 727, 735 (6th Cir. 2011)). The law challenged here makes no mention of speech or recording. *See* Tenn. Code Ann. § 39-16-612. It thus could not possibly regulate speech or recording in a way that "treats different *messages* differently." *McLemore II*, 149 F.4th at 866 (quoting *Lichtenstein*, 83 F.4th at 588); *cf. Blankenship*, 162 F.4th at 657 (holding a location restriction content-neutral).

***Interests.*** The interests underlying the Bystander Interference Act are "legitimate," to say the very least. *Lichtenstein*, 83 F.4th at 598 (quoting *McCullen*, 573 U.S. at 486). "The State has a legitimate interest in enforcing its traffic laws," *Colten*, 407 U.S. at 109; *see Edwards*, 58 F.4th at 377, and "[p]ublic safety and security" are "significant governmental [concerns]," *Blankenship*, 162 F.4th at 657 (quoting *Reform Am. v. City of Detroit*, 37 F.4th 1138, 1149–50 (6th Cir. 2022). Of course, some "risk of harm" arises "whenever police officers . . . effect a stop," *United States v. Robinson*, 846 F.3d 694, 698 (4th Cir. 2017) (en banc), or confront some other "situation" they must "unquestion[ably] command," *Wilson*, 519 U.S. at 414 (quoting *Michigan*, 452 U.S. at 703). All these interests can justify reasonable police orders that tell bystanders "to stop approaching or to retreat." Tenn. Code Ann. § 39-16-612(a); *see*, *e.g.*, *Haggerty*, 391 F.3d at 657. If they can justify such police orders, they can justify a law that punishes those who disregard them.

***Tailoring.*** "[S]o long as the governmental interest[s]" identified "would [be] achieved less effectively in its absence," the Bystander Interference Act qualifies as narrowly tailored in the relevant legal sense. *Blankenship*, 162 F.4th at 658 (quoting *Reform Am.*, 37 F.4th at 1149). Here, the challenged law was passed precisely because pre-existing laws were "less effective[]" in "achiev[ing]" the government's ends. *Id.* (quoting *Reform Am.*, 37 F.4th at 1149). The State lacked a bright-line rule telling bystanders when "approaching" police would create unsafe conditions or interfere with police work. Tenn. Code Ann. § 36-16-612(a). Without the ability to "enforc[e] a restricted area, . . . police would have no control over the individuals present within the[ir] immediate vicinity." *Blankenship*, 162 F.4th at 658. There simply is no "'variety of approaches that appear capable of serving' the interests of public security and safety" in such circumstances. *Id.* at 659 (quoting *McCullen*, 573 U.S. at 494); *cf. Weed*, 873 F.3d at 1029 (rejecting an overbreadth argument raised against laws preventing obstruction of police work).

***Alternative Channels.*** When it comes to considering whether a law leaves open ample alternative channels of communication, "[t]he relevant question . . . is 'whether the proffered alternatives allow the speaker to reach its intended audience.'" *Blankenship*, 162 F.4th at 659 (quoting *Contributor v. City of Brentwood*, 726 F.3d 861, 865 (6th Cir. 2013)). That question hardly makes sense in this case, given Plaintiffs' conflation of "information gathering" with speech. Still, to the extent alternative means of gathering information must be considered, those considerations favor the State.

The obvious alternative to "approach[ing] within twenty-five feet" of an "officer after the officer has ordered . . . to stop approaching or to retreat" is *not* "approach[ing] within twenty-five feet" of the officer but otherwise engaging in the same activities. Tenn. Code Ann. § 39-16-612(a). Bystanders will thus necessarily have the option to record from, at most, twenty-five feet away.

*See id.* They will likewise have the option to access "body and dash cam video" that has become ubiquitous in modern police work. *Feagin*, 155 F.4th at 600. When it comes to interviewing others, they can do that from a distance or simply wait for police to conclude their "duties." Tenn. Code Ann. § 39-16-612(a). The upshot is that the Act does not close off any "channels" of gathering information; all "channels" remain open for anyone to use. *Reform Am.*, 37 F.4th at 1151.

It should likewise go without saying that the Bystander Interference Act allows Plaintiffs "to reach [their] intended audience.'" *Blankenship*, 162 F.4th at 659 (quoting *Contributor*, 726 F.3d at 865). Again, it does nothing to limit access to any audience or even limit what sorts of facts may be gathered or conveyed. Thus, trying to shoehorn the Act into this rubric only illustrates the baselessness of Plaintiffs' theory. The Act allows everyone to reach their intended audience because it does not actually contain any restriction on speech.

**3. Plaintiffs lack standing to sue DA Mulroy.**

In seeking a preliminary injunction, Plaintiffs must make a "clear showing" that they are "likely" to establish the Court's jurisdiction. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quotation omitted). But Plaintiffs stumble over this hurdle because they have not shown that DA Mulroy has either enforced or threatened to enforce the Bystander Interference Act against them.

The Constitution limits "federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (quoting U.S. Const. art. III, § 2). To invoke that limited jurisdiction, "a plaintiff must have standing to sue." *Fox v. Saginaw Cnty., Mich.*, 67 F.4th 284, 292-93 (6th Cir. 2023) (quotation omitted). That means a plaintiff must show that he has: "(1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Fed. Election Comm'n. v. Cruz*, 596 U.S. 289, 296 (2022).

An injury in this context typically requires an official to enforce an allegedly unconstitutional law against the plaintiff. *Friends of George's, Inc. v. Mulroy*, 108 F.4th 431, 435 (6th Cir. 2024). Here, no Plaintiff establishes that DA Mulroy has ever enforced the Bystander Interreference Act against them. So to obtain pre-enforcement relief, Plaintiffs must establish an "imminent . . . injury" that is "real, immediate, and direct." *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2015) (quotation omitted). That is, Plaintiffs must show that they intend to engage in conduct that "generates a '*certainly impending*' threat of prosecution." *Friends of George's*, 108 F.4th at 435 (quoting *Crawford*, 868 F.3d at 454).

Plaintiffs do not. Nothing in their motion shows that DA Mulroy has ever threatened them with prosecution under the Bystander Interference Act or enforced it against any other person. *See id.* at 440. Rather, buried in a footnote, Plaintiffs merely assert that this Court has jurisdiction over DA Mulroy because he has authority to prosecute violations of Tennessee's criminal statutes. Prelim. Inj. Br., D.16-2 at 224 n.6. But authority "in the *abstract*" says nothing about whether DA Mulroy would enforce the law "against anything like [Plaintiffs'] *specific*" conduct. *Davis v. Colerain Twnp., Ohio*, 51 F.4th 164, 174 (6th Cir. 2022). And Plaintiffs need specific evidence about what DA Mulroy "has done, is doing, or might do to injure" them to obtain a preliminary injunction. *See Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022); *see also Lawson v. Hargett*, No. 3:24-cv-00538, 2024 WL 3867526, at *10-12 (M.D. Tenn. Aug. 19, 2024) (holding that allegations of a hypothetical or possible future prosecution did not establish standing against district attorneys general). Because Plaintiffs cannot show that they are under any threat of prosecution, they cannot show that they are likely to have standing to sue DA Mulroy. *Murthy*, 603 U.S. at 58.

## II. The equities do not favor preliminary injunctive relief.

"Even if a plaintiff has shown a likelihood of success on the merits, 'a preliminary injunction does not follow as a matter of course.'" *EOG*, 134 F.4th at 883 (quoting *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam)). In this case, the equities do not favor "the court's immediate intervention" to keep public officials from "enforc[ing] the [public's] will." *Id.* at 883.

Plaintiffs' contrary argument completely depends on their mistaken views of the law. The conduct of "gather[ing] information" is not a "'First Amendment freedom[],'" Prelim. Inj. Br., D.16-2 at 224 (quoting *Elrod*, 427 U.S. at 373. And the Act does not empower State Troopers to prohibit information gathering. Moreover, an injunction prohibiting "retaliation" would be as useless as it sounds. Prelim. Inj. Br., D.16-2 at 224. That practice is already illegal. *See Grady*, 170 F.4th at 996. And Colonel Perry could not have authorized it in his official capacity.

As for the potential harm to the State Defendants and the Tennessee public, there is no gainsaying what is at stake. Our Constitution puts "the power to make the laws" in the hands of "those chosen by the people." *King v. Burwell*, 576 U.S. 473, 498 (2015). And the American people largely protect their own safety—and that of public officials—through state legislation. *See Lee II*, 137 F.4th at 576. A federal court order impeding that "sovereign interest" would thus irreparably harm all Tennesseans. *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 591 (6th Cir. 2024) (quoting *Kentucky v. Biden*, 23 F.4th 545, 598 (6th Cir. 2022)). It would also impede sound police work while allowing "harmful conduct . . . to continue." *Abbott v. Perez*, 585 U.S. 579, 595 (2018).

## CONCLUSION

For the reasons given above, the Court should deny the motion for preliminary relief.

Respectfully submitted,

**JONATHAN SKRMETTI**
**Attorney General and Reporter**

s/ David M. Rudolph
David M. Rudolph, BPR #13402
Senior Assistant Attorney General
Shannon Hoffert, BPR #28430
Deputy Attorney General
Robert W. Wilson, BPR #34492
Senior Assistant Attorney General
Mark Weston, BPR #38585
Assistant Attorney General
Office of the Tennessee Attorney General
40 South Main Street, Suite 1014
Memphis, Tennessee 38103-1877
Phone: 901-543-4162
Fax: 901-543-9025
david.rudolph@ag.tn.gov
shannon.hoffert@ag.tn.gov
robert.wilson@ag.tn.gov
mark.weston@ag.tn.gov
*Counsel for Defendants Colonel Matt Perry and District Attorney General Steven J. Mulroy in their official capacities*

## CERTIFICATE OF SERVICE

I hereby certify that on July 8, 2026, a copy of the foregoing document was filed electronically. Notice of this filing will be sent by operation of the Court's ECF system to:

Scarlet Kim
Ken Sexauer
Brian Hauss
American Civil Liberties Union Foundation
125 Borad Street, 18th Floor
New York, NY 10004
scarletk@aclu.org
ksexauer@aclu.org
bhauss@aclu.org

Zee Scout
Lucas Cameron-Vaughn
ACLU Foundation of Tennessee
P.O. Box 120160
Nashville, TN 37212
zscout@aclu-tn.org
lucas@aclu-tn.org

Faith E. Gay
Corey Stoughton
Katherine Buoymaster
Sylvia Woodmansee
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
fgay@selendygay.com
cstoughton@selendygay.com
kbuoymaster@selenday.com
swoodmansee@selendygay.com

Matthew Borden
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
borden@braunhagey.com

Marissa R. Benavides
BRAUNHAGEY & BORDEN LLP
200 Madison Ave., 23rd Floor
New York, NY 10016
benavides@braunhagey.com

Melanie R. Dunlap
Jennifer H. Collins
United States Attorney's Office
Western District of Tennessee
167 N. Main Street, Suite 800
Memphis, Tennessee 38103
melanie.dunlap@usdoj.gov
jennifer.collin@usdoj.gov

s/ David M. Rudolph
David M. Rudolph
Senior Assistant Attorney General
*Counsel for Defendants Colonel Matt Perry and*

*District Attorney General Steven J. Mulroy in their official capacities*