**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

HUNTER DEMSTER *et al.*,

*Plaintiffs*,

v.

TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States*, *et al.*,

*Defendants*.

Case No. 26–cv–02546

**REPLY EXPERT DECLARATION OF JIM PUGEL**

I, Jim Pugel, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge:

1. I have reviewed the opposition briefs and declarations submitted by Defendants. In my opinion, they largely do not address the expert opinions that I offered in my declaration or the evidence that I reviewed to support my opinions.

2. Defendants' opposition briefs attach only the declarations of two of their employees, neither of whom were involved in, or even present for, the law enforcement actions at issue in this case. Defendants have submitted the Declaration of Daryl Diamond ("Diamond Declaration"), but he does not offer any testimony on the Halo Law as applied to Plaintiffs. Nor does he appear to have much experience making routine street arrests because he states that he has about nine years of experience working in various capacities for the U.S. Marshals Service, helping to apprehend dangerous suspects. Arresting wanted and dangerous fugitives is materially different from policing routine street crime and immigration enforcement, even when some suspects may

be felons or potentially armed. Defendants have also submitted the Declaration of Colonel Matt Perry. However, he does not offer any testimony about the retaliatory actions at issue in this case or invocation of the Halo Law as applied to Plaintiffs, either.

3. I further note that the Diamond Declaration makes sweeping characterizations of and statements about Plaintiffs' conduct, but fails to identify any materials he reviewed or any experience or other information he relied upon in making his declaration.

## I. Defendants Do Not Refute Any of the Evidence I Relied on to Form My Expert Opinions

4. The Diamond Declaration does not address any of the facts that form the bases of my expert opinions. For example, it states that Task Force agents "may" request that people move back to a "safe distance" (¶ 18), or that they "may use" flashlights for law enforcement purposes (¶ 17). But these statements do not respond to the specific testimony that Plaintiffs offered about what happened to them. For example, at paragraphs 36 and 39–40 of his declaration, Mr. Demster testifies that on November 7, 2025, law enforcement officers asked him to move back and prevented him from recording and observing when he was not obstructing their operations. The Diamond Declaration offers no explanation for why this occurred. This is just one example. Mr. Demster testifies about over 20 incidents where he was not obstructing law enforcement, but Task Force members targeted him anyway. Mr. Halt testifies about approximately a dozen such incidents, Ms. Chodor testifies about approximately 5 such incidents, and Ms. Peeler also testifies about approximately 5 such incidents. The Diamond Declaration does not respond to any of the specific incidents in any of these declarations that form the basis of my expert opinions.

5. The Diamond Declaration offers similarly vague and non-responsive statements in other parts. For example, in Paragraph 22, it states: "In these vehicular incidents, after Task Force officers approached Plaintiffs in their vehicles, the officers consistently advised the drivers that,

through their conduct of following vehicles, they were impeding, interfering or creating a safety hazard." This statement does not specify how any Plaintiff was supposedly obstructing law enforcement. Nor does it address the many incidents Plaintiffs describe that occurred when they were on foot. For example, Mr. Demster testified that, on October 24, 2025, "I continued to walk through the parking lot filming the vehicles leaving. I was standing near a grassy median filming the vehicles slowly driving out of the parking lot when an unmarked black Ford Expedition, driven by one of the unmarked and masked agents, sped up and swerved towards me as he approached me and then braked immediately once he passed me." Demster Decl. ¶ 30. The Diamond Declaration does not deny that a Task Force officer swerved his vehicle at Mr. Demster. Nor does it offer any reason for why swerving at Mr. Demster was necessary for any legitimate law enforcement purpose, much less show that Mr. Demster was obstructing law enforcement.

6. Paragraph 19 of the Diamond Declaration states that officers did not tell Plaintiffs they could not "record a scene" and that officers "only had to ask them to move back if they began to interfere with or impede their operations, thus creating a dangerous situation, at which point the Plaintiffs are not exercising their First Amendment rights." But again, this vague and conclusory pronouncement and argument about the First Amendment does not address the specific evidence that forms the bases for my expert opinions. For example, it does not address that officers forced Plaintiffs to stand in locations where they could not adequately "record a scene." *See, e.g.*, Demster Decl. ¶¶ 19–25, 33–41, 42–47, 71–73, 81–86, 87–89, 90–94, 103-106, 118–122, 127–129; Peeler Decl. ¶¶ 30–32, 56–62; Chodor Decl. ¶¶ 15–16. Nor does it offer any reason that requiring people to stand where they could not sufficiently record or observe was necessary under the specific facts and circumstances detailed in the declarations. Nor does Paragraph 19 refute or explain events

such as what happened to Mr. Demster on October 2, 2025 at around 9:50 a.m. when, according to Mr. Demster's testimony:

> An agent asked me to stay back and I complied and stayed 25 feet away from the officer. The officer then stood directly between my line of sight and the person the agents were detaining, blocking my camera view. When I stepped a few feet in another direction to try to get a clear view, the agent mirrored my steps and again blocked my view. … I tried to move up and down the block while remaining 25 feet away from the scene, and the officer also moved, to continue to obstruct my view of the arrest. Because I was so far away from the scene, I also could not hear what was being said. By complying with the Halo Law, I was not able to adequately record or gather information about the arrest.

Demster Decl. ¶ 16.

7. Other than the vague statements in Paragraphs 19 and 22 of the Diamond Declaration, Defendants have not offered anything to try to show that Plaintiffs were somehow interfering with law enforcement at the time of the events described in their declarations. At no point did Plaintiffs appear to physically interfere with law enforcement activities in any of the video or written descriptions I reviewed in connection with this case. Neither the volume nor the content of Plaintiffs' communications to or around the agents should have prevented the agents from carrying out their duties under the circumstances presented. In fact, those materials show that Plaintiffs' encounters with Task Force agents have frequently occurred either after agents have concluded their enforcement activities, such as a traffic stop or detention, or when agents do not appear to be engaged in enforcement activity at all—for example, when agents have been parked outside Plaintiffs' homes. *See, e.g.*, Demster Decl. ¶¶ 29–32, 43–47, 50–52, 62–67, 71–73, 88–89, 98–102; Halt Decl. ¶¶ 30–32, 48–56, 69–80, 86–88, 90–94, 95–99, 100–105, 108–116.

## II. Defendants Do Not Show that the Halo Law Is Necessary as Applied to Plaintiffs

8. None of the materials submitted by Defendants show that the Halo Law, as applied to Plaintiffs, is necessary to stop them from interfering with law enforcement. Paragraph 15 of the

Diamond Declaration states that law enforcement officers must be aware of their surroundings to protect themselves and others. While this statement is true, this is not a reason for a blanket, 25-foot buffer. As I explained in my expert declaration, and Defendants do not contest, police around the country do not need such a buffer to operate safely and without obstruction by observers, especially when making static arrests.

9. In addition, the videos and descriptions of Plaintiffs' experiences with the Task Force that I have reviewed consistently reflect the presence of five to over twenty agents. This is more than sufficient to maintain full situational awareness without requiring a blanket 25-foot buffer. As I explained in my expert declaration, and Defendants also do not contest, I regularly made or was present for arrests during chaotic protests where our officers were significantly outnumbered by unruly crowds without needing a 25-foot buffer. While there could be situations where more distance is needed (although Defendants have not pointed to any, nor have I seen any in the record), a person who did not comply with a request to relocate under those theoretical circumstances could be arrested under other obstruction laws.

10. The Diamond Declarations states that "Task Force agents may . . . request persons not involved in the enforcement operation to step back to a safe distance to avoid distracting law enforcement." Diamond Decl. ¶18. But it offers no opinion as to what such a minimum "safe distance" would be as to the activities described by Plaintiffs, why it would need to be 25 feet every time, or even why officers would need a halo law at all, given the numerous other statutes targeting obstruction and interference with law enforcement.

Executed this 29th day of July, 2026

Signed by:
Jim Pugel
7B8BFB9408E84F3...

Jim Pugel