# Exhibit 1

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

HUNTER DEMSTER *et al.*,

*Plaintiffs*,

v.

TODD BLANCHE, *in his official capacity as Acting Attorney General of the United States*, *et al.*,

*Defendants*.

Case No. 26–cv–02546

**FIRST SUPPLEMENTAL DECLARATION OF HUNTER DEMSTER**

I, Hunter Demster, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge:

1. I am over the age of 18, am competent to give this declaration, and testify from my own personal knowledge regarding the facts in this declaration.

2. I incorporate by reference all definitions from my opening declaration. ECF No. 16-49.

3. I am submitting this declaration to detail and document recent acts of retaliation by Task Force agents that I experienced on August 26, August 30, and September 3, 2026.

4. In my opening and reply declarations, ECF No. 16-49 and ECF No. 44-1, I explained how the many instances of retaliation I have experienced have led to severe anxiety and resulted in my pulling back or altering how I observe and record Task Force activity when I learn about it.

5. I have been working with a trauma therapy specialist to process the stress and anxiety caused by the persistent retaliation I have experienced. I was starting to feel a bit more

balanced, so I decided to go out to film and observe on August 26 after learning about a large Task Force gathering.

**August 26, 2026**

6. On August 26, 2026, I heard that a large number of Task Force agents had gathered in the Berclair neighborhood. When I arrived around 6:45 p.m., I saw that a car had crashed into the back of a parked truck. I talked to a bystander at the scene who told me that someone crashed a car while attempting to evade law enforcement officers and then fled on foot. I drove a few blocks away, parked my car, and then approached the corner of N. Mendenhall Road and Owen Road on foot while filming.

7. I observed a large group of Task Force agents clustered on the side of N. Mendenhall Road between Owen Road and Durbin Ave, where a large ditch ends perpendicular to Mendenhall ("the Scene"). I saw ten or more plainclothes federal Task Force agents wearing vests marked U.S. Marshals, DHS, HSI, CBP, and Border Patrol, as well as at least 7 uniformed THP troopers. I stopped at least 25 feet away from the Scene, stood on the sidewalk next to a telephone pole, and filmed the Task Force agents for approximately 20 minutes. I was not interfering with, impeding, or intervening in Task Force activity, and Task Force agents walked by me several times without engaging with me at all.

8. After approximately 20 minutes of recording, the agents pulled a young black man out of the ditch and detained him on the Scene. I walked a few feet closer to capture clear footage of the scene. I was not interfering with, impeding, or intervening in the agents' activity and remained a safe distance from the agents and the young man. I was worried for the young man's safety because multiple black men have been killed in interactions with federal authorities in recent months and it looked like the young man may have already been injured when the agents removed him from the ditch. Less than two minutes after the agents pulled him from the ditch, I saw a THP

trooper gesture at me and then multiple agents pointed at me and shouted, "25 feet." I responded that I was "25 feet" away but nevertheless started backing up.

9. As I was backing up, two HSI agents started walking towards me and repeatedly invoking the Halo Law. One of the agents was wearing jeans, a gray t-shirt, glasses with a glasses chain, and a vest marked Police HSI that listed his name as Dayhoff. Agent Dayhoff continued to walk towards me without stopping and told me, "you're going to have to go 25 feet back from me." I kept backing up, and asked, "so every time you walk toward me I got to go back 25 feet?" The other HSI agent responded, "Yes sir, that's the law." This agent was wearing jeans, a blue t-shirt, and a vest marked HSI. I told her that she was mischaracterizing the law and stopped retreating. I was more than 40 feet from the Scene at this point and could not see or hear what was happening at the Scene. The HSI agent in the blue t-shirt again told me "25 feet." Because I was so far away, I did not back up further, and that agent turned and walked back to the scene. I told Agent Dayhoff that I was more than 25 feet back from the Scene and Agent Dayhoff responded, "you've gotta be 25 feet back from me because I've extended the scene."

10. Another agent with blonde hair, colored tattoos on both her arms, a black t-shirt, black gloves, a black baseball cap, and a vest marked "Police HSI" approached me while saying "you gotta go back" and "25 feet from the last officer." I stated that I was more than 25 feet back from the scene and that I was filming and not impeding. She responded "we can arrest you." I responded that I was more than 40 feet back from the scene. During this exchange, an agent wearing an orange and black baseball cap, a black t-shirt, black gloves, and a vest marked "Police U.S. Border Patrol" approached and circled behind me. The blonde HSI agent ordered me to move back an additional 25 feet "from the last officer" two more times and then called back towards the Scene for another agent named "Eric." I again asserted that I had a right to film and that the agents were

continually pushing me back and violating my First Amendment rights. I raised my phone in an attempt to see the Scene beyond the blonde HSI agent and Agent Dayhoff standing in front of me, and the blonde HSI agent held her hand up in front of my phone and said "goodbye" and "we're done."

11. Agent Dayhoff and the blonde HSI agent then each grabbed one of my arms and pulled them behind me. The Border Patrol agent grabbed my legs from behind, pulled them out from under me so I fell hard on my knees, and then tackled me forwards. The three agents pinned me to the ground, and Agent Dayhoff handcuffed me. The Border Patrol agent forcibly bent my knees by pushing my feet up, and I am still having pain in one of my knees. After I was cuffed, three more agents approached and I could hear them shouting "25 feet" to other bystanders.

12. I was arrested 60 feet or more from the Scene.

13. Included as Exhibit A is footage of the incident taken with my phone, from before the Task Force agents pulled the young man out of the ditch to my arrest.[1] Included as Exhibit B is footage of my arrest taken by a bystander who was standing across the street.[2] I have reviewed the video taken by the bystander and it accurately depicts me and my experience of the arrest.

14. After I was cuffed, the agents sat me down on the curb. I heard the agents discussing amongst themselves that they had called the MPD to come pick me up. The blonde HSI agent told me I was going to jail, and at one point walked outside my vision with my phone for approximately 5 minutes. When she returned, she placed my phone and other personal items on the ground near

---

[1] Available at: ACLU, *Hunter Demster – August 26, 2026 (Arrest) (Part 1)* (YouTube, Sep. 8, 2026), https://www.youtube.com/watch?v=nHJe9rSTaOc&list=PLKV5kiDxrRS8&index=1.

[2] Available at: ACLU, *Hunter Demster – August 26, 2026 (Arrest) (Part 2)* (YouTube, Sep. 8, 2026), https://www.youtube.com/watch?v=HqoMaIGy-Xs&list=PLKV5kiDxrRS8&index=2.

me. Although my phone was locked, I am concerned that the Task Force either attempted to access my phone or placed some form of surveillance technology on my phone.

15. Approximately 20 minutes after I was tackled and cuffed, Lucas Cameron-Vaughn, Legal Director of the ACLU Foundation of Tennessee and one of my lawyers in this lawsuit, arrived. When Mr. Cameron-Vaughn arrived, the Border Patrol agent and blonde HSI agent were standing on either side of me where they had forced me to sit on the curb. Mr. Cameron-Vaughn introduced himself as my lawyer and asked what I was being arrested for and whether I was being detained. The blonde HSI agent responded that I was being detained, and they were waiting for MPD. Mr. Cameron-Vaughn asked what I was being detained for, and the blonde HSI agent responded, "I'm not answering any questions right now." I told Mr. Cameron-Vaughn that it was because of the Halo Law, and the blonde HSI agent acknowledged this, and then ordered Mr. Cameron-Vaughn and another bystander recording the interaction back 25 feet from where we were. Mr. Cameron-Vaughn explained that there is a pending lawsuit regarding the Halo Law and the agent again ordered him to retreat 25 feet from her. Mr. Cameron-Vaughn immediately complied with the order. As Mr. Cameron-Vaughn was backing up, Agent Dayhoff came to stand behind me, near the Border Patrol agent. Mr. Cameron-Vaughn then approached a few feet and asked the agent to identify herself. She asked him to move back 25 feet again. Mr. Cameron-Vaughn asked for her badge number, and she indicated that her HSI badge number was 11388.

16. After a few minutes, the blonde HSI agent walked away behind me. The Border Patrol agent shifted to take her place, while Agent Dayhoff continued to stand on the other side of me. Mr. Cameron-Vaughn asked me which agents had detained me, and I identified the three of them. Mr. Cameron-Vaughn approached, again identified himself as my attorney, and asked for the agents' badge numbers. Agent Dayhoff immediately responded by saying "back up" and

refused to provide his badge number. Mr. Cameron-Vaughn repeated that he was my attorney and Agent Dayhoff responded, "do you want to get arrested for violating the law?" Mr. Cameron-Vaughn asked for his name, and Agent Dayhoff responded. Mr. Cameron-Vaughn then backed up. Plaintiff Kenneth Halt, who was also present, offered Agent Dayhoff a measuring wheel to measure out 25 feet so the people present could be sure to remain a proper distance away, but Agent Dayhoff refused to do so. Mr. Halt then offered the measuring wheel to the Border Patrol agent who did not accept it either.

17. After several more minutes, the blonde HSI agent returned and removed the cuffs. As I was standing up from the curb, the Border Patrol agent reached out and put his hand on my back as if to prevent me from standing up. I was terrified and shaken deeply.

18. Included as Exhibit C is footage from when Mr. Cameron-Vaughn arrived on the scene to when the Task Force agents released me taken by a bystander.[3] I have reviewed the video taken by the bystander and it accurately depicts me and my experience of the arrest.

**August 30, 2026**

19. On August 30, 2026, I was at home when a group of Task Force agents gathered across the street from my house. Around 12:30 p.m., I briefly went outside to investigate, saw the agents, and then went back inside my house. Shortly thereafter I walked back outside my house, and the second I did, a Tennessee Department of Correction agent, who was standing in the group of agents, said, "Hunter Demster, stay back 25 feet."

20. I went across the street to talk to my neighbor. Upon crossing the street, I filmed the group of agents. There were six plainclothes agents wearing vests bearing various Task Force

[3] Available at: ACLU, *Hunter Demster – August 26, 2026 (Arrest) (Part 3)* (YouTube, Sep. 8, 2026), https://www.youtube.com/watch?v=hXtTXpjUSQU&list=PLKV5kiDxrRS8&index=3.

insignia standing in a group on the sidewalk one house down and across the street from my house. The agents' vests bore U.S. Marshals, HSI, Border Patrol, and Tennessee Department of Correction insignia. Included as Exhibit D is footage of the group of Task Force agents gathered across the street from my house.[4]

21. After speaking with my neighbor, I approached the group of agents and one of the agents said, "Have a good day, Hunter." I did not see any of the agents engage with other community members or enter any homes on the block. None of my neighbors knew what the agents were doing and no one saw the agents go into any house.

22. After about ten minutes, the agents dispersed to unmarked vehicles and departed, except for one agent wearing a U.S. Marshals vest. As I walked down the street back towards my house, this U.S. Marshal, who was driving an unmarked vehicle, started to do a U-turn but then parked perpendicular in the street for 2 to 3 minutes. The U.S. Marshal held up his phone towards me and filmed or photographed me as I was standing on my porch. I felt vulnerable and scared in my own home.

**September 3, 2026**

23. On September 3, 2026, I drove home from work and arrived on my block just before 2:30 p.m. As I turned onto my street, I saw a gray unmarked SUV parked directly in front of my house. The vehicle stood out to me as a Task Force vehicle because it was oddly new and clean with heavy window tinting on all the side windows. I drove past the vehicle but could not see past the tinting on the side windows. I then made a U-turn, and from the front, could tell that there were Task Force agents in the SUV. I parked in my driveway, briefly entered my home, notified other

---

[4] Available at: ACLU, *Hunter Demster – August 30, 2026* (YouTube, Sep. 8, 2026), https://www.youtube.com/watch?v=qAZW_dLPhi0&list=PLKV5kiDxrRS8&index=6.

community members that Task Force agents were in front of my home, including my fellow Plaintiff Melissa Peeler, and then returned outside while filming.

24. I approached the vehicle to investigate and tried to get the occupants' attention. After some time, the agent in the passenger seat partially rolled down his window. I was able to see that the agent in the driver's seat was wearing a vest marked "Police HSI." This agent looked familiar, like I had seen him before while observing and filming Task Force activity. I asked if there was anything I could help them with. The agent in the passenger seat said "no" and immediately rolled the window back up. Included as Exhibit E is footage of me interacting with the Task Force agents and the agent rolling the window back up.[5] I was unable to see if the agent in the passenger seat was wearing a vest or any agency affiliation. I continued filming and walking around the vehicle. As I was filming from the sidewalk behind the SUV, I saw the agent in the passenger's seat roll down the window, hold his phone out the window, and point it at me for several seconds. I believe he was photographing or filming me. Included as Exhibit F is footage of me interacting with the Task Force agents, walking behind their car, and one of the agents photographing or filming me.[6]

25. I notified community members on my street that Task Force agents were sitting in front of my home. Shortly thereafter, and about 15 minutes after I had arrived home, Plaintiff Melissa Peeler arrived. She drove past the SUV and parked several houses down the street. As she walked toward the SUV filming, the agents drove away from my house.

---

[5] Available at: ACLU, *Hunter Demster – September 3, 2026 (Part 1)* (YouTube, Sep. 8, 2026), https://www.youtube.com/watch?v=mm_deHNnMls&list=PLKV5kiDxrRS8&index=5.

[6] Available at: ACLU, *Hunter Demster – September 3, 2026 (Part 2)* (YouTube, Sep. 8, 2026), https://www.youtube.com/watch?v=bNbnUy7COl4&list=PLKV5kiDxrRS8&index=4.

26. After the agents left, a neighbor told me that earlier that day, she had received a call that there was a suspicious vehicle matching the SUV's description parked on our street, and she left work to check on her home. I believe this means the vehicle had been parked in front of my home for a substantial amount of time. It felt like the agents were looking for me.

27. I am still feeling the effects of almost a year of retaliation and intimidation by the Task Force. I was beginning to feel a bit less anxious after working with the trauma therapy specialist and limiting my observing and recording of Task Force activity. But being arrested and having the Task Force outside my house twice in five days has brought back as much, if not more, stress and anxiety as before when I was more regularly observing and recording Task Force activity.

Executed this 8th day of September, 2026

____________________________
Hunter Demster