**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

JACK DICKINSON, also known as the Portland Chicken; LAURIE ECKMAN; RICHARD ECKMAN; HUGO RIOS; MASON LAKE, on behalf of themselves and those similarly situated,

*Plaintiffs - Appellees*,

v.

DONALD J. TRUMP, President of the United States, in his official capacity; MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security (DHS), in his official capacity; UNITED STATES DEPARTMENT OF HOMELAND SECURITY,

*Defendants - Appellants*.

No. 26-1609

D.C. No. 3:25-cv-02170-SI

OPINION

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

EXHIBIT 1

Argued and Submitted July 10, 2026
Pasadena, California

Filed November 10, 2026

Before: Kenneth K. Lee, Ana de Alba, and Eric C. Tung, Circuit Judges.

Opinion by Judge Lee;
Partial Concurrence and Partial Dissent by Judge de Alba

## SUMMARY*

### Preliminary Injunction / First Amendment

The panel vacated the district court's preliminary injunction and provisional class certification in an action brought by five plaintiffs—peaceful protesters and independent journalists who were exposed to tear gas or pepper balls used to disperse crowds near the U.S. Immigration and Customs Enforcement (ICE) facility in Portland, Oregon—alleging that the government specifically targeted them in retaliation for exercising their First Amendment rights.

The district court preliminarily enjoined the government from using non-lethal crowd-control munitions unless someone poses an imminent threat of physical harm to law enforcement or other persons and further ordered that the

* This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

ICE agents' uniforms must be altered to have more conspicuous and unique identifying markings. In a prior order, the panel granted the government's motion to stay the district court's preliminary injunction pending appeal, holding that the government made a strong showing that it would likely succeed on the merits and that the district court acted beyond its authority in fashioning an overbroad injunction to redesign federal agent uniforms. On appeal from the preliminary injunction order, the panel reaffirmed the stay order's holding and vacated the preliminary injunction and provisional class certification.

The panel held that the plaintiffs have not shown that they are likely succeed on the merits of their First Amendment claim. The district court erred in assuming that the government can use non-lethal munitions only in response to the threat of imminent physical harm. Under the court's precedent, law enforcement agents may use nonlethal force to clear crowds and restore order and need not wait until they face an imminent threat of physical harm. Moreover, the plaintiffs have not shown an unwritten policy, pattern, or practice of First Amendment retaliation and the record does not support the plaintiffs' claim that federal agents retaliated against them for exercising their First Amendment rights.

The panel next held that the injunction is overbroad and unworkable. First, the injunction improperly grants relief not only to the five named plaintiffs but to anyone protesting or reporting at the Portland ICE facility. Second, the injunction is overbroad because it restricts federal agents from using non-lethal munitions unless they face imminent threat of physical harm. Finally, the injunction's requirement that federal agents' uniforms be redesigned with

conspicuous and unique identifying markings is beyond the court's power.

Because the remaining stay factors favored the government, the panel vacated the preliminary injunction.

The panel also vacated the district court's provisional class certification order, which certified all people who "have, desire to, or will nonviolently protest against or report on DHS activities." The panel held that the provisional class does not meet Rule 23's commonality requirement, and even if the plaintiffs could establish commonality, the provisional class must be decertified because the plaintiffs cannot satisfy Rule 23(b)(2)'s indivisible-remedy requirement.

Concurring in part and dissenting in part, Judge de Alba concurred to the extent that three provisions of the preliminary injunction are overbroad, and otherwise dissented. She would uphold the preliminary injunction as to its prohibition against federal officers firing munitions "at the head, neck, or torso of any person, unless the officer is legally justified in using deadly force against that person." She would also hold that the district court did not abuse its discretion when it ruled that the plaintiffs' proposed class met Rule 23's commonality and indivisibility requirements.

## COUNSEL

Kimberly S. Hutchison (argued) and Mark Fleming, Singleton Schreiber LLP, San Diego, California; Matthew B. Borden (argued), J. Noah Hagey, Kory J. Debark, Megan Wachspress, Marissa Benavides, and Hadley Rood, BraunHagey & Borden LLP, San Francisco, California; Kelly Simon and Eri Andriola, American Civil Liberties Union of Oregon, Portland, Oregon; J. Ashlee Albies, Albies & Stark LLC, Portland, Oregon; Jane L. Moisan, People's Law Project, Portland, Oregon; for Plaintiffs-Appellees.

Michael Shih (argued), Douglas C. Dreier (argued), Brenna H. Scully, Mark R. Freeman, and August E. Flentje, Attorneys, Appellate Staff; Brad P. Rosenberg, Trial Attorney; John Bailey, Counsel; Eric D. McArthur, Deputy Assistant Attorney General; Yaakov M. Roth, Principal Deputy Assistant Attorney General; Brett A. Shumate, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants.

Jona J. Maukonen, Assistant Attorney-In-Charge; Robert A. Koch, Attorney-In-Charge; Civil & Administrative Appeals; Paul L. Smith, Solicitor General; Dan Rayfield, Oregon Attorney General; Office of the Oregon Attorney General, Salem, Oregon; for Amicus Curiae State of Oregon.

Denis M. Vannier, Senior Deputy City Attorney, Portland Office of the City Attorney, Portland, Oregon, for Amicus Curiae City of Portland.

**OPINION**

LEE, Circuit Judge:

The First Amendment shields the people from governmental suppression of their right to protest peacefully and speak freely. But the First Amendment cannot be a sword to justify vandalism of federal buildings, criminal trespass of government property, or obstruction of law enforcement—all of which have occurred frequently outside the U.S Immigration and Customs Enforcement (ICE) office in Portland.

Faced with agitators who have flung bricks, blocked the movement of ICE cars, and physically attacked federal agents, the government has used tear gas and other nonlethal methods to disperse crowds. Five plaintiffs—peaceful protesters and independent journalists who were exposed to tear gas or pepper balls—sued, claiming that the government specifically targeted them for exercising their First Amendment rights. The district court preliminarily enjoined the government from using non-lethal crowd-control munitions unless someone "poses an imminent threat of physical harm" to law enforcement or other persons. The court also ordered that the ICE agents' uniforms must be altered to have more "conspicuous and unique identifying markings."

We earlier stayed the preliminary injunction pending appeal because the government made a strong showing that it would likely succeed on the merits. The record did not show that the agents had the subjective intent to retaliate or that the government has an unwritten policy targeting them. *Dickinson v. Trump*, 174 F.4th 634, 637 (9th Cir. 2026). We also held that the district court acted beyond its authority in

fashioning an overbroad injunction to redesign federal agent uniforms.

Now on appeal from the preliminary injunction order, we reaffirm the stay order's holding and vacate the preliminary injunction and provisional class certification. The plaintiffs have not shown that they are likely succeed on the merits: Under our precedent, law enforcement agents may use nonlethal force to clear crowds and restore order—they need not wait until they face "an imminent threat of physical harm." The record also does not support the plaintiffs' claim that federal agents retaliated against them for exercising their First Amendment rights. Rather, the plaintiffs appear to be unfortunate collateral casualties of federal agents' efforts to quell an unruly and sometimes violent crowd.

## BACKGROUND

### I. Factual Background

#### A. Peaceful protests—and unrest—in Portland.

Over the past year, the Portland ICE facility has become ground zero for protestors who oppose the federal government's immigration policy. But along with peaceful protest has come significant unrest. Between June 2025 and February 2026, at least 150 protests have been staged at the ICE facility in Portland. Crowds as large as several thousand people have gathered outside the facility.

While many protesters peacefully exercise their First Amendment right to oppose governmental policies, some provocateurs have carried bats and improvised weapons while donning shields and ballistic vests. One protest involved hundreds of protesters pounding on the ICE building entry points, trying to penetrate the building, and preventing ICE cars from entering or exiting the building.

At other times, demonstrators have smashed security cameras; hurled rocks, glass, bricks, metal, and deployed munitions canisters at law enforcement officers; flung fireworks toward the facility; torn the plywood off the facility's guard shack; used wooden pallets and other debris to block the doors of the facility; banged on the front door of the facility building while trying to break the front gate by rocking it; pushed officers and tried to seize their shields; and weaponized high-powered strobe lights and lasers against officers to impair their vision and coordination. One protester even threw a smoke canister on the facility's roof, causing a fire. *Id.* One officer was dragged by a crowd while seeking to detain a subject. *Id.*

In response, federal law enforcement has at times used non-lethal munitions to disperse crowds and de-escalate, especially when officers are largely outnumbered by the crowd. Chemical irritants allow officers to avoid physical confrontation with protesters. *Id.* This results in fewer injuries and enables officers to control large, disorderly crowds. *Id.*

**B. Plaintiffs peacefully protest and observe amid the violence.**

Plaintiffs Jack Dickinson, Laurie Eckman, Richard Eckman, Mason Lake, and Hugo Rios are protesters or freelance journalists who were at some of the protests. They claim that U.S. Department of Homeland Security ("DHS") officers targeted them with crowd-control devices in retaliation for exercising their First Amendment rights. They say they were shot by pepper balls, pepper-sprayed, or tear-gassed in response to their First Amendment activity.

But declarations by supervisory DHS officials and related use-of-force reports show that, at those protests,

officers consistently faced violent, disruptive, or otherwise unlawful behavior. The plaintiffs appeared near those other protesters acting violently or unlawfully. For example, on September 1, 2025, protesters arrived at the ICE facility carrying "bats, improvised weapons, [and] shields," and they blocked the entrance to the facility despite multiple warnings to clear the entryway. After several protesters removed three wooden boards from the fence at the facility, officers deployed pepper balls. Later that night, protesters placed a prop guillotine in front of the facility, blocking the driveway. Although blocking the ICE facility's driveway is illegal, the federal government could not rely on the Oregon State Police or Portland Police Bureau to help. That is because there are "sanctuary laws in the Oregon Revised Statute and also the City of Portland that prohibit [them] from facilitating immigration-related activity or enforcement."

To clear the driveway, federal law enforcement again deployed pepper balls. During that night, after 10 p.m., plaintiff Hugo Rios was filming the protests by the driveway to the ICE facility. While filming, he "heard some automated [long range acoustic device] announcements that [he] heard every time [he] was there warning that they might deploy gas and talking about how trespassing was illegal and things like that." When DHS used pepper balls to clear the crowd, Rios was hit. Rios walked away, and he testified that he has no intention of returning to the ICE facility.

On September 13, protesters again obstructed the driveway to the facility. Federal agents ordered them to disperse, but they refused. ICE deployed pepper balls toward the ground to clear the group. About 90 minutes later, after more warnings were ignored, ICE again used pepper ball rounds to disperse trespassers from the driveway. When federal officers pushed out of the gate in line

formation to clear the driveway and arrest a protester who had started a fire on the driveway, "multiple demonstrators surrounded them," "pushed the officers," and "attempted to seize their shields." One protester held an object that resembled a katana sword. After multiple warnings, DHS deployed pepper balls and tear gas. Plaintiff Mason Lake was at the protest and stood off to the side of the driveway to the federal building on the public sidewalk to document the protest. He was exposed to pepper spray.

On October 4, protesters again trespassed federal property and refused to depart despite multiple dispersal orders. An individual shoved an officer and "threw a large, heavy object, striking the officer's upper body." During one instance when an officer sought to detain one protester who was obstructing the front entrance, the protester tried to bite his groin area and forcefully grabbed his penis, refusing to release their grip. Officers then used pepper balls and tear gas to disperse protesters. Plaintiffs Laurie and Richard Eckman were at the protest. Outside the Portland ICE building, the Eckmans stood with other protesters right by the federal property and just east of the driveway to the building. Mrs. Eckman was struck by a pepper ball, and Mr. Eckman was exposed to tear gas.

Two weeks later, protesters again blocked the driveway and were "aggressive and hostile, shining strobe lights directly at the [officers] to impair their vision and coordination." Plaintiff Jack Dickinson, who is known as the Portland Chicken because he wears a chicken suit to protests at the facility, was at the protest. Dickinson confirmed that he and others would intentionally block the ICE facility's driveway and refuse to comply with lawful instructions to clear the driveway. As the day progressed, the "crowd was becoming more agitated leading up to [them]

throwing and kicking heavy cans at officers." Officers tried to apprehend a person who had thrown a canister at another officer earlier in the day, but the crowd surrounded the officers. Law enforcement deployed smoke canisters, and protesters threw them back at officers. Officers then deployed tear gas. Dickinson noted that the "chemicals also seeped into his mask, affecting [his] nose and throat."

These unruly protests continued into the new year. On January 19, Dickinson and about 20 others trespassed on the ICE facility's driveway to block the entrance/egress. After the trespassers failed to heed warnings to depart, Federal Protective Service ("FPS") officers deployed pepper balls and pepper spray but the trespassers refused to leave. Four trespassers, including Dickinson, were taken into custody for failure to comply and trespassing.

Just five days later, hundreds of protesters flooded the ICE facility's vehicle entrance and began pounding on the building's entry points. They tried to penetrate the building. *Id.* After FPS issued multiple warnings that were ignored, FPS deployed pepper balls to disperse the crowds. *Id.* But less than 80 minutes later, the protesters had created additional barricades with scooters and began moving toward the gate. *Id.* Federal agents used pepper balls and tear gas to push the protesters back. *Id.* Protesters then began to tamper with the facility's security cameras with rakes and rocks, which caused FPS to deploy further pepper balls and flash bangs. Dickinson attended the protest and noted that he was "only wearing a KN-95 mask," so he was "pretty exposed to the chemicals that were not adequately filtered through the mask." After tear gas was released, Dickinson stated that he picked up a sign and waved it to "try [to] diffuse some of the tear gas." *Id.* He claims that "DHS fired in my direction because I was holding and waving the

sign," and that he was hit in the right ankle with less-lethal munitions. *Id.* He put the sign down after that. *Id.*

Later on January 31, thousands of protesters gathered outside the ICE facility. Dickinson called this "the largest protest of its kind or in this area." Ten to fifteen trespassers "entered the property and began banging on the guard shack and attempted to barricade the door and tear[] plywood off the guard shack." After warnings were issued to disperse, multiple trespassers produced umbrellas and formed a shield wall. Others ran to the vehicle gate with ropes, appearing to try to tie the gate shut. Federal officers deployed tear gas toward protesters destroying the guard shack. Protesters hurled rocks or other hard objects at law enforcement officers and at cameras on the building. Protesters also moved a dumpster toward the front gate, and a security guard observed protesters again prying plywood from the guard shack. Officers again used crowd-control devices to disperse the crowd and prevent further damage to federal property. Plaintiffs Mr. Eckman and Mrs. Eckman were at the protest. They originally attended an interfaith gathering at Elizabeth Caruthers Park, three blocks from the Portland ICE Building. After listening to speeches at the park, they walked towards the ICE Building with the crowd and were later exposed to tear gas.

## II. Procedural History

The plaintiffs sued President Donald J. Trump, then-DHS Secretary Kristi Noem, and the U.S. Department of Homeland Security, alleging that the defendants have unconstitutionally chilled their First Amendment rights to dissent and to document dissent. They claim that the defendants, through an unwritten policy, pattern, and practice, have used excessive force via non-lethal munitions

against peaceful protesters in retaliation for exercising their First Amendment rights.

After extensive discovery and a three-day evidentiary hearing, the district court entered a preliminary injunction. First, the injunction prohibits DHS and its "agents and employees" from "direct[ing] or us[ing] chemical or projectile munitions, including but not limited to . . . pepper ball or paintball guns, tear gas or other chemical irritants, . . . and flashbang . . . grenades, *unless* the specific target of such a weapon or device poses an *imminent threat of physical harm*." (emphasis added).

Second, the injunction prohibits DHS officers from firing any such devices "at the head, neck, or torso of any person, unless the officer is legally justified in using deadly force against that person." *Id.* Third, the injunction sets forth special instructions governing the use of pepper spray and similar devices (which the injunction distinguishes from "chemical irritants"). DHS officers may not use "pepper spray . . . unless the specific target . . . exhibits, at a minimum, active resistance," defined to exclude "trespassing, refusing to move, refusing to obey an order to disperse, and 'going limp.'" The injunction also bans the use of pepper spray "against groups of people where bystanders foreseeably would be affected." *Id.* Pepper spray may only be "used against specific individuals actively engaged in violent unlawful conduct, actively resisting arrest, or as reasonably necessary in a defensive capacity."

Finally, the preliminary injunction also requires the parties to "confer regarding how" DHS officers "can place conspicuous and unique identifying markings . . . on the uniforms, vests, and/or helmets" of the agents deployed to the Portland ICE facility. "If the parties cannot reach

agreement," the district court will itself decide how to redesign DHS officers' uniforms and will modify the preliminary injunction "appropriately." The district court denied the government's motion to stay the injunction pending appeal.

The same day that the injunction was issued, the district court certified a provisional class of "[a]ll people who, since [June 2025], have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE Building." The injunction covers all individuals who happen to be "in the vicinity of" the Portland ICE facility, whether or not an individual is a member of the class or not. The district court denied the government's motion to stay the injunction pending appeal.

The federal government moved to stay the district court's preliminary injunction pending appeal, which we granted. We now address the appeal of the injunction.

## STANDARD OF REVIEW

We review a preliminary injunction order "for abuse of discretion, but review any underlying issues of law de novo." *Norbert v. City & Cnty. of San Francisco*, 10 F.4th 918, 927 (9th Cir. 2021) (citation omitted). We "review a class certification determination for legal error under a de novo standard, and if no legal error occurred, will proceed to review the decision for abuse of discretion." *O'Connor v. Uber Techs.*, 904 F.3d 1087, 1094 (9th Cir. 2018) (quotation marks omitted).

## DISCUSSION

### I. We vacate the preliminary injunction because the plaintiffs have failed to establish any of the required *Winter* factors.

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. We vacate the district court's injunction because the plaintiffs have failed to satisfy any of these factors.[1]

#### A. The plaintiffs will not likely succeed on their First Amendment claim.

To prevail on a First Amendment retaliation claim, a plaintiff "must establish a [but-for] 'causal connection' between the government defendant's 'retaliatory animus' and [his or her] 'subsequent injury.'" *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019). A plaintiff must show that: (1) he or she was "engaged in a constitutionally protected activity";

[1] The government argues that the plaintiffs lack standing to seek prospective relief. In vacating a preliminary injunction, "a court with appellate jurisdiction may reverse on either jurisdictional or merits grounds." *Mullin v. Doe*, 146 S. Ct. 2121, 2137 (2026) (plurality opinion) ("[I]n evaluating the likelihood-of-success question for the purpose of ruling on a request for interim relief, courts may consider both the likelihood that they have jurisdiction and the likelihood that the claim will succeed on the merits."). Rather than address the more murky jurisdictional issue, we reverse the preliminary injunction on merits grounds.

(2) the defendant's "actions would chill a person of ordinary firmness from continuing to engage in the protected activity"; and (3) "the protected activity was a substantial or motivating factor in the [defendant's] conduct." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020). We focus here on the third prong.

As we noted in our stay order, the district court made two critical legal errors in ruling that the plaintiffs likely will prevail on their First Amendment retaliation claim. *Dickinson*, 174 F.4th at 642.

First, it erred in assuming that the government can use non-lethal munitions only in response to the threat of imminent physical harm. *Id.* Based on that incorrect assumption, the district court concluded that the government's use of tear gas, pepper balls, and other devices to disperse the crowd was "strong circumstantial evidence of Defendants' intent to punish the crowd for their expression." *Id.*

But that assumption is not the law in our circuit. We recently emphasized that law enforcement can use non-lethal force in response to "imminent lawlessness" by protesters who claim they are exercising their First Amendment rights. *Puente v. City of Phoenix*, 123 F.4th 1035, 1062 (9th Cir. 2024). There, the Phoenix police used tear gas, "flash-bang grenades," and other chemical irritants to scatter a protesting crowd at a "Free Speech Zone" outside a political rally held by President Trump. *Id.* at 1042–43. Addressing a First Amendment claim, we held that law enforcement officers can still use non-lethal munitions to disperse a protesting crowd if there are "objectively reasonable grounds to conclude that there [is] a 'clear and present danger of riot, *disorder, interference with traffic upon the public streets, or*

*other immediate threat to public safety, peace, or order*.'" *Id.* at 1062 (emphasis added) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)). And that is what law enforcement appears to have done here in response to vandalism, the blocking of street traffic, and the trespassing on ICE property—all of which are "immediate threat[s] to public safety, peace, [and] order." *Id.*

The dissent lists a series of incidents involving the plaintiffs and other peaceful protestors to suggest that federal agents had intentionally targeted them for their free expression. But we cannot view these incidents in isolation from the larger mayhem of dozens (and sometimes hundreds) of people impeding law enforcement, vandalizing federal property, or assaulting federal agents. If we airbrush away the surrounding unlawful activities, we are left with a sanitized portrait of only peaceful protestors. But that does not accurately depict the messy reality of law enforcement trying to tamp down an unruly crowd and unfortunately causing collateral harm to peaceful protestors in the process. And in "assessing whether a sufficient clear and present danger justifies dispersal of a crowd, it is the tenor of the demonstration *as a whole* that determines whether the police may intervene." *Puente*, 123 F.4th at 1062 (emphasis added) (internal citation omitted and cleaned up). The "tenor of [the Portland protests] as a whole" was of chaos and confusion.

As we discussed in our stay order, the district court tried to distinguish *Puente* by saying that the case "involved a single protest event, as opposed to a systematic and sustained pattern of escalating violence over a period of months." *Dickinson*, 174 F.4th at 643. But *Puente* did not say that the First Amendment hinges on whether there is a single protest or a series of demonstrations. In any event, that factual difference may potentially cut the other way. *Id.* The

government may be more justified in using tear gas and other non-lethal munitions in Portland to establish order, given the months-long siege of the ICE facility there. *Id.*

Instead of following *Puente*'s standard for First Amendment claims, the district court relied on an inapt Fourth Amendment excessive force case to suggest that evidence of purported excessive force "is strong circumstantial evidence of Defendants' intent to punish the crowd for their expression." *Dickinson v. Trump*, 827 F. Supp. 3d 1375, 1396 (D. Or. 2026) (relying on *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012)). In *Nelson*, the court held that there was a potential Fourth Amendment violation when a police officer allegedly shot a pepper ball at the eye of a college student during the Picnic Day festivities at an apartment complex near the University of California at Davis. *Nelson*, 685 F.3d at 873-74. A police officer permanently damaging a student's eye at a raucous college party is not the same as federal agents using crowd-control tactics to disperse an unruly crowd that has repeatedly vandalized federal property, obstructed law enforcement efforts, and at times even assaulted federal agents. And doctrinally, the Fourth Amendment's excessive force analysis differs from the First Amendment's intent to retaliate framework.

In short, the district court's erroneous legal assumption colored its analysis: It incorrectly concluded the five plaintiffs were likely being intentionally targeted for their First Amendment rights because there purportedly was no valid reason for the government to use tear gas and other non-lethal munitions. Once that foundational—and faulty—assumption is cast aside, the court's finding of intent to retaliate collapses. We are left with a more plausible explanation of events: As detailed earlier, the five plaintiffs

(out of hundreds of protesters) were not intentionally targeted for their First Amendment activity but were rather unfortunate collateral casualties during a chaotic effort to quell disorder.[2]

Second, the plaintiffs have not shown an unwritten policy, pattern, or practice of First Amendment retaliation. The district court did not identify any direct evidence that DHS, as an agency, intentionally targeted the plaintiffs for their First Amendment activities.[3] To the contrary, DHS policies expressly prohibit its officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." Any officer who retaliates against protesters would violate these policies.

Despite this express policy against retaliation, the district court inferred an unwritten DHS policy of retaliation based on individual DHS officers who used crowd-control munitions. The district court implored us to "review" the "video evidence" submitted by the plaintiffs, describing

[2] The dissent faults the government for not coordinating with protestors and decreasing the number of warnings it gave before acting. But we have held that law enforcement may take action without giving even a single verbal dispersal order. *Puente*, 123 F.4th at 1064 (rejecting First Amendment challenge). And the fact that the district court found only a few instances of alleged retaliation—despite over 150 protests outside the Portland ICE facility from June 2025 to February 2026—suggests that law enforcement is not retaliating against protestors for exercising their First Amendment rights.

[3] The district court also did not address the conflicting and contextual facts offered by the government. Protesters repeatedly trespassed onto the ICE facility, blockaded the facility's gates, vandalized federal property, and attacked federal officers. Yet the district court did not acknowledge, much less address, this evidence.

them as "unambiguous and disturbing." We have reviewed the dozens of video clips—and we come to a different conclusion. As explained earlier, the district court's analysis appears to have been influenced by its erroneous legal assumption that law enforcement cannot use non-lethal munitions against protesters unless they pose imminent physical harm to the officers. Viewed from that lens, law enforcement agents' use of non-lethal chemical munitions against "peaceful" protesters unlawfully trespassing the ICE facility driveway or blocking street traffic might appear unjustified. But we have held that law enforcement can use such non-lethal munitions in the face of "disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order." *Puente*, 123 F.4th at 1062. And when viewed under this proper legal lens, the use of such non-lethal force to disperse crowds engaging in unlawful behavior does not amount to an unwritten policy of retaliation but rather reflects law enforcement.

The plaintiffs also cannot use a Fourth Amendment claim that they failed to raise in their preliminary injunction motion "to bolster" their First Amendment claim. Plaintiffs cite *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020), but the case does not suggest that a Fourth Amendment violation would provide "exceptionally strong" evidence of a First Amendment violation. *Compare* Pl. Br. 39 n.4 (contending that a "pattern of misconduct that may very well amount to excessive force is 'exceptionally strong' evidence of retaliation" (quoting *Index Newspapers*, 977 F.3d at 829)), *with Index Newspapers*, 977 F.3d at 829 ("Because the district court's findings include so many instances in which plaintiffs were standing nowhere near protesters while photographing and observing the Federal

Defendants' actions, they provide exceptionally strong evidentiary support for the district court's finding that some of the Federal Defendants were motivated to target journalists in retaliation for plaintiffs' exercise of their First Amendment rights."). That discussion in *Index Newspapers* was about the specific evidence in that case and cannot be read to establish a broad rule that alleged excessive force shows strong evidence of a First Amendment violation. The Fourth Amendment is "legally and factually inapt" to this First Amendment case. *Dickinson*, 174 F.4th at 643.

To be sure, a court might conclude that an officer used too much force to disperse a protest because, despite his "subjective apprehensions," the circumstances did not objectively "present[] a clear and present danger of imminent lawlessness." *Puente*, 123 F.4th at 1062. A court might also conclude that the officer used too much force because he misperceived "the tenor of [a] demonstration" as being more "infected with violence or obstruction" than it was. *Id.* (citation omitted).[4] But even if the officers' actions were not justified, they would not compel the conclusion that the officers acted because of subjective antipathy to First Amendment activity. By conflating these inquiries, the district court only reinforced *Puente*'s conclusion that the First Amendment retaliation framework is a "poor fit" for the plaintiffs' claims. *Id.* at 1063.

[4] Some video clips submitted by the plaintiffs—at least based on the snippets divorced from the full context—may show that some officers may have used unprovoked or excessive force. But the individuals do not appear to be any of the plaintiffs. And even if the use of force was unjustified, we do not know the motives of the agents involved. Nor can we infer an unwritten policy or practice of retaliation based on just these few incidents out of the hundreds of encounters at the Portland ICE facility over the past year.

Finally, our recent decision in *Los Angeles Press Club v. Noem* does not require a different result because its factual record differs significantly. 171 F.4th 1179, 1189 (9th Cir. 2026). There, our court held that "[b]ecause direct evidence of officers' subjective motives is rarely available, Plaintiffs may rely on circumstantial evidence to establish retaliatory intent." *Id.* But the court did not hold that the use of excessive force, standing alone, is always sufficient to infer retaliatory intent. And the court did not conclude that allegations of subjective chill standing alone are enough to support standing. Rather, the court relied on specific factual findings and "an 'avalanche' of circumstantial evidence to conclude that Plaintiffs' First Amendment activity was a 'substantial motivating factor' for Defendant's actions." *Id.* (citation omitted). "The record," the court said, "contains extensive evidence that federal officers repeatedly targeted journalists and peaceful legal observers who stood far from any protesters or bad actors." *Id.*

Not so here. The record here does not contain an "avalanche of circumstantial evidence" or "extensive evidence" that the federal officers "repeatedly targeted" peaceful individuals standing far from the disruptive activity near the ICE facility. *Dickinson*, 174 F.4th at 645. Instead, the record reveals law enforcement's response to a substantial degree of violence, obstruction of law enforcement, and unrest—with protesters repeatedly trespassing onto the ICE facility, blockading the facility's gates, vandalizing federal property, and attacking federal officers. *Id.*

**B. The injunction is grossly overbroad and unworkable.**

The injunction must also be vacated because its scope exceeds the district court's authority.

First, the injunction improperly grants relief not only to the five named plaintiffs but to anyone protesting or reporting at the Portland ICE facility. That cannot be reconciled with *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), which reaffirmed that Article III courts lack equitable authority to grant "relief that extend[s] beyond the parties." *Id.* at 843.

We have reaffirmed that principle just recently. In *Los Angeles Press Club*, we held that the preliminary injunction there was overbroad, having several provisions that expressly apply to non-parties and are broader than necessary to afford "complete relief *to the plaintiffs before the court*." *Los Angeles Press Club*, 171 F.4th at 1191 (citing *CASA*, 606 U.S. at 852 (emphasis in original)). The injunction there prohibited the defendants from firing tear gas canisters or flash-bang grenades aimed at striking "any person." *Id.* That made the injunction overbroad.

Similarly, here, as discussed in our stay order, the district court's injunction is equally overbroad. The district court justified the injunction's breadth as necessary to provide complete relief to the named plaintiffs. To be sure, "[t]he equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *CASA*, 606 U.S. at 851 (emphasis in original) (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)). That allows "party-specific injunctions" to benefit nonparties "incidentally." *Id.* But as we explained in *Los Angeles Press Club*, it does not permit injunctions that

"[b]y their explicit terms . . . are not limited to providing relief only to the individual Plaintiffs." 171 F.4th at 1191. Indeed, *Los Angeles Press Club* rejected a nearly identical injunction on similar facts—even though the district court had relied on the complete-relief principle. *See id.*; *see Los Angeles Press Club v. Noem*, 799 F. Supp. 3d 1036, 1070–71 (C.D. Cal. 2025) (attempting to justify overbroad injunction using complete-relief principle). Talismanic incantation of "complete relief" is not a free pass around *CASA*. And like the injunction that *Los Angeles Press Club* deemed overbroad, the injunction here improperly extends not merely to the five plaintiffs but to anyone in the world who wishes to protest at the Portland ICE facility.[5]

Second, the injunction is too broad because it improperly handcuffs federal agents from using non-lethal munitions unless they face "imminent threat of physical harm." As explained, under the First Amendment, officers may disperse a crowd not only in response to an imminent threat of physical harm but also in response to "imminent lawlessness," including a threat of "riot, disorder, [or] interference with traffic." *Puente*, 123 F.4th at 1062 (quoting *Cantwell*, 310 U.S. at 308). For example, the First Amendment allows officers to use crowd-control munitions if protesters block the street, criminally trespass on government property, or thwart law enforcement efforts. But the district court's injunctive order prohibits officers from using crowd-control devices to stop those unlawful acts. Instead, the injunctive order allows law enforcement to use such crowd-control munitions only if the "specific target

[5] The district court also justified its broad injunctive relief by provisionally certifying a class. But as explained later, the provisional class certification was improper.

. . . poses an imminent threat of physical harm," and then further prohibits officers from using pepper spray except when the "specific target . . . exhibits, at a minimum, active resistance" (defined to exclude all manner of disruptive acts). That was error.

Finally, the injunction's requirement that federal agents' uniforms be redesigned with "conspicuous and unique identifying markings (using numbers and/or letters) . . . so that they can be identified at a reasonable distance . . ." is beyond the court's power. No one disputes that the law enforcement officers have identifying information on their uniforms, though perhaps not to the plaintiffs' liking. But like the *Los Angeles Press Club* injunction, the injunction here and its power to design DHS officers' uniform is "attenuated from the First Amendment injury" that the plaintiffs allege. 171 F.4th at 1191 ("An injunction that exempts Plaintiffs, non-party journalists, and non-party legal observers from lawful, *non-retaliatory* dispersal orders is broader than necessary to 'remedy the specific harm alleged' in Plaintiffs' First Amendment claims.").

Courts cannot be the couture of the executive branch. *See Chicago Headline Club v. Noem*, 168 F.4th 1033, 1037 (7th Cir. 2026) (noting that the Seventh Circuit stayed a similar injunction because, by "enumerat[ing] and proscrib[ing] the use of scores of riot control weapons and other devices in a way that resembles a federal regulation," the district court exceeded its authority (internal quotation marks omitted)).

In sum, federal courts "must be reluctant to expand their authority by requiring intrusive and unremitting judicial management of the way the Executive Branch performs its duties." *Hein v. Freedom from Religion Found., Inc.*, 551

U.S. 587, 617 (2007) (Kennedy, J., concurring). Judges are not "executive officers, vested with discretion over law enforcement policy and decisions." *United States v. Simpson*, 927 F.2d 1088, 1089 (9th Cir. 1991).

### C. The remaining *Winter* factors favor the government.

The remaining equitable factors likewise support the government's position. Even assuming plaintiffs have shown irreparable harm, the balance of equities tips in the government's favor and the injunction is not in the public interest. The injunction is extremely dangerous to both federal officers and the public. It harms the government by impeding officers' ability to enforce the law and protect themselves and the Portland ICE facility from attack and disruption. *See Tincher v. Noem*, 164 F.4th 1097, 1100 (8th Cir. 2026) (staying similar injunction because its "breadth and vagueness" may "cause federal agents to hesitate in performing their lawful duties," thereby "harm[ing] the government and undermin[ing] the public interest"); *CASA*, 606 U.S. at 861 ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (alteration in original) (citation omitted)). The government need not wait for catastrophe or damage to happen before enforcing laws.

The injunction also harms the government because, by "prevent[ing] the Government from enforcing its policies against nonparties," *CASA*, 606 U.S. at 859, it transgresses the separation of powers by "effectively establish[ing] the district court as the supervisor of all Executive Branch activity" near the ICE facility. *Chicago Headline Club*, 168 F.4th at 1040; *see also Trump v. Int'l Refugee Assistance*

*Project*, 582 U.S. 571, 580–81 (2017) (recognizing "the Government's interest in enforcing [the law]").

Moreover, the injunction eliminates "key tools for deterring escalation" and "potentially allow[s] breaches or violence to occur that could . . . otherwise [be] prevented." Requiring law enforcement officers to go "hands on" because they do not have crowd-control devices could be a tinder for a wildfire of violence. Indeed, the "supervisory power simply does not give the courts the authority to make up the rules as they go, imposing limits on the executive according to whim or will." *Simpson*, 927 F.2d at 1090 (citations omitted). "By penalizing executive conduct that violates neither the Constitution nor a federal statute, the court invaded the domain of the legislature, whose role it is to establish limits on such conduct by law; and it invaded the province of the executive, whose function it is, within legal limits, to decide how to enforce the law." *Id.*

Federal courts cannot and should not superintend DHS officers' day-to-day decision making because we "do not possess a roving commission" to "exercise general legal oversight of the . . . Executive Branch[]." *TransUnion LLC v. Ramirez,* 594 U.S. 413, 423–24 (2021). That principle applies even more to law-enforcement activities responding to safety risks, which inevitably involve "split-second judgments" and a balancing of factors in "tense, uncertain, and rapidly evolving" situations. *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam) (citation omitted). Under the injunction, however, DHS officers' real-time judgments would be subject to judicial second-guessing in contempt proceedings based on whether officers complied with the injunction's vague terms—such as whether a protester engaged in "active resistance" or whether the officer's

actions were "reasonably necessary" or "legally justified" in the eyes of the court.

There are good reasons why courts should not micromanage day-to-day law-enforcement operations in this way. Article III does not "transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger." *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453 (1990). And "[t]he scope of federal equity power" cannot "be extended to the fashioning of prophylactic procedures for a [government] agency designed to minimize this kind of [alleged] misconduct on the part of a handful of its employees." *Rizzo v. Goode*, 423 U.S. 362, 378 (1976). "[I]t is one thing to dissect and scrutinize an officer's actions with the '20/20 vision of hindsight,' 'in the peace of a judge's chambers.' It is quite another to make 'split-second judgments' on the ground, 'in circumstances that are tense, uncertain, and rapidly evolving.'" *Barnes v. Felix*, 605 U.S. 73, 89–90 (2025) (Kavanaugh, J., concurring) (citation omitted) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). The preliminary injunction order strayed from those principles. *Accord Tincher*, 164 F.4th at 1099–100 (staying similarly prescriptive injunction).

**II. We vacate the provisional class certification order.**

To justify its universal relief, the district court provisionally certified a class of "[a]ll people who, since" June 2025, "have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE Building."

The provisional class was improperly certified because it does not meet Rule 23's commonality requirement. *See*

Fed. R. Civ. P. 23(a)(2). Class certification is "not to be granted lightly." *Black Lives Matter Los Angeles v. City of Los Angeles*, 113 F.4th 1249, 1258 (9th Cir. 2024). Rule 23 does not impose a mere pleading standard; plaintiffs cannot plead their way to class certification through just allegations and assertions. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Rather, the plaintiffs must "affirmatively demonstrate" by a preponderance of actual evidence that they satisfy all the Rule 23 prerequisites. *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1192 (9th Cir. 2024) (quoting *Wal-Mart*, 564 U.S. at 350). In doing so, plaintiffs "must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Id.* at 1201 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014)). This demanding requirement applies equally to so-called provisional classes, even assuming that they are valid. *See Newberg & Rubenstein on Class Actions* § 4:30 (6th ed.).[6]

Here, the district court did not engage in the required "rigorous analysis" to determine whether the Rule 23(a) commonality requirement has been met. *Wal-Mart*, 564 U.S. at 351. To meet their burden, the plaintiffs argue that the proposed class satisfies Rule 23's commonality requirement because DHS allegedly maintains an unwritten policy of retaliation. But that must be "affirmatively demonstrate[d]," not merely alleged. *Wal-Mart*, 564 U.S. at 350. Moreover, even assuming such an unwritten policy of retaliation could be shown, the plaintiffs have failed to show how "every [class member] has experienced the same

[6] The text of Rule 23 says nothing about provisional classes, but courts have asserted the power to provisionally certify a class. *See, e.g.*, *Vasquez Perdomo v. Noem*, 148 F.4th 656, 688 n.15 (9th Cir. 2025).

challenged practice or suffered the same injury due to" that alleged policy. *Willis v. City of Seattle*, 943 F.3d 882, 885 (9th Cir. 2019).

Indeed, the problem is that there is no commonality across the class provisionally certified. The district court certified all people who "have, desire to, or will nonviolently protest against or report on DHS activities." The provisional class thus includes (a) protesters who peacefully hold signs on the sidewalk 250 feet away from the ICE facility, (b) people who block the ICE driveway to prevent cars from entering or exiting the building, (c) people who "passively" resist arrest by trespassing, refusing to abide by law enforcement orders, and "going dead weight," and (d) even those who vandalize the ICE building. But there is little in common between an Antifa provocateur who destroys the security camera at the ICE facility and a peaceful protester who holds a sign several hundred feet away on the public sidewalk. Simply put, the plaintiffs here have not shown the existence of common evidence that can resolve in "one stroke" the class members' claims that hinge on a wide array of facts. *See Black Lives Matter*, 113 F.4th at 1260 (9th Cir. 2024) (quoting *Wal-Mart*, 564 U.S. at 350). That is error.

Even those class members who were allegedly retaliated against "will face an uphill challenge in showing that common questions exist," *Black Lives Matter*, 113 F.4th at 1258–60, because First Amendment retaliation claims must be evaluated based on "all of the circumstances" (including the mental state of the federal officers who acted), *Puente*, 123 F.4th at 1062–63. These "fact-specific" and "individualized considerations" require "separate analyses" and are therefore not "amenable to class treatment." *Black Lives Matter*, 113 F.4th at 1258–60; *see also Puente*, 123 F.4th at 1063 (confirming that a First Amendment retaliation

claim must "focus on subjective causation," which "will often raise 'particularly difficult' causation questions" (citation omitted); *Willis*, 943 F.3d at 885 ("Allegations of individual instances of mistreatment, without sufficient evidence, do not constitute a systemic deficiency or overarching policy of wrongdoing."); *Black Lives Matter Los Angeles,* 113 F.4th 1249, 1258–60; *cf. Tincher*, 164 F.4th at 1099 (rejecting theory that class certification would be appropriate given the fact-specific inquiries that must occur where "observers and protestors [were] engaging in a wide range of conduct, some of it peaceful but much of it not").[7] The individualized nature of this inquiry, with its focus on the subjective motivation of the particular officer committing an act of alleged retaliation, prevents such claims from being amenable to class certification.

Plaintiffs' reliance on *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014), is inapposite. That case challenged "systemic Eighth Amendment violations" in Arizona state prisons; it was not a First Amendment case. *Parsons*, 754 F.3d at 662. The court found commonality because the plaintiffs there challenged statewide policies that affected all prisoners (*e.g.*, a policy of understaffing medical facilities, a policy of providing nutritionally inadequate meals to all prisoners in isolation). *Id.* at 679. In contrast, First

[7] Plaintiffs attempt to distinguish *Tincher*—which similarly sought certification of a class of "'[a]ll persons who do or will in the future record, observe, and/or protest against'" "the ongoing immigration-enforcement effort in the Twin Cities," 164 F.4th at 1098—because "'federal agents [were] responding in various ways' to 'different conduct, by different officers, at different times.'" But that is precisely the case here. The differences between different federal agents working for different federal components in response to different protesters doing different things cannot be waved away.

Amendment retaliation claims are "'fact-specific'" and depend on "'individualized considerations,'" thus requiring "separate analyses" that are not "amenable to class treatment.'" *Dickinson*, 174 F.4th at 647 (quoting *Black Lives Matter*, 113 F.4th at 1258-60); *see also Puente*, 123 F.4th at 1063. Moreover, because we have found no unwritten policy of First Amendment retaliation, there is no "glue" that holds together the putative class and the putative subclass. *Parsons*, 754 F.3d at 678. The plaintiffs thus have failed to demonstrate commonality.[8]

Even if plaintiffs could establish commonality, the provisional class must be decertified because plaintiffs cannot satisfy Rule 23(b)(2)'s indivisible-remedy requirement. To proceed under Rule 23(b)(2), plaintiffs must demonstrate both that Rule 23(a)'s prerequisites, including commonality, are satisfied, but also that one of the

[8] The exceedingly difficult task of certifying a class based on alleged First Amendment retaliation is similar to the almost insuperable obstacles that plaintiffs usually face when they try to certify a class premised on a Fourth Amendment violation. Both claims require highly individualized, fact-specific inquiries. *See, e.g., Black Lives Matter*, 113 F.4th at 1261 (9th Cir. 2024) ("Whether [a government action] violates the Fourth Amendment, like other excessive force issues, is usually 'fact-specific' and 'likely to turn on the credibility of the witnesses.'") (citation omitted). *See also Sandoval v. Cty. of Sonoma,* 912 F.3d 509, 519 (9th Cir. 2018) (holding that plaintiffs could not establish Fourth Amendment liability on a class-wide basis, rendering their claims atypical and unsuitable for class treatment); *Willis*, 943 F.3d at 885–87 (denying class certification for a Fourth Amendment challenge to homeless encampment "sweeps" because the plaintiffs failed to point to a specific, uniform practice as the record indicated that "each sweep is different" and the plaintiffs relied on "extra-regulatory conduct" by individual officers).

conditions of Rule 23(b) is satisfied. *See* Fed. R. Civ. P. 23(b). The court here certified a class under Rule 23(b)(2).

"The key to the (b)(2) class is the *indivisible nature* of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or none of them." *Wal-Mart*, 564 U.S. at 360 (emphasis added) (quotation marks omitted). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Id.* It "does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant." *Id.*; *see also Farley v. Lincoln Benefit Life Co.*, 150 F.4th 1197, 1204-05 (9th Cir. 2025) (reversing Rule 23(b)(2) class-certification order due to the divisible nature of the remedy). Here, the class includes "[a]ll people who, since" June 2025, "have, desire to, or will nonviolent protest against or report on DHS activities at the Portland ICE Building."

The plaintiffs again rely on *Parsons* in discussing this requirement, but their arguments are unavailing. Again, *Parsons* turned on Eighth Amendment case law based on a state-wide policy that affected all prisoners. 754 F.3d at 687 (collecting authorities). But even *Parsons* confirms that the indivisible-remedy inquiry focuses on "whether 'the party opposing the class has acted or refused to act on grounds that apply generally to the class.'" *Id.* at 688. That is not so here.

Here, the proposed class would encompass (1) putative class members who assert a variety of First Amendment injuries caused by a wide array of allegedly unlawful conduct; (2) members who assert only some of those injuries, or who were exposed to only a subset of that

allegedly unlawful conduct; and (3) members who protested, observed, recorded, or reported on the Portland ICE Facility without any basis to allege injury. The plaintiffs "attempt to aggregate a plethora of discrete claims" of constitutional injury "into one super-claim" against the defendants "without demonstrating that the class members have been harmed in essentially the same way." *Ahmad v. City of St. Louis*, 995 F.3d 635, 644 (8th Cir. 2021) (quotation marks omitted). Because the individual class members were harmed differently or not at all, each class member "would be entitled to a different injunction or declaratory judgment against" defendants or no relief whatsoever. *Wal-Mart*, 564 U.S. at 360.

## CONCLUSION

The First Amendment enshrines the right of the people to peacefully protest our government's policies. That is a sacred right that has endured throughout American history. But the First Amendment does not greenlight protesters to engage in vandalism, criminal trespass, or obstruction of law enforcement. Such unlawful acts, however, have been commonplace around the ICE building in Portland over the past year. The plaintiffs' arguments offer no basis for this court to depart from its conclusion in stay proceedings that the preliminary injunction was improper. We vacate the preliminary injunction and the provisional class certification orders.

**PRELIMINARY INJUNCTION VACATED.**

de Alba, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority opinion to the extent that it concludes that three provisions of the preliminary injunction are overbroad.[1] I otherwise respectfully dissent. Plaintiffs' political speech outside the U.S. Immigration and Customs Enforcement facility in Portland, Oregon ("Portland ICE facility") is the type of speech that "rest[s] on the highest rung of the hierarchy of First Amendment values." *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1021 (9th Cir. 2009) (quoting *Carey v. Brown*, 447 U.S. 455, 467 (1980)).

The Supreme Court has recognized that "the practice of persons sharing common views banding together to achieve a common end is deeply embedded in the American political process." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 907 (1982) (citation modified). It is this critical practice that is at stake in this appeal. *See Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.").

While the government should not be enjoined from exercising lawful, non-retaliatory conduct, the preliminary injunction is overbroad only in part. As discussed below, the preliminary injunction should be upheld as to its prohibition against federal officers firing munitions "at the head, neck,

[1] The overbroad provisions are those (1) that prohibit officers from directing or using chemical or projectile munitions "unless the specific target . . . poses an imminent threat of physical harm"; (2) that prohibit officers from using aerosol restraint spray "unless the specific target . . . exhibits, at a minimum, active resistance"; and (3) regarding uniforms, vests, and/or helmets.

or torso of any person, unless the officer is legally justified in using deadly force against that person." This prohibition protects essential First Amendment rights, and the district court did not abuse its discretion in issuing it.

**I.**

**A.**

The district court properly determined that Plaintiffs showed a likelihood of success on the merits of their First Amendment retaliation claim. For this claim, Plaintiffs needed to show that (1) "they were engaged in a constitutionally protected activity" (2) the government's actions would "chill a person of ordinary firmness from continuing to engage in the protected activity," and (3) the protected activity was a "substantial or motivating factor" in the government's conduct. *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020).

The third element is at issue. To meet it, Plaintiffs must show (1) subjective retaliatory intent, *see Mendocino Env't Center v. Mendocino County*, 192 F.3d 1283, 1300 (9th Cir. 1999); and (2) a policy, pattern, or practice of retaliation. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005).[2]

**1.**

A plaintiff can establish subjective retaliatory intent through "direct or circumstantial evidence" that the defendant "intended to interfere with the plaintiff's First Amendment rights." *Ariz. Students' Ass'n v. Ariz. Bd. of*

---

[2] Plaintiffs must show a policy, pattern, or practice of retaliation because they do not bring this action against any individual federal officers who engaged in allegedly retaliatory conduct.

*Regents*, 824 F.3d 858, 870 (9th Cir. 2016) (citation modified).

Here, the district court relied on an avalanche of circumstantial evidence that it properly determined showed federal officers were, in many instances, motivated by retaliatory intent in their use of force. Among other things, the district court found that protesters and journalists were "directly targeted with force in the head and other areas of the body without warning and despite posing no threat nor creating a driveway obstruction," were "shot while standing apart from others," were "attacked after verbally engaging with officers," and had their "cameras or recording equipment hit directly by officers." *Dickinson v. Trump*, 827 F. Supp. 3d 1375, 1395–96 (D. Or. 2026); *see L.A. Press Club v. Noem*, 171 F.4th 1179, 1189 (9th Cir. 2026) (concluding that the district court properly found retaliatory intent where the record contained evidence that "federal officers repeatedly targeted journalists and peaceful legal observers who stood far from any protesters or bad actors" and "deployed crowd control weapons even when crowds were already dispersing or attempting to comply with orders to disperse"). The district court also found that federal officers "sho[t] into nonviolent crowds from dangerous angles like the roof of the Portland ICE [facility]," from which accuracy was significantly limited and which was "strong circumstantial evidence of Defendants' intent to punish the crowd for their expression." *Dickinson*, 827 F. Supp. 3d at 1396; *see also L.A. Press Club*, 171 F.4th at 1189 ("The presence of some violent actors did not give Defendants *carte blanche* to fire crowd control weapons indiscriminately into crowds of peaceful protesters, legal observers, and members of the press"). Based on the record, the district court determined that federal officers' use of

force was often "indiscriminate, unpredictable, and blanket [in] nature."

Expert testimony, video evidence, and Plaintiffs' testimonies support the district court's findings. The district court relied, in part, on Gil Kerlikowske's expert testimony as well as other expert testimony. *See Dickinson*, 827 F. Supp. 3d at 1396–97. Kerlikowske is a former Commissioner of U.S. Customs and Border Protection and a former Chief of Police of Seattle, Washington, who—as the district court noted—is an expert in "public order policing," which is the "effective and constitutional policing and crowd control at large public events." *Id.* at 1386 n.3 (citation modified). The district court summarized Kerlikowske's declaration, stating that Kerlikowske:

> identified a myriad of misuses of crowd control munitions at the Portland ICE [facility], including federal officers using teargas on a peaceful crowd, shooting munitions from a roof into a crowd, using munitions on persons who posed no threat, using munitions or non-trivial force on people who were not actively resisting, using volleys of munitions in a grossly disproportionate manner, failing to provide warnings and failing to engage in de-escalation approaches before using force, shooting pepper balls or teargas at people directly, targeting a person in the head (which, he noted, can be lethal), shooting at people across long distances (which, he noted, is dangerous due to loss of accuracy),

> and using munitions to retaliate against First Amendment activity.

*Id.* at 1396–97.

Kerlikowske's testimony mirrors the district court's findings discussed above and reflects the video evidence in this case, which the district court recommended that this court review. The video evidence depicts various incidents across the span of months. In my dissent from the order staying the preliminary injunction in this case, I highlighted numerous notable moments from the videos, including:

- A protester holding a megaphone who is struck in the eye with a projectile, causing his eye to bleed.
- Two officers running straight into, and forcefully knocking down from behind, a protester who was standing still.
- An officer directly spraying, for several seconds, the air intake valve on the back of an inflatable costume a seemingly peaceful protester is wearing, presumably in an attempt to fill the costume with the spray.
- An officer spraying chemical munitions directly into the face of a protester who is standing still and another officer beating the protester with a baton.
- An officer shoving a protester and then immediately spraying him directly in the face.

- An officer spraying two protesters—one of whom appeared to be speaking with the officer—directly in the face, causing the protesters to stumble and sit on the street, at which point one of the protesters screams in apparent agony.
- An officer shooting projectiles at a protester, even as the protester is walking out of the Portland ICE facility driveway.
- An officer shooting a projectile directly at a seemingly peaceful protester.
- An officer pushing two protesters who were standing still several times. One of the protesters—an older person—falls backward after the officer pushes him a final time. The protester struggles to stand back up until he is hoisted up by two other protesters.
- An officer shoving protesters seemingly without provocation or warning.
- An officer throwing a chemical munition into an uncrowded location where no one is directly around the munition.
- An officer throwing a chemical munition over a crowd of protesters, seemingly indiscriminately, while calling the protesters "motherfuckers." Following this, officers throw multiple chemical munitions into the crowd, creating a chemical munitions haze so thick that it is

not possible to see through. Even so, an officer throws a chemical munition into the haze.

- An officer launching a chemical munition so far and high it hits near the top of a building before ricocheting off and landing far from its initial impact site.
- An officer launching a chemical munition far across the street in the direction of Gray's Landing, an affordable housing complex.
- An officer throwing a chemical munition far into the street, not seemingly at any particular protester; officers throw multiple chemical munitions into the street afterward, often flying over protesters and traveling long distances. One of the munitions appears to hit Gray's Landing.
- An officer throwing a chemical munition high up in the air, seemingly indiscriminately, over a crowd of seemingly peaceful protesters, and officers throwing multiple chemical munitions into the crowd thereafter, filling the screen with a chemical munitions haze.
- Officers throwing or shooting a chemical munition at a crowd of seemingly peaceful protesters.

- Officers throwing so many chemical munitions at a seemingly peaceful crowd of protesters that the street fills with a chemical munitions haze that is nearly impossible to see through.
- A protester yelling, "You are so unorganized," and shortly afterward, an officer throwing a chemical munition at a crowd of protesters, close to where officers are as well, seemingly catching at least one of the officers off guard.
- Officers on the roof of the Portland ICE facility shooting projectiles seemingly indiscriminately into a crowd of what appear to be peaceful protesters.
- An officer grabbing a peaceful protester and pulling her over the line of the Portland ICE facility grounds; shortly thereafter, multiple officers rush into the sidewalk where protesters are standing, the protester who was pulled over the line is thrown to the ground, other protesters are shoved, and the shots of projectiles ring.
- Officers throwing multiple chemical munitions into a crowd of seemingly peaceful protesters; one of the protesters juggles balls and others simply stand about or disperse.
- Multiple protesters standing or sitting still along the driveway of the Portland ICE

facility while officers spray the protesters directly in the face and push and shoot the protesters with projectiles.

- Officers entering the Portland ICE facility driveway and shooting projectiles and throwing chemical munitions at protesters without any apparent warning or cause.
- Protesters dancing outside the Portland ICE facility, performing the Cha-Cha Slide, when the gates of the facility open and officers appear to immediately deploy a large number of chemical munitions, seemingly without warning.
- An officer launching a chemical munition at a crowd of seemingly peaceful protesters, which hits a protester or journalist taking photos of the protest.
- Officers pushing crowds of protesters about a block from the Portland ICE facility and then throwing chemical munitions and flashbangs at the protesters and shooting them with pepper balls. This video is from Oregon Public Broadcasting, and the journalist narrating the video and who was on scene states, “It wasn’t clear what the crowds did to provoke this.”

*Dickinson v. Trump*, 174 F.4th 634, 656–57 (9th Cir. 2026) (de Alba, J., concurring in part and dissenting in part). To

me, the videos are just as the district court describes: "unambiguous and disturbing."

Plaintiffs' testimonies, and videos depicting Plaintiffs or that Plaintiffs captured, further support the district court's determination that the federal officers' use of force was motivated by retaliatory intent in many instances. For example, on September 1, 2025, Plaintiff Hugo Rios wore gear identifying him as a member of the press. Rios stood on a sidewalk across the street from the Portland ICE facility and documented federal officers exiting the facility and immediately, and without any warning, shooting chemical and projectile munitions at a crowd that was dancing outside the facility. Then, without any warning, a federal officer pushed Rios from behind. Several minutes later, another federal officer told Rios to move back. When Rios explained that he was simply filming, the officer stated, "I don't care," and then "very forcefully" shoved Rios about four times from the front and hit Rios's camera, which "damaged it to the point that it stopped recording." About six minutes later, a federal officer tossed a tear gas canister at Rios's feet even though he was "standing away from the crowd and was alone at the time, and was not engaged in any activity." Then, federal officers "repeatedly shot" Rios with pepper balls or other impact munitions. Rios was struck about 20 times across the front and back of his body. His battery pack was also hit, creating a dent in it. Rios testified that he was hesitant to document protests at the Portland ICE facility following this incident because he was afraid federal agents would target him and "injure [him] even more severely."

On September 13, 2025, Plaintiff Mason Lake—who was also wearing gear identifying him as a member of the press—was documenting protests at the Portland ICE facility when he was pepper sprayed. "The spray liberally

covered [his] upper body and [his] head and [his] camera equipment" and caused him to seek medical assistance given a variety of symptoms, including his eyes stinging to the point that he could "not open them." Lake's camera equipment needed extensive cleaning, and his microphone was "damaged beyond repair."

Lake testified that he had documented over 150 protests prior to 2025 and that he had seen "an increase in unpredictable behavior" from federal officers at the Portland ICE facility compared to the prior protests he had documented. For example, Lake testified that he was "shot through clouds of gas where [he] couldn't even be seen, and [he] wasn't doing anything"; he had seen "munitions carelessly thrown around"; "munitions used by federal officers [to] set fire to local property"; and federal officers allowing "civilian content creators" into the Portland ICE facility even though the facility was ostensibly "closed to the public."

In the afternoon on October 4, 2025, Plaintiffs Laurie and Richard Eckman—who were both in their eighties—were protesting outside the Portland ICE facility. A fellow protester, using a megaphone, instructed the crowd to be peaceful, not engage or provoke federal officers, and not step onto federal property. Laurie Eckman testified that the "protest crowd was peaceful[,] . . . cheerful[,] and calm" and that she did not observe anyone enter federal property or provoke federal officers. Nonetheless, without warning, federal officers entered the Portland ICE facility driveway and "suddenly started firing their munitions," which filled the air with chemical gas. Laurie Eckman then "heard a loud bang and felt an extremely hard and direct impact that caused a sharp pain on the right side of [her] head near [her] right temple." She was in "severe pain" and "coughing and

choking" and could not see. Around the same time, while Richard Eckman was attempting to leave the area, a federal officer fired a chemical munition at him, creating a chemical haze around his walker. The Eckmans left the protest with the assistance of other protesters.

Once home, Laurie Eckman "realized that [she] was soaked in blood," which was "so saturated into [her] clothing that it had soaked through [her] jacket, [her] shirt, covered [her] bra, and even was on [her] jeans." Her hair "also had blood saturated on it." She was later treated for a concussion, developed bruising around her right eye, and formed a scar on the right side of her head where she had been struck with a munition. Laurie Eckman testified that the federal officers' use of force was "unprovoked and unnecessary"; she "had no idea that federal agents would target peaceful people, much less vulnerable people like [herself]"; she continued to cough and have trouble breathing following the protest on October 4, 2024; and that she "no longer fe[lt] safe attending protests where federal agents may be present," despite her desire to attend such protests.

Several months later, on January 31, 2026, the Eckmans attended a "family-friendly" interfaith gathering "committed to nonviolence" that their church sponsored at a park three blocks away from the Portland ICE facility. Laurie testified that she did not anticipate getting close to the Portland ICE facility and that she believed she would be safe at a "daytime event with kids and families." The event participants eventually walked slowly toward the Portland ICE facility with a large crowd. The Eckmans nonetheless stopped about a half a block away from the facility, by Gray's Landing. Other members of the Eckmans' church stopped with the

Eckmans because they were "afraid of getting close" to the Portland ICE facility.

When a group of protesters approached the gate of the Portland ICE facility and reportedly attacked it with plywood and tried to secure the gate with rope, federal officers on the roof of the Portland ICE facility threw chemical munitions over the crowd. These chemical munitions were sent down the street from the facility, nowhere near the gate. Laurie testified that federal officers "continued to throw tear gas at [her and the other protesters] when [they] were trying to get away." She testified that, if the federal officers "wanted [protesters] to leave the area, they made it very difficult to do so by firing tear gas toward the back of the crowd and in the pathway [from which] the crowd had to exit the area." Laurie testified that, as a result of the chemical munitions, her "face stung, and it was hard to breathe," and that other protesters were "retching, vomiting, crying."

Craig Dobson, who served as the Incident Commander for the Portland Police Bureau on January 31, 2026, testified that federal officers' deployment of tear gas from the Portland ICE facility was "excessive and disproportionate to the threat posed" and affected "hundreds of peaceful protesters who were not involved in the actions at the gate."

Starting in April 2025, Plaintiff Jack Dickinson attended numerous protests outside the Portland ICE facility. Around June 2025, Dickinson started wearing a yellow chicken suit to the protests and became known as the "Portland Chicken." He testified that federal officers repeatedly used force against him while he protested. For example, on August 16, 2025, a federal officer shot a pepper ball at Dickinson from the roof of the Portland ICE facility, which hit his respirator

filter. Around the same time, a flash bang or tear gas canister "sparked" next to his leg and "burned" the chicken suit he was wearing.

On August 23, 2025, Dickinson stood on a public sidewalk near the Portland ICE facility when federal officers shoved him, "knock[ing] [him] backwards." When he stood up, he "started crossing the street to walk away" but was nonetheless "shot in the back with munitions from an agent located on the roof of the [Portland ICE facility]."

And on October 18, 2025, Dickinson attended a protest outside the Portland ICE facility when federal officers launched so many chemical munitions that they created a large chemical haze. This caused Dickinson to experience severe nausea and significant pain, leading him to lie down on the street and receive medical attention. Dickinson suffered residual pain throughout the next day.

Dobson also attended the October 18, 2025, protest to observe Portland Police Bureau operations. He testified that "most of the crowd was [ ] involved in peaceful protest" and that the protest had "the feel of a festive street party, with music, dancing, and many folks in costumes." Notably, after federal officers unleashed chemical munitions on the crowd, Dobson testified that the Portland Police Bureau officers on the scene left the area because the severity of the chemical haze prevented them from safely performing law enforcement duties.

As illustrated above, Plaintiffs have presented an overwhelming amount of evidence that supports the district court's finding of retaliatory intent. And as stated previously, "The presence of some violent actors did not give Defendants *carte blanche* to fire crowd control weapons indiscriminately into crowds of peaceful protesters, legal

observers, and members of the press." *L.A. Press Club*, 171 F.4th at 1189. Moreover, the record shows that on multiple occasions federal officers "deployed crowd control weapons even when crowds were already dispersing or attempting to comply with orders to disperse," which is evidence of retaliatory intent. *Id.* The record also shows instances in which federal officers used force against Plaintiffs and other similarly situated individuals when they were "standing nowhere near protesters," which is "exceptionally strong evidentiary support for the district court's finding that some [federal officers] were motivated to target [protesters and] journalists in retaliation for [P]laintiffs' exercise of their First Amendment rights." *Index Newspapers LLC*, 977 F.3d at 829 ("The evidence that at least some of the Federal Defendants' conduct was retaliatory supports the district court's conclusion that the plaintiffs are likely to succeed on the merits of their retaliation claim."). Nor, in many instances, was there "legitimate justification" for the federal officers' use of force. *Sanderlin v. Dwyer*, 116 F.4th 905, 911 (9th Cir. 2024). From this, the district court "reasonably infer[red]" that federal officers' use of force was often motivated by retaliatory intent. *Id.*

The government's reliance on *Puente v. City of Phoenix* is unavailing on the question of retaliatory intent. 123 F.4th 1035 (9th Cir. 2024). In *Puente*, this court determined that the district court properly granted summary judgment to the defendants on the plaintiffs' First Amendment retaliation claim because the undisputed facts did not support "a reasonable inference of retaliatory intent." *Id.* at 1063. The *Puente* court reasoned that the Phoenix Police Department (PPD) "worked in advance to coordinate with protesters in order to ensure that the protests were conducted peacefully, and the protests went on without any serious incident for

several hours." *Id.* "When problems then began to arise, the PPD initially responded with more limited measures and only decided to disperse the crowd when the requisite objective clear and present danger had materialized." *Id.* Because the facts indicated that PPD's use of force was "taken in immediate response to a clear and present danger" rather than because of "hostility to the protesters' views," "no reasonable jury could conclude that the dispersal was in fact subjectively motivated by antipathy to [the plaintiffs'] political speech." *Id.* at 1063–64.

Here, it is undisputed that protests occurred almost daily at the Portland ICE facility between June 2025 and the filing of this action. The protests largely mirrored one another with at least one federal officer stating, "It's been a bit of groundhog day out here." Yet, unlike in *Puente*, the government does not point to evidence showing that it "worked in advance to coordinate with protesters in order to ensure that the protests were conducted peacefully." *Id.* at 1063. Instead, the evidence reflects that the government increasingly escalated its use of force against protesters and journalists while it, at the same time, decreased its communication with them. For example, the district court found that, "before President Trump's [September 2025] social media post about 'war ravaged' Portland, audible warnings using . . . Long Range Acoustic Devices [ ] had been regularly given before [U.S. Department of Homeland Security (DHS)] officers would fire tear gas and pepper-ball munitions, but afterward, there were fewer audible warnings and the use of tear gas and pepper-ball munitions against nonviolent and peaceful protesters became more frequent but also more unpredictable." *Dickinson*, 827 F. Supp. 3d at 1388.

Undeterred, the government relies on *Puente* to argue that Plaintiffs' First Amendment retaliation claim is "a poor fit for the crowd-dispersal context." 123 F.4th at 1063. This argument is unavailing. In *Puente*, it was not "entirely clear from [the] [p]laintiffs' briefs whether [the] [p]laintiffs [were] contending that a First Amendment retaliation claim may properly be asserted in the crowd-dispersal context *in addition to* a clear-and-present-danger claim or only as an *alternative* to it."[3] *Id.* (emphasis in original).

Without resolving the question of whether a First Amendment retaliation claim may be brought in addition to a clear-and-present-danger claim, the *Puente* court suggested that "a conventional First Amendment retaliation framework, with its focus on subjective causation, is a poor fit for the crowd-dispersal context, because it adds little to the objective clear-and-present-danger analysis and will often raise particularly difficult causation questions." *Id.* (citation modified) (concluding that the court need not resolve any causation questions because there was no triable issue that the dispersal in *Puente* was undertaken with retaliatory intent).

Here, however, Plaintiffs do not bring a clear-and-present-danger claim: they bring a First-Amendment-retaliation claim alone. And we have previously determined

[3] A clear-and-present-danger claim is one that alleges the defendants enjoined or prevented First Amendment activities "before the demonstration pose[d] a clear and present danger," which is "presumptively a First Amendment violation." *Collins v. Jordon*, 110 F.3d 1363, 1371 (9th Cir. 1996). Unlike a First Amendment retaliation claim, "[w]hether a particular situation presents a clear and present danger of imminent lawlessness must be evaluated under an objective standard, rather than based on the subjective apprehensions of the officers." *Puente*, 123 F.4th at 1062.

that plaintiffs can show First Amendment retaliation in the crowd-dispersal context. *See L.A. Press Club*, 171 F.4th at 1189; *Index Newspapers LLC*, 977 F.3d at 829. As discussed above, the district court appropriately found retaliatory intent through a significant amount of circumstantial evidence.

The government next argues that Plaintiffs' allegations of excessive force are more appropriately addressed under the Fourth Amendment "or any other doctrines that might apply to individual officer misconduct." Allegations that First Amendment retaliation occurred through excessive force pose no meaningful conceptual or doctrinal challenge.

*Aldridge v. City of St. Louis* is illustrative. 75 F.4th 895 (8th Cir. 2023). There, the Eighth Circuit affirmed a district court's grant of summary judgment to a police officer on a plaintiff's First Amendment retaliation claim, which was "base[d] . . . on an allegation of excessive force," specifically, a law enforcement officer's use of pepper spray on the plaintiff during a protest. *Id.* 898 (citation modified). Notably, the plaintiff brought a separate Fourth Amendment retaliation claim against the officer. *See id.* The district court determined that, because it had granted summary judgment to the officer on the Fourth Amendment excessive force claim, the plaintiff's First Amendment retaliation claim failed to survive summary judgment. *See id.*; *see also id.* at 900 n.4 (noting that the district court concluded that its "analysis . . . regarding [the plaintiff's] Fourth-Amendment claim applies to his First-Amendment claim as well") (citation modified).

Yet the Eighth Circuit concluded that the "analyses for First Amendment claims and Fourth Amendment claims are distinct." *Id.* at 900 n.4. It explained that, for a First

Amendment retaliation claim, "the issue presented is not whether the officer's use of force was 'reasonable,' but rather whether the use of force was retaliatory." *Id.* In other words, "even if an officer makes an unreasonable mistake regarding the use of force, he is not liable for First Amendment retaliation unless a plaintiff proves the officer was motivated by retaliatory animus." *Id.* The Eighth Circuit then reviewed the First Amendment retaliation claim separately from the Fourth Amendment excessive force claim. *See id.* It determined that no evidence in the record indicated the officer had animus toward the plaintiff and the evidence instead suggested that "the use of force"—i.e., "utilizing [ ] pepper spray"—was "a crowd control mechanism rather than retaliati[on] against a particular protestor." *Id.* at 899–900.

The same principles apply here, and Plaintiffs' First Amendment retaliation claim remains intact and distinct from a Fourth Amendment excessive force claim even though Plaintiffs allege that the retaliation occurred through the use of force. *See Ballentine v. Tucker*, 28 F.4th 54, 65 (9th Cir. 2022) (concluding that "it would be unlawful to arrest Plaintiffs in retaliation for their First Amendment activity, notwithstanding the existence of probable cause"); *see also Reichle v. Howards*, 566 U.S. 658, 665 (2012) ("[T]he right in question is not the general right to be free from retaliation for one's speech, but the more specific right to be free from a retaliatory arrest that is otherwise supported by probable cause."); *cf. Index Newspapers, LLC*, 977 F.3d at 829 (noting that retaliatory conduct in violation of the First Amendment "may well support . . . claims of excessive force").

Similarly, the majority concludes that the district court erroneously relied on *Nelson v. City of Davis*, a Fourth

Amendment case, and incorrectly assumed that the government could use force only in response to the threat of imminent physical harm. 685 F.3d 867 (9th Cir. 2012). The majority contends that this assumption undergirds the district court's conclusion that the government's use of chemical munitions was "strong circumstantial evidence of the Defendants' intent to punish the crowd for their expression." *See Dickinson*, 827 F. Supp. 3d at 1396. I agree that the district court erroneously relied on *Nelson*. Yet the majority reads too much into the district court's reliance on *Nelson*. The district court cited *Nelson* once in its thirty-four-page opinion, and fuller context of the district court's statement regarding "strong circumstantial evidence" is illuminating. The district court stated, "Several protesters describe DHS officers shooting into nonviolent crowds from dangerous angles like the roof of the Portland ICE [facility]. *This* is strong circumstantial evidence of Defendants' intent to punish the crowd for their expression." *Id.* (emphasis added.) Indeed, as the district court noted, Kerlikowske testified that "shooting at people across long distances . . . is dangerous due to loss of accuracy." *Id.* at 1396–97. And *Puente* did not greenlight reckless use of force. *See Puente*, 123 F.4th at 1062. Moreover, as discussed above, the district court pointed to numerous other instances in which federal officers used force in a manner our court has determined can support a finding of retaliatory intent. *See L.A. Press Club*, 171 F.4th at 1189; *Index Newspapers LLC*, 977 F.3d at 829.

**2.**

To show a policy, pattern, or practice of First Amendment retaliation, a plaintiff must demonstrate (1) a longstanding practice or custom which constitutes the "standard operating procedure" of the government; (2) a decision-making official was a final policymaking authority

whose edicts or acts may fairly be said to represent official policy in the area of decision; or (3) an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate. *Menotti*, 409 F.3d at 1147. First Amendment retaliation "may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant [] officers were not discharged or reprimanded." *Id.* "An official retaliatory policy is a particularly troubling and potent form of retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by an individual officer." *Lozman v. Riviera Beach*, 585 U.S. 87, 100 (2018).

Here, the district court properly found that federal officers operated under a practice of First Amendment retaliation against protesters and journalists outside the Portland ICE facility, and that federal officers were not discharged or reprimanded despite repeated instances of First Amendment retaliation. The district court found that the federal officers' retaliatory uses of force were "not infrequent" and "appear to have been escalating in frequency until the [district court] issued its TRO [or temporary restraining order]." *Dickinson*, 827 F. Supp. 3d at 1390. At the same time, the district court found that the "agents involved were not put on leave and do not appear to have been held accountable in any way." *Id.* at 1397. As the district court noted, Kerlikowske testified that he saw "many violations of DHS's written policies, both in the videos and in the use-of-force reports but saw no corrective action being taken." *Id.* at 1391.

The district court also found that, [r]ather than reprimanding DHS violence against protesters, senior [government] officials have publicly condoned it." *Id.* at 1397. The district court determined that "statements made

by DHS officials and senior federal executives show that the culture of the agency and its employees is to celebrate violent responses over fair and diplomatic ones." *Id.* at 1398. In fact, as stated above, the district court explained that, after President Trump's September 2025 social media post, "there were fewer audible warnings [before federal officers used force] and the use of tear gas and pepper-ball munitions against nonviolent and peaceful protesters became more frequent but also more unpredictable." *Id.* at 1388.

It is true that DHS policy prohibits officers from "profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights." Yet "Defendants cannot avoid potential liability by pointing to DHS policies that correctly set out the bounds for the use of less lethal munitions, when their actions were inconsistent with those policies," *L.A. Press Club*, 171 F.4th at 1189, "otherwise an entity . . . always could avoid liability by pointing to a pristine set of policies." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1075 n.10 (9th Cir. 2016).

In fact, Roberto Cantu—the Deputy Director of the Federal Protective Service, Region 10 (which includes Oregon)—opined that force federal officers used during an incident was "inappropriate" and "not reasonable." Nonetheless, the district court found that the officers involved in the incident "were not put on leave and do not appear to have been held accountable in any way." *Dickinson*, 827 F. Supp. 3d at 1397.

Although the government represents that investigations of federal officers who may have violated DHS policy while assigned to the Portland ICE facility during the protests relevant to this action are ongoing, the government does not

represent that the federal officers were put on leave during the pendency of the investigations or otherwise "discharged or reprimanded." *Cf. Menotti*, 409 F.3d at 1147 (citation modified).

Ultimately, the district court did not abuse its discretion in finding that federal officers' use of force was likely motivated by retaliatory intent and that federal officers likely operated under a policy, pattern, or practice of retaliating against protesters and journalists for exercising their First Amendment rights outside the Portland ICE facility.[4]

**B.**

The district court did not abuse its discretion in determining that Plaintiffs will likely suffer irreparable harm in the absence of the preliminary injunction. "[A] party seeking preliminary injunctive relief in a First Amendment context can establish irreparable injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment claim." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (citation modified); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

Here, because Plaintiffs have established a likelihood of success on the merits, they have established a likelihood of irreparable harm. *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) ("If a plaintiff in [a case alleging

[4] As discussed below, Plaintiffs have established that the balance of hardships tips sharply in their favor, and Plaintiffs meet the other preliminary injunction factors. Accordingly, Plaintiffs needed only to show "serious questions" on the merits, "a lesser showing of likelihood of success." *Where Do We Go Berkeley v. Cal. Dep't of Transp.*, 32 F.4th 952, 859 (9th Cir. 2022) (citation modified).

constitutional injury] shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation.") (citing *Planned Parenthood Ariz., Inc. v. Humble*, 753 F.3d 905, 911 (9th Cir. 2014), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022)); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). "The harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech." *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009).

As discussed above, based on the evidence the parties presented, the district court reasonably determined that federal officers' use of force against Plaintiffs and the provisional class members at the Portland ICE facility was based on a policy, pattern, or practice of First Amendment retaliation and "will likely keep recurring." *Dickinson*, 827 F. Supp. 3d at 1398. Likewise, protests at the Portland ICE facility have been ongoing. *See Melendres*, 695 F.3d at 1002 (concluding that, based on the evidence presented, it was reasonable for the district court to determine that "Plaintiffs faced a real possibility that they would again be . . . subjected to unlawful detention" and had therefore shown a likelihood of irreparable harm).

Moreover, the district court determined that some protesters and journalists were "fully chilled." *Dickinson*, 827 F. Supp. 3d at 1398 (citation modified). As in *Los Angeles Press Club*, "[t]he government's actions have already caused severe and lasting physical injuries and trauma to some Plaintiffs—some on more than one occasion . . . during different protests," which "has had a chilling

EXHIBIT 1

effect on some Plaintiffs' ability to exercise freedoms protected by the First Amendment." 171 F.4th at 1189–90 (concluding that the demonstrated injuries and chilling effect were sufficient to show a likelihood of irreparable harm); *see also Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019) ("[O]ur cases do not require a strong showing of irreparable harm for constitutional injuries"; "where the plaintiff's First Amendment rights [are] being chilled daily, the need for immediate injunctive relief without further delay is, in fact, a direct corollary of the matter's great importance.") (citation modified).

Accordingly, the district court did not abuse its discretion in concluding that Plaintiffs and the provisional class members face a likelihood of irreparable harm absent a preliminary injunction.

**C.**

The district court did not abuse its discretion in determining that the balance of equities and public interest weigh in Plaintiffs' and the provisional class members' favor. "When the government is a party, the last two factors (equities and public interest) merge." *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 668 (9th Cir. 2021) (citing *Nken*, 556 U.S. at 435), *overruled on other grounds by Ariz. All. for Ret. Ams. v. Mayes*, 186 F.4th 622 (9th Cir. 2026) (en banc). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," and we have "consistently recognized the significant public interest in upholding First Amendment principles." *L.A. Press Club*, 171 F.4th at 1190 (citation modified); *see also id.* (concluding that the plaintiffs raise "serious First Amendment questions, . . . [so] the balance of hardships tips sharply in [their] favor." (quoting *Cmty. House, Inc. v. City*

*of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007)). The district court therefore did not abuse its discretion in determining that the balance of the equities and the public interest weigh in Plaintiffs' and the provisional class members' favor.

## II.

The district court abused its discretion by issuing an overly broad injunction as to three of the preliminary injunction's provisions. Although district courts have "considerable discretion in fashioning suitable relief and defining the terms of an injunction," such relief "must be tailored to remedy the specific harm alleged." *Washington v. Trump*, 145 F.4th 1013, 1037–38 (9th Cir. 2025) (citation modified). I agree with the majority that the preliminary injunction was not sufficiently narrowly tailored with respect to those provisions (1) that prohibit officers from directing or using chemical or projectile munitions "unless the specific target . . . poses an imminent threat of physical harm"; (2) that prohibit officers from using aerosol restraint spray "unless the specific target . . . exhibits, at a minimum, active resistance"; and (3) regarding uniforms, vests, and/or helmets.

Yet the district court properly enjoined federal officers from firing munitions "at the head, neck, or torso of any person, unless the officer is legally justified in using deadly force against that person." In *Los Angeles Press Club*, this court concluded that a similar "prohibition against 'firing [kinetic impact projectiles] or other crowd control weapons at the head, neck, groin, back, or other sensitive areas' is directly tethered to the specific harms alleged by [the] [p]laintiffs and recognized by the district court—namely, [the] [d]efendants' aiming of crowd control weapons at sensitive areas of the body, including heads, in retaliation for

First Amendment protected conduct." 171 F.4th at 1192. The same is true here.[5]

Similarly, here, the district court found that protesters and journalists were "directly targeted with force in the head and other areas of the body without warning and despite posing no threat nor creating a driveway obstruction," *Dickinson*, 827 F. Supp. 3d at 1395, and the prohibition is directly tethered to the specific harms Plaintiffs and the provisional class members allege.[6]

**III.**

The district court did not abuse its discretion when it ruled that Plaintiffs' proposed class met Federal Rule of Civil Procedure 23's commonality and indivisibility requirements. Plaintiffs proposed a class consisting of:

> All people who, since the beginning of Operation Skip Jack [i.e., the deployment of DHS officers at the Portland ICE facility], have, desire to, or will nonviolently protest against or report on DHS activities at the Portland ICE [facility].

---

[5] Notably, the court in *Los Angeles Press Club* further concluded, "Although federal policies already prohibit the intentional targeting of sensitive areas unless the use of deadly force is reasonable, the district court found that DHS officers failed to follow those policies in response to Plaintiffs' protected conduct, resulting in chilling of Plaintiffs' exercise of First Amendment rights." 171 F.4th at 1192.

[6] The majority's reliance on *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), for the proposition that any equitable relief should be limited to Plaintiffs is misplaced because the district court in *CASA* had not properly certified a provisional class whereas the district court here did, as discussed below.

"A district court can certify a provisional class for purposes of a preliminary injunction," *Vasquez Perdomo v. Noem*, 148 F.4th 656, 688 n.15 (9th Cir. 2025) (citation modified), provided that the parties seeking class certification demonstrate by a preponderance of the evidence that the proposed class meets Rule 23(a)'s requirements, including commonality, and at least one of the provisions of Rule 23(b). *White v. Symetra Assigned Benefits Serv. Co.*, 104 F.4th 1182, 1191–92 (9th Cir. 2024). Here, Plaintiffs propose a class under Rule 23(b)(2), which sets out an indivisibility requirement.

With respect to commonality, Plaintiffs must show that the putative class members' claims depend on a common question that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *see also id.* at 359 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do." (citation modified)). "[C]ommonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Parsons v. Ryan*, 754 F.3d 657, 682 (9th Cir. 2014) (citation modified); *see also Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 809 (9th Cir. 2020) (concluding that a question regarding the lawfulness of a system-wide practice or policy affecting all putative class members is "plainly suitable for classwide resolution"). "Under such circumstances, individual factual differences among class members pose no obstacle to commonality." *Parsons*, 754 F.3d at 682 (citation modified).

In *Parsons*, this court affirmed the district court's certification of a class of inmates in Arizona's prison system

who claimed that they were subjected to systemic Eighth Amendment violations through "numerous policies and practices of statewide application governing medical care, dental care, mental health care, and conditions of confinement in isolation cells." *Id.* at 662. The district court certified a class consisting of "[a]ll prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care policies and practices of the [Arizona Department of Corrections (ADC)]." *Id.* at 672. On appeal, the parties disputed whether the plaintiffs had shown commonality. *Id.* at 672–73. The defendants argued that the "Eighth Amendment healthcare and conditions-of-confinement claims are inherently case specific and turn on many individual inquiries" and present "an insurmountable hurdle for a commonality finding because *Wal-Mart* instructs that dissimilarities between class members 'impede the generation of common answers.'" *Id.* at 675 (quoting *Wal-Mart*, 564 U.S. at 350). This court noted that the defendants' position "amounts to a sweeping assertion that, after *Wal-Mart*, Eighth Amendment claims can *never* be brought in the form of a class action." *Id.* at 675–76 (emphasis in original); *see also id.* at 676 n.18 ("As the defendants put it, '[t]he very individualized nature of inadequate health care and conditions-of-confinement claims makes it very difficult, if not impossible, to satisfy *Wal-Mart*'s one stroke standard.'") (citation modified).

This court rejected the assertion that the plaintiffs' claims are "little more than an aggregation of many claims of individual mistreatment" because the complaint did not allege that the care provided "on any particular occasion to any particular inmate . . . was insufficient, but rather that ADC policies and practices of statewide and systemic application expose all inmates in ADC custody to a

substantial risk of serious harm." *Id.* at 676 (citation modified). In other words, ADC policies and practices were "the 'glue' that holds together the putative class . . . ; either each of the policies and practices is unlawful as to every inmate or it is not." *Id.* at 678 ("That inquiry does not require us to determine the effect of those policies and practices upon any individual class member (or class members) or to undertake any other kind of individualized determination."). Accordingly, this court determined that the district court did not abuse its discretion in finding commonality. *Id.*

Similarly, here, the district court did not abuse its discretion in finding commonality. It provisionally certified Plaintiffs' proposed class based on an unlawful practice of First Amendment retaliation that affects all the class members and is the glue holding the class together.[7] In fact, federal officers at the Portland ICE facility conceded that the days were largely indistinguishable because they were so similar, involving similar responses to similar behavior. As the district court explained, "The reason that Defendants' uses of force are chilling speech is because of their indiscriminate, unpredictable, and blanket nature." *See Index Newspapers LLC*, 977 F.3d at 827, 829 (noting that First Amendment retaliation claims involve "questions of fact that normally should be left for trial" but that "plaintiffs are likely to succeed on the merits" of their claim because "at least some of the Federal Defendants' conduct was retaliatory"). Accordingly, the government's unlawful practice of First Amendment retaliation had the potential to

[7] Notably, the provisional class here is defined more narrowly than the class certified in *Parsons*. While the class in *Parsons* consisted of *all* prisoners in Arizona's entire prison system, the class here includes individuals who have, desire to, or will protest at one location: the Portland ICE facility.

affect those who have, desire to, or will protest against or report on DHS activities at the Portland ICE facility. *See Parsons*, 754 F.3d at 676 (noting that it "would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them") (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)).

The class here is also distinguishable from the class the Eighth Circuit found overbroad in *Tincher v. Noem*, 164 F.4th 1097 (8th Cir. 2026) (per curiam). The plaintiffs in *Tincher* proposed a class of "[a]ll persons who do or will in the future record, observe, and/or protest against" Operation Metro Surge, "the ongoing immigration-enforcement effort in the Twin Cities." *Id.* at 1098. The Eighth Circuit determined that "[e]ven the named plaintiffs' claims involve different conduct, by different officers, at different times, in different places," which meant that there were no questions of law or fact common to the class. *Id.* at 1099. Unlike here, however, *Tincher* did not involve an unlawful practice that affected all proposed class members.

Similarly, the government's reliance on *Black Lives Matter Los Angeles v. City of Los Angeles* is misplaced. 113 F.4th 1249 (9th Cir. 2024). There, this court vacated the district court's class certification order because the district court failed to conduct any analysis on commonality and remanded the case to the district court for further analysis. *Id.* at 1260. This court noted that, "[g]iven the extensive individualized evidence necessary to prove the [plaintiff's] claims, the plaintiffs will face an uphill challenge in showing that common questions exist, let alone predominate over individual ones." *Id.* Again, unlike here, the district court had not properly determined that the government was

operating under an unlawful practice that affected all proposed class members.

With respect to indivisibility, a class action may be maintained under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Although we have certified many different kinds of Rule 23(b)(2) classes, the primary role of this provision has always been the certification of civil rights class actions." *Parsons*, 754 F.3d at 686. "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them." *Id.* (quoting *Wal-Mart*, 564 U.S. at 360). Rule 23(b)(2)'s requirements are "unquestionably satisfied when members of a putative class seek uniform injunctive or declaratory relief from policies or practices that are generally applicable to the class as a whole." *Id.* at 688. "[A]s the text of the rule makes clear, this inquiry asks only whether 'the party opposing the class has acted or refused to act on grounds that apply generally to the class.'" *Id.* (quoting Rule 23(b)(2)); *see also id.* ("That inquiry does not require an examination of the viability or bases of the class members' claims for relief, does not require that the issues common to the class satisfy a Rule 23(b)(3)-like predominance test, and does not require a finding that all members of the class have suffered identical injuries.") (footnote omitted).

Here, Plaintiffs sought a preliminary injunction prohibiting the government from enacting its practice of using force to retaliate against protesters and journalists for exercising their First Amendment rights at the Portland ICE

facility. This practice generally applies to the proposed class members, and the district court did not abuse its discretion in finding indivisibility. *See id.*

* * *

For the reasons above, I concur in part and otherwise respectfully dissent.