**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

HUNTER DEMSTER *et al*.,

*Plaintiffs*,

v.

TODD BLANCHE, *in his official capacity as Attorney General of the United States*, *et al*.,

*Defendants*.

Case No. 26–cv–02546–MSN–atc

**PLAINTIFFS' RESPONSE TO FEDERAL DEFENDANTS' NOTICE OF SUPPLEMENTAL AUTHORITY**

In *Dickinson*, five plaintiffs who were exposed to tear gas or pepper balls used to disperse crowds near the Portland ICE facility alleged that the government retaliated against them for exercising their First Amendment rights. *Dickinson v. Trump*, No. 26-1609, 2026 WL 3403295, at *1 (9th Cir. Nov. 10, 2026). The district court preliminarily enjoined the government from (1) using "chemical or projectile munitions . . . unless the specific target . . . poses an imminent threat of physical harm;" (2) firing chemical or projectile munitions "at the head, neck, or torso of any person, unless the officer is legally justified in using deadly force;" and (3) using pepper spray "against groups of people where bystanders foreseeably would be affected." *Id.* at *5. The district court further ordered the alteration of DHS agents' uniforms to have more "conspicuous and unique identifying markings." *Id.* The Ninth Circuit previously stayed the preliminary injunction pending appeal, *see Dickinson v. Trump*, 174 F.4th 634, 637 (9th Cir. 2026), and the parties addressed the relevance of that opinion in earlier briefing, ECF No. 34 at 13, 18; ECF No. 44 at 12, 14.

On appeal, the Ninth Circuit reaffirmed the stay order and vacated the preliminary injunction. The court described DHS as "[f]aced with agitators who have flung bricks, blocked the movement of ICE cars, and physically attacked federal agents." *Dickinson*, 2026 WL 3403295, at *1. The court noted that "provocateurs have carried bats and improvised weapons while donning shields and ballistic vests. One protest involved hundreds of protesters pounding on the ICE building entry points, trying to penetrate the building, and preventing ICE cars from entering or exiting the building." *Id.* at *3. The court further described demonstrators who

> smashed security cameras; hurled rocks, glass, bricks, metal, and deployed munitions canisters at law enforcement officers; flung fireworks toward the facility; torn the plywood off the facility's guard shack; used wooden pallets and other debris to block the doors of the facility; banged on the front door of the facility building while trying to break the front gate by rocking it; pushed officers and tried to seize their shields; and weaponized high-powered strobe lights and lasers against

> officers to impair their vision and coordination. One protester even threw a smoke canister on the facility's roof, causing a fire. One officer was dragged by a crowd while seeking to detain a subject.

*Id.* (citations omitted).

Against those facts, the court held that the plaintiffs were not likely to succeed on the merits of their First Amendment retaliation claim. *Id.* at *6. Specifically, the court held that law enforcement can lawfully "use non-lethal force in response to 'imminent lawlessness'"—and that the record demonstrates that, "at those protests, officers consistently faced violent, disruptive, or otherwise unlawful behavior," and the plaintiffs "appeared near those other protesters acting violently or unlawfully." *Id.* at *3, *6. In the context of the "mayhem of dozens (and sometimes hundreds) of people impeding law enforcement, vandalizing federal property, or assaulting federal agents," the court decided that the use of non-lethal force was not evidence that the five plaintiffs were "intentionally targeted for their First Amendment activity." *Id.* at *7. Nor had the plaintiffs shown a policy, pattern, or practice of First Amendment retaliation, the court held, where the record contained little evidence "that the federal officers 'repeatedly targeted' peaceful individuals standing far from the disruptive activity near the ICE facility"; to the contrary, "the record reveals law enforcement's response to a substantial degree of violence, obstruction of law enforcement, and unrest—with protesters repeatedly trespassing onto the ICE facility, blockading the facility's gates, vandalizing federal property, and attacking federal officers." *Id.* at *8–9.

The court also deemed the injunction overbroad and unworkable. It held that the injunction's scope "exceed[ed] the district court's authority" because it "improperly grant[ed] relief . . . to anyone protesting or reporting at the Portland ICE facility"; prevented "federal agents from using non-lethal munitions unless they face 'imminent threat of physical harm'"; and required "that federal agents' uniforms be redesigned," which "is 'attenuated from the First Amendment

injury' that the plaintiffs allege." *Id.* at *9–10.

*Dickinson* provides no basis to deny Plaintiffs' pending motion for a preliminary injunction. *First*, the factual contexts and records in the two cases are worlds apart. *Dickinson* concerned alleged retaliatory incidents amid the "mayhem" of "an unruly and sometimes violent crowd." *Id.* at *1, *7. The *Dickinson* court therefore concluded that the plaintiffs there were "unfortunate collateral casualties" of law enforcement's lawful use of force in response to "imminent lawlessness." *Id.* at *6–7. In contrast, none of the alleged retaliatory incidents at issue in this case involved protests, much less violent interactions between Memphis Safe Task Force ("Task Force") agents and protesters. Plaintiffs' expert Jim Pugel, who reviewed each of Plaintiffs' declarations and video exhibits, ECF No. 16-58 ("Pugel Decl.") ¶ 26, attested that the law enforcement encounters at issue here did not involve "any obvious threat or resistance to the officers' actions," *id.* ¶ 41. Instead, Plaintiffs' encounters "frequently occurred either after agents ha[d] concluded their enforcement activities" or "when agents d[id] not appear to be engaged in enforcement activity at all—for example, when agents have been parked outside Plaintiffs' homes." ECF No. 44-2 ("Pugel Reply Decl.") ¶ 7. Moreover, the incidents in this case involved Task Force agents expressly targeting Plaintiffs in response to their information-gathering or recording, such as by threatening them with arrest, swerving at them with vehicles, tailing them, pulling them over, sitting outside their homes, and even using force and arresting them. *See* ECF No. 74-3 ("App. 1"). Unlike in *Dickinson*, then, Defendants' threatening and violent responses to Plaintiffs' peaceful, non-obstructive information-gathering and recording *are* "strong circumstantial evidence of Defendants' intent to punish the crowd for their expression." *Dickinson*, 2026 WL 3403295, at *7; *cf. L.A. Press Club v. Noem*, 171 F.4th 1179, 1189 (9th Cir. 2026) (affirming "district court's finding that Defendants acted with retaliatory intent" where there was

"extensive evidence that federal officers repeatedly targeted journalists and peaceful legal observers").[1]

*Second*, *Dickinson*'s holding that the plaintiffs in that case "have not shown an unwritten policy, pattern, or practice of First Amendment retaliation," *Dickinson*, 2026 WL 3403295, at *8, is inapposite. In *Dickinson*, the court concluded that there was no "direct evidence that DHS, as an agency, intentionally targeted the plaintiffs"; instead, the district court had inferred a policy "based on individual DHS officers who used crowd-control munitions" in a lawful manner. *Id.* But *Dickinson* distinguished *L.A. Press Club*, where there had been an "avalanche of circumstantial evidence" that federal officers "repeatedly targeted" individuals engaged in non-obstructive First Amendment activity, which supported the conclusion that "Plaintiffs' First Amendment activity was a 'substantial motivating factor' for Defendant's actions," *Dickinson*, 2026 WL 3403295, at *9 (quoting *L.A. Press Club*, 171 F.4th at 1189); *see also L.A. Press Club v. Noem*, No. 25-05563, 2026 WL 2806999, at *9 (C.D. Cal. June 25, 2026) (certifying a class because "Plaintiffs have sufficiently established . . . the existence of a policy within DHS that treats the mere public recording of its agents as a threat that may be viewed as criminal in nature and responded to with force at the scene"). The same is true here, where Plaintiffs have documented over three dozen incidents in which agents responded to their peaceful and non-obstructive information-gathering and recording with verbal threats, physical intimidation, unwarranted stops, stakeouts of their homes, obstruction, and even force and arrest. ECF No. 73 at 4; App. 1. If anything, *Dickinson*, especially read together with *L.A. Press Club*, counsels in favor of finding a policy, pattern, or practice of retaliation here.

---

[1] Plaintiffs have also submitted *direct* evidence of Defendants' retaliatory intent, attesting to incidents in which Task Force agents have explicitly stated that their adverse action is *because* of Plaintiffs' expressive activities. *See* ECF No. 16-2 at 15 (citing examples).

Moreover, the 2019 DHS policy, which prohibits "officers from 'profil[ing], target[ing], or discriminat[ing] against any individual for exercising his or her First Amendment rights,'" *Dickinson*, 2026 WL 3403295, at *8, does not change the analysis. As an initial matter, Defendants contend that gathering information about and recording law enforcement operations are not activities protected by the First Amendment; thus, by Defendants' own terms, the DHS policy does not preclude them from retaliating against Plaintiffs for gathering information about or recording law enforcement. *See* ECF No. 34 at 17 ("Plaintiffs claim a First Amendment right to observe, record, and gather information about law-enforcement operations. The Supreme Court has rejected such a right."). In any event, *Dickinson* did not hold that the 2019 policy forecloses a finding of retaliation, only that the district court could not assume a contrary unwritten policy from individual officers' lawful use of crowd-control munitions. 2026 WL 3403295, at *8–9 (distinguishing *L.A. Press Club* where the record contained "extensive evidence that federal officers repeatedly targeted journalists and peaceful legal observers"). *L.A. Press Club* also affirmed that the government "cannot avoid potential liability by pointing to DHS policies" to the contrary where, as here, the officers' "actions were inconsistent with those policies." 171 F.4th at 1189 (citing *Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1075 n.10 (9th Cir. 2016) ("[A] plaintiff can show a custom or practice of violating a written policy; otherwise an entity . . . always could avoid liability by pointing to a pristine set of policies.")).

*Finally*, *Dickinson*'s description of the scope of the injunction before it, 2026 WL 3403295, at *9–10, says nothing about the propriety of the injunction requested here. In fact, *Dickinson* reaffirmed "[t]he equitable tradition [that] has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *Id.* at *10 (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025)). The *Dickinson* court stated that the injunction there departed from that

tradition because it "grant[ed] relief not only to the five named plaintiffs but to anyone protesting or reporting" at the ICE facility. 2026 WL 3403295, at *9. But, unlike in *Dickinson*, Plaintiffs' proposed injunction runs solely to the individual named Plaintiffs. *See* ECF No. 68-1 at 3.

Moreover, unlike in *Dickinson*, the proposed injunction does not "improperly handcuff[] federal agents." 2026 WL 3403295, at *10. The *Dickinson* court was concerned specifically with an injunction that expressly prohibited agents from engaging in *lawful* enforcement actions—*i.e.*, the use of "non-lethal munitions . . . not only in response to an imminent threat of physical harm but also in response to 'imminent lawlessness.'" *Id.* Here, however, the proposed injunction restrains officers only from engaging in *unlawful* First Amendment retaliation—*i.e.*, "where Plaintiffs' information-gathering and recording of Task Force agents performing their duties in public is a motivating factor for such actions and where Plaintiffs are not impeding, interfering with, or obstructing agents' enforcement duties." ECF No. 68-1 at 1. The proposed injunction thereby preserves agents' ability to issue "lawful, non-retaliatory . . . orders," *Dickinson*, 2026 WL 3403295, at *10 (quoting *L.A. Press Club*, 171 F.4th at 1191) (emphasis omitted).

Nor is the proposed injunction "'attenuated from the First Amendment injury' that the plaintiffs allege." *Id.* (discussing the requirement that "federal agents' uniforms be redesigned with 'conspicuous and unique identifying markings (using numbers and/or letters) . . . so that they can be identified at a reasonable distance'"). To the contrary, the proposed injunction in this case is "directly tethered to the specific harms alleged" by Plaintiffs. *L.A. Press Club*, 171 F.4th at 1192 (affirming injunction against "aiming of crowd control weapons at sensitive areas of the body . . . in retaliation for First Amendment protected conduct"). It proposes enjoining specific, discrete adverse actions that Plaintiffs have already documented Task Force agents undertaking against them. *See* ECF No. 68-1 at 3; App. 1.

For these reasons and those in Plaintiffs' prior submissions, *Dickinson* does not change the analysis, and Plaintiffs are entitled to injunctive relief.

Dated: November 19, 2026

Respectfully Submitted,

*/s/ Faith Gay*

Faith E. Gay (Bar No. 2117117)
Corey Stoughton (Bar No. 4152633)
Katherine Buoymaster (Bar No. 6096903)
Sylvia Woodmansee (Bar No. 6136618)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 390-9000
fgay@selendygay.com
cstoughton@selendygay.com
kbuoymaster@selendygay.com
swoodmansee@selendygay.com

Scarlet Kim*
Ken Sexauer*
Brian Hauss*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
scarletk@aclu.org
ksexauer@aclu.org
bhauss@aclu.org

Zee Scout (BPR# 042637)
Lucas Cameron-Vaughn (BPR# 036284)
ACLU FOUNDATION OF TENNESSEE
P.O. Box 120160
Nashville, Tennessee 37212
Tel: (615) 320-7260
zscout@aclu-tn.org
lucas@aclu-tn.org

Matthew Borden*
BRAUNHAGEY & BORDEN LLP
747 Front Street, 4th Floor
San Francisco, CA 94111
Tel: (415) 599-0210
borden@braunhagey.com

Marissa R. Benavides*
BRAUNHAGEY & BORDEN LLP
200 Madison Ave., 23rd Floor
New York, NY 10016
Tel: (646) 829-9403
benavides@braunhagey.com

*Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs Hunter Demster, Jessica Chodor, Kenneth Halt, and Melissa Peeler*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19, 2026, the foregoing was filed with the Clerk of the Court using the CM/ECF system, upon defendants' counsel.

Respectfully Submitted,

*/s/ Faith Gay*

Faith E. Gay (Bar No. 2117117)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 390-9000
fgay@selendygay.com